2024-1935

_____

# United States Court of Appeals
# for the Federal Circuit

_____

**In re: ESTECH SYSTEMS IP, LLC,**

*Appellant*,

═══════════════════════════════════════════════

Appeal from the United States Patent and Trademark Office in
*Ex parte* Reexamination Control No. 90/014,804

═══════════════════════════════════════════════

## JOINT APPENDIX

Fred I. Williams
WILLIAMS  SIMONS  &  LANDIS
PLLC
601 Congress Ave., Suite 600
Austin, TX 78701
(512) 543-1354
fwilliams@wsltria.com

John Wittenzellner
WILLIAMS  SIMONS  &  LANDIS
PLLC
1735 Market Street, Suite A#453
(512) 543-1373
johnw@wsltrial.com

Farheena Y. Rasheed
Solicitor

Amy J. Nelson
Deputy Solicitor

Michael S. Forman
Michael Tyler
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark
Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035

*Counsel for Appellant Estech Systems
IP, LLC*

*Attorneys for the Director of the United
States Patent and Trademark Office*

**Table of Contents**

| # | Description | Beg APPX | End APPX |
|---|---|---|---|
| 1 | Final Decision on Appeal | APPX0001 | APPX0037 |
| 2 | Certified List | APPX0038 | APPX0042 |
| 3 | Rejected Claims | APPX0043 | APPX0045 |
| 4 | Request for *Ex Parte* Reexamination Transmittal Form | APPX0046 | APPX0049 |
| 5 | Request for *Ex Parte* Reexamination of U.S. Patent No. 7,068,684 | APPX0050 | APPX0129 |
| 6 | Ex. 1001 – U.S. Patent No. 7,068,684 | APPX0130 | APPX0155 |
| 7 | Ex. 1003 – File Wrapper for U.S. Patent No. 7,068,684 | APPX0156 | APPX0501 |
| 8 | Ex. 1007 – U.S. Patent No. 5,065,425 ("Lecomete") | APPX0502 | APPX0509 |
| 9 | Ex. 1009 – U.S. Patent No. 6,515,963 ("Bechtolsheim") | APPX0510 | APPX0531 |
| 10 | Ex. 1010 – U.S. Patent No. 6,658,027 ("Kramer") | APPX0532 | APPX0547 |
| 11 | Notice of Reexamination Request Filing Date | APPX0548 | |
| 12 | Decision Granting *Ex Parte* Reexamination | APPX0549 | APPX0563 |
| 13 | Patent Owner's Statement Under 37 C.F.R. § 1.530 | APPX0564 | APPX0583 |
| 14 | Non-Final Office Action, dated July 27, 2022 | APPX0584 | APPX0602 |
| 15 | Decision on Petition | APPX0603 | APPX0609 |
| 16 | Reply Under 37 C.F.R. § 1.111 | APPX0610 | APPX0641 |
| 17 | Final Office Action, dated November 21, 2022 | APPX0642 | APPX0665 |
| 18 | Patent Owner's Statement of the Interview Under 37 C.F.R. § 1.560(b) | APPX0666 | APPX0668 |
| 19 | Reply Under 37 C.F.R. § 1.116 | APPX0669 | APPX0677 |
| 20 | Advisory Action Before the Filing of an Appeal Brief | APPX0678 | APPX0681 |

| 21 | *Ex Parte* Reexamination Interview Summary | APPX0682 | APPX0683 |
|---|---|---|---|
| 22 | Office Action Appendix | APPX0684 | APPX0685 |
| 23 | Notice of Appeal from the Examiner to the Patent Trial and Appeal Board | APPX0686 | APPX0687 |
| 24 | Appeal Brief Under 37 C.F.R. § 41.37 | APPX0688 | APPX0803 |
| 25 | Examiner's Answer | APPX0804 | APPX0841 |
| 26 | Reply Brief Under 37 C.F.R. § 41.41 | APPX0842 | APPX0903 |
| 27 | Oral Hearing Demonstratives | APPX0904 | APPX0918 |
| 28 | Transcript of Oral Hearing | APPX0919 | APPX0932 |
| 29 | Patent Owner's Notice of Appeal to the Court of Appeals for the Federal Circuit | APPX0933 | APPX0935 |
| 30 | Ex. 1006 – U.S. Patent Application Publication No. US 2002/0071424 ("Chiu") | APPX0936 | APPX0953 |
| 31 | Ex. 1008 – U.S. Patent No. 5,313,454 ("Bustini") | APPX0954 | APPX0987 |
| 32 | Ex. 2002 – Newton's Telecom Dictionary, Harry Newton, Sixteenth Edition, 2000 | APPX0988 | APPX0992 |

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,804 | 07/16/2021 | 7068684 | 3725700.00001 | 9925 |

183824        7590        05/29/2024
Williams Simons & Landis PLLC/Estech
The Littlefield Building
601 Congress Ave., Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| FOSTER, ROLAND G |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/29/2024 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

*Ex parte* ESTECH SYSTEMS, INC.
Patent Owner and Appellant

———————

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684
Technology Center 3900

———————

Before ALLEN R. MACDONALD, THOMAS L. GIANNETTI, and
JENNIFER L. McKEOWN, *Administrative Patent Judges*.

McKEOWN, *Administrative Patent Judge*.


DECISION ON APPEAL

STATEMENT OF THE CASE

Pursuant to 35 U.S.C. §§ 134(a) and 306, Patent Owner (Appellant)[1]
appeals from the Examiner's decision to reject claims 29–41. *See* Final
Act. 1. We have jurisdiction under 35 U.S.C. § 6(b).

We AFFIRM.

---

[1] Appellant identifies the real party in interest as Estech Systems IP, LLC.
Appeal Br. 1.

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

# BACKGROUND

A request for *ex parte* reexamination of U.S. Patent No. 7,068,684 Bl ("the '684 patent") was filed on July 16, 2021, and assigned Reexamination Control No. 90/014,804 ("Request"). The '684 patent, entitled "Quality of Service in a Voice Over IP Telephone System," issued June 27, 2006 to Eric G. Suder and Harold E.A. Hansen, II, based on Application No. 09/775,018, filed February 1, 2001.[2]

The '684 patent is the subject of several proceedings, including those identified by Patent Owner on pages 2–3 on the Appeal Brief.[3] The United

---

[2] The application for the '684 patent was filed on February 1, 2001 with a term adjustment, under 35 U.S.C. 154(b), by 877 days. We understand, then, that the '684 patent is now expired.

[3] *Estech Systems IP, LLC v. 99 Cents Only Stores, LLC and 99 Cents Only Stores Texas, Inc.*, 2:22-cv-00006 (E.D. Tex.); *Estech Systems IP, LLC v. Abbott Laboratories*, 2:21-cv-00476-JRG-RSP (E.D. Tex.); *Estech Systems IP, LLC v. Carvana, LLC*, 2:21-cv-00482-JRG-RSP (E.D. Tex.); *Estech Systems IP, LLC v. Conduent Incorporated, Conduent Business Process Optimization Services, Inc., Conduent BPO Services, LLC and Conduent Legal & Compliance Solutions, LLC*, 2:21-cv-00478-JRG-RSP (E.D. Tex.); *Estech Systems IP, LLC v. First American Financial Corporation and Republic Title of Texas, Inc.*, 2:22-cv-00007-JRG-RSP (E.D. Tex.); *Estech Systems IP, LLC v. Fiserv, Inc. and Fiserv Solutions, LLC*, 2:21-cv-00477-JRG-RSP (E.D. Tex.); *Estech Systems IP, LLC v. Liberty Mutual Group, Inc.*, 2:21-cv-00475-JRGRSP (E.D. Tex.); *Estech Systems IP, LLC v. Marriott International, Inc.*, 2:21-cv-00480-JRGRSP (E.D. Tex.); *Estech Systems IP, LLC v. Mite! Networks, Inc.*, 2:21-cv-00473-JRG-RSP (E.D. Tex.); *Estech Systems IP, LLC v. Primoris Services Corporation and Primoris Design & Construction, Inc.*, 2:21-cv-00481-JRG-RSP (E.D. Tex.); *Estech Systems IP, LLC v. Public Storage*, 2:21-cv-00483-JRG-RSP (E.D. Tex.); *Estech Systems IP, LLC v. Randstad US LLC and Randstad Professionals US, LLC*, 2:21-cv-00479-JRG-RSP (E.D. Tex.); *Estech Systems IP, LLC v. Safi Technologies, Inc. and Safi Mortgage, LLC*,

2

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

States District Court for the Eastern District of Texas issued a claim construction order in *Estech Systems IP, LLC, v. Mitel Networks, Inc.*, Case No. 2:21-cv-00473-JRG-RSP, Dkt. No. 328 (E.D. Tex. March 28, 2023). The '684 patent was also the subject of *Cisco Systems, Inc. v. Estech Systems, Inc.*, IPR2021-00331 (PTAB July 6, 2021). In that case, the Board denied institution based on the factors outlined in *Apple Inc. v. Fintiv Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020).

A video oral hearing was held on January 30, 2024. The transcript of the oral hearing (Tr.) was published on March 8, 2024.

## CLAIMED SUBJECT MATTER

The claims are directed to "information processing systems, and in particular, to the use of Voice over IP technology to transmit voice conversations." '684 Patent, 1:6–8.

Claim 29, reproduced below with disputed limitations emphasized, illustrates the claimed subject matter:

> 29. In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, *a telephone coupled to the hub*, *a workstation coupled to the hub through the telephone*, and a data server coupled to the hub, a method comprising the steps of:

---

2:21-cv-00485-JRG-RSP (E.D. Tex.); *RingCentral, Inc. v. Estech Systems IP, LLC*, 2:23-mc-00001-JRG (E.D. TX); *RingCentral, Inc. v. Estech Systems IP, LLC*, 2:23-mc-00002-JRG (E.D. TX); *Estech Systems, Inc. v. Howard Midstream Energy Partners*, Case No. 2023-1199 (Fed. Cir.); *Estech Systems, Inc. v. RingCentral, Inc.*, Case No. 2023-1241 (Fed. Cir.); and *Estech Systems, Inc. v. RingCentral, Inc.*, Case No. 2023-1242 (Fed. Cir.). Appeal Br. 2–3

3

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

> transferring data from the workstation to the telephone,
> wherein the data sent from the workstation is addressed for
> transmission to the data server;
> communicating audio information between the telephone
> and the multimedia server; and
> *sufficiently throttling the data sent from the workstation*
> *to the telephone to increase a rate of transfer of the audio*
> *information during the communicating step, wherein the*
> *throttling step further comprises the step of monitoring an*
> *amount of the audio information being received by the*
> *telephone from the multimedia server.*

## REFERENCES

The Examiner relies on the following references to reject the claims:

| Name | Reference | Date |
|---|---|---|
| Chiu | US 2002/0071424 A1 | June 13, 2002 |
| Bustini | US 5,313,454 | May 17, 1994 |

## REJECTION

Claims 29–41 are rejected under 35 U.S.C § 103 as unpatentable over Chiu and Bustini. Final Act. 3–15.

## ISSUES

(1) Under § 103, does the combination of Chiu and Bustini teach or suggest a workstation coupled to the hub through the telephone, as recited in the preamble of independent claims 29, 36, and 37?

(2) Under § 103, does the combination of Chiu and Bustini teach or suggest sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the

4

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

telephone from the multimedia server, as recited in independent claims 29, 36, and 37?

(3) Would a skilled artisan at the time of the invention have had a reasonable expectation of success in combining Chiu and Bustini, as set forth by the Examiner? Additionally, would the combination have changed Chiu's principle of operation or rendered Chiu inoperable for its intended purpose?

(4) With respect to claim 36, does the combination of Chiu and Bustini teach or suggest throttling comprising reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold?

(5) With respect to claim 37, does the combination of Chiu and Bustini teach or suggest the monitoring step further comprises the step of the telephone sending a congestion message to the multimedia server when the amount of the audio information falls below the predetermined level?

(6) With respect to claims 38 and 39, does the combination of Chiu and Bustini teach or suggest the multimedia server sending a throttling signal to the telephone in response to receipt of the congestion message and wherein the throttling step operates in response to receipt of the throttling signal, respectively?

5

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

## OPINION

*Claims 29–41*

Issue 1: "*workstation coupled to the hub through the telephone*"

Examiner's Findings and Conclusions

The Examiner determines that the combination of Chiu and Bustini teaches or suggests the limitations of the claimed invention. Final Act. 3–10. The Examiner generally notes that Chiu, like the claimed invention, is directed to a server-based IP telephony system. Final Act. 4. The Examiner compares Figure 1 of the '684 patent and Figure 1 of Chiu, both reproduced below, to demonstrate the architectural or structural similarities. Final Act. 4.



**Figure 1 of the '684 patent depicting IP telephony device 105 coupling workstation 106 to hub 103.**

6

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684



**FIG. 1**

**Figure 1 of the Chiu depicting IP telephone peripheral 100 coupling computer 200 to network 130.**

The Examiner finds the claimed telephone reads on Chiu's IP telephone peripheral. Final Act. 5, 16; Ans. 8. The Examiner explains that Chiu repeatedly refers to an IP *telephone* peripheral and "[a] telephone peripheral is a species of the genus telephone." Final Act. 16. The Examiner finds that Chiu discloses that the IP telephone peripheral performs typical telephonic functions and that the IP telephone peripheral may be connected to the computer by USB peripheral connection. Ans. 8, 18, 23 (citing Chiu, ¶¶ 25–26, 29, 31); Final Act 16. The Examiner also points out that Chiu expressly discloses a *stand-alone* Nortel Networks i2004 Internet telephone

7

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

(Nortel telephone). Ans. 8, 18, 23 (citing Chiu, ¶¶ 25–26, 29). *See also*
Request 17 (noting that Chiu discloses "an existing Nortel device.").

According to the Examiner, Patent Owner's arguments that Chiu's IP
telephone peripheral is "not a separate device" and "not capable of making
or receiving telephone calls by itself" are based on an unduly narrow
interpretation of the claimed telephone. Ans. 22. The Examiner maintains
that the "repeated and explicit disclosure [in Chiu] also provides intrinsic
evidence that one of ordinary skill in the art at the time the invention was
made would [have understood] that Chiu's peripheral device would be
considered a telephone." Ans. 23. The Examiner further explains that the
claimed invention does not include the "very specific type of structural
telephone envisioned (but not claimed) by the Patent Owner." Ans. 23. The
Examiner, thus, determines that Chiu's IP telephone peripheral at least
suggests the claimed telephone.

Patent Owner's Contentions

As an initial matter, Patent Owner contends that the claimed telephone
should be construed as a distinct or separate component from the claimed
workstation. In particular, Patent Owner asserts that "[b]y [the preamble]
listing the elements separately and by using the word 'coupled,'" the
claimed invention requires the telephone, hub, and workstation to be distinct
or separate components. Appeal Br. 8. Patent Owner cites Figures 1 and 3
depicting the telephone and workstation as "distinct components (i.e.
separate device[s])" as support. Appeal Br. 8–9.

8

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

> Patent Owner next argues the claimed telephone
>
> necessarily includes (i) an interface (e.g., keypad or keyboard)
> for dialing another individual to initiate a telephone call with the
> other individual, (ii) a speaker so that the user of the claimed
> "telephone" can listen to the other individual during the
> telephone call, and (iii) a microphone to capture the voice of the
> user of the claimed "telephone," so that the captured voice can
> be transmitted to the other individual during the telephone call.

Appeal Br. 10. According to the Patent Owner, the "the well-understood

meaning of the word 'telephone'" requires the components that are

"necessary for it to function as a telephone (i.e., interface, microphone,

speaker)." Reply Br. 4. Patent Owner maintains the Specification similarly

supports this interpretation by depicting both telephony device 105 of Figure

8 and fast ethernet telephone of Figure 4 as including an interface, a speaker,

and a microphone. Appeal Br. 11–13.

Turning to the rejection, Patent Owner contends that Chiu's IP

telephone peripheral cannot satisfy the claimed telephone. Appeal Br. 16.

Patent Owner argues that Chiu's IP telephony peripheral is a component

integrated *within* Chiu's computer, and, as such, Chiu's IP telephony

peripheral is not a separate device, is not capable of making or receiving

calls by itself, and does not include the necessary interface (or keypad),

speaker, or microphone. Reply Br. 6–7; *see also* Reply Br. 8 (asserting that

"Chiu unequivocally describes 'IP Telephony Peripheral 100' as being

operational only through a computer program the same computer that that

peripheral is part of.").

Patent Owner maintains the Examiner only identifies the stand-alone

Nortel telephone as the claimed telephone for the first time in the Answer.

Reply Br. 4. Patent Owner contends that Chiu never discloses the IP

9

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

telephony peripheral *is* the stand-alone Nortel telephone. Reply Br. 4–5.
Instead, according to the Patent Owner, Chiu provides minimal discussion of
the Nortel telephone and does not identify what problems the Nortel
telephone addresses. Reply Br. 5. Patent Owner asserts that Chiu does not
disclose that the Nortel telephone has a USB or PCMCIA connection and,
thus, the Nortel telephone cannot be Chiu's IP telephony peripheral.
Reply Br. 5–6.

Patent Owner argues that the Examiner erroneously relies on Chiu's
Figure 3 to suggest the IP telephony peripheral is the Nortel telephone.
Reply Br. 8. For example, Patent Owner asserts "the Examiner ignores the
express disclosure in Chiu that Figure 3 depicts 'a simplified computer-
screen based interface of the IP telephony peripheral'" and "does not show
that 'IP Telephony Peripheral 100' is the 'Nortel Networks i2004 Internet
Telephone' as the Examiner contends." Reply Br. 8.

Patent Owner acknowledges that Chiu, at times, refers to a
"telephone" peripheral instead of "telephony" peripheral, but argues this is
merely a typographical error. *See* Reply Br. 9 (noting that telephony is used
24 times compared to telephone only being used 5 times so a skilled artisan
would "conclude 'telephony peripheral' is the correct label"). Therefore,
Patent Owner contends the Examiner erred in finding that that Chiu teaches
or suggests the claimed telephone.

Analysis

As noted above, we understand the '684 patent has expired. In a
reexamination proceeding involving claims of an expired patent, we
construe claims pursuant to *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316

10

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

(Fed. Cir. 2005) (words of a claim "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention). *See In re Rambus Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012).

Based on the record before us, we agree with Patent Owner that a skilled artisan would understand, based on the plain language of the claim, that the claimed workstation and telephone are distinct or separate devices. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention."); *Comcast Cable Communs., LLC v. Promptu Sys. Corp.*, 838 Fed. App'x. 551, 553 (Fed. Cir. 2021) (unpublished) ("By listing the elements separately and by using the word "coupled," [the claim] strongly indicates the "speech recognition system" is distinct from the "wireline node."). This interpretation is consistent with Figures 1 and 4 of the '684 patent depicting the telephone and workstation as separate devices.

We disagree with Patent Owner, however, that the claimed telephone requires the asserted particular structural features, namely an interface, microphone, and speaker. The '684 patent notably defines "[a]n IP telephone" or "telephony device" as any apparatus, device, system, etc., that can communicate multimedia traffic using IP telephony technology." '684 patent, 4:24–27. While a telephone may optionally include a keypad, microphone, and speaker, Patent Owner fails to identify intrinsic or extrinsic evidence demonstrating these features are *required*. Patent Owner's general assertions, without more, are unpersuasive. *See Enzo Biochem, Inc. v. Gen-*

11

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

*Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence.").

Nevertheless, even if we were to construe the claimed telephone to require an interface, microphone, and speaker, we agree with the Examiner that Chiu satisfies the claimed limitation. Namely, Chiu at least suggests that the IP telephone peripheral is a separate device and has an interface, microphone, and speaker. Ans. 19.

While Chiu describes the IP telephone peripheral as an IP telephone card in one instance, Chiu also teaches a stand-alone IP telephone as an alternative. For example, as the Request identifies (Request 17), Chiu expressly discloses an exemplary stand-alone IP telephone.[4] Chiu describes the "Nortel Networks i2004 Internet Telephone" is "a hardware based telephony apparatus" and "is a standalone IP telephone client device which connects to an IP network directly and provides the familiarity and ease-of use of a traditional telephone." Chiu, ¶ 25. This is consistent with Chiu's disclosure that peripherals, which a skilled artisan would understand to include the IP telephone *peripheral*, may be connected to the computer through a USB connection. Chiu, ¶ 31.

---

[4] We note the Examiner cites to the Nortel telephone in the Answer. This citation is consistent with the Examiner's findings in the Final Action that Chiu discloses the claimed telephone. Additionally, we note that whether the Examiner entered an undesignated new ground of rejection by citing the Nortel telephone in the Answer is a petitionable--not appealable--matter that is not before us. *See* 37 C.F.R. § 41.40(a) (noting that any request seeking review of the Examiner's failure to designate a new ground of rejection must be made via a petition filed before filing a Reply Brief).

12

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

As the Examiner also identifies, Chiu, at least in some instances, recites an IP *telephone* peripheral. We disagree with Patent Owner that this use of "telephone" is a typographical error, but rather demonstrates known interchangeability of the terms telephone and telephony at the time of the invention. *See also* '684 patent, 4:24–27 (defining "IP telephone" or "telephony device" with the same definition).

Moreover, we agree with the Examiner that Figure 3 at least suggests the IP telephone peripheral may be the stand-alone Nortel telephone. Chiu describes Figure 3 as "the simplified computer screen based graphical user interface (GUI) of the IP telephony peripheral 100 of FIG. 1." Chiu, ¶ 34. In other words, a skilled artisan would understand Figure 3 depicts the computer screen with a graphical representation of the *physically* attached IP telephony peripheral. As shown below, Figure 3 includes an indication of the *Nortel telephone* in the upper left corner.



**FIG. 3**

13

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

**Chiu's Figure 3 depicting a simplified computer-screen based interface of the IP telephony peripheral of FIG. 1.**

As such, based on the record before us, a skilled artisan would understand Chiu teaches or suggests a stand-alone IP telephone peripheral. Therefore, we are not persuaded of error in the Examiner's findings.

Issue 2: *"sufficiently throttling" step*
Examiner's Findings and Conclusions

The Examiner determines that the combination of Chiu and Bustini teaches or suggests the claimed throttling step. The Examiner first points out that the '684 Patent "admits that 'throttling can be performed using many different methods.'" Final Act. 8 (citing '684 patent, 13:50–51). The Examiner finds that Chiu discloses implementing "collision avoidance mechanisms well known in the network arts" and Bustini teaches an exemplary collision avoidance method to arrive at the claimed throttling limitation. Final Act. 8 (citing Bustini, Abstract, ¶ 43; Request 41–42).

The Examiner points out that Bustini expressly describes that "real-time communications such as full-period voice signals require high integrity throughput because such packets are sensitive to both delay and data loss" whereas "data traffic, such as file transfers, is relatively insensitive to delay but is data loss sensitive." Final Act. 9 (citing Bustini, 1:58–60; 7:66–8:1). The Examiner then explains that

> Bustini monitors the audio information network traffic and
> specifically throttles the bursty data (e.g. a file transfer from a
> computer workstation) in favor of the higher priority audio
> information as "[c]ongestion control is accomplished by
> controlling the transmission rate of bursty traffic in the presence

14

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

> of high priority, voice, low speed statistical, high speed
> deterministic and multicast data." Abstract, 1:61-68. Thus,
> Bustini monitors an amount of audio data being received in order
> to assign it higher priority as discussed above.

Final Act. 9. According to the Examiner, by throttling the bursty data in favor of the higher priority voice or audio information "the audio data rate is increased over what the audio data rate would have been in the presence of congested, bursty traffic." Final Act. 9. The Examiner also notes that "the claims do not recite where the throttling occurs, merely that data 'sent from the workstation' is throttled. Thus, the claims facially encompass throttling data at the workstation or throttling data at the IP Telephone or both." Ans. 25.


Patent Owner's Contentions

Patent Owner argues that Chiu and Bustini combined fail to teach or suggest the claimed throttling step. Appeal Br. 24–26. Patent Owner contends the Examiner improperly relies on two different algorithms in Bustini, a main algorithm and a background algorithm, without explaining sufficient reasons to combine the algorithms. Appeal Br. 25–26. According to the Patent Owner, Bustini's background algorithm fails to satisfy the claimed throttling because Bustini's background algorithm can only throttle data transmitted *from* the network node, not data transmitted *to* the network node. Appeal Br. 27. In other words, Patent Owner maintains that Bustini's background algorithm does not throttle data transmitted from the workstation to the telephone. *Id.*

With respect to Bustini's main algorithm, Patent Owner argues Bustini requires three nodes, and the Examiner "has not provided any details

15

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

on how Chiu's 'IP Telephony Peripheral' fits within the multi-node architecture of Bustini's Main Algorithm." Appeal Br. 29. According to Patent Owner, "Bustini's Main Algorithm requires at least three nodes (i.e., source node, intermediate node(s), destination node) that exchange multiple control signals. The Examiner has not provided any details on how Chiu's 'IP Telephony Peripheral' fits within the multi-node architecture of Bustini's Main Algorithm." Appeal Br. 29.

Patent Owner also argues that neither Bustini's background algorithm nor main algorithm increase a rate of transfer of audio information. Appeal Br. 33–35. Patent Owner maintains that Bustini merely discloses controlling the rate of transfer of *bursty traffic*, not an increase in the rate of transfer of audio information. *Id.* According to Patent Owner, "the Examiner provided no evidence that any bandwidth savings from throttling the 'bursty traffic' is necessarily allocated to increase the transfer rate of 'voice' data," and "[i]t is much more likely that any bandwidth savings would be allocated to maintain or increase the transfer rate of data with a higher priority than the 'voice' data." Appeal Br. 34. Patent Owner asserts that "[n]o details are disclosed regarding the 'servicing algorithms' and how these algorithms 'allocate bandwidth' by 'discriminat[ing] between traffic classes.'" Appeal Br. 35–36. As such, Patent Owner contends that neither Bustini's background or main algorithms teach or suggest the claimed increase in rate of transfer of audio information. *Id.*

Analysis

The claimed throttling step broadly recites sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer

16

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

of the audio information during the communicating step and monitoring an amount of the audio information being received by the telephone from the multimedia server. As Patent Owner acknowledges, the throttling step does not limit where the throttling occurs (Tr. 12:4–19) and, further, the '684 patent admits the claimed throttling "can be performed using many different methods." Final Act. 8 (citing '684 patent, 13:50–51). *See also* Ans. 25 (noting that "the claims do not recite where the throttling occurs, merely that data 'sent from the workstation' is throttled. Thus, the claims facially encompass throttling data at the workstation or throttling data at the IP Telephone or both.").

Contrary to Patent Owner's assertions, the Examiner, here, does not improperly rely on different algorithms. As the Examiner explains, Bustini teaches multiple congestion control methods that may be combined with Chiu to arrive at the claimed invention. Ans. 25. For example, as discussed in more detail below, both the alleged background algorithm as well as the alleged main algorithm teach the claimed throttling step. Moreover, as the Examiner also points out, "Bustini's solution builds on the background prior art, the [background and main algorithms] are neither opposed nor inconsistent." Ans. 26.

Both Chiu and Bustini recognize the importance of avoiding delays for voice transmissions. For example, Chiu teaches that delays do not effect data file transfers, but may impact real time streaming such as voice calls. Chiu ¶¶4, 6. Bustini similarly teaches "voice traffic is relatively delay sensitive and insensitive to occasional cell loss. In contrast, data traffic, such as file transfers, is relatively insensitive to delay but is data loss sensitive." Bustini, 1:57–60. In view of these teachings, the benefits of prioritizing

17

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

voice or audio transmissions would have been readily apparent to a skilled artisan at the time of the invention.

Bustini describes multiple well known congestion control methods and teaches prioritizing certain traffic classes, including voice. Bustini, Abstract. Bustini, in particular, teaches that an intermediate node monitors the buffer queue lengths of received traffic (i.e. monitoring amount of audio received from the multimedia server) and generates a control signal, indicating the state of congestion, that is forwarded to the destination node. *See, e.g.*, Bustini, Abstract (discussing monitoring buffer queue lengths, generating a control signal indicating congestion, and forwarding the signal to the destination node according to the alleged main algorithm); 2:24–27, 3:24–37 (discussing monitoring buffer queue lengths, generating a congestion indication bit, and forwarding with the packet according to the alleged background algorithm); Final Act. 8–9, 17. *See also* Bustini, Figure 8, 8:42–43 (disclosing monitoring of traffic queues of received traffic).

In other words, Bustini teaches monitoring traffic queues, which would include received voice or audio transmissions, to indicate network congestion. A skilled artisan would understand these traffic queues include audio information received from other nodes, such as the multimedia server. *See In re Preda*, 401 F.2d 825, 826 (CCPA 1968) (noting that "in considering the disclosure of a reference, it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom"). As the Examiner also highlights, Bustini teaches monitoring *all* classes of traffic, including audio traffic, in order to prioritize certain classes. Final Act. 9.

18

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

Thus, Bustini at least suggests monitoring the amount of audio information received from the multimedia server.

Bustini discloses the congestion control signal may be fed back to the source node, such as Chiu's *source* computer, to regulate the rate of bursty data transmission (i.e. sufficiently throttling the data sent from the workstation to the telephone). Although we disagree with Patent Owner that the Examiner relies on separate embodiments as discussed above, we note Bustini teaches sending this feedback to the *source node* in both the alleged background and main algorithms. *See, e.g.*, Bustini, Abstract (teaching a feedback rate control signal sent to the source node to regulate the rate of bursty data transmissions over the network); Bustini, 2:23–27 (discussing that medium-term congestion control known in the art includes "closed-loop techniques that sense the level of congestion on the virtual circuit and control the in-flow of traffic based on feedback of congesting status information to the source terminal."). *See also* Bustini, 3:8–26, 4:17–32 (discussing known feedback techniques in congestion control). As such, Bustini discloses throttling data transmissions sent to an intermediate node, such as Chiu's IP telephone device, to stem the "in-flow of traffic" to the network.

As the Examiner explains, "Bustini monitors an amount of audio data being received in order to assign it higher priority as discussed above. As a result, the audio data rate is increased over what the audio data rate would have been in the presence of congested, bursty traffic. Final Act. 9. *See also* Final Act. 17 (noting that "Bustini's congestion control algorithms, which generally throttle lower priority data types (decrease the data rate of lower priority data types) in order to increase the data rate of higher priority data

19

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

types, such that the available network traffic rate is not exceeded. That is the reason for congestion control based on the priority of data classes."); Ans. 32 ("Allocating 'spare bandwidth' to higher priority voice and limiting (throttling) spare bandwidth to lower priority bursty data increases the data rate of the voice data when the voice data utilizes the spare (extra) bandwidth."). In other words, a skilled artisan would understand that because voice or audio information has a higher priority, limiting the transmission rate in lower priority bursty data teaches an increase in transmission rate in higher priority voice or audio information in at least some instances. As such, we agree with the Examiner that Bustini's disclosure reads on the claimed throttling step and are not persuaded of error in the Examiner's findings.

Issue 3: *Combination of Chiu and Bustini*

Examiner's Findings and Conclusions

As noted above, the Examiner finds that Bustini teaches prioritizing certain network traffic types based on delivery sensitivities. Final Act. 9. Specifically, the Examiner points out that "Bustini teaches that real-time communications such as full-period voice signals require high integrity throughput because such packets are sensitive to both delay and data loss." *Id.* The Examiner also finds that Chiu teaches "the phone server acts as an intermediary between devices that transmits digital audio information in different formats" and teaches implementing "collision avoidance

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

mechanisms well known in the network arts." Final 8 (citing Chiu ¶¶ 41,

43). The Examiner then reasons that

> A person of ordinary skill in the art would understand that
> the Bustini-type algorithm would readily function in the system
> of Chiu. A person of ordinary skill would easily program the
> algorithm disclosed by Bustini into the circuitry disclosed by
> Chiu including, for example, the media access controller which
> would employ such an algorithm "well known in the networking
> arts" with expected results. ¶4. This would improve the reliability
> of real-time communication in VoIP systems where data was also
> being transmitted in addition to voice, such as that of Chiu. As
> Bustini's algorithm is bidirectional (9:15, 9:58-10:2), its
> implementation within the IP telephone of Chiu would be able to
> monitor data coming to the telephone from the multimedia server
> as well as throttle data coming from the workstation to the
> telephone and vice versa.

Final Act. 9–10. The Examiner concludes that to "one of ordinary skill in the

art at the time the invention was made, it would have been obvious to add

the data prioritization mechanisms of Bustini as discussed above to the IP

telephony system of Chiu." Final Act. 10.


Patent Owner's Contentions

With respect to the combination of Chiu and Bustini, Patent Owner

argues that the combination has no reasonable expectation of success.

Appeal Br. 29–30. Namely, Patent Owner contends Bustini's algorithms are

designed to operate over geographically distant nodes connected by digital

trunk lines, whereas Chiu's computer and IP telephone peripheral

communicate via PCMCIA bus. Appeal Br. 30–31. According to the Patent

Owner,

21

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

> The Examiner provides no evidence that Bustini's
> algorithms, designed for execution on geographically distant
> nodes connected by T1 lines, could be successfully implemented
> on the PCMCIA architecture in Chiu. The Examiner's
> contentions that a POSITA could "easily program Bustini's
> algorithm" into Chiu's system, (Action, p. 9), is a gross
> oversimplification.

Appeal Br. 31.

Moreover, according to the Patent Owner, the proposed combination
would require "sophisticated hardware and software to implement Bustini's
ICA feedback control system" in Chiu and "the Examiner provides no
evidence that such a drastic modification could be successfully
implemented." Reply Br. 13–14. Patent Owner disagrees that "[a]dding
congestion control algorithms to [Chiu's] IP Telephone 100 is consistent
with its role offloading complicated negotiation and delivery network
requirements from computer 200." Reply Br. 14. Rather, Patent Owner
asserts "a POSITA would find it unrealistic to expect Chiu's 'IP Telephony
Peripheral 100' to act as a node in Bustini's ICA feedback control system."
Reply Br. 14.

Patent Owner next argues that the combination of Chiu and Bustini
would change Chiu's principle of operation. Appeal Br. 31–32. Patent
Owner points out that Chiu discloses the IP telephony peripheral merely
"acts as a 'pass-through' and implements 'collision avoidance mechanisms'
to avoid interfering with Chiu's 'computer data'." Appeal Br. 32. According
to the Patent Owner then, because the Examiner's combination requires
programming Chiu's IP telephony peripheral with Bustini's algorithm to
throttle "computer data," the combination violates Chiu's principle of

22

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

operation to operate "without influencing said computer data." Appeal
Br. 32–33.

Similarly, in the Reply Brief, Patent Owner alleges that modifying
Chiu to set a header bit, as taught by Bustini, "violates its core function as a
mere 'pass-through,'" and Chiu teaches away from this combination because
"Chiu[] express[ly] disclos[es] that 'IP Telephony Peripheral 100' acts as a
mere 'pass-through' for bursty data." Reply Br. 13. Patent Owner then
concludes "the Examiner's proposed modification is too drastic to be
obvious." *Id.*

In the Reply Brief, Patent Owner also argues that the Examiner's
combination of Chiu and Bustini would be inoperable. Reply Br. 12. In
particular, Patent Owner points out that the claimed invention recites that
data sent from the workstation is addressed for the data server, not the
multimedia server. *Id.* Patent Owner maintains that "the Examiner's
proposed combination would be inoperable because Chiu's 'phone server
110' (Bustini's 'Node C') (the Examiner-identified 'multimedia server')
would not even receive the bursty data in the first place." *Id.* According to
Patent Owner then,

> Chiu's "phone server 110" (Bustini's "Node C") (the
> Examiner-identified "multimedia server") could not "examine[]
> the headers of each bursty data virtual circuit and generate[] an
> estimate of the congestion status by comparing the average c-bit
> rate with a threshold reference value" and transmit "an ICA rate
> control message" if congestion is detected, as Bustini's ICA
> feedback control system requires.

Reply Br. 12. Thus, Patent Owner concludes the combination of Chiu and
Bustini fails to render the claimed invention obvious. Reply Br. 16.

23

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

Analysis

    In sum, Patent Owner asserts that the combination of Chiu and Bustini
(1) would have had no reasonable expectation of success, (2) would have
changed the principle of operation of Chiu, and (3) would have rendered
Chiu inoperable. Appeal Br. 29–33; Reply Br. 10–16. These arguments
particularly challenge the compatibility of Bustini's components within
Chiu's system. However, "[t]he test for obviousness is not whether the
features of a secondary reference may be bodily incorporated into the
structure of the primary reference; nor is it that the claimed invention must
be expressly suggested in any one or all of the references. Rather, the test is
what the combined teachings of the references would have suggested to
those of ordinary skill in the art." *In re Keller*, 642 F.2d 413, 425 (C.C.P.A.
1981). *See also Axonics, Inc. v. Medtronic*, Inc., 73 F.4th 950, 957 (Fed. Cir.
2023) (noting that the "inquiry is not whether a relevant artisan would
combine a first reference's feature with a second reference's feature to meet
requirements of the first reference that are not requirements of the claims at
issue."); *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) ("It is well-
established that a determination of obviousness based on teachings from
multiple references does not require an actual, physical substitution of
elements."). Moreover, Patent Owner's arguments rely on attorney argument
without persuasive evidentiary support. *See Enzo Biochem, Inc. v. Gen-
Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no
substitute for evidence.").

    "Evidence of a reasonable expectation of success, just like evidence of
a motivation to combine, may flow from the prior art references themselves,
the knowledge of one of ordinary skill in the art, or, in some cases, from the

24

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

nature of the problem to be solved." *Elekta Ltd. v. ZAP Surgical Sys., Inc.*, 81 F.4th 1368, 1377 (Fed. Cir. 2023) (citations omitted). Patent Owner, here, asserts there would have been no reasonable expectation for success in combining Chiu and Bustini because it is "unrealistic" for Chiu's IP Telephony peripheral to act as a geographically distant node and the there is no evidence that the "drastic modification" of adding Bustini's "sophisticated hardware and software" into Chiu would be successful. Appeal Br. 29–30; Reply Br. 13–14. Patent Owner's argument, however, is merely attorney argument without persuasive evidentiary support.

The Examiner, on the other hand, provides substantial support and explanation for the finding that there would have been a reasonable expectation of success. For example, Chiu expressly discloses the computer and IP telephone peripheral communicate with the network through a *network* connection and the IP Telephone peripheral includes a medium access controller (MAC) that implements well known network collision avoidance mechanisms. Ans. 10, 26–27. *See also* Ans. 34 (discussing the "ample processing capability" of Chiu's IP telephone noting that "IP Telephone 100 contains processor DSP 410, Controller 414, MAC 428, Packetizer 434, and Controller 450 []. For example, Chiu teaches that packetizer 434 is capable of building packets. [] IP Telephone can even perform higher layer processing that involves reading, routing and generating packets.").

The Examiner points out that "[a]dding congestion control algorithms to IP Telephone 100 is consistent with [Chiu's] role offloading complicated negotiation and delivery network requirements from computer 200." Ans. 30–31; *see also* Chiu, ¶ 14. Moreover, the Examiner notes Patent Owner's

25

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

arguments are not commensurate with the scope of the claim. Namely, given the breath of the claimed invention, Chiu's workstation may implement the claimed throttling. Ans. 29.

Bustini as well as the nature of the problem to solve also support the Examiner's finding that there would have been a reasonable expectation of success. Notably, Bustini teaches congestion control algorithms that are "well known in the networking arts." Ans. 10–11, 26–27; *see also* Chiu, ¶ 42–43. Based on the combined these teachings of Chiu and Bustini, the benefits of modifying Chiu to include Bustini's well known congestion control algorithm prioritizing voice would have been readily apparent to a skilled artisan at the time of the invention. Namely implementing Bustini's bidirectional congestion control algorithm into Chiu's system would provide the expected result of improving the reliability of real time communications when data is communicated in addition to voice. Ans. 11. As such, based on the record before us, the Examiner has sufficiently shown the combination of Chiu and Bustini would have had a reasonable expectation of success.

Patent Owner's arguments that setting a header would violate Bustini's "core function" as a pass-through device thus changing the principle of operation of Chiu similarly lacks merit. Chiu merely discloses "[t]he physical transport 430 may contain a dedicated port or termination node to the network 130 or it may involve a pass-through connection serving as an intermediary between another network device such as a computer and the network 130." Chiu, ¶ 43. This disclosure does not suggest that modifying a header would violate this is a "core function" of Chiu. Namely, a skilled artisan would understand describing Chiu's disclosure as a pass-through device refers to not altering *the content* of the transmission. For

26

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

example, as Bustini points out, a header is at time used for "'house-keeping functions,' including routing." Bustini, 3:18–20. *See also, e.g.*, Ans. 30 (noting that the cited paragraph is optional).

Finally, Patent Owner's arguments that the combination would be inoperable is likewise unavailing. As discussed above, Patent Owner maintains Chiu's phone server, when combined with Bustini, would not receive bursty data because data from the workstation that is addressed for the data server, not the multimedia server. This argument, however, fails to consider the combination as set forth by the Examiner. Namely, in the Final Action the Examiner finds that Chiu teaches the claimed data sent from the workstation is addressed to the data server.

For example, the Examiner finds "[a] person of ordinary skill would understand that the computer data (as shown in the annotated Fig. 1 below) of Chiu transported to and from said computer 200 (annotated) through IP telephone device 100 would be addressed, as it is IP data," and "[o]ne such available destination to which the data would be addressed would be to a data server on the network 130 (Internet), such as the other computer 170, another web server, or any other point-to-point IP server on the internet." Final Act. 7. As such, the Examiner expressly finds Chiu teaches other destinations that satisfy the claimed data server limitation. *See also, e.g., In re Mouttet*, 686 F.3d at 1332 ("It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements.").

Based on the record before us, we are not persuaded of error in the Examiner's conclusion of obviousness.

27

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

Issue 4: *Claim 36*

Examiner's Findings and Conclusions

Claim 36 additionally recites:

> wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold.

The Examiner finds that Bustini teaches, in a congestion control method, monitoring a queue length of data to be transmitted, where certain packets are protected and others discarded when a "chosen metric (usually queue lengths) for congestion threshold is exceeded." Final Act. 10 (citing Bustini, 3:1–4). According to the Examiner, a skilled artisan "would understand this queue management reduces a future amount of data from being transferred from a node if the amount of data within that node exceeds a predetermined threshold." Final Act. 10.

The Examiner identifies that Bustini's other algorithms also render the claimed threshold limitation obvious. Final Act. 11. *See also* Ans. 34 ("The congestion-control teachings of Bustini, as discussed above, are in no way limited to color coding of packets, which Bustini mentions in one paragraph."). For example, the Examiner finds that Bustini "describes invoking certain collision avoidance mechanisms when a monitored queue length in a buffer exceeds a prescribed threshold using congestion indicator bits to trigger the discarding of cells when congestion occurs." Final Act. 11 (citing Bustini, 11:35–44). As such, the Examiner determines that Chiu and Bustini renders claim 36 obvious.

28

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

Patent Owner's Contentions

Patent Owner argues that the cited combination fails to teach or suggest "wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold," as recited by claimed 36. Appeal Br. 39. Specifically, Patent Owner argues that the Examiner erred in determining that a skilled artisan would incorporate Bustini's rate regulation scheme that color-codes packets into Chiu. Appeal Br. 40. According to the Patent Owner, "[t]here is simply no component in Chiu's architecture that could perform the necessary comparisons and color code the claimed 'data' red and the claimed 'audio information' green, as proposed by the Examiner, while still meeting the requirements of claim element 36[c]." Appeal Br. 40. *See also* Appeal Br. 43 ("The Examiner has failed to explain why it would be obvious to combine the color coded 'rate regulation scheme' with Bustini's Main Algorithm.").

Additionally, Patent Owner argues that the rejection is in error because Bustini's color-coding scheme merely assigns different colors to packets from a single bursty data source. Appeal Br. 40–41. Patent Owner reasons that the Examiner's citing of red and green packets would require the packets to come from different data sources to meet the claim. Appeal Br. 41. Patent Owner contends "[t]he Examiner fails to articulate why a POSITA would extend the color scheme to two data sources instead of a single data source and/or apply the color scheme to non-bursty data. This is a defect in the Examiner's obviousness rejection." Reply Br. 17. As such, according to Patent Owner, the combination of Chiu and Bustini fails to render claims 36 obvious. Appeal Br. 44–45.

29

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

Analysis

We are not persuaded of error in the Examiner determination. Similar to the arguments discussed above, Patent Owner's arguments rely on bodily incorporating Chiu and Bustini and fail to consider the combined teachings to a skilled artisan at the time of the invention. *See, e.g.*, *In re Keller*, 642 F.2d at 425 ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art."). Notably, *claim 36 does not recite the argued color-coded rate regulation scheme*, nor does claim 36 require assigning colors from different data sources. Instead, claims 36 merely recites using a predetermined threshold when considering whether to reduce the amount of data transferred from the workstation.

As the Examiner explains, Bustini teaches using a threshold for controlling the amount of data transmitted. Final Act. 11. For example, Bustini describes a queue management scheme that compares the queue length to a threshold. Final Act. 11 (citing Bustini, 3:8–46; 11:35–44). The Examiner explains the "queue length triggers the feedback control that Bustini notes 'regulates the rate of bursty data transmission' over the network in accordance with the feedback control." *Id.* As such, a skilled artisan would have understood at the time of the invention "that queue management reduces a future amount of data from being transferred from a node if the amount of data within that node exceeds a predetermined threshold." Ans. 12. Moreover, we note that Patent Owner's arguments,

30

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

without more, are merely unsupported attorney argument. *See Enzo Biochem, Inc.*, 424 F.3d at 1284 ("Attorney argument is no substitute for evidence."). As such, we are not persuaded of error in the Examiner's determination.

Issue 5: *Claims 37*

Examiner's Findings and Conclusions

Claim 37 additionally recites:

> wherein the monitoring step further comprises the step of the telephone sending a congestion message to the multimedia server when the amount of the audio information falls below the predetermined level.

The Examiner relies on Bustini for this limitation, finding that Bustini teaches "setting minimum bandwidth assignments for certain classes of [traffic]." Final Act. 12 (Bustini, 19:15–16, 19:64–68). According to the Examiner, "Bustini teaches monitoring an amount of audio information and prioritizing that information if it falls below a selectable minimum bandwidth (i.e. a predetermined level)." Final Act. 12 (citing Bustini 4:25–28); *see also* Ans. 36 (explaining "it would have been obvious that the threshold for the ECN trigger is a selectable, minimum bandwidth.").

The Examiner further reasons

> a person of ordinary skill in the art would understand that the transition between thresholds would be triggered by the level of packets buffered in a queue in a given switch. 5:33-35. When necessary, a lower threshold is used (and therefore more throttling needed) a corresponding ECN is sent, when a higher threshold is sufficient (and less throttling needed) a different corresponding ECN would be sent. Thus, the reliability and consistency of the data transfer rate would have been increased.

31

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

Final Act. 12. According to the Examiner then, "to one of ordinary skill in the art at the time the invention was made, it would have been obvious to add the data prioritization mechanisms of Bustini as discussed above to the IP telephony system of Chiu." *Id.*

Patent Owner's Contentions

Patent Owner argues that Bustini fails to teach or suggest the claimed sending a congestion message limitation of claim 37. Appeal Br. 47–48. Patent Owner maintains that the Examiner relies on Bustini's threshold being *exceeded*, not failing below the predetermined level as claimed. Appeal Br. 47. According to the Patent Owner, the claimed limitation is "the reverse of the trigger disclosed in Bustini." Appeal Br. 47–48 (emphasis omitted). Patent Owner also presents additional arguments similar to those discussed above, namely that the Examiner relies on separate algorithms of Bustini. *See, e.g.,* Appeal Br. 48 (asserting that Bustini's "'reactive (feedback) control method' is not the same as Bustini's Main Algorithm").

Analysis

We agree with the Examiner that Bustini at least suggests the limitations of claim 37. As the Examiner explains, Bustini teaches setting minimum bandwidth assignments for certain classes of traffic. Final Act. 11 (citing Bustini, 19:15–16, 19:64–68). In other words, a skilled artisan would understand that because Bustini sets a *minimum* bandwidth for audio information, the audio information level going below this minimum predetermined level indicates network congestion and, thus, sending of the congestion signal. Ans. 36.

32

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

As discussed above, Patent Owner's argument regarding separate algorithms is likewise unavailing. *See also* Ans. 36 (noting that the Examiner does not rely on separate algorithms). Moreover, as the Examiner explains, the benefits of prioritizing audio data by applying a minimum bandwidth for audio information would have been readily apparent to a skilled artisan at the time of the invention to improve the reliability and consistency for transferring audio data. *See, e.g.*, Final Act. 12. As such, we are not persuaded of error in the Examiner determination.

Issue 5: *Claims 38 and 39*

Examiner's Findings and Conclusions

Claim 38 recites:

38. The method as recited in claim 37, further comprising the step of the multimedia server sending a throttling signal to the telephone in response to receipt of the congestion message.

Claim 39 recites:

39. The method as recited in claim 38, wherein the throttling step operates in response to receipt of the throttling signal.

The Examiner relies on Bustini's teaching

[i]f the congestion bits indicate a high congestion condition over the network, the server uses feedback mechanism to send a throttle signal to the source node. Upon receipt of the signal, the source node reduces the window size from its current value thereby reducing the effective network data rate.

Final Act. 13 (citing Bustini, 3:38-46). The Examiner explains that "[r]educing the window size is a way to throttle 'the effective network data rate by having the user adjust the window duration controlling the number of

33

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

contiguous packets that can be transmitted at a given time.'" Final Act. 14
(citing Bustini, 3:8–17).

Patent Owner's Contentions

Patent Owner contends that Bustini fails to teach or suggest "sending
a throttling signal to the telephone in response to receipt of the congestion
message." Appeal Br. 49–51. In particular, Patent Owner argues that Bustini
does not teach that the throttling signal, i.e. feedback signal, is sent *in
response* to Bustini's congestion message. *Id.* Additionally, Patent Owner
again argues that the Examiner improperly combines different embodiments
of Bustini. *See, e.g.,* Appeal Br. 50 (arguing that Bustini's "'window control
method' is not the same as the 'reactive (feedback) control method' or
Bustini's Main Algorithm. Accordingly, to meet claim 38, the Examiner
must combine the 'window control method,' the 'reactive (feedback) control
method,' and Bustini's Main Algorithm.").

Patent Owner emphasizes that claim 39 includes all the limitations of
claims 37 and 38. Appeal Br. 51. Patent Owner then argues that "none of the
algorithms [of Bustini] teach throttling the data sent from the workstation to
the telephone, based on the amount of audio information (i.e., voice packets)
received by the telephone, as claim 39 requires." Appeal Br. 52.

Analysis

Patent Owner's arguments are unpersuasive.  As the Examiner points
out, Bustini teaches

> A remote destination server (e.g. multimedia server) receives the
> packets, and counts the number of set congestion bits. [] If the

34

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

> congestion bits indicate a high congestion condition over the
> network, the server uses feedback mechanism to send a throttle
> signal to the source node. Upon receipt of the signal, the source
> node reduces the window size from its current value thereby
> reducing the effective network data rate.

Final Act. 13 (citing Bustini, 3:38–46). In other words, Bustini teaches that

the feedback signal is *in response* to the congestion bits received within a

time period and is used to control or throttle the transmission from the

source node to an intermediate node, such as Chiu's IP telephone.

Final Act. 14 (citing Bustini, 3:8–17, 38–46); *see also* Bustini, 2:24–27

(noting know congestion control techniques that use feedback information to

control the *in-flow* of traffic); Abstract (disclosing that "The *source node*

regulates the rate of bursty data transmission over the cell network in

accordance with the feedback control signal." (emphasis added)).

    As discussed above, we are not persuaded that the Examiner

incorrectly relied upon separate algorithms of Bustini. For example, the

Examiner explains that the window control method is a feedback control

method. Final Act. 14. Moreover, as also discussed above, Bustini's alleged

main algorithm teaches using a feedback control signal to throttle data. *See,*

*e.g.*, Bustini, Abstract. As such, we are not persuaded of error in the

Examiner determination.

    Accordingly, based on the record before us, we affirm the Examiner's

rejection of claims 29–41[5] under 35 U.S.C. § 103 as unpatentable over Chiu

and Bustini.

---

[5] We note Patent Owner does not separately argue the limitations of claims
40 and 41, but relies on the previously discussed arguments presented for
claims 36–39. *See* Appeal Br. 52.

Appeal 2024-000245
Reexamination Control 90/014,804
Patent 7,068,684

## CONCLUSION

The Examiner's rejection of claims 29–41 under 35 U.S.C. §103 as unpatentable over Chiu and Bustini is AFFIRMED.

## DECISION SUMMARY

The following table summarizes our decision:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 29–41 | 103 | Chiu, Bustini | 29–41 | |

## REQUESTS FOR EXTENSIONS OF TIME

Requests for extensions of time in this ex parte reexamination proceeding are governed by 37 C.F.R. § 1.550(c). *See* 37 C.F.R. § 41.50(f).

## AFFIRMED

PATENT OWNER/APPELLANT

WILLIAMS SIMONS & LANDIS PLLC/ESTECH
THE LITTLEFIELD BUILDING
601 CONGRESS AVE., STE 600
AUSTIN, TX 78701

THIRD PARTY REQUESTER

K&L GATES R. LLP – (GENERAL)
P.O. BOX 1135
CHICAGO, IL 60690

36

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

In re Estech Systems IP, LLC   )
            )
Serial No. 90/014,804    )     Appeal No: 24-1935
            )

## <u>NOTICE FORWARDING CERTIFIED LIST</u>

A notice of appeal to the United States Court of Appeals for the Federal Circuit

was timely filed on June 7, 2024, in the Patent and Trademark Office in connection with

the above-identified **ex parte re-examination** proceeding.  Pursuant to 35 U.S.C. § 143

and Federal Circuit Rule 17(b)(1), a certified list is this day being forwarded to the

Federal Circuit.

Michael S. Forman is the attorney representing the Director in this appeal.

Counsel for appellant must contact the Solicitor's Office at 571-272-9035 to arrange for

designating the record.

        Respectfully submitted,

        Under Secretary of Commerce for
        Intellectual Property and Director of the
        United States Patent and Trademark Office


Date:  July 22, 2024    By:  */s/Natasha M. Brotten*
         Natasha M. Brotten
         Paralegal Specialist
         Mail Stop 8
         P.O. Box 1450
         Alexandria, VA 22313-1450
         571-272-9035

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing **NOTICE**

**FORWARDING CERTIFIED LIST** has been served, via electronic mail, on counsel for

appellant this 22nd day of July, 2024 as follows:


Fred I. Williams
fwilliams@wsltrial.com

John Wittenzellner
johnw@wsltrial.com


By: /s/*Natasha M. Brotten*___
**Natasha M. Brotten**
Paralegal Specialist

Form PTO 55 (12-80)

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

**July 22, 2024**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the contents comprised from the electronic file of the Patent Re-examination Application identified below; said contents being a list of the documents comprising the record before the United States Patent and Trademark Office for the Reexamination Proceeding of:

**Patent Owner(s):**    **Estech Systems, Inc.; Cisco Systems, Inc.; Nolan R. Hubbard**

**Reexamination No.: 90/014,804**

**Filed:**    **07/16/2021**

**Title of Invention:**    **Quality of Service in a Voice Over IP Telephone System**

By authority of the

**DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE**

*/s/Natasha M. Brotten*

*Certifying Officer*



## Prosecution History 90/014,804

| Date | Document |
|------|----------|
| 07/16/2021 | Request for Ex Parte Reexamination |
| 07/16/2021 | Information Disclosure Statement |
| 07/16/2021 | Change in Power Attorney for Third Party Requester |
| 07/16/2021 | Info Disclosure Statement Filed by 3rd Party |
| 07/16/2021 | Fee Worksheet |
| 08/07/2021 | Title Report |
| 08/07/2021 | Bibliographic Data Sheet |
| 08/09/2021 | Notice of Assignment of Reexamination Request |
| 08/09/2021 | Notice of Reexamination Request Filing Date |
| 09/17/2021 | Order Granting Request for Ex Parte Reexamination |
| 09/17/2021 | Information Disclosure Statement |
| 10/29/2021 | Request to Terminate Ex Parte Reexamination |
| 10/30/2021 | Power of Attorney |
| 10/30/2021 | Statement Under 37 CFR 3.73 |
| 11/17/2021 | Patent Owner's Statement Under 37 C.F.R. 1.530 |
| 11/22/2021 | Change of Address |
| 11/22/2021 | Bibliographic Data Sheet |
| 06/02/2022 | Notice of concurrent proceedings |
| 07/27/2022 | Non-Final Office Action |
| 08/01/2022 | Decision on Petition |
| 08/01/2022 | Notice of Acceptance of Power of Attorney |
| 09/27/2022 | Submission Under 37 C.F.R. 1.28(c) |
| 09/27/2022 | Reply After Non-Final Office Action |
| 09/27/2022 | Fee Worksheet |
| 09/28/2022 | Fee Worksheet |
| 10/17/2022 | Mail Returned to USPTO as Undelivered |
| 11/21/2022 | Final Office Action |
| 12/23/2022 | Summary of Examiner's Interview |
| 01/23/2023 | Fee Worksheet |
| 01/23/2023 | Response After Final Office Action |
| 01/23/2023 | Fee Worksheet |
| 02/17/2023 | Advisory Action |
| 02/17/2023 | Examiner Interview Summary Record |
| 02/17/2023 | Office Action Appendix |
| 03/21/2023 | Notice of Appeal to the Patent Trial and Appeal Board |
| 05/22/2023 | Appeal Brief |
| 06/29/2023 | Notice of Concurrent Proceedings |
| 08/16/2023 | Examiner's Answer |
| 10/16/2023 | Reply Brief |
| 10/16/2023 | Request for Oral Hearing |
| 10/16/2023 | Fee Worksheet |
| 10/25/2023 | Patent Trial and Appeal Board Docketing Notice |

| | |
|---|---|
| 11/07/2023 | Notification of Appeal Hearing |
| 11/27/2023 | Confirmation of Hearing by Appellant |
| 12/14/2023 | Decision Granting Video Hearing |
| 01/16/2024 | Affidavit/Declaration/ Exhibit After Notice of Appeal |
| 03/08/2024 | Patent Trial and Appeal Board (PTAB) Oral Hearing Transcript |
| 05/29/2024 | Decision on Appeal |

## REJECTED CLAIMS

Claims 29-41 of U.S. Patent No. 7,068,684 are the patent claims at issue:

29.   In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of:

transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;

communicating audio information between the telephone and the multimedia server; and

sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server.

30.   The method as recited in claim 29, wherein the hub, multimedia server, data server, telephone, and workstation are coupled to each other via a network.

31.   The method as recited in claim 30, wherein the network is a TCP/IP network.

32.   The method as recited in claim 30, wherein the network is a packet switched network.

33.   The method as recited in claim 30, wherein the telephone and multimedia server communicate using an IP protocol.

34.   The method as recited in claim 29, wherein the monitoring step further comprises the step of monitoring a predetermined level within a jitter buffer.

35.   The method as recited in claim 29, wherein the throttling results in no data being sent from the workstation to the telephone.

36.   In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of:

transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;

communicating audio information between the telephone and the multimedia server; and

sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold.

37.   In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of:

transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;

communicating audio information between the telephone and the multimedia server; and

sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server, wherein the monitoring step further comprises the step of the telephone sending a congestion message to the multimedia server when the amount of the audio information falls below the predetermined level.

38.  The method as recited in claim 37, further comprising the step of the multimedia server sending a throttling signal to the telephone in response to receipt of the congestion message.

39.  The method as recited in claim 38, wherein the throttling step operates in response to receipt of the throttling signal.

40.  The method as recited in claim 39, wherein the throttling signal includes a mode level.

41.  The method as recited in claim 40, wherein the throttling step further comprises the step of adjusting a level of throttling of the data in response to the mode level included in the throttling signal.

PTO/SB/57 (01-18)
Approved for use through 11/30/2021. OMB 0651-0064
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.
(Also referred to as FORM PTO-1465)

# REQUEST FOR *EX PARTE* REEXAMINATION TRANSMITTAL FORM

Address to:
**Mail Stop *Ex Parte* Reexam**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA  22313-1450**

Attorney Docket No.: 3725700.00001

Date: July 16, 2021

1. ■ This is a request for *ex parte* reexamination pursuant to 37 CFR 1.510 of patent number 7,068,684

   issued June 27, 2006 . The request is made by:

   ☐ patent owner.          ■ third party requester.

2. ■ The name and address of the person requesting reexamination is:

   Cisco Systems, Inc.

   170 West Tasman Dr.

   San Jose, CA 95135

3. Requester ☐ asserts small entity status (37 CFR 1.27) or ☐ certifies micro entity status (37 CFR 1.29). Only a patent owner requester can certify micro entity status. Form PTO/SB/15A or B must be attached to certify micro entity status.

4. This request is accompanied by payment of the reexamination fee as set forth in:
   ■ 37 CFR 1.20(c)(2); **or**
   ☐ **37 CFR 1.20(c)(1). In checking this box for payment of the fee set forth in 37 CFR 1.20(c)(1), requester asserts that this request has forty (40) or fewer pages and complies with all other requirements of 37 CFR 1.20(c)(1).**

   Payment of the reexamination fee is made by the method set forth below.

   a. ☐ A check in the amount of $_____ is enclosed to cover the reexamination fee;

   b. ■ The Director is hereby authorized to charge the reexamination fee
      to Deposit Account No. 02-1818 ;

   c. ☐ Payment by credit card.  Form PTO-2038 is attached; **or**

   d. ☐ Payment made via EFS-Web.

   ■ In addition, the Director is hereby authorized to charge any fee deficiencies to
   Deposit Account No. 02-1818 .

5. ■ Any refund should be made by ☐ check or ■ credit to Deposit Account No. 02-1818 .
   37 CFR 1.26(c). If payment is made by credit card, refund must be to credit card account.

6. ■ A copy of the patent to be reexamined having a double column format on one side of a separate paper is enclosed. 37 CFR 1.510(b)(4).

7. ☐ CD-ROM or CD-R in duplicate, Computer Program (Appendix) or large table
   ☐ Landscape Table on CD

[Page 1 of 3]

This collection of information is required by 37 CFR 1.510. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) a request for reexamination. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 18 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO:  Mail Stop *Ex Parte* Reexam, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/SB/57 (01-18)
Approved for use through 11/30/2021. OMB 0651-0064
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

8. ☐ Nucleotide and/or Amino Acid Sequence Submission
   *If applicable, items a. – c. are required.*

   a. ☐ Computer Readable Form (CRF)

   b. Specification Sequence Listing on:

       i. ☐ CD-ROM (2 copies) or CD-R (2 copies) **or**

       ii. ☐ paper

   c. ☐ Statements verifying identity of above copies.

9. ☑ A copy of any disclaimer, certificate of correction or reexamination certificate issued in the patent is included.

10. ☑ Reexamination of claim(s) 29 to 41 _____ is requested.

11. ☑ A copy of every patent or printed publication relied upon is submitted herewith including a listing thereof on Form PTO/SB/08, PTO-1449, or equivalent.

12. ☐ An English language translation of all necessary and pertinent non-English language patents and/or printed publications is attached.

13. ☑ The attached detailed request includes at least the following items:

   a. A statement identifying each substantial new question of patentability based on prior patents and printed publications. 37 CFR 1.510(b)(1).

   b. An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited art to every claim for which reexamination is requested. 37 CFR1.510(b)(2).

14. ☐ A proposed amendment is included (only where the patent owner is the requester). 37 CFR 1.510(e).

15. ☑ It is certified that the statutory estoppel provisions of 35 U.S.C. 315(e)(1) or 35 U.S.C. 325(e)(1) do not prohibit requester from filing this *ex parte* reexamination request. 37 CFR 1.510(b)(6).

16.     Service

   a. ☑ It is certified that a copy of this request (if filed by other than the patent owner) has been served in its entirety on the patent owner as provided in 37 CFR 1.33(c).

   The name and address of the party served are:

   Kelly Kordzik, Fish & Richardson, P.O. Box 1022, Minneapolis, MN 55440-1022

   courtesy copy to: Kelly Kordzik, Matheson Keys & Kordzik PLLC, 7004 Bee Cave Road, Bldg, 1, Suite 110, Austin, TX  78746

   courtesy copy to: Todd Landis, Williams Simons & Landis PLLC, 327 Congress Ave., Suite 490, Austin, TX  78701

   Date of Service: July 16, 2021

   **OR**

   b. ☐ A duplicate copy is enclosed since service on patent owner was not possible. An explanation of the efforts made to serve patent owner **is attached**. See MPEP 2220.

[Page 2 of 3]



US007068684B1

(12) **United States Patent**
Suder et al.

(10) **Patent No.:** US 7,068,684 B1
(45) **Date of Patent:** Jun. 27, 2006

(54) **QUALITY OF SERVICE IN A VOICE OVER IP TELEPHONE SYSTEM**

(75) Inventors: **Eric G. Suder**, Plano, TX (US);
**Harold E. A. Hansen, II**, Plano, TX (US)

(73) Assignee: **Estech Systems, Inc.**, Plano, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 877 days.

(21) Appl. No.: **09/775,018**

(22) Filed: **Feb. 1, 2001**

(51) **Int. Cl.**
| | |
|---|---|
| *H04L 12/66* | (2006.01) |
| *H04J 1/02* | (2006.01) |
| *H04J 1/14* | (2006.01) |
| *H04M 11/00* | (2006.01) |

(52) **U.S. Cl.** ...................... 370/493; 370/352; 370/496; 379/93.29; 379/93.09

(58) **Field of Classification Search** ......... 370/229, 370/352, 353, 401, 230, 389, 493, 494, 495, 370/535, 395.42, 395.21, 433, 443, 444, 370/445
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,119,372 | A | * | 6/1992 | Verbeek ...................... 370/230 |
| 5,751,791 | A | * | 5/1998 | Chen et al. .............. 379/88.13 |
| 5,878,120 | A | * | 3/1999 | O'Mahony ............... 379/93.09 |
| 5,982,779 | A | | 11/1999 | Krishnakumar et al. .... 370/447 |
| 6,504,926 | B1 | * | 1/2003 | Edelson et al. ........ 379/390.01 |
| 6,515,996 | B1 | * | 2/2003 | Tonnby et al. .............. 370/401 |
| 6,535,521 | B1 | * | 3/2003 | Barghouti et al. .......... 370/462 |
| 6,587,433 | B1 | * | 7/2003 | Borella et al. ............. 370/230 |
| 6,678,280 | B1 | * | 1/2004 | Kim et al. ................. 370/429 |

| | | | | |
|---|---|---|---|---|
| 6,735,209 | B1 | * | 5/2004 | Cannon et al. ............. 370/401 |
| 6,760,429 | B1 | * | 7/2004 | Hung et al. ........... 379/265.09 |
| 6,785,261 | B1 | * | 8/2004 | Schuster et al. ........... 370/352 |
| 6,798,768 | B1 | * | 9/2004 | Gallick et al. ............. 370/352 |
| 6,839,341 | B1 | * | 1/2005 | Nakajima ................... 370/352 |
| 6,876,648 | B1 | * | 4/2005 | Lee ........................... 370/353 |

OTHER PUBLICATIONS

Harry Newton, *Newton's Telecom Dictionary*, 16th Edition, copyright 2000, pp. 126-127.
*Avaya Communication*, "Avaya IP Telephone," available via the Internet at www lucent com/enterprise/solutions/eclips/pdf/black₁₃ white_paper pdf, Nov. 9, 2000.
*Avaya Communication*, "Quality of Service (QoS) considerations with 4600 Series IP Telephones," available via the Internet at www lucent com/enterprise/solutions/eclips/pdf/QoSwhite_paper pdf, Jan. 29, 2000.

* cited by examiner

*Primary Examiner*—Hanh Nguyen
(74) *Attorney, Agent, or Firm*—Kelly K. Kordzik; Winstead Sechrest & Minick P.C.

(57) **ABSTRACT**

An information handling system comprises a TCP/IP network connecting a hub to a multimedia server and the hub to a data server, and the hub to an IP telephony device that is then coupled to a network device. Data sent from the network device is addressed for transmission to the data server and is transmitted through the IP telephony device to the TCP/IP network. The IP telephony device monitors when an amount of data being received over the network falls below a predetermined threshold. If this occurs, the IP telephony device will send a signal to the multimedia server, which will then generate a congestion signal to send to all or selected IP telephony devices in the network to throttle data being received by the IP telephony devices from their respective connected network devices.

**61 Claims, 13 Drawing Sheets**



CISCO EXHIBIT 1001
Page 1 of 25



**Fig. 1**



**Fig. 2**

CISCO EXHIBIT 1001
Page 2 of 25

U.S. Patent

Jun. 27, 2006

Sheet 2 of 13

US 7,068,684 B1



**Fig. 3**

CISCO EXHIBIT 1001
Page 3 of 25

U.S. Patent    Jun. 27, 2006    Sheet 3 of 13    US 7,068,684 B1



**Fig. 4**

Diagram labels:

- 101
- 401 MAIN BOARD
- 409
- 402 IP NETWORK CARD
- 304 IP ROUTER
- 413
- 103 ETHERNET HUB
- 201 WIDE AREA NETWORK
- 416
- 412
- 414
- 105 FAST ETHERNET TELEPHONE
- 407 POWER PACK
- 403 IDE HDD
- 410
- 411
- BACKPLANE (10 SLOTS)
- 405 PERIPHERAL (P-CARDS)
- 404
- CO
- • CO
- • CO/ANALOG
- • T1
- 406 ANALOG TELEPHONE
- 415
- 106 WORKSTATION
- 120VAC
- 301

CISCO EXHIBIT 1001
Page 4 of 25

U.S. Patent

Jun. 27, 2006

Sheet 4 of 13

US 7,068,684 B1



DSP FARM EXPANSION CONNECTOR

*402*

*501* I/O

*503* ECP

*505* DSP

*507*

*510*

*513* FPGA

*514*

*515* 10/100 MAC/PHY

*517*

PCI BUS

DE HDD CONNECTION FROM M.B.

*410*

*502*

DSP *506*

*508*

*516* 10/100 MAC/PHY

*416*

*504* DRAM

DIGITAL CROSSPOINT SWITCH

*509*

SRAM *511*

CONNECTORS

BACKPLANE *404*

PCARD Ø *405*

PCARD L *405*

5

*409*

SYSTEM HIGHWAYS

**Fig. 5**

I/O AND BUFFERS *512*

*411*

CISCO EXHIBIT 1001
Page 5 of 25

U.S. Patent    Jun. 27, 2006    Sheet 5 of 13    US 7,068,684 B1



Fig. 6

CISCO EXHIBIT 1001
Page 6 of 25

U.S. Patent      Jun. 27, 2006      Sheet 6 of 13      US 7,068,684 B1

701 — MICROCONTROLLER (ECP)

BUSSES

702 — DSP

TDM

405

706 — CODECS

708 — LOOP START CO INTERFACES

CO

703 — 512KB DRAM

TDM

DIGITAL CROSSPOINT SWITCH

707 — CODECS

709 — ANALOG TELEPHONE INTERFACES

ANALOG PHONES 406

411

SYSTEM SPEECH/ CONTROL HIGHWAYS TO/FROM CARD 402

704 — BUFFERS

TIMING

SYSTEM TIMING FROM CARD 402

**Fig. 7**

CISCO EXHIBIT 1001
Page 7 of 25

U.S. Patent    Jun. 27, 2006    Sheet 7 of 13    US 7,068,684 B1



Fig. 8

CISCO EXHIBIT 1001
Page 8 of 25



**Fig. 9**

CISCO EXHIBIT 1001
Page 9 of 25

**Fig. 10**





**Fig. 11**

CISCO EXHIBIT 1001
Page 11 of 25

**Fig. 12A**



CISCO EXHIBIT 1001
Page 12 of 25



**Fig. 12B**

CISCO EXHIBIT 1001
Page 13 of 25



**Fig. 13**

CISCO EXHIBIT 1001
Page 14 of 25

US 7,068,684 B1

1

# QUALITY OF SERVICE IN A VOICE OVER IP TELEPHONE SYSTEM

## TECHNICAL FIELD

The present invention relates in general to information processing systems, and in particular, to the use of Voice over IP technology to transmit voice conversations.

## BACKGROUND INFORMATION

Voice over IP ("VoIP") is a relatively recent development that is utilized to transmit voice conversations over a data network using the Internet Protocol ("IP"). Internet Protocol is a part of the TCP/IP family of protocols described in software that tracks the Internet address of nodes, routes outgoing messages, and recognizes incoming messages. Such a data network may be the Internet or a corporate intranet, or any TCP/IP network. There are several potential benefits for moving voice over a data network using IP. First, there is a savings in money compared to the need to use traditional tolled telecommunications networks. Additionally, Voice over IP enables the management of voice and data over a single network. And, with the use of IP phones, moves, adds and changes are easier and less expensive to implement. Moreover, additional and integrated new services, including integrated messaging, bandwidth on demand, voice e-mails, the development of "voice portals" on the Web, simplified setting up and tearing down, and transferring of phone calls are capable.

Using Voice over IP technology, phone systems can communicate with each other over existing TCP/IP data networks typically present between remote offices. This feature alone can eliminate the need for expensive, dedicated circuits between facilities. The shared bandwidth can also be used for voice calls and data communication simultaneously; no bandwidth is dedicated to one or the other.

Another advantage of a Voice over IP system is the ability to implement a phone system over an existing data network that is already connecting workstations within a local area network, such as over an Ethernet. An Ethernet operates over twisted wire and over coaxial cable for connecting computers, printers, workstations, terminals, servers, etc., within the same building or a campus. The Ethernet utilizes frame packets for transmitting information. Voice over IP can utilize such packet switching capabilities to connect IP phones onto the Ethernet. However, the implementation of Voice over IP onto an Ethernet has proven to have some difficulties. Data networks were originally designed to allow for latency (delays) in the delivery of packets between sources and destinations. If a packet became lost, then the Ethernet would go through a re-send protocol to have the packet sent again from the source to the destination, and the data then reassembled at the destination end. With voice (or for that matter, video or any other real-time application), such delays present problems. Real-time applications cannot tolerate significant delays or they no longer become real-time applications. Such quality of service ("QOS") concerns are especially amplified when attempting to implement Voice over IP onto an Ethernet, which utilizes a 10/100 Base T protocol, since it can be affected by bursts of data transfers among the workstations and servers, etc. For example, a large print job or a file access can significantly occupy the bandwidth on such an Ethernet, thus greatly degrading the ability to transmit any real-time information during that data burst. This problem worsens as more and more Voice over IP telephones are added to the network.

2

Therefore, there is a need in the art for an improved information processing system that can handle multimedia traffic in conjunction with typical bursty data transmissions.

## SUMMARY OF THE INVENTION

The present invention addresses the foregoing need by providing an information processing system whereby an IP telephony system is designed to share a network with data devices communicating with a network operating system. In one embodiment, the network is an Ethernet local area network. Because these systems share a common hardware media, there is a possibility to saturate the network. Multimedia traffic can be adversely affected by jitter and latency, while data traffic is typically immune to these types of disruptions. This bandwidth contention requires a suitable quality of service arrangement to give the multimedia traffic priority during peak traffic loads.

More specifically, an IP telephony device will contain two separate media access controllers ("MACs") configured to provide a two-port, layer 2 Ethernet switch. This approach permits one MAC to be connected to the network, while the other MAC is dedicated to a connected network device. This allows all traffic flowing between MACs to be manipulated by a hardware/software approach within the IP telephony device. The quality of service algorithm of the present invention uses this configuration to restrict data traffic to/from the network device during peak traffic conditions, thus providing increased multimedia traffic bandwidth when needed.

In one embodiment of the present invention, voice jitter buffers within each IP telephony device are used to minimize the effects of jitter and latency by providing a buffer of three voice packets. If the bandwidth usage of the Ethernet link becomes too great, the jitter buffer will start to deplete. The IP telephony device will detect this condition and report it to a quality of service task running within a multimedia server coupled to the Ethernet.

If any of the IP telephony devices report to the multimedia server that their jitter buffers have hit a specified threshold, the multimedia server will issue a command to all (or selected) IP telephony devices simultaneously to begin a flow control process between their respective network devices and the network. If, after a programmable interval, the multimedia server ceases receiving quality of service messages from the IP telephony devices, the multimedia server will issue a command to stop the flow control process.

In an embodiment of the present invention, the command that the multimedia server issues to instruct the IP telephony devices to start the flow control process will contain a parameter used to signify how aggressively the IP telephony devices should flow control their respective data paths. For example, the multimedia server would first send the most aggressive value. Once the quality of service messages cease from the IP telephony devices, the multimedia server would then send a next lower aggressive parameter value. If no quality of service messages are received, the multimedia server will turn off the quality of service algorithm. If, however, during any stage if the quality of service messages are received from the IP telephony devices, the multimedia server will reissue the next higher flow control value.

In one embodiment of the present invention, during the quality of service flow control processes, the IP telephony devices may flood the private network between the IP telephony devices and the network devices with idle patterns (jabber). The various levels of flow control needed could be achieved by a jabber duty cycle. For example, a most

CISCO EXHIBIT 1001
Page 15 of 25

US 7,068,684 B1

3

aggressive value may have an eighty percent duty cycle, while a least aggressive value may have a twenty percent duty cycle. During the jabber process, communication between the network device and server is disrupted, allowing more bandwidth for the voice packets between the IP telephony devices and the multimedia server.

The foregoing has outlined rather broadly the features and technical advantages of the present invention in order that the detailed description of the invention that follows may be better understood. Additional features and advantages of the invention will be described hereinafter which form the subject of the claims of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention, and the advantages thereof, reference is now made to the following descriptions taken in conjunction with the accompanying drawings, in which:

FIG. 1 illustrates an information processing system configured in accordance with the present invention;

FIG. 2 illustrates a wide area network configuration of the present invention;

FIG. 3 illustrates another embodiment of a wide area network configuration of the present invention;

FIG. 4 illustrates a block diagram of a configuration of the present invention;

FIG. 5 illustrates a block diagram of a network card configured in accordance with the present invention;

FIG. 6 illustrates a block diagram of the main board of the present invention;

FIG. 7 illustrates a block diagram of a peripheral card configured in accordance with the present invention;

FIG. 8 illustrates a block diagram of a telephony device configured in accordance with the present invention;

FIG. 9 illustrates a flow diagram of a station-to-station telephone call;

FIGS. 10, 11, 12A and 12B illustrate flow diagrams configured in accordance with the present invention; and

FIG. 13 illustrates functions implemented in the processing means of the main board.

DETAILED DESCRIPTION

In the following description, numerous specific details are set forth such as specific network configurations, network devices, types of multimedia traffic, etc. to provide a thorough understanding of the present invention. However, it will be obvious to those skilled in the art that the present invention may be practiced without such specific details. In other instances, well-known circuits have been shown in block diagram form in order not to obscure the present invention in unnecessary detail. For the most part, details concerning timing considerations and the like have been omitted in as much as such details are not necessary to obtain a complete understanding of the present invention and are within the skills of persons of ordinary skill in the relevant art.

Refer now to the drawings wherein depicted elements are not necessarily shown to scale and wherein like or similar elements are designated by the same reference numeral through the several views.

FIG. 1 illustrates an information processing system configured in accordance with the present invention. FIG. 1 essentially illustrates a local area network ("LAN"), which in one configuration could be implemented with an Ethernet protocol. However, the present invention is not limited to

4

use with any particular data transfer protocol. Workstation PC 106, network hub 103 and server 104 coupled to each other illustrate a typical LAN configuration where data is communicated between the workstation 106 and the server 104. Naturally, other workstations and servers could also be coupled to the LAN through hub 103, including the use of additional hubs. Hub 103 may be a 10 Base T or 10/100 Base T Ethernet hub. In an alternative embodiment, the hub 103 and server 104 may be implemented in the same data processing system. Herein, the term "workstation" can refer to any network device that can either receive data from a network, transmit data to a network, or both.

To add in the voice communication capabilities, an IP multimedia server 101 is coupled to hub 103 and an IP telephony device 105 is connected between the workstation 106 and the hub 103. The IP multimedia server 101 is coupled to a central office ("CO") 102 so that telephony device 105 can communicate to other telecommunications networks, such as the public switched telephone network ("PSTN"). Naturally, additional IP telephony device 105 can be coupled to hub 103, including having workstations coupled to hub 103 through such IP telephony devices. Further details on multimedia server 101 and IP telephony device 105 are described below. An IP telephone, or telephony device, is any apparatus, device, system, etc., that can communicate multimedia traffic using IP telephony technology. IP telephony is defined within Newton's Telecom Dictionary, Harry Newton, Sixteenth Edition, page 454, which is hereby incorporated by reference herein.

Information, or data, on the network includes both the voice and data information, and any other multimedia traffic. Traffic as a result of the data transmissions between workstation 106 and server 104 affects the bandwidth available for communications between telephony device 105 and multimedia server 101. However, as discussed above, because the multimedia traffic is real-time, it must be transferred with no or minimum latency. An embodiment of the present invention provides a protocol for ensuring that the multimedia data is transferred within a specified minimum or no latency by having the data information pass through the IP telephony device 105 as it is being transferred to/from workstation 106. This configuration, as will be subsequently discussed in further detail, permits the IP telephony device 105 to throttle the data to/from workstation 106, effectively giving the IP telephony device 105 priority on the network.

FIG. 2 illustrates how the information processing system of the present invention as noted above with respect to FIG. 1 can be implemented across a wide area network ("WAN") 201 where the multimedia server 101 of FIG. 1 is coupled to another multimedia server 202 across LAN 201. Note that the other items described above in FIG. 1 have been omitted in FIG. 2 for the sake of simplicity.

FIG. 3 illustrates further detail of a configuration of the present invention over a WAN 201. Note that such a WAN may implement the TCP/IP protocol, and could be a public WAN, such as the Internet, a private data network, an intranet, or a Virtual Private Network ("VPN").

FIG. 3 illustrates an exemplary system where WAN 201 couples an information processing system 301 in Dallas, Tex. to another information processing system 302 in Detroit, Mich., while also permitting a remote system 303 to couple to both systems 301 and 302 through WAN 201, such as from a telecommuter's home.

System 301 is similar to the system described above with respect to FIG. 1. System 301 is coupled to WAN 201 through router 304.

CISCO EXHIBIT 1001
Page 16 of 25

US 7,068,684 B1

5

System 302 is similar to system 301 with the exception that a data server is not implemented within system 302. Router 305 is similar to router 304, multimedia server 306 is similar to multimedia server 101, hub 307 is similar to hub 103, IP telephony device 308 is similar to IP telephony device 105, and workstation 309 is similar to workstation 106.

Remote system 303 is coupled to WAN 201 using a modem 310, such as an ADSL (asymmetric digital subscriber line) modem. A NAT (Network Address Translation) router/hub 311 then couples a workstation PC 312 and an IP telephony device 313 to the modem 310. Not only can data be transferred across WAN 201 between systems 301–303, but also any one of telephony devices 105, 308 and 313 can communicate with each other and with the PSTN (not shown) over CO lines coupled to either of systems 301 and 302.

FIG. 4 illustrates further details of system 301. As noted above, system 301 is coupled to WAN 201 through IP router 304, which is coupled by line 413 to Ethernet hub 103. Ethernet hub 103 is connected by line 414 to fast Ethernet telephony device 105, which is coupled by line 415 to workstation 106. Ethernet hub 103 is coupled to IP network card 402 by connection 416, which may be a 10/100 Base T connector.

Multimedia server 101 is comprised of main board 401, network card 402, hard drive 403, backplane 404 and peripheral cards 405. network card 402 is further discussed below in more detail with respect to FIG. 5. network card 402 is coupled by ribbon cable 409 to main board 401, which is further described below in more detail with respect to FIG. 6. multimedia server 101 is powered through power pack 407. IDE (Integrated Drive Electronics) HDD (hard disk drive) 403 is coupled by ribbon cable 410 to network card 402 and main board 401, while network card 402 is coupled to backplane 404 through ribbon cable 411. Backplane 404 provides capacity for several peripheral cards (P-cards) 405, which are of a typical configuration for enabling a telephone system to connect to a central office (CO), T1 lines, analog central office trunks and analog telephones 406. Alternatively, ribbon cable 411 could be coupled to one of the peripheral cards 405 directly.

Referring next to FIG. 5, there is illustrated a block diagram of network card 402. Network card 402 is responsible for communicating with all IP telephones, remote telephones and remote sites via a 10/100 Base T connection. The higher-level communication protocol used may be a standard UDP/IP (User Datagram Protocol/Internet Protocol) protocol. In addition, network card 402 communicates with the main board 401 for overall system control. Network card 402 has effectively replaced individual electronic key telephone circuits with a single Ethernet interface, and network card 402 now acts as the central distribution point for all peripheral cards 405, which can plug into backplane 404.

Ribbon cable 410 from hard drive 403 is received at I/O 501 coupled to bus 502. Bus 502 is coupled to ECP (Enhanced Call Processing) microcontroller 503, DRAM 504, DSPs 505 and 506, DSP farm expansion connector 507, digital cross-point switch 509, and I/O and buffers 512. ECP 503 is a microcontroller responsible for overall communications between network card 402 and main board 401. ECP 503 directly interfaces the DSPs 505, 506 via the host port interface. The host port interface is a parallel (8 bit) interface between the DSPs and the host processor. This interface can be used to directly manipulate the DSP memory by a host processor. I/O 501 is a mailbox type parallel communication

6

channel, which is multiplexed between communication with the IDE disk drive 403 and I/O 501 allowing direct control for functions such as firmware download and message passing. ECP 503 is based on a 16-bit Hitachi H8 family processor with built-in flash memory.

DSPs 505 and 506 can be implemented using Texas Instrument 5410 DSPs that perform packet encoding/decoding, jitter buffer management and UDP/IP protocol stacked functions. DSPs 505, 506 are connected to an external SRAM 511 and ASIC (FPGA) 513 that performs a PCI bridge function between bus 508 and bus 514, which is coupled to connectors 517 and 416 via 10/100 MAC/PHY devices 515 and 516. DSPs 505, 506 communicate with peripherals 405 via bus 502. DSP firmware is downloaded via the host port interface 501. I/O 501 allows communication with the main board 401 and the hard drive 403. Additionally, EPC 503 can directly control a daughter card containing additional DSPs through expansion connector 507 for functions such as speech compression.

Digital cross-point switch 509 is used to connect system voice conversations as needed between peripherals. Main board 401 houses the master cross-points with 616 discussed below with respect to FIG. 6. The peripheral cards 405 share a pool of 160 time slots. Cross-point switch 509 is primarily responsible for connecting the packet-switched voice connections of the IP telephones or remote systems to the circuit switchboard. The FPGA/PCI bridge 513 performs the functions required to connect the 10/100 Base T Ethernet MAC/PHY devices 515, 516. Since devices 515, 516 are designed to communicate via a standard PCI bus 514, the FPGA 513 implements a minimal PCI bus implementation. Additionally, the FPGA 513 implements 1/0 latches and buffers as required.

The 10/100 Base T devices 515, 516 are stand-alone Ethernet devices, which perform the media access control ("MAC") and the PHYsical layer functions in a single, low-cost chip. Devices 515, 516 communicate to the host processor via a standard PCI bus 514, and communicate to the network via a pulse transformer coupled RJ-45 connection 517, 416. These devices contain FIFOs to minimize lost packets during traffic peaks. Per the PCI bus mastering specification, devices 515, 516 take control of the DSP bus and DMA data directly to SRAM 511. Conversely; the DSP 505, 506 writes data to be sent into the SRAM 511 and the devices 515, 516 DMA data via the PCI bus 514 to the network (LAN).

Referring next to FIG. 6, there is illustrated, in block diagram form, main board 401 for integrating call processing and voice processing using a single processing means, which in this example is one microprocessor 601. Microprocessor 601, which may be a Motorola 68000 class microprocessor, communicates with hard disk 607 using driver circuitry 602. Hard disk 607 stores program data, voice prompts, voice mail messages, and all other types of speech used within main board 401.

Microprocessor 601 also includes watchdog timer 603 and real-time clock source 604.

Microprocessor 601 is coupled via bus 608 to flash memory 605 and dynamic random access memory ("DRAM") 606. Flash memory 605 is used to store boot-strap data for use during power up of main board 401. DRAM 606 stores the program accessed by microprocessor 601 during operation of main board 401.

Bus 608 also couples microprocessor 601 to signal processing circuitry, which in this example is digital signal

CISCO EXHIBIT 1001
Page 17 of 25

US 7,068,684 B1

7

processor ("DSP") 615. Digital signal processor 615 implements a number of functions traditionally implemented by discrete analog components.

Referring next to FIG. 13, there are illustrated some of the primary functions implemented in DSP 615. DTMF receivers 1301 are implemented using frequency domain filtering techniques. DTMF receivers 1301 detect all 16 standard DTMF (touch-tone) digits.

Automatic gain control ("AGC") 1302 is a closed-loop gain control system which normalizes received audio levels during recording.

Recording buffers 1303, which are coupled to AGC 1302, receive and store speech samples after they have passed through AGC block 1302. These speech samples are converted to L-law PCM (Pulse Code Modulation) and double buffered (several samples per buffer). Microprocessor 601 copies the record data out of DSP buffers 1303 into RAM buffers (not shown), which are located in the microprocessor 601 data RAM area.

Fax tone detector 1304 is implemented using frequency domain filtering techniques. Fax tone detector 1304 detects the standard 1100 Hz FAX CNG tone (also referred to as the Calling Tone).

Caller ID modems 1305 are 1200 baud FSK modems similar to Bell 202-type modems. Caller ID modems 1305 are implemented as a frequency discriminator where a time delayed (quadrature) signal is multiplied by the original signal, low pass filtered, then sliced, which produce the square wave caller ID data stream.

Call processing tone generators 1307 are free running oscillators which generate the appropriate tones (and tone pairs) which make up the industry standard call processing tones. These tones include:

    dial tone
    busy/reorder tone
    ring back tone
    single frequency (440 Hz) tone
    DTMF dialer tones

Play buffers 1308 replay data from hard disk 607 through microprocessor 601 and place this play data in buffers 1308. This data is converted from an 8-bit μ-law PCM signal to 14-bit linear data.

Conference bridges 1306 allow multiple conference bridges to mix together conferees into a multi-party conference. These conferees may be a mixture of inside and outside parties. A combination of "loudest speaker" and "summing" is utilized.

DSP 615 communicates with microprocessor 601 via a host interface port ("HIP") via bus 608. The HIP link supports a command-based protocol, which is used to directly read or write DSP memory locations. DSP 615 is a RAM-based part and has its program downloaded from microprocessor 601. Once downloaded and running, microprocessor 601 (the host) polls for events or receives interrupts indicating that data is available. DSP 615 speech connections are made over an industry standard 32-time slot, 2.048 megabits per second (Mb/s) digital serial link 618. Link 618 occupies one of the digital highways implemented by digital cross-point matrix 616. Each service of DSP 615 occupies a single time slot. For example, DTMF receiver 1 occupies time slot 0 while conference bridge circuit 12 occupies time slot 31.

Digital cross-point matrix 616 is also coupled to bus 608 and operates to connect any voice path to any other voice path. Digital cross-point matrix 616 is a VLSI (Very Large Scale Integration) integrated circuit. An example of digital cross-point matrix 616 is manufactured by MITEL Semi-

8

conductor Corporation as part No. 8980. Digital cross-point matrix 616 communicates with microprocessor 601 via a memory mapped input/output (I/O) scheme. A command/control protocol is used for communication between microprocessor 601 and digital cross-point matrix 616 via bus 608. Cross-point matrix 616 is coupled by highway 618 to DSP 615. Cross-point matrix 616 is coupled to highway 617.

Digital cross-point matrix 616 is capable of making 256 simultaneous fully non-blocking connections. However, it may be upgraded by adding additional DSPs and/or cross-point matrices.

Gate array 612 is an SRAM (Static Random Access Memory) based device. An example of gate array 612 is manufactured by XILINX. Gate array 612 is responsible for generating all system timing. A master clock signal is provided by microprocessor 601 at 16.384 MHz. This clock signal is divided down to provide a number of phase coherent system clocks such as 4.096 MHz, 2.048 MHz and 8 KHz (frame sync). In addition, a 5-bit time slot counter is implemented which allows all the system CODECs to detect the appropriate time slot to use (0–31). An additional divider chain is included to divide the system clock down to 20 Hz, which is used by the ringing generator power supply (not shown).

Gate array 612 is downloaded at boot-up by system software. Gate array 612 is based on an SRAM architecture. That is, the internal fusible links commonly found in programmable logic are actually stored in volatile SRAM. Because of this architecture, gate array 612 is downloaded after power-up. Also, note the added flexibility of being able to modify the logic by simply loading new system software. Because the device is SRAM-based, it loses its programming when power is removed.

Bus 608 is also coupled to modem 610, which provides a capability of calling into system 401 on a remote basis to load additional programs, voice prompts, etc., or updates thereto, into hard disk 607. Modem 610 is coupled to coder/decoder ("CODEC") 611, which is coupled to highway 617. This connection allows coupling of modem 610 through cross-point matrix 616 to CO lines through bus 409 to the p-cards described with respect to FIG. 5.

Also coupled to highway 617 is dual subscriber line access chip (DSLAC) 619, which is well-known in the art, and which is coupled to analog ports 620 and 621, which provide an ability for system 401 to communicate to analog-type connections such as cordless telephones and fax machines.

Highway 617 is also coupled to CODEC 622, which is coupled to transformer 623 to a music source, which provides an ability to couple an external music source to a caller through cross-point matrix 616 for such things as providing the caller with music on hold.

Power to system 401 is provided through switching power supply 407, which converts AC to the various DC supply voltages needed by circuitry within system 401.

Referring next to FIG. 7, there is illustrated peripheral-card ("p-card") 405, which is coupled to main board 401. Main board 401 communicates with p-card 405 via system speech/control highways 411. This connection 411 is made to microcontroller 701 via digital crosspoint switch 705. P-card 405 provides interconnections between CO lines and analog phone lines to network card 402.

Microcontroller 701 controls all the real-time functions associated with p-card 405. When p-card 405 is plugged into backplane 404, a card address is assigned to p-card 405. This card address is read by microcontroller 701 and is used to filter commands over communication link 411. When net-

CISCO EXHIBIT 1001
Page 18 of 25

US 7,068,684 B1

9

work card software wants to communicate with the specific p-card 405, the address is sent in the message packet which all p-cards 405 receive. P-cards 405 match the address in the message to the hard-wired address on the ribbon cable 411. If a match is made, only that p-card 405 responds to the command set.

Microcontroller 701 contains an internal program memory (not shown) and is connected to an external DRAM 703. The internal program memory contains a bootstrap program which upon reset or power-up, requests a fresh firmware load from network card 402. This firmware load is transferred to DRAM 703. Upon download completion, the program is run from within DRAM 703. This scheme allows for microcontroller 701 firmware to be updated and loaded at any time.

Network card 402 sources all system timing through buffers 704. Timing signals to p-card 405 consists of a 2.048 MHz clock signal, an 8 KHz frame sync, which signifies the first time slot of a 32 time slot highway, and 5 time slot counter bits, which represent a binary count from 0 to 31.

As mentioned above, p-card 405 is assigned a card slot address when it is connected to network card 402. This card slot address is used to calculate which time slots p-card 405 should be using. The time slots used for the CO codecs 706 and analog phone codecs 707 are generated by buffers 704.

The loop start central office (CO) lines are supplied by the local telephone company and consist of a wet balanced differential audio pair. The term "wet" refers to the fact that a voltage of −48 volts is present on the pair. The system requests dial tone from the CO by providing a nominal 200 ohm loop across the TIP and RING conductors and releases the connection by opening the loop. The CO rings the system by placing a 90 vrms AC, 20 Hz sine wave on the TIP and RING conductors. The system seizes the line by going off hook.

Interfaces 708 incorporate a circuit that monitors the voltage present across TIP and RING of each CO. This line voltage monitor circuit serves to detect the ring voltage present during ringing (ring detection) and the unique feature of monitoring the CO line status for conditions such as whether the CO is plugged in or if someone is off hook in front of the system. The latter can be used to detect theft of service or allow a credit card verification terminal to be used without interfering with normal system operation.

The voltage monitor circuit consists of a balanced differential op-amp connected across TIP and RING of the CO lines through a very high impedance (>10M ohms). The output of the four voltage monitor op-amps are fed to an analog-to-digital converter with a built-in analog multiplexer (not shown). Microcontroller 701 firmware monitors the line voltages.

There is also a balanced differential AC coupled op amp across the CO TIP and RING to monitor the low level audio tones present during caller ID. The output of these op-amps are selected via an analog switch during the idle period and are connected to the CO line codec 706.

To correctly terminate the CO line (seizure) care must be taken to satisfy the DC loop requirements (~200 ohms) and the AC impedance requirements (~600 ohms). The classic approach has been to terminate TIP and RING with an inductor (called a holding coil) which has a large inductance (>1 Hy) and a DC resistance of ~200 ohms. The inductor separates the AC and DC components to give the desired effect. The problem is that the inductor must be large enough not to saturate with currents as high as 100 milliamps. An inductor which satisfies these requirements is physically cumbersome.

10

P-card 405 incorporates a solid state inductor circuit called a gyrator (not shown) to implement the holding coil function. This single transistor emulates an inductor with the above requirements while taking up very little PCB space.

A small solid state relay (not shown) is used as the hook switch. When energized, the gyrator holding coil is placed across TIP and RING closing the loop. The audio present on TIP and RING is AC coupled to a small dry transformer. The secondary of this transformer is connected to the AC termination impedance and to the codec 708, which may be implemented on a dual subscriber line access chip ("DSLAC").

High voltage protection is provided for all paths on the TIP and RING connections. These paths include TIP to RING, TIP to GROUND, RING to GROUND, and TIP and RING to GROUND. This high voltage protection is accomplished by first passing the TIP and RING conductors through positive temperature coefficient varistors (not shown). These varistors act as resettable fuses. When excessive current flows through these varistors, they become resistive thus limiting the current flow. When the excessive current is stopped, the original resistance is restored.

Referring to FIG. 8, there is illustrated a block diagram of further detail of IP telephony device 105. IP telephony device 105 may be a DSP based telephone instrument. Telephony device 105 communicates with the multimedia server 101 via the UDP/IP Protocol. PHYsical connection to the LAN is via an Ethernet 10/100 Base T interface. IP telephony device 105 contains the ability to perform layer-2 switching between two Ethernet ports in the telephony device for total control over voice versus data quality of service in accordance with the present invention. Speech samples are digitized, stored in 16 millisecond long packets and transmitted to the multimedia server 101 via the UDP/IP Protocol. As packets are received, they are triple-buffered to compensate for jitter before playback.

Connection 415 from workstation 106 is received by Ethernet RJ-45 connector 815, which is coupled to MAC/PHY device 813. Connection 414 between hub 103 and telephony device 105 is connected to RJ-45 connector 816 which is coupled to MAC/PHY device 814. Devices 813 and 814 are coupled by PCI bus 812 to FPGA/PCI bridge 802.

DSP 801 may be a Texas Instruments Model 5402 DSP; DSP 801 can be the only processor implemented within telephony device 105. DSP 801 performs typical DSP audio algorithms such as tone generation, gain, speaker phone algorithms, and energy detection. In addition, DSP 801 acts as a standard control processor performing such tasks as scanning the keyboard 807, lighting LED lamps 808, displaying LCD messages on LCD 810, performing UDP/IP stack functions, and communicating with devices 813, 814 via the PCI bus 812. Note that DSP 801 communicates with keyboard 807, LEDs 808, LCD display 810, and peripheral connection 811 by I/O device 809 in a typical manner. Peripheral connection 811 permits a coupling of DSP 801 to a DSS console. A DSS console is a stand-alone device, which connects to the IP telephony device 105 to provide 64 individual LED lamps and keys. The lamps can be programmed by the user to monitor the status of individual stations, trunks or features. Pressing the key will access the associated function. Each telephony device in the system can connect to a DSS console. The DSS console communicates with the IP telephony device 105 via a 9600 baud serial communication link. The IP telephony device 105 does not contain a serial UART device, so the serial data protocol is controlled by software running in DSP 801.

CISCO EXHIBIT 1001
Page 19 of 25

US 7,068,684 B1

11

Physical connection between the telephony device and DSS console may be via a standard two pair modular line cord.

DSP 801 is coupled to an external FLASH memory 803 and a fast SRAM 804, and FPGA 802 via buses 805 and 806.

CODEC 817 and CODEC 819 perform analog to digital and digital to analog conversion of speech signals. CODEC 817 is connected to the handsets, speaker and microphone elements (not shown) via connector 818, while CODEC 819 is connected to the hands-free speaker 821 through amplifier 820, and to the hands-free microphone 822. Separating the functionality in this way permits the IP telephony device 105 to send tones or voice to one speaker while allowing a normal conversation over the other.

FPGA/PCI bridge 802 performs the functions required to connect telephone 105 to the 10/100 Base T Ethernet devices 813, 814. Since devices 813, 814 are designed to communicate via a standard PCI bus 812, the FPGA 802 implements a minimal PCI bus implementation. In addition, the FPGA 802 implements I/O latches and buffers as required.

Devices 813, 814 perform the Media Access Control and the PHYsical layer functions. Devices 813, 814 communicate to DSP 801 via a standard PCI bus 812, and communicate to the LAN via post-transformer coupled RJ-45 connections 815, 816. Devices 813, 814 can contain FIFOs to minimize lost packets during traffic peaks. Per the PCI bus mastering specification, devices 813, 814 take control of the buses 805, 806 and direct memory access (DMA) data directly to SRAM 804. Conversely, DSP 801 writes data to be sent into the SRAM 804 and the devices 813, 814 DMA the data via the PCI bus 812 to the LAN.

Referring to FIG. 9, there is illustrated a station-to-station call to a remote cite. In step 901, a user 105 in Dallas 301 lifts the handset to place an intercom call to user 308 in Detroit 302. In step 902, user 105 dials an access code associated with site 302. These codes are currently three digits long and are in the range 700–799. User 105 then dials the extension number of user 308. In step 903, the IP series multimedia server 101 assigns one of the pooled, compressed voice channels used for voice communication between sites. In step 904, the IP series multimedia server 101 then checks a configuration database for the IP address associated with user 308. A control message is sent to multimedia server 306 via the TCP/IP space WAN 201, requesting the called party 308 to start ringing. Data contained in the control message includes the originator's caller ID. In step 905, the remote multimedia server 306 acknowledges the request and attempts to ring the called extension 308 in the same fashion that a local extension would (i.e., the remote station is now acting as though it was placing the call from the local site). In step 906, if the called party 308 does not answer, the call is handled by the normal call processing routines to re-route the call (in this case, the call is rerouted to voice mail).

Referring to FIG. 11, there is illustrated a process implemented within an IP telephony device, such as telephony device 105, which process can be run within DSP 801. The process detects network congestion and notifies the multimedia server 101 via a congestion message. The process begins in step 1101, and proceeds to step 1102 to determine whether the IP telephony device 105 is off the hook. If it is, the process proceeds to step 1103 where audio data packets are received by telephony device 105 from the hub 103. The audio (voice) data packets being received by telephony device 105 and some other telecommunications device coupled to the system. As these packets are received, they

12

are saved within the jitter buffer, which fills up to a certain level. After this level is reached, the audio packets will then be played by telephony device 105 to the user through the speaker 821 or handset 818. It is generally understood within the design of such IP telephony devices that when a packet is played to the user, it is replaced in the jitter buffer by an incoming packet. There is some cushion in the jitter buffer, but when the audio packets are not replaced sufficiently, then the ability of the IP telephony device to communicate the audio information to the user in real-time becomes jeopardized. This is described in further detail below. In step 1104, as these packets are run through a jitter buffer, a determination is made whether the number of packets buffered by the jitter buffer falls below a predetermined threshold, or level. If not, the process merely returns to step 1103. However, if level of packets buffered by the jitter buffer falls below the predetermined threshold, or level, in step 1104, the process will proceed to step 1105 to send a congestion message to multimedia server 101.

Note, the process of FIG. 11 is not limited to audio data, but can be utilized in any system where there is a need to increase the transfer rate of multimedia data between two network devices to overcome bursty transmissions of data in the network. Though the invention is helpful when there is a need to transmit the multimedia data in, or substantially in, real-time, the invention is applicable even when there is not a need for real-time transmissions.

Essentially, a data packet transmitting voice data contains 16 milliseconds (ms) of voice data. For there to be a real-time transmittal of voice communications no more than 16 ms can pass between received data packets. A jitter buffer is utilized to temporarily store received data packets. A jitter buffer generally will hold three data packets passing through the jitter buffer. Typically, up to a 48 ms delay is acceptable with audio communications before such a delay is discernable to the listener. The jitter buffer can be used to monitor whether the congestion on the network has increased to such an extent that unacceptable delays in the receipt of voice data packets is perceived. A jitter buffer will typically use a pointer that points to the buffer entry where the next data packet that is received is to be stored, while an out pointer points to the last jitter buffer. If the pointers become closer, this will indicate that congestion within the network is increasing. How close the pointers are can determine the predetermined threshold that is monitored in step 1104.

Referring next to FIGS. 12A and 12B, a flow diagram is illustrated that is implemented within multimedia server 101 upon receipt of a congestion message from any IP telephony device within the network. The process begins in step 1201, and proceeds to step 1202 to determine whether a congestion message has been received from any telephony device. If yes, the process proceeds to step 1203 to determine whether the multimedia server 101 is already in a quality of service (QOS) mode. If yes, the process will move forward to step 1206. If not, the process will proceed to step 1204 to switch to QOS mode. Thereafter, in step 1205, a signal will then be sent from multimedia server 101 to all (or only a selected group of) IP telephony devices within the network for such devices to begin a QOS algorithm using a Most Aggressive Mode. Such a QOS algorithm is further described below with respect to FIG. 10. Thereafter, in step 1206, a timer is started, or restarted if the timer has previously begun and is still running. In step 1207, a determination is made whether the timer has expired. If not, the process will proceed to step 1208 to determine whether another congestion message has been received from any IP telephony device. If not, the process merely returns to step 1207. However, if another

CISCO EXHIBIT 1001
Page 20 of 25

US 7,068,684 B1

13

congestion message has been received from an IP telephony device, the process will return to step **1206** to restart the timer.

If in step **1207**, the timer has expired, the process will proceed to step **1209**, where a determination is made whether the QOS mode is in the Most Aggressive Mode. If yes, the process will proceed to step **1211** to then send a signal to all (or a selected group of) IP telephony devices on the network to use a Least Aggressive Mode, which is further described below with respect to FIG. **10**. Thereafter, in step **1212**, the previously noted timer will be restarted and the process will return to step **1207**. If in step **1209**, the QOS mode is not in the Most Aggressive Mode, then in step **1210**, a signal will be sent to all IP telephony devices on the network to stop the QOS algorithm described below with respect to FIG. **10**. And the process will return to step **1202**.

Referring now to FIG. **10**, there is illustrated a process run within each of the IP telephony devices on the network when such devices receive one of the aforementioned QOS messages from the multimedia server **101**. The process begins in step **1001** and continues to step **1002** where a determination is made whether one of the aforementioned QOS mode signals has been received from the multimedia server **101**. If yes, the process proceeds to step **1003** to determine whether the signal that has been received is a signal indicating that the IP telephony device **105** should enter into a Most Aggressive Mode. If yes, the process will then proceed to step **1004** to throttle the workstation **106** using the Most Aggressive Mode. The process then returns to step **1002**. If in step **1003** it is determined that the signal received from the multimedia server **101** is not a Most Aggressive Mode signal, the process proceeds to step **1005** to determine if the signal received is a signal to the IP telephony device **105** to enter into a least aggressive mode. If yes, the process proceeds to step **1006** to throttle the workstation **106** using the Least Aggressive Mode. If in step **1005** the signal received from the multimedia server **101** is not either to enter into the Most Aggressive Mode or the Least Aggressive Mode, then a determination is made whether the signal received from the multimedia server **101** is to turn off the QOS Mode. If yes, then in step **1008**, the IP telephony device **105** discontinues throttling data to and from the workstation **106**.

Essentially, the process illustrated in FIG. **10** has the IP telephony device **105** beginning a hold-off procedure with the workstation **106**. The level of aggressiveness, whether it is the Most Aggressive Mode or the Least Aggressive Mode can be thought of as a duty cycle whereby the device blocks data from the workstation **106** for a percentage of the time.

The throttling can be performed using many different methods. One method would be for the telephony device **105** to flood the connection **415** to the workstation **106** with idle patterns (jabber). The various levels of flow control needed could be achieved by a jabber duty cycle. The Most Aggressive Mode may have an eighty percent duty cycle while the Least Aggressive Mode may have a twenty percent duty cycle. During the jabber process, communication between the workstation **106** and the server **104** is disrupted, allowing more bandwidth for the voice packets between the telephony device **105** and the multimedia server **101**.

"Jabbering" is a standard Ethernet process. In local area networking technology, to jabber is to continuously send random data (garbage). This locks up the network with the incessant transmission of the garbage. In an Ethernet network, any node can transmit at any time. If more than one node happens to transmit at the same time, both nodes will notice that a collision has occurred, hold off for some

14

amount of time, then re-transmit. If a collision is detected again, the process continues until the data is delivered. Jabbering is the process of flooding the network with collisions in such a way that no data can actually be transmitted due to the number of collisions. Since the connection between the IP telephony device **105** and workstation **106** is a separate network, the jabbering by the IP telephony device **105** merely stops data from flowing between the IP telephony device **105** and the workstation **106**. The network on the other side of the IP telephony device **105** is unaffected because it is in a different "collision domain."

The workstation **106** cannot then transmit data because the jabbering is present. Each side will try to send data to the other side, but every time they try, they will fail because of the jabbering. The source of the jabbering signal is not important. Jabbering can be explained in a hardware fashion as follows. When one and only one station is transmitting, the voltage on the wire is a certain voltage as specified by the IEEE 802.3 Specification. If two stations start to transmit, the voltage is double so any station listening is capable of detecting the collision. When the voltage goes to zero because the offenders are holding off, it is now safe to try again. Jabbering can be thought of as a station placing a static voltage level on the wire between the workstation **106** and the IP telephony device **105** sufficiently high as to be detected as a collision. Neither the IP telephone **105** or the workstation **106** will attempt to transmit to each other until this voltage level goes away.

The present invention permits the IP telephony device **105** from stopping the workstation **106** from sending data by causing so many collisions that none of the data can make it through. Essentially, data transmission between the IP telephony device **105** and the workstation **106** is frozen. The IP telephony device **105** will perform this jabbering process in bursts. When the collisions stop, the data the workstation **106** was trying to send will then be passed on to the network through the IP telephony device **105**. Also, if the IP telephony device **105** was trying to send something from the network to the workstation **106**, that side is frozen as well. These collision bursts are generally short enough that the protocol does not time out, but long enough to throttle the data flow. The duty cycle of the collision bursts may be proportional to the amount of data allowed to flow (i.e., if the duty cycle is 80/20, eighty percent of the time data is blocked).

A duty cycle may be used since jabbering cannot continue forever because the underlying protocols such as TCP/IP or NOVELL and the workstation **106** will eventually time out and give up on the data it is trying to send. The duty cycle allows data to flow often enough so that the effective throughput is reduced while allowing the protocols to survive. As an example, consider data flowing unobstructed between the workstation **106** and the network on the other side of the IP telephony device **105**. Multimedia transmissions are initiated which, in combination with the network data, starts to choke the network. The detection mechanism (monitoring circuitry) in the IP telephony devices **105** alerts the multimedia server **101** that the network is in trouble with respect to too much congestion to permit real-time multimedia communications to occur, or merely that the transfer rate of such communications has decreased unsatisfactorily. The multimedia server **101** messages to all of the IP telephony devices that they need to throttle-down the workstation data they are receiving using the most aggressive algorithm (e.g., using an 80/20 duty cycle where eighty percent of the time the devices are in the jabber state, and

CISCO EXHIBIT 1001
Page 21 of 25

US 7,068,684 B1

15

twenty percent of the time they are allowing data to flow). As the IP telephony devices stop reporting congestion, the multimedia server **101** may issue the next lower level or hold-off (e.g., a 50/50 duty cycle). The multimedia server **101** will continue until a point of equilibrium exists that allows the maximum data flow in the network along with the required multimedia traffic bandwidth.

As an alternative, jitter buffers with the multimedia server **101** may also monitor their level of receipt of multimedia data from individual IP telephony devices to determine whether a congestion message should be sent to the IP telephony devices to throttle down data through such devices from their respective workstations.

The present invention incorporates many other unique features. Essentially, the present invention is able to emulate one large, monolithic phone system. As such, features available at one particular site are available remotely to all sites. For example, the present invention can implement a direct station selection with busy indication feature providing an ability for a user at one IP telephone to see that another person in a remote system at another IP telephone is currently idle, busy, or in a do not disturb state. Another feature of the present invention is an ability to park a call in one system and page a user in a remote system to pick up the parked call. The remote user answers the call in the same manner they would a local call. Another feature capable within the present invention is an ability to transfer a call to a remote site, and if the call transferred to the remote site goes unanswered, the call will be returned to the originator. The present invention also provides for call forwarding between systems. For example, if a user is going to be in a remote site for some period of time, that user can forward his/her calls to that location.

Another feature available within the present invention is call rerouting. When a call goes unanswered, the system of the present invention allows the call to be rerouted to voicemail, another extension, etc. In a remote site implementation, these destinations do not have to be in the same physical system. In other words, a call into a local system where the caller has dialed an extension associated with a remote system, the local system will automatically reroute that call to the remote system.

Another unique feature of the present invention allows a user, such as a supervisor, to monitor the audio conversations of users on the system and current display information of another station. This can be done between remote systems so that the monitoring individual does not have to be in the same system as the user who is being monitored.

Yet another unique feature of the present invention permits automatic call distribution agents to be distributed among remote systems with all the feature functionality available to a single system.

Yet another unique feature of the present invention permits a user to answer a call in a remote site using the pick up feature. The present invention allows members of departments and live ringing groups to be located anywhere in the distributed system.

The present invention also increases the voicemail functionality of a telephone system. A virtual mail box key feature allows a user to monitor the status of a mail box in a remote system. If the key is lit, the user can press the key to retrieve messages stored in that mail box. Another feature is the quick group feature that allows a user to leave voicemail messages in a number of recipients' mail boxes by merely pressing their associated DSS key. The recipients can be in remote systems as well as the local system. Like the quick groups feature, a quick move feature allows a user to

16

move a copy of a voicemail message to a number of recipients by merely depressing their respective DSS keys on the user's telephone.

Another unique feature to the present invention permits a user to dial numbers stored in a series of lists. A user is permitted to scroll through a list of remote sites. When the user finds the desired site, the user is then presented with the same options a user local to that site would have. An example of this feature would allow a user in Los Angeles to locate the New York site, then call Bob Smith using a particular feature all without the need of an operator or printed directory.

Although the present invention and its advantages have been described in detail, it should be understood that various changes, substitutions and alterations can be made herein without departing from the spirit and scope of the invention as defined by the appended claims.

What is claimed is:

1. An information handling system comprising:

a hub;

a multimedia server coupled to the hub;

a telephony device coupled to the hub; and

a first network device coupled to the hub through the telephony device, wherein the telephony device includes circuitry for throttling data sent from the first network device, wherein the telephony device includes circuitry for monitoring an amount of data addressed to and received by the telephony device, wherein the throttling circuitry reduces a future amount of data from being transferred from the first network device if the amount of data addressed to and received by the telephony device falls below a predetermined threshold.

2. The system as recited in claim 1, wherein the monitoring circuitry comprises a jitter buffer where the predetermined threshold is a predetermined level within the jitter buffer.

3. The system as recited in claim 1, wherein the monitoring circuitry further comprises circuitry for sending a congestion message to the multimedia server when the amount of data addressed to and received by the telephony device falls below the predetermined threshold.

4. The system as recited in claim 3, wherein the multimedia server further comprises circuitry for sending a throttling signal to the telephony device in response to receipt of the congestion message from the monitoring circuitry.

5. The system as recited in claim 4, wherein the throttling circuitry in the telephony device throttles the future amount of data sent from the first network device in response to receipt of the throttling signal.

6. The system as recited in claim 5, wherein the throttling signal includes a mode level in which the throttling circuitry should operate.

7. The system as recited in claim 6, wherein the throttling circuitry adjusts its level of throttling of the data in response to the mode level included in the throttling signal.

8. The system as recited in claim 7, wherein the mode level is a most aggressive mode, wherein the throttling circuitry will throttle the future amount of data sent from the first network device at a highest level in response to the mode level being in the most aggressive mode.

9. The system as recited in claim 8, wherein the sending circuitry in the multimedia server will designate the mode level at the most aggressive mode as long as the congestion message is received from any telephony device coupled to the multimedia server within a specified time period.

10. The system as recited in claim 9, wherein the throttling signal will switch to a least aggressive mode if the

CISCO EXHIBIT 1001
Page 22 of 25

US 7,068,684 B1

17

congestion message is not received from any telephony device coupled to the multimedia server within the specified time period.

**11.** The system as recited in claim 10, wherein the throttling circuitry will throttle the future amount of data sent from the first network device at a level lower than the highest level in response to the mode level being in the least aggressive mode.

**12.** The system as recited in claim 11, wherein the throttling signal will contain a signal to stop the throttling of the future amount of data if the congestion message is not received from any telephony device coupled to the multimedia server within the specified time period while the mode level has been in the least aggressive mode.

**13.** The system as recited in claim 12, further comprising another telephony device coupled between the hub and a second network device, wherein the telephony device also includes throttling circuitry for throttling a future amount of data sent from the second network device in response to receipt of the throttling signal.

**14.** An information handling system comprising:

a TCP/IP network;

a hub;

a multimedia server coupled to the hub via the TCP/IP network;

a first IP telephony device coupled to the hub via the TCP/IP network;

a first network device coupled to the first IP telephony device;

a second network device coupled to the hub via the TCP/IP network, wherein data sent from the first network device is addressed for transmission to the second network device and is transmitted through the first IP telephony device to the TCP/IP network, wherein the first IP telephony device includes first circuitry for monitoring if an amount of multimedia data being addressed to the IP telephony device and received over the TCP/IP network falls below a first predetermined threshold, wherein the first IP telephony device includes first circuitry for throttling the data sent from the first network device in response to the first monitoring circuitry determining that the amount of multimedia data being received by the first IP telephony device over the TCP/IP network falls below the first predetermined threshold.

**15.** The system as recited in claim 14, further comprising:

a second IP telephony device coupled to the hub via the TCP/IP network; and

a third network device coupled to the second IP telephony device, wherein data sent from the third network device is addressed for transmission to the second network device and is transmitted through the second IP telephony device to the TCP/IP network,

wherein the second IP telephony device includes second circuitry for throttling the data sent from the third network device in response to the first monitoring circuitry determining that the amount of multimedia data being received by the first IP telephony device over the TCP/IP network falls below the first predetermined threshold.

**16.** The system as recited in claim 15, wherein the first monitoring circuitry further comprises first circuitry for sending a first congestion message to the multimedia server over the TCP/IP network when the amount of multimedia data being received by the first IP telephony device over the TCP/IP network falls below the first predetermined threshold.

18

**17.** The system as recited in claim 16, wherein the multimedia server further comprises circuitry for sending a throttling signal to the first and second IP telephony devices over the TCP/IP network in response to receipt of the first congestion message from the first monitoring circuitry.

**18.** The system as recited in claim 17, wherein the first throttling circuitry in the first IP telephony device throttles the data sent from the first network device in response to receipt of the throttling signal, wherein the second throttling circuitry in the second IP telephony device throttles the data sent from the third network device in response to receipt of the throttling signal.

**19.** The system as recited in claim 18, wherein the throttling signal includes a mode level in which the first and second throttling circuitries should operate.

**20.** The system as recited in claim 19, wherein the first throttling circuitry adjusts its level of throttling of the data in response to the mode level included in the throttling signal, wherein the second throttling circuitry adjusts its level of throttling of the data in response to the mode level included in the throttling signal.

**21.** The system as recited in claim 20, wherein the mode level is a most aggressive mode, wherein the first throttling circuitry will throttle the data sent from the first network device at a highest level in response to the mode level being in the most aggressive mode, wherein the second throttling circuitry will throttle the data sent from the third network device at a highest level in response to the mode level being in the most aggressive mode.

**22.** The system as recited in claim 21, wherein the second IP telephony device includes second circuitry for monitoring if a second amount of multimedia data being received by the second IP telephony device over the TCP/IP network falls below a second predetermined threshold, wherein the second monitoring circuitry further comprises second circuitry for sending a second congestion message to the multimedia server over the TCP/IP network when the second amount of multimedia data being received by the second IP telephony device over the TCP/IP network falls below the second predetermined threshold.

**23.** The system as recited in claim 22, wherein the sending circuitry in the multimedia server will designate the mode level at the most aggressive mode as long as the first or second congestion messages are received within a specified time period.

**24.** The system as recited in claim 23, wherein the throttling circuitry will throttle the data sent from the second network device at a level lower than the highest level in response to the mode level being in the least aggressive mode.

**25.** The system as recited in claim 24, wherein the multimedia data includes real-time audio information.

**26.** The system as recited in claim 22, wherein the throttling signal will switch to a least aggressive mode if the congestion message is not received from any IP telephony device coupled to the multimedia server within the specified time period.

**27.** The system as recited in claim 26, wherein the throttling signal will contain a signal to stop the throttling of the data if the congestion message is not received from any IP telephony device coupled to the multimedia server within the specified time period while the mode level has been in the least aggressive mode.

**28.** The system as recited in claim 14, wherein the data sent from the first network device is sufficiently throttled so

CISCO EXHIBIT 1001
Page 23 of 25

US 7,068,684 B1

19

that the first IP telephony device can communicate real-time signals to and from the multimedia server over the TCP/IP network.

**29.** In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of:

transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;

communicating audio information between the telephone and the multimedia server; and

sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server.

**30.** The method as recited in claim **29**, wherein the hub, multimedia server, data server, telephone, and workstation are coupled to each other via a network.

**31.** The method as recited in claim **30**, wherein the network is a TCP/IP network.

**32.** The method as recited in claim **30**, wherein the network is a packet switched network.

**33.** The method as recited in claim **30**, wherein the telephone and multimedia server communicate using an IP protocol.

**34.** The method as recited in claim **29**, wherein the monitoring step further comprises the step of monitoring a predetermined level within a jitter buffer.

**35.** The method as recited in claim **29**, wherein the throttling results in no data being sent from the workstation to the telephone.

**36.** In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of:

transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;

communicating audio information between the telephone and the multimedia server; and

sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold.

**37.** In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of:

transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;

communicating audio information between the telephone and the multimedia server; and

sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being

20

received by the telephone from the multimedia server, wherein the monitoring step further comprises the step of the telephone sending a congestion message to the multimedia server when the amount of the audio information falls below the predetermined level.

**38.** The method as recited in claim **37**, further comprising the step of the multimedia server sending a throttling signal to the telephone in response to receipt of the congestion message.

**39.** The method as recited in claim **38**, wherein the throttling step operates in response to receipt of the throttling signal.

**40.** The method as recited in claim **39**, wherein the throttling signal includes a mode level.

**41.** The method as recited in claim **40**, wherein the throttling step further comprises the step of adjusting a level of throttling of the data in response to the mode level included in the throttling signal.

**42.** The method as recited in claim **41**, wherein the step of the multimedia server sending a throttling signal to the telephone in response to receipt of the congestion message further comprises the step of setting the mode level to a most aggressive mode, wherein the throttling step will throttle the future amount of data sent from the workstation at a highest level in response to the mode level being in the most aggressive mode.

**43.** The method as recited in claim **42**, wherein the setting step will designate the mode level at the most aggressive mode as long as the congestion message is received from any telephone coupled to the multimedia server within a specified time period.

**44.** The method as recited in claim **43**, wherein the step of the multimedia server sending a throttling signal to the telephone in response to receipt of the congestion message further comprises the step of setting the mode level to a least aggressive mode if the congestion message is not received from any telephone coupled to the multimedia server within the specified time period.

**45.** The method as recited in claim **44**, wherein the throttling step will throttle the future amount of data sent from the workstation at a level lower than the highest level in response to the mode level being in the least aggressive mode.

**46.** The method as recited in claim **45**, wherein the step of the multimedia server sending a throttling signal to the telephone in response to receipt of the congestion message further comprises the step of sending a message to stop the throttling of the future amount of data if the congestion message is not received from any telephone coupled to the multimedia server within the specified time period while the mode level has been in the least aggressive mode.

**47.** An IP telephony device comprising:

an input data port for receiving data, wherein the data is addressed for transmission to a location other than the IP telephony device;

circuitry for communicating information to and from the IP telephony device;

circuitry for sufficiently throttling the data so that the communication of the information can be performed in real-time, wherein the IP telephony device communicates the information using an IP protocol, wherein the throttling circuitry further comprises circuitry for sending a congestion message from a data output port when the amount of the information being received by the IP telephony device falls below a predetermined level.

**48.** The IP telephony device as recited in claim **47**, wherein the throttling circuitry throttles the future amount of

CISCO EXHIBIT 1001
Page 24 of 25

US 7,068,684 B1

21

data received at the input data port in response to receipt of a throttling signal at the input data port, wherein the throttling signal is a function of the congestion message.

**49.** The IP telephony device as recited in claim **48**, wherein the throttling signal includes a mode level in which the throttling circuitry should operate.

**50.** The IP telephony device as recited in claim **49**, wherein the throttling circuitry adjusts its level of throttling of the data in response to the mode level included in the throttling signal.

**51.** The IP telephony device as recited in claim **50**, wherein when the mode level is a most aggressive mode, the throttling circuitry will throttle the future amount of data at a highest level in response to the mode level being in the most aggressive mode.

**52.** The IP telephony device as recited in claim **51**, wherein the throttling circuitry will throttle the future amount of data sent from the workstation at a level lower than the highest level in response to the mode level being in a least aggressive mode.

**53.** The IP telephony device as recited in claim **48**, further comprising:

a microphone;

a speaker; and

circuitry for communicating the audio information to the speaker and from the microphone.

**54.** A multimedia server comprising:

a network connection for connecting the multimedia server to a data network, wherein the network is a TCP/IP network;

circuitry operable for communicating audio information with a telephone connected to the data network;

circuitry operable for sending a throttling signal onto the data network in response to receipt of a congestion

22

message from the data network, wherein the throttling signal includes a mode level, wherein the sending circuitry will designate the mode level at a most aggressive mode as long as the congestion message is received within a specified time period.

**55.** The multimedia server as recited in claim **54**, wherein the network is a packet switched network.

**56.** The multimedia server as recited in claim **54**, wherein the communicating circuitry further comprises circuitry operable for communicating the audio information using an IP protocol.

**57.** The multimedia server as recited in claim **54**, wherein the throttling signal will switch to a least aggressive mode if the congestion message is not received within the specified time period.

**58.** The multimedia server as recited in claim **57**, wherein the throttling signal will contain a stop data throttling signal if the congestion message is not received within the specified time period while the mode level has been in the least aggressive mode.

**59.** The multimedia server as recited in claim **54**, further comprising:

a peripheral card adaptable for coupling to a telecommunications network.

**60.** The multimedia server as recited in claim **59**, wherein the telecommunications network is a public switched telephone network.

**61.** The multimedia server as recited in claim **59**, further comprising:

switching circuitry for communicating the audio information between the network connection and the peripheral card.

* * * * *

CISCO EXHIBIT 1001
Page 25 of 25

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,804 | 07/16/2021 | 7068684 | 3725700.00001 | 9925 |

26201        7590        09/17/2021
FISH & RICHARDSON P.C. (AU)
P.O BOX 1022
MINNEAPOLIS, MN 55440-1022

| EXAMINER |
|---|
| FOSTER, ROLAND G |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/17/2021 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

MICHAEL E. MARTIN
AKIN, GUMP, STRAUSS, HAUER & FELD L.L.P.
P.O. BOX 688
DALLAS, TX 75313-0688

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,804* .

PATENT UNDER REEXAMINATION *7068684* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

APPX0550

| *Order Granting Request For Ex Parte Reexamination* | Control No. 90/014,804 | | Patent Under Reexamination 7068684 | |
|---|---|---|---|---|
| | Examiner ROLAND G FOSTER | | Art Unit 3992 | AIA (FITF) Status No |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed 07/16/2021 has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:   a)☐   PTO-892,        b)☑   PTO/SB/08,    c)☑   Other: See the Decision.

1. ☑   The request for *ex parte* reexamination is GRANTED.

     RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

| /ROLAND G FOSTER/ Primary Examiner, Art Unit 3992 | | |
|---|---|---|

cc:Requester ( if third party requester )

U.S. Patent and Trademark Office
PTOL-471G(Rev. 01-13)        **Office Action in *Ex Parte* Reexamination**        Part of Paper No. 20210902

APPX0551

Application/Control Number: 90/014,804                                           Page 2
Art Unit: 3992

### DECISION GRANTING *EX PARTE* REEXAMINATION

A substantial new question of patentability (SNQ) is raised affecting claims 29-41 of US Patent

No. 7,068,684 B1 to Suder et al. (the "Suder" patent) by the request for *ex parte* reexamination filed July

16, 2021 (the "Request").

### *Prior Art Relied Upon in the Request*

The Request relies upon the following prior art to raise a SNQ as to claims 29-41 of the Suder

patent:

U.S. Patent Publication No. 2002/0071424 to Chiu et al. ("Chiu") (Exhibit 1006 to the Request).

U.S. Patent No. 5,313,454 to Bustini et al. ("Bustini") (Exhibit 1008 to the Request).

U.S. Patent No. 5,065,425 to Lecomte et al. ("Lecomte") (Exhibit 1007 to the Request).

U.S. Patent No. 6,515,963 to Bechtolsheim et al. ("Bechtolsheim") (Exhibit 1009 to the Request).

Request, 15.

### *Issues Raised in the Request*

Requester asserts that: (1) Chiu, alone or in combination with various secondary references,

raises a SNQ as to claims 20-41 of the Suder patent; and (2) Lecomte, alone or in combination with

various secondary references, raises a SNQ as to claims 29-41.  Request, 22-71.

Application/Control Number: 90/014,804                                                    Page 3
Art Unit: 3992

### *The SNQ Requirement*

A printed publication raises a SNQ where there is a substantial likelihood that a reasonable examiner would consider the printed publication important in deciding whether or not the claim is patentable, unless the same SNQ has already been decided as to the claim in a final holding of invalidity by the Federal court system or by the Office in a previous examination. MPEP § 2242.

It is not sufficient that a request for reexamination merely proposes one or more rejections of a patent claim or claims as a basis for reexamination. It must first be demonstrated that a patent or printed publication that is relied upon in a proposed rejection presents a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the patent for which reexamination is requested, and during the prosecution of any other prior proceeding involving the patent for which reexamination is requested. MPEP § 2216.

The substantial new question of patentability may be based on art previously considered by the Office if the reference is presented in a new light or a different way that escaped review during earlier examination. MPEP § 2216.

An earlier concluded examination or review of the patent, on which an SNQ is based, incudes the review of the patent in an earlier concluded trial by the Patent Trial and Appeal Board, such as a post-grant review, *inter partes* review, or covered business method review of the patent. MPEP 2242.I.

*Prosecution History of the Williams Patent*

The Suder patent issued on June 26, 2006 from U.S. Application No. 09/775,108 (the "Suder

'018" application), which was filed on February 1, 2001.

During prosecution of the Suder '018 application, dependent claims 43 and 44 (of subject claims

38-50 and 56) recited:

> Claim 43.  The method as recited in claim 38, wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold.

> Claim 44.  The method as recited in claim 38, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server.

> Amendment filed September 19, 2005.

Subject claims 38-50 and 56 were subsequently rejected.  See the Non-final Rejection, mailed

October 12, 2005, PTOL-326.  In this rejection, the Examiner stated:

> In claim 43, Chen does not disclose reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold. The Official Notice is taken that it is a well-known skill in the art such as data flow control to reduce a future amount of data from being transferred from a workstation if the amount of data exceeds a predetermined threshold in order to prevent data congestion.

> Id. at 4.

The Examiner also asserted claim 44 was disclosed by the prior art.

The Applicant responded by filing an Amendment on December 7, 2005. The Applicant asserted regarding the taking of Official Notice.

> Applicants respectfully traverse the Examiner's taking of Official Notice.
> . . . .
> Applicants respectfully assert that reducing a future amount of data from being transferred from a workstation if the amount of data exceeds a predetermined threshold is not capable of instant and unquestionable demonstration as being well known. It would not be appropriate for the examiner to take official notice of facts without citing a prior art reference where the facts asserted to be well-known are not capable of instant and unquestionable demonstration as being well-known. Jd. Thus, Applicants respectfully assert that the Examiner must cite a prior art reference in support of the Examiner's taking of Official Notice.

Amendment, December 7, 2005, 18.

The Applicant further asserted the prior art failed to teach claim 44. Id. at 19.

The Applicant also amended the claims consistent with the arguments set forth above. For example, the Applicant amended dependent claim 43 into independent form by expressly incorporating the limitations of all its respective parent claims. Id. at 10. The Applicant also introduced the following new limitation into the remaining independent claim 38 (of the subject claims) while cancelling dependent claim 44, which recited the same limitation:

> wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server.

Id. at 9.

In a Subsequent Notice of Allowance, mailed February 10, 2006, the Examiner subsequently withdrew the rejections of the subject claims 38-43 and 45-51 (claim 44 was cancelled as discussed

above) and allowed the claims without comment. Subject claims 38-43 and 45-51 subsequently issued

as claims 29-41 for which reexamination is now sought.

In view of the prosecution history above, the technological features recited in original,

dependent claims 43 and 44 are important to the patentability of issued claims 29-41 of the Suder

patent, for which reexamination is now sought.

### Technological Features Important to the Patentability of the Williams Patent

In view of the prosecution history described above, if a new reference or a reference applied in

a new light teaches one of the following technological features, then that reference (or combination

based on that reference) may raise a SNQ for those claims that recite one or more of the following

technological features in a communication system providing multiple user access:

(1) a throttling step that reduces a future amount of data from being transferred from a
workstation if the amount of data exceeds a predetermined threshold.

(2) a throttling step that monitors an amount of the audio information being received by a
telephone from a multimedia server.

### New Art

The prior art cited in the Request was not previously cited and is considered new prior art. See

also the Request, 2.

### Other Proceedings

The Patent and Trademark Trial Board denied institution of IPR Proceeding No. IPR2021-00331

on procedural reasons related to co-pending litigation. No substantive analysis regarding the

patentability over any prior art was performed by the Board. See also the Request, 4.

### The Proposed SNQ based on Chiu and Bustini

It is agreed that the combination of Chiu and Bustini, alone or in combination with the various, secondary teaching references, raises a SNQ of patentability as to claims 29-41 of the Suder patent.

As was discussed in the prosecution history above, the following features are technological features important to the patentability of all the independent claims for which reexamination is requested, specifically <u>any one of</u> the following technological features would be a feature important to patentability thereby raising a SNQ.

1) a throttling step that reduces a future amount of data from being transferred from a workstation if the amount of data exceeds a predetermined threshold.

(2) a throttling step that monitors an amount of the audio information being received by a telephone from a multimedia server.

Chiu, similarly to the Suder patent for which reexamination is requested, is directed to a server-based IP telephony system. Compare Fig. 1 of Suder to Fig. 1 of Chiu regarding the architectural (structural) similarities between the two disclosures.



Fig. 1 of Suder Patent for which Reexamination is Requested.



Fig. 1 of Chiu prior art.

Regarding the technological features important to patentability, as described above, it is first

noted that the Suder patent, for which reexamination requested, admits that "throttling can be

performed using many different methods." Col. 13, ll. 50-51. See also the Request, p. 31.

To this point, Chiu teaches the use of "collision avoidance mechanisms well known in the

network arts." ¶ 43. Request, 41. Bustini details one such collision avoidance mechanism in the form of

a "feedback control system for congestion prevention in a cell (packet) switching communication

network" that controls the "transmission rate of bursty traffic in the presence of high priority, voice . . .

." Abstract. See also the Request, 41, 42. Thus, Bustini teaches the technologically important feature

discussed above of throttling data (e.g., bursty data) (e.g., a file transfer) from a computer workstation

in favor of the higher priority voice data. See also the Request, 44. Such a throttling step would also

monitor the amount of audio information. See also the Request, 47. A substantial question thus exists

as to whether the teachings of Bustini would have been an obvious addition to Chiu in order to, for

example, improve the reliability of real-time communication in IP telephony systems such as Chiu. See

also the Request, 45.

Thus, the combination of Chiu in view of Bustini raises a SNQ as to whether the technological feature important to the patentability of the claims 29-41 of the Suder patent are indeed unpatentable.

See also the Request, particularly pages 40-52 and 68, which apply the combination of Chiu and Bustini alone or in view of various secondary teaching references in a detailed manner to each limitation of the claims for which reexamination is requested.

There was also no final holding of invalidity by the Federal Courts regarding the requested claims of the Suder patent. See the Request, pp. 2-5.

Thus, a reasonable examiner would view the new technological teachings of the combination of Chiu and Bustini alone or in view of additional secondary references, important in deciding to allow the claims being considered, thus raising a SNQ as to claims 29-41 of the Suder patent.


### The Proposed SNQ based on Chiu Alone

It is not agreed that the Chiu publication alone raises a SNQ of patentability as to claims 29-41 of the Suder patent.

As was discussed in the prosecution history above, the following features are technological features important to the patentability of all the independent claims for which reexamination is requested, specifically <u>any one of</u> the following technological features would be a feature important to patentability thereby raising a SNQ.


(1) a throttling step that reduces a future amount of data from being transferred from a workstation if the amount of data exceeds a predetermined threshold.

(2) a throttling step that monitors an amount of the audio information being received by a telephone from a multimedia server.

The Request however cited to no teachings in Chiu for the teaching of these technological

limitations. See, e.g., the Request, 32, 36. Thus, Chiu alone does not raise a SNQ of patentability as to

claims 29-41 of the Suder patent.


### The Proposed SNQ based on Lecomte and Bechtolsheim

It is not agreed that the combination of Lecomte and Bechtolsheim alone, or in view of various

secondary references, raises a SNQ of patentability as to claims 29-41 of the Suder patent.

As was discussed in the prosecution history above, the following features are technological

features important to the patentability of all the independent claims for which reexamination is

requested, specifically <u>any one of</u> the following technological features would be a feature important to

patentability thereby raising a SNQ.


(1) a throttling step that reduces a future amount of data from being transferred from a
workstation if the amount of data exceeds a predetermined threshold.

(2) a throttling step that monitors an amount of the audio information being received by a
telephone from a multimedia server.


Lecomte fails to teach any of these technological features. Request, 18, 53, 58, 63.

However, Bechtolsheim cannot be relied to teach these technological features to remedy

Lecomte because there is no substantial question as to whether Bechtolsheim would have been an

obvious addition to Lecomte. That is, the proposed combination of Lecomte and Bechtolsheim cannot

raise any SNQ of patentability because the propose combination as set forth in the Request would have

been unreasonable. For example, Lecomte is directed to an early <u>circuit</u>-switching technology: the

Integrated Services Digital Network (ISDN). Col. 2, ll. 44-65. In contrast, Bechtolsheim is related to

<u>packet</u>-switching technology. Col. 1, ll. 28-52. The Request provides no further explanation as to how

the packet-switching technologies of Bechtolsheim could have been adapted to the fundamentally

different circuit-switching technology in an obvious manner. In one example, the buffering teachings of

Bechtolsheim are germane to bursty packet-switching technology. Col. 1, l. 59 – col. 3, l. 54. In a circuit-

switching technology such as ISDN however, there little packet burstiness because a dedicated circuit

connection is established at a set data rate.


## Conclusion

### Service of Papers

After the filing of a request for reexamination by a third party requester (if any), a document

filed by either the patent owner or the third party requester (if any) must be served on the other party

(or parties where two or more third party requester proceedings are merged) in the reexamination

proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550(f).


### Extensions of Time

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because

the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination

proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be

conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in *ex parte* reexamination

proceedings are provided for in 37 CFR 1.550(c).


### Amendment in Reexamination Proceedings

Patent owner is notified that any proposed amendment to the specification and/or claims in this

reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally presented pursuant

to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR 1.20(c).

### *Submissions*

In order to ensure full consideration of any amendments, affidavits or declarations or other documents as evidence of patentability, such documents must be submitted in response to the <u>first Office action on the merits</u> (which does not result in a close of prosecution). Submissions after the second Office action on the merits, which is intended to be a final action, will be governed by the requirements of 37 CFR 1.116, after final rejection and by 37 CFR 41.33 after appeal, which will be strictly enforced.

### *Notification of Concurrent Proceedings*

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving the Suder patent throughout the course of this reexamination proceeding. The third party requester (if any) is also reminded of the ability to similarly appraise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

**All** correspondence relating to this *ex parte* reexamination proceeding should be directed as follows:

By EFS:        Registered users may submit via the electronic filing system EFS-Web, at
               https://efs.uspto.gov/efile/myportal/efs-registered

By Mail to:    Mail Stop *Ex Parte* Reexam
               Central Reexamination Unit
               Commissioner for Patents
               P.O. Box 1450
               Alexandria, VA 22313-1450

By FAX to:     (571) 273-9900
               Central Reexamination Unit

By hand to:    Customer Service Window
               Randolph Building
               401 Dulany St.
               Alexandria, VA 22314

For EFS-Web transmission, 37 CFR 1.8(a)(1)(i) (C) and (ii) states that correspondence (except for a request for reexamination and a corrected or replacement request for reexamination) will be considered timely if (a) it is transmitted via the Office's electronic filing system in accordance with 37 CFR 1.6(a)(4), and (b) includes a certificate of transmission for each piece of correspondence stating the date of transmission, which is prior to the expiration of the set period of time in the Office action.

Any inquiry concerning this communication should be directed to Roland Foster at telephone number 571-272-7538.

Signed:


/ROLAND G FOSTER/
Primary Examiner, Art Unit 3992


Conferee: /DAVID E ENGLAND/
          Primary Examiner, Art Unit 3992

/M.F/
Supervisory Patent Examiner, Art Unit 3992

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,804 | 07/16/2021 | 7068684 | 3725700.00001 | 9925 |

183824     7590     11/21/2022
Williams Simons & Landis PLLC/Estech
The Littlefield Building
601 Congress Ave, Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| FOSTER, ROLAND G |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/21/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

NOLAN R. HUBBARD
K & L GATES LLP-CHICAGO
P.O. BOX 1135
CHICAGO, IL 60690

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,804* .

PATENT UNDER REEXAMINATION *7068684* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.


### *Background*

Claims 29-41 of US Patent No. 7,068,684 B1 to Suder et al. (the "Suder" patent) are currently under reexamination in this *ex parte* reexamination proceeding 90/014,804.

The subject claims are rejected below based on prior art held to raise a Substantial New Question ("SNQ") of patentability in the Order granting *ex parte* reexamination, mailed September 17, 2021 (hereinafter the "Order") in response to the request for *ex parte* reexamination filed July 16, 2021 (the "Request").

> *U.S. Patent Publication No. 2002/0071424 to Chiu et al. ("Chiu") (Exhibit 1006 to the Request).*
>
> *U.S. Patent No. 5,313,454 to Bustini et al. ("Bustini") (Exhibit 1008 to the Request).*

Request, 15.

The Patent Owner filed a Patent Owner's Statement in Response to the Order on November 17, 2021, which has been considered by the Examiner.

The Patent Owner responded with a petition to vacate the proceedings, filed October 29, 2021, which was dismissed in the Decision, mailed August 1, 2022.

The first Office action was mailed July 22, 2022 rejecting all pending claims.

The Patent Owner responded with a Request for Reconsideration filed September 27, 2022 asserting the pending claims distinguished over the applied, prior art of record (hereinafter the "Response").

The Response has been considered by the Examiner, but for the reasons explained below, the rejections are repeated herein and this Office action is made FINAL.

### *Claim Rejections - 35 USC § 103*

In the event the determination of the status of the application as subject to AIA 35 U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the statutory basis for the rejection will not be considered a new ground of rejection if the prior art relied upon, and the rationale supporting the rejection, would be the same under either status.

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

This application currently names joint inventors. In considering patentability of the claims under pre-AIA 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of pre-AIA 35 U.S.C. 103(c) and potential pre-AIA 35 U.S.C. 102(e), (f) or (g) prior art under pre-AIA 35 U.S.C. 103(a).

Claims 29-41 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over U.S. Patent Publication No. 2002/0071424 to Chiu et al. ("Chiu") in view of U.S. Patent No. 5,313,454 to Bustini et al. ("Bustini").

Regarding claim 29, and as an initial matter, Chiu (similarly to the instant Suder patent under

reexamination) is directed to a server-based IP telephony system.  Compare Fig. 1 of Suder to Fig. 1 of

Chiu regarding the architectural (structural) similarities between the two disclosures.



Fig. 1 of Suder Patent for which Reexamination is Requested.



Fig. 1 of Chiu prior art.

Regarding independent claim 29,

*In an information handling system comprising a hub, a multimedia server ("multimedia server")
coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through
the telephone, and a data server coupled to the hub,*

Figure 1 of Chiu (as annotated below) depicts a system implementing IP telephony.  See also ¶

17.  Software Internet telephony requires multimedia computing resources on both the originating and

destination points in order to establish and maintain a call.  ¶ 4.  Thus, all originating and destination

points, which are processor-based devices executing software, illustrated in Fig.  1 are multimedia

devices.



FIG. 1

Fig. 1 further illustrates telephony device 100 (annotated below) (the recited "hub") connected

to network 130 (annotated below).   See also ¶12.   The instant Suder patent under reexamination

describes the claimed hub as a multi-port device used to connect, or network, multiple devices together.

4:1-12.  Similarly, Chiu discloses that telephony device 100 connects multiple devices together via IP

telephony calls.  Fig. 1 and ¶¶ 26, 29.  A person of ordinary skill  in the art would, therefore, understand

that the interaction between hub 100 and network 130, which can comprise a LAN/WAN or the Internet,

would include a hub that connects the claimed devices together to allow for the transfer of packets from one device to another. Chiu also describes PSTN gateway 140, which a person of ordinary skill in the art would understand to also be an example of the claimed hub. ¶ 28.

Chiu uses the term "coupled" to describe the connection of these components, rendering obvious the connections under whatever construction is attributed to the word "coupled." Further, like the instant Suder patent under reexamination, Chiu is silent with regard to any wireless connection such that it implies its disclosures are limited to wired connections.

As discussed above, all originating and destination points illustrated in Figure 1 are multimedia devices. Thus, this server corresponds to the claimed multimedia server. Figure 1 depicts a second computer 170, also connected to the network. A person of ordinary skill in the art would understand network 130, which Chiu describes as the Internet (¶ 26), would include a variety of known servers taking different forms, such that a traditional "web server" would be an example of the claimed data server as it would be capable of receiving and sending data packets to computer 100 via the network. This is confirmed because the network 130 illustrated above connects to a PSTN, which is a public network. A person of ordinary skill in the art also understand that network 130, which Chiu describes as the Internet (¶ 26), would include servers, including data servers for handling information transmitted throughout network 130, for example, point-to-point internet protocol servers between the IP (internet protocol) telephony peripheral and the PSTN gateway.

Chiu clearly illustrates telephone 160 coupled to the hub (IP telephony peripheral 100 or PSTN Gateway 140) via network 130 (Internet). Fig. 1. Chiu further clearly discloses computer 200 and computer 170 (workstations) couple to said hubs via the Internet.

*a method comprising the steps of: transferring data from the workstation to the telephone,*
*wherein the data sent from the workstation is addressed for transmission to the data server;*

Chiu describes, and indeed claims, network transport for coupling the computer to the network,

via the phone. Claim 12. Chiu further states that the phone's physical transport 430 may pass through

data from the computer to the network. ¶43.

A person of ordinary skill would understand that the computer data (as shown in the annotated

Fig. 1 below) of Chiu transported to and from said computer 200 (annotated) through IP telephone

device 100 would be addressed, as it is IP data; IP is an addressed point-to-point protocol. (¶¶38, 44).

One such available destination to which the data would be addressed would be to a data server on the

network 130 (Internet), such as the other computer 170, another web server, or any other point-to-

point IP server on the internet.



FIG. 1

*communicating audio information between the telephone and the multimedia server;*

Chiu states that phone 100 would be an IP telephone having a predetermined IP address. ¶ 9. Ip telephony phone 100 is used for sending and receiving audio information.

Chiu also teaches that the phone server acts as an intermediary between devices that transmits digital audio information in different formats. ¶411. For example, a phone with an OSI level 3 controller may receive data from a phone sending packets in OSI level 4 that contain "control information which it cannot process internally." ¶10. See also Fig. 1 Thus, the phone server acts as a control, receipt and response intermediary that is transparent to the destination telephony device. ¶ 11.

*and sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server.*

As an initial matter the Suder patent, for which reexamination requested, admits that "throttling can be performed using many different methods." Col. 13, ll. 50-51. See also the Request, p. 31.

To this point, Chiu teaches the use of "collision avoidance mechanisms well known in the network arts." ¶ 43.

Bustini teaches monitoring an amount of the audio information being received by the telephone from the multimedia server. Specifically, Bustini details one such collision avoidance mechanism in the form of a "feedback control system for congestion prevention in a cell (packet) switching communication network" that controls the "transmission rate of bursty traffic in the presence of high priority, voice . . . ." Abstract. See also the Request, 41, 42. Thus, Bustini teaches throttling data (e.g., bursty data) (e.g., a file transfer) from a computer workstation in favor of the higher priority voice data.

Specifically, Bustini describes six types of data network traffic sent throughout a network, which are prioritized in accordance with their respective delivery sensitivities. 1:32-54. Bustini teaches that real-time communications such as full-period voice signals require high integrity throughput because such packets are sensitive to both delay and data loss. 7:66-8:1. On the other hand, "data traffic, such as file transfers, is relatively insensitive to delay but is data loss sensitive." 1:58-60. Bustini notes that this "bursty traffic and multicast traffic [is] relatively delay insensitive," such that there is little concern for when the data ultimately arrives, as long as it arrives. 8:12-14. Bustini monitors the audio information network traffic and specifically throttles the bursty data (e.g. a file transfer from a computer workstation) in favor of the higher priority audio information as "[c]ongestion control is accomplished by controlling the transmission rate of bursty traffic in the presence of high priority, voice, low speed statistical, high speed deterministic and multicast data." Abstract, 1:61-68. Thus, Bustini monitors an amount of audio data being received in order to assign it higher priority as discussed above. As a result, the audio data rate is increased over what the audio data rate would have been in the presence of congested, bursty traffic. See also Bustini, Fig. 16, col. 4, ll. 47-67 and col. 23, l. 48-col. 24, l. 60 and particularly Fig. 16, step 508, rate increase ("yes") and col. 24, ll. 6-14.

Further, Chiu notes that its teachings are applicable to asynchronous transfer mode ("ATM") (¶ 42, as is Bustini (4:17-32, 11:2).

The teaching/suggestion/motivation for adding the teachings of Bustini would have been as follows. A person of ordinary skill in the art would understand that the Bustini-type algorithm would readily function in the system of Chiu. A person of ordinary skill would easily program the algorithm disclosed by Bustini into the circuitry disclosed by Chiu including, for example, the media access controller which would employ such an algorithm "well known in the networking arts" with expected results. ¶ 4. This would improve the reliability of real-time communication in VoIP systems where data was also being transmitted in addition to voice, such as that of Chiu. As Bustini's algorithm is

bidirectional (9:15, 9:58-10:2), its implementation within the IP telephone of Chiu would be able to

monitor data coming to the telephone from the multimedia server as well as throttle data coming from

the workstation to the telephone and vice versa.

Thus, to one of ordinary skill in the art at the time the invention was made, it would have been

obvious to add the data prioritization mechanisms of Bustini as discussed above to the IP telephony

system of Chiu.


Regarding independent **claim 36**, see the claim 29 rejection for additional details regarding the

information handling system taught by Chiu in view of Bustini.

Claim 36 further recites:

*sufficiently throttling the data sent from the workstation to the telephone to increase a rate of
transfer of the audio information during the communicating step, wherein the throttling step
further comprises the step of reducing a future amount of data from being transferred from the
workstation if the amount of data exceeds a predetermined threshold.*


Regarding the data prioritization mechanisms obviously added to Chiu as discussed in the claim

29 rejection above, Bustini further teaches that reducing a future amount of data if the amount of data

being transferred from the workstation if the amount of data exceeds a predetermined threshold.

Specifically, Bustini describes an algorithm utilizing a token system. 2:60-3:4. In this system,

information (in the form of colored tokens) is communicated along with the packets to ensure, when

needed, the right types of packets are limited. 2:60-3:4. The algorithm monitors a queue length of data

to be transmitted in which "green packets are protected and passed along while red packets are

discarded upon arrival whenever the chosen metric (usually queue lengths) for congestion threshold is

exceeded." 3:1-4. This queue length triggers the feedback control that Bustini notes "regulates the rate

of bursty data transmission" over the network in accordance with the feedback control. Abstract.

A person of ordinary skill in the art would understand that queue management reduces a future amount of data from being transferred from a node if the amount of data within that node exceeds a predetermined threshold. The rate of transfer of the green packets (e.g. audio information) would thereby be increased with priority access to network bandwidth.

Bustini describes other algorithms that also render obvious this element. 3:8-46. For example, it describes invoking certain collision avoidance mechanisms when a monitored queue length in a buffer exceeds a prescribed threshold using congestion indicator bits to trigger the discarding of cells when congestion occurs. 11:35-44.

The teaching/suggestion/motivation for adding the teachings of Bustini would have been as follows. A person of ordinary skill in the art would understand the combination of Chiu and Bustini renders this element obvious for the same reasons discussed in the clam 29 rejection above. Moreover, as discussed, the consistency, rate and reliability of the data communications would have been increased because queue length triggers the feedback control that "regulates the rate of bursty data transmission" (Bustini, Abstract) and increases the data transfer rate of high priority traffic.

Thus, to one of ordinary skill in the art at the time the invention was made, it would have been obvious to add the data prioritization mechanisms of Bustini as discussed above to the IP telephony system of Chiu.

Regarding independent **claim 37**, see the claim 29 rejection for additional details regarding the information handling system taught by Chiu in view of Bustini.

Claim 37 further recites:

*wherein the monitoring step further comprises the step of the telephone sending a congestion message to the multimedia server when the amount of the audio information falls below the predetermined level*

Bustini further describes setting minimum bandwidth assignments for certain classes of data. 19:15-16, 19:64-68. Bustini teaches monitoring an amount of audio information and prioritizing that information if it falls below a selectable minimum bandwidth (i.e. a predetermined level).

Bustini states that "a reactive (feedback) control method that combines cell tagging with explicit congestion notification (ECN)" was a known way of managing transmissions. 4:17-32. These ECNs may be transmitted to a variety of destinations, including a target component or target node. 4:17-32. ECNs may be triggered if a threshold is exceeded. 4:22-30. The switches of Bustini operate at one of two preset thresholds using these ECNs. 4:25-28.

The teaching/suggestion/motivation for adding the teachings of Bustini would have been as follows.  A person of ordinary skill in the art would understand the combination of Chiu and Bustini renders this element obvious for the same reasons discussed in the clam 29 rejection above.  Moreover, a person of ordinary skill in the art would understand that the transition between thresholds would be triggered by the level of packets buffered in a queue in a given switch. 5:33-35. When necessary, a lower threshold is used (and therefore more throttling needed) a corresponding ECN is sent, when a higher threshold is sufficient (and less throttling needed) a different corresponding ECN would be sent. Thus, the reliability and consistency of the data transfer rate would have been increased.

Thus, to one of ordinary skill in the art at the time the invention was made, it would have been obvious to add the data prioritization mechanisms of Bustini as discussed above to the IP telephony system of Chiu.

Regarding **claim 30**, see the claim 29 rejection above.

Regarding **claims 30-34**, see the claim 29 rejection above for additional details.  Both Chiu and Bustini clearly teach that devices are connected via a network. For example, see Chiu, Fig. 1 and Bustini,

6:18-19. Bustini teaches a packet switching network. 1:12-15. Bustini teaches that lower-priority data

packets (e.g. those of the "bursty" type), are frozen out or halted altogether when the network

encounters periods of high data traffic. 18:52-57.


Regarding **claim 38**, Bustini teaches to an example of "prior art feedback control" known as "a

window control method" whereas "[t]he window control method indirectly controls the effective

network data rate by having the user adjust the window duration controlling the number of contiguous

packets that can be transmitted at a given time." 3:8-17. These packets transmitted by a source node

(e.g. IP telephone device) are equipped with a congestion information bit that is set in high congestion

conditions. 3:31-34. A remote destination server (e.g. multimedia server) receives the packets, and

counts the number of set congestion bits. 3:38-46. If the congestion bits indicate a high congestion

condition over the network, the server uses feedback mechanism to send a throttle signal to the source

node. Upon receipt of the signal, the source node reduces the window size from its current value

thereby reducing the effective network data rate. 3:38-46.

The teaching/suggestion/motivation for adding the teachings of Bustini would have been as

follows. A person of ordinary skill in the art would understand the combination of Chiu and Bustini

renders this element obvious for the same reasons discussed in the clam 29 rejection above. Moreover,

if the congestion bits indicate a high congestion condition over the network, the server uses feedback

mechanism to send a throttle signal to the source node. Upon receipt of the signal, the source node

reduces the window size from its current value thereby reducing the effective network data rate. 3:38-

46. Thus, the reliability and consistency of the data transfer rate during periods of congestion would

have been increased.

Thus, to one of ordinary skill in the art at the time the invention was made, it would have been obvious to add the data prioritization mechanisms of Bustini as discussed above to the IP telephony system of Chiu.

Regarding **claim 39**, Bustini teaches a "prior art feedback control method" known as a "window control method." In the final step of this feedback mechanism, "[t]he user transport entity updates the window size based on the number of packet congestion bits set during the last transmission window used. If at least 50% of the bits are set, the window size is reduced from its current value." 3:38-46. Reducing the window size is a way to throttle "the effective network data rate by having the user adjust the window duration controlling the number of contiguous packets that can be transmitted at a given time." 3:8-17.

The teaching/suggestion/motivation for adding the teachings of Bustini would have been as follows.   A person of ordinary skill in the art would understand the combination of Chiu and Bustini renders this element obvious for the same reasons discussed in the clam 29 rejection above.  Moreover, reducing the window size is a way to throttle "the effective network data rate by having the user adjust the window duration controlling the number of contiguous packets that can be transmitted at a given time." 3:8-17.  Thus, the reliability and consistency of the data transfer rate during periods of congestion would have been increased.

Thus, to one of ordinary skill in the art at the time the invention was made, it would have been obvious to add the data prioritization mechanisms of Bustini as discussed above to the IP telephony system of Chiu.

Regarding **claims 40 and 41**, Bustini further teaches that the feedback control (as added in the parent claim rejection) can include mode levels to throttle the data transmission at different rates,

moderate rate decrease, and large rate decrease.  13:28-41, 12:57-66.  A "two-bit coded message

embedded in the cell header (octet 3, bits 2 and 3) of return traffic is used to encode a four state rate

message: increase, decrease, large decrease and no-change. In response to the rate control message,

controller 811 increases the rate by linear additive increments (typically 1/10 of MIR [minimum

information rate"]) and incrementally decreases the rate by a multiplicative factor of 7/8 or '%2, the

latter being used when cell loss in conjunction with congestion is detected by the destination FRP 59."

12:57-66. The throttling rate is dynamically decreased by different amounts (e.g., large decrease or

increase) depending on the state of packet transmission at that time.

The teaching/suggestion/motivation for adding the teachings of Bustini would have been as

follows.   A person of ordinary skill in the art would understand the combination of Chiu and Bustini

renders this element obvious for the same reasons discussed in the clam 29 rejection above.   Moreover,

throttling modes with variable data rates would have increased the versatility of the throttling

mechanism added in the parent rejection by responding to different levels of congestion with more

granular data rate decrease or increases.

### Response to Arguments

On page 3 of the Response, the Patent Owner asserts (original emphasis maintained):

An IP Telephone <u>Peripheral</u> 100 is not a telephone.

The Examiner disagrees.  As noted by the Patent Owner, Chiu explicitly discloses an IP

<u>Telephone</u> Peripheral 100, which the Examiner will not disregard.  A telephone peripheral is a species of

the genus telephone.  Moreover, Chiu discloses that the IP Telephone Peripheral 100 performs typical

telephonic functions.  ¶¶26, 29, 34.  The Examiner declines to read claimed limitations regarding the

particulars of a specific type of telephone in order to read the "telephone" out of Chiu's explicitly

disclosed telephone.

The Patent Owner repeatedly asserts that Chiu discloses "a workstation coupled to the hub

through the telephone" as required by the preamble (Response, 5-9), however for the reasons above,

Chiu discloses a telephone.  That is, the disclosed "IP Telephone Peripheral 100" is a telephone.

On page 10 of the Response, the Patent Owner asserts Bustini fails to disclose "throttling the

data . . . to increase a rate of transfer of the audio information" because the congestion control

algorithms of Bustini would have only hypothetically increased the audio data rate.

However, Bustini teaches regarding congestion:

During periods of network traffic <u>congestion</u>, <u>when</u> network <u>traffic</u> demands <u>exceeds the
network's bandwidth</u> capacity, servicing algorithms are typically employed to discriminate
between traffic classes in order to allocate bandwidth.

1:64-68 (emphasis added).

There is nothing hypothetical about Bustini's explicit teachings.  As Bustini notes, when

congestion occurs, traffic exceeds the network's bandwidth.  When traffic exceeds available bandwidth

without the benefit of any congestion control algorithms, the data transfer rate of that traffic cannot be

increased from the available bandwidth of the network to the required bandwidth of the traffic.  If audio

information is being transmitted as part of overall traffic being transmitted at the available network data

rate without the benefit of any congestion control algorithms, the audio bandwidth cannot be increased

any further because that act alone would push the overall network traffic rate over the available traffic

rate.  Bustini's congestion control algorithms, which generally throttle lower priority data types

(decrease the data rate of lower priority data types) in order to increase the  data rate of higher priority

data types, such that the available network traffic rate is not exceeded.  That is the reason for

congestion control based on the priority of data classes.  Otherwise, there would be no point for

Bustini's class-based congestion control algorithms.  Whether the decreased (throttled) data makes way

for more audio data to be transmitted on a single channel or more audio data to be transmitted on

additional channels, the end result is the same:  throttling lower priority data to increase the rate of

transfer of higher priority audio information without exceeding the network's bandwidth.

See also Bustini Fig. 6, which illustrates that overall bandwidth goes down to zero (including audio information) during increased congestion (region III) without congestion control.



Thus, Bustini's congestion control throttles teaches the recited "throttling the data . . . to increase a rate of transfer of the audio information," for example, by throttling lower priority data in order to increase the rate of overall bandwidth (including audio information) from zero.

On page 12 of the Response, the Patent Owner asserts Fig. 16 of Bustini teaches only increased or decreasing the rate of lower priority, bursty traffic.

However, as discussed above, Bustini's congestion control algorithm to throttle lower priority data (such as bursty traffic) increases the rate of overall bandwidth (including audio information) from zero during severe congestion.

On page 13 of the Response, the Patent Owner asserts Bustini's algorithm enables the network node to throttle data from the network node, not to the network node.

However, data flows from the source to the destination, thus the data is throttled both from the source and to the destination.

On page 14 of the Response, the Patent Owner asserts Bustini pertains monitoring different classes of data, not identifying difference sources of data.

However, the claims do not recite identifying the particular source of data (e.g., identifying the source as a multimedia server).  Arguments directed to unclaimed features are unpersuasive.

On page 15 of the Response, the Patent Owner asserts that in Bustini, the "length of the buffer queue (i.e., the amount of data in the buffer queue) at any given time does not necessarily reflect the amount of data received by the network node."

However, the claims do not recite necessarily reflecting the amount of data received by the network node.  Arguments directed to unclaimed features are unpersuasive.

On page 17 of the Response, the Patent Owner asserts the claim 35 analysis is missing, but this claim is broadly recited and clearly disclosed by the combination of Chiu in view of Bustini.  Clearly, no data would be sent while Chiu in view of Bustini throttles (buffers) the data, as discussed extensively in the claim 1 rejection. The claims broadly fail to recite any specific period of time when the data is not sent.

On page 20 of the Response, the Patent Owner asserts Bustini's "'green packets' and 'red packets' come from the same 'bursty data source.' Bustini, 2:27-3:7."

However, the cited portion of Bustini does not disclose the green packets and red packets come from the same source.  Rather, Bustini's teaching that the green tokens "fall within the minimum guaranteed bandwidth protocol" suggests they belong to a high priority class of data, such as voice. Bustini is wholly directed to congestion control for difference priorities of data, such as voice versus data. 1:34-51. Even if Bustini did teach that the green and red packets came from the same source, which it does not, it would not be dispositive.  A single source would be expected to generate different types of traffic, such as the computer source disclosed by Chiu (voice via IP telephony and data).

The Patent Owner's remarks on page 23 that throttling data by reducing the data rate of non-priority data (e.g., bursty data) even to the point of <u>discarding</u> those packets does not result in "reducing a future amount of data from being transferred from the workstation" is unpersuasive. Moreover, and as already noted above, congestion control to limit traffic exceeding an available, network bandwidth to the available bandwidth results generally in reducing the future amount of data transferred that originally exceeded the available, network bandwidth.

On page 24 of the Response, the Patent Owner asserts Bustini at 11:35-44 does not teach using congestion indicator bits to trigger the discarding of cells when congestion occurs.

However, Bustini teaches at this cited portion regarding the TXR 56 unit that monitors queue length and marks the c-bit to indicate congestion:

This same TXR 56 unit also performs a traffic control function including the <u>discarding</u> of cells when congestion conditions require.

Bustini, 11:42-44 (emphasis added).

On page 28 of the Response, the Patent Owner asserts that Bustini fails to disclose a throttle signal in response to a congestion message because "Bustini's alleged 'throttle signal" and the 'ECD' belong to two different journal articles discussed in the background section of Bustini."

However, the Examiner cites to the background teachings of Bustini as to what it teaches to a person of ordinary skill in the art for the purposes of an obviousness analysis. The Examiner did not cite to any journal articles.

The remaining Patent Owner arguments have already been considered above (particularly asserting Bustini's congestion control does not increase the data audio rate) or are conclusory.

<div align="center">Conclusion</div>

**THIS ACTION IS MADE FINAL.**

A shortened statutory period for response to this action is set to expire 2 months from the mailing date of this action.

**Extensions of time under 37 CFR 1.136(a) do not apply in reexamination proceedings.** The provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Further, in 35 U.S.C. 305 and in 37 CFR 1.550(a), it is required that reexamination proceedings "will be conducted with special dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37 CFR 1.550(c).** A request for extension of time must specify the requested period of extension and it must be accompanied by the petition fee set forth in 37 CFR 1.17(g). Any request for an extension in a third party requested ex parte reexamination must be filed on or before the day on which action by the patent owner is due, and the mere filing of a request will not effect any extension of time. A request for an extension of time in a third party requested ex parte reexamination will be granted only for sufficient cause, and for a reasonable time specified. Any request for extension in a patent owner requested ex parte reexamination (including reexamination ordered under 35 U.S.C. 257) for up to two months from the time period set in the Office action must be filed no later than two months from the expiration of the time period set in the Office action. A request for an extension in a patent owner requested ex parte reexamination for more than two months from the time period set in the Office action must be filed on or before the day on which action by the patent owner is due, and the mere filing of a request for an extension for more than two months will not effect the extension. The time for taking action in a patent owner requested ex parte reexamination will not be extended for more than two months from the time period set in the Office action in the absence of sufficient cause or for more than a reasonable time.

The filing of a timely first response to this final rejection will be construed as including a request to extend the shortened statutory period for an additional two months. In no event, however, will the statutory period for response expire later than SIX MONTHS from the mailing date of the final action.

See MPEP § 2265.

PTO/AIA/31 (05-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **NOTICE OF APPEAL** FROM THE EXAMINER TO THE PATENT TRIAL AND APPEAL BOARD | Docket Number (Optional) |
|---|---|

| I hereby certify that this correspondence is being facsimile transmitted to the USPTO, transmitted via the USPTO's patent electronic filing system, or deposited with the United States Postal Service with sufficient postage in an envelope addressed to "Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450" [37 CFR 1.8(a)] on ___March 21, 2023___ <br> Signature __/Mark McCarthy/__ <br> Typed or printed name __Mark McCarthy__ | First Named Inventor <br> Suder, et al. |
|---|---|

First Named Inventor: Suder, et al.

| Application Number <br> 90/014,804 | Filed <br> July 16, 2021 |
|---|---|

For
QUALITY OF SERVICE IN A VOICE OVER IP TELEPHONE SYSTEM

| Art Unit <br> 3992 | Examiner <br> Roland G. Foster |
|---|---|

Applicant hereby **appeals** to the Patent Trial and Appeal Board from the last decision of the examiner.

The fee for this Notice of Appeal is (37 CFR 41.20(b)(1))                                        $ 840.00

☐ Applicant asserts small entity status. See 37 CFR 1.27. Therefore, the fee shown above is reduced by 50%, and the resulting fee is:                                        $ _____

☐ Applicant certifies micro entity status. See 37 CFR 1.29. Therefore, the fee shown above is reduced by 75%, and the resulting fee is:                                        $ _____
Form PTO/SB/15A or B or equivalent must either be enclosed or have been submitted previously.

☐ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☑ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment to Deposit Account No. __604293__.

☑ Payment made via USPTO's patent electronic filing system (Patent Center or EFS-Web).

☐ A petition for an extension of time under 37 CFR 1.136(a) (PTO/AIA/22 or equivalent) is enclosed.
For extensions of time in reexamination proceedings, see 37 CFR 1.550.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

☐ applicant          ☑ attorney or agent of record <br> Registration number __69,575__          ☐ attorney or agent acting under 37 CFR 1.34 <br> Registration number _____

Signature __/Mark McCarthy/__

Typed or printed name __Mark McCarthy__

Telephone Number __(512) 717-6583__

Date __March 21, 2023__

**NOTE:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. Submit multiple forms if more than one signature is required, see below*.

☐ * Total of _____ forms are submitted.

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 12 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013). https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf

Routine uses of the information in this record may include disclosure to: 1) law enforcement, in the event that the system of records indicates a violation or potential violation of law; 2) a Federal, state, local, or international agency, in response to its request; 3) a contractor of the USPTO having need for the information in order to perform a contract; 4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record; 5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record; 6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations; 7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals; 8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)); 9) the Office of Personnel Management (OPM) for personnel research purposes; and 9) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.

**Additional Uses**

Additional USPTO uses of the information in this record may include disclosure to: 1) the International Bureau of the World Intellectual Property Organization, if the record is related to an international application filed under the Patent Cooperation Treaty;  2) the public i) after publication of the application pursuant to 35 U.S.C. 122(b), ii) after issuance of a patent pursuant to 35 U.S.C. 151, iii) if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections, or an issued patent, or iv) without publication of the application or patent under the specific circumstances provided for by 37 CFR 1.14(a)(1)(v)-(vii); and/or 3) the National Archives and Records Administration, for inspection of records.

Reexam of Patent No. 7,068,684
Control No. 90/014,804

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

*In re* Reexam of: U.S. Patent No. 7,068,684

Control No.: 90/014,804

Confirmation No.: 9925; Art Group: 3992

Reexam Request Filed: July 16, 2021

Appellant: Estech Systems IP, LLC

Title:  QUALITY OF SERVICE IN A VOICE OVER IP TELEPHONE SYSTEM

### APPEAL BRIEF UNDER 37 C.F.R. § 41.37

Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Mark J.E. McCarthy (Reg. No. 69,575)
601 Congress Avenue, Suite 600
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

## TABLE OF CONTENTS

I.　REAL PARTY IN INTEREST ...............................................1

II.　RELATED APPEALS, INTERFERENCES, AND TRIALS.............2

III.　SUMMARY OF THE CLAIMED SUBJECT MATTER ....................4

IV.　ARGUMENT ...........................................................................7

　　A.　Claim Construction ....................................................7

　　　　1.　The preambles of independent claims 29, 36, and 37. .....7

　　　　2.　"telephone" ..................................................10

　　　　3.　"throttling the data sent from the workstation to the telephone" ...............................................13

　　B.　Ground 1 — U.S. Patent Publication No. 2002/0071424 ("*Chiu*") and U.S. Patent No. 5,313,454 ("*Bustini*") Do Not Render Obvious Claims 29-41................................16

　　　　1.　*Chiu* and *Bustini* do not render independent claim 29 obvious..................................................16

　　　　　　a.　*Chiu* and *Bustini* do not teach or suggest the preamble of claim 29. ...........................16

　　　　　　b.　*Chiu* and *Bustini* do not teach or suggest claim element 29[a]. .........................................23

　　　　　　c.　*Chiu* and *Bustini* do not teach or suggest claim element 29[b]. .........................................24

　　　　　　d.　*Chiu* and *Bustini* do not teach or suggest claim element 29[c]. .........................................24

　　　　　　　　i.　"throttling the data sent from the workstation to the telephone" ...........................................25

　　　　　　　　ii.　"throttling the data . . . to increase a rate of transfer of the audio information"..................33

　　　　2.　*Chiu* and *Bustini* do not render claims 30-35 obvious. ..36

　　　　3.　*Chiu* and *Bustini* do not render independent claim 36 obvious..................................................37

　　　　　　a.　*Chiu* and *Bustini* do not teach or suggest the preamble of claim 36. ...........................37

i

b. *Chiu* and *Bustini* do not teach or suggest claim element 36[a]. ..........................................................37

c. *Chiu* and *Bustini* do not teach or suggest claim element 36[b]. ..........................................................38

d. *Chiu* and *Bustini* do not teach or suggest claim element 36[c]. ..........................................................38

    i. "throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information"................................38

    ii. "wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold." .............39

4. *Chiu* and *Bustini* do not render independent claim 37 obvious..................................................................45

a. *Chiu* and *Bustini* do not teach or suggest the preamble of claim 37. ..............................................45

b. *Chiu* and *Bustini* do not teach or suggest claim element 37[a]. ..........................................................45

c. *Chiu* and *Bustini* do not teach or suggest claim element 37[b]. ..........................................................46

d. *Chiu* and *Bustini* do not teach or suggest claim element 37[c]. ..........................................................46

    i. "throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information"................................47

    ii. "wherein the monitoring step further comprises the step of the telephone sending a congestion message to the multimedia server when the amount of the audio information falls below the predetermined level." ..........................................................47

5. *Chiu* and *Bustini* do not render claim 38 obvious. .........49

6. *Chiu* and *Bustini* do not render claim 39 obvious. .........51

ii

7.    *Chiu* and *Bustini* do not render claims 40-41 obvious. ..52
V.    NO    SUBSTANTIAL    NEW    QUESTION    (SNQ)    OF
      PATENTABILITY EXISTS ................................................................54
VI.   CONCLUSION ....................................................................................56
VII.  CLAIMS APPENDIX ..........................................................................57
VIII. EVIDENCE APPENDIX .....................................................................61

APPX0691

# TABLE OF AUTHORITIES

### Cases

*Acceleration Bay, LLC v. Activision Blizzard, Inc.*,
 908 F.3d 765 (Fed. Cir. 2018) ................................................7

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
 616 F.3d 1249 (Fed. Cir. 2010) ..............................................8

*CAE Screenplates, Inc. v. Heinrich Fiedler Gmbh & Co. Kg*,
 224 F.3d 1308 (Fed. Cir. 2000) ..............................................8

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
 289 F.3d 801 (Fed. Cir. 2002) ................................................7

*Comcast Cable Communs., LLC v. Promptu Sys. Corp.*,
 838 Fed. App'x. 551 (Fed. Cir. 2021) .....................................8

*In re Fought*,
 941 F.3d 1175 (Fed. Cir. 2019) ..............................................7

*In re Ratti*,
 270 F.2d 810 (CCPA 1959) ...................................................31

*In re Stepan Co.*,
 868 F.3d 1342 (Fed. Cir. 2017) ...................... 26, 43, 48, 50

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*,
 821 F.3d 1359 (Fed. Cir. 2016) ............................................30

*KSR Int'l Co. v. Teleflex Inc.*,
 550 U.S. 538 (2007)................................................... passim

*Microsoft Corp. v. Proxyconn, Inc.*,
 789 F.3d 1292 (Fed. Cir. 2015) ........................... 10, 13, 15

*Plas-Pak Indus. v. Sulzer Mixpac AG*,
 600 F. App'x. 755 (Fed. Cir. 2015) ......................................31

APPX0692

**Statutes**

35 U.S.C. § 103 ........................................................................ 26, 29, 43, 50
35 U.S.C. § 112 ................................................................................ 50, 51

**Other Authorities**

MPEP § 2143 ................................................................................... passim

v

## I.  REAL PARTY IN INTEREST

Estech Systems IP, LLC ("Patent Owner") is the sole owner of U.S. Patent

No. 7,068,684 (the "'684 Patent").  Patent Owner is the real party in interest.

Patent Owner is a subsidiary of Estech Systems, Inc.

1

Reexam of Patent No. 7,068,684
Control No. 90/014,804

## II.    RELATED APPEALS, INTERFERENCES, AND TRIALS

The following matters may be related to, directly affect, or be directly affected by or have a bearing on the Board's decision in the pending appeal:

*Estech Systems IP, LLC v. 99 Cents Only Stores, LLC and 99 Cents Only Stores Texas, Inc.*, 2:22-cv-00006 (E.D. Tex.)*.*

*Estech Systems IP, LLC v. Abbott Laboratories*, 2:21-cv-00476-JRG-RSP (E.D. Tex.).

*Estech Systems IP, LLC v. Carvana, LLC*, 2:21-cv-00482-JRG-RSP (E.D. Tex.).

*Estech Systems IP, LLC v. Conduent Incorporated, Conduent Business Process Optimization Services, Inc., Conduent BPO Services, LLC and Conduent Legal & Compliance Solutions, LLC*, 2:21-cv-00478-JRG-RSP (E.D. Tex.).

*Estech Systems IP, LLC v. First American Financial Corporation and Republic Title of Texas, Inc.*, 2:22-cv-00007-JRG-RSP (E.D. Tex.).

*Estech Systems IP, LLC v. Fiserv, Inc. and Fiserv Solutions, LLC*, 2:21-cv-00477-JRG-RSP (E.D. Tex.).

*Estech Systems IP, LLC v. Liberty Mutual Group, Inc.*, 2:21-cv-00475-JRG-RSP (E.D. Tex.).

*Estech Systems IP, LLC v. Marriott International, Inc.*, 2:21-cv-00480-JRG-RSP (E.D. Tex.).

2

*Estech Systems IP, LLC v. Mitel Networks, Inc.*, 2:21-cv-00473-JRG-RSP (E.D. Tex.).

*Estech Systems IP, LLC v. Primoris Services Corporation and Primoris Design & Construction, Inc.*, 2:21-cv-00481-JRG-RSP (E.D. Tex.).

*Estech Systems IP, LLC v. Public Storage*, 2:21-cv-00483-JRG-RSP (E.D. Tex.).

*Estech Systems IP, LLC v. Randstad US LLC and Randstad Professionals US, LLC*, 2:21-cv-00479-JRG-RSP (E.D. Tex.).

*Estech Systems IP, LLC v. Sofi Technologies, Inc. and Sofi Mortgage, LLC*, 2:21-cv-00485-JRG-RSP (E.D. Tex.).

*RingCentral, Inc. v. Estech Systems IP, LLC*, 2:23-mc-00001-JRG (E.D. TX).

*RingCentral, Inc. v. Estech Systems IP, LLC*, 2:23-mc-00002-JRG (E.D. TX).

*Estech Systems, Inc. v. Howard Midstream Energy Partners*, Case No. 2023-1199 (United States Court of Appeals for the Federal Circuit).

*Estech Systems, Inc. v. RingCentral, Inc.*, Case No. 2023-1241 (United States Court of Appeals for the Federal Circuit).

*Estech Systems, Inc. v. RingCentral, Inc.*, Case No. 2023-1242 (United States Court of Appeals for the Federal Circuit).

3

## III.    SUMMARY OF THE CLAIMED SUBJECT MATTER

Independent claim 29 is directed to a method that is executed within an information handling system.  The information handling system includes a hub, a multimedia server coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub.  *See* '684 Patent, Fig. 1, Fig. 3 (element 301), Fig. 4 (elements 304, 103, 105, 106).  The method includes the telephone receiving audio information (i.e., voice packets) from the multimedia server.  '684 Patent, 11:54-12:10, Fig. 11 (element 1103).  Based on the amount of audio information (i.e., voice packets) received by the telephone, the workstation is throttled, reducing the amount of data or the rate at which data is transmitted from the workstation to the telephone.  '684 Patent, 12:15-13:35, 14:30-34, Fig. 11 (1104, 1105), Fig. 10 (elements 1004, 1006).  One purpose of the throttling is to increase the rate at which audio information is exchanged between the telephone and the multimedia server.  *See id.*

Independent claim 36 is directed to a method that is executed within an information handling system.  The information handling system includes a hub, a multimedia server coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub.  *See* '684 Patent, Fig. 1, Fig. 3 (element 301), Fig. 4 (elements 304, 103, 105, 106).  The method includes the telephone receiving audio information (i.e., voice packets) from

APPX0697

the multimedia server. '684 Patent, 11:54-12:10, Fig. 11 (element 1103). The workstation is throttled, reducing the amount of data or the rate at which data is transmitted from the workstation to the telephone. '684 Patent, 12:15-13:35, 14:30-34, Fig. 11 (1104, 1105), Fig. 10 (elements 1004, 1006); original claim 43. One purpose of the throttling is to increase the rate at which audio information is exchanged between the telephone and the multimedia server. *See id.*

Independent claim 37 is directed to a method that is executed within an information handling system. The information handling system includes a hub, a multimedia server coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub. *See* '684 Patent, Fig. 1, Fig. 3 (element 301), Fig. 4 (elements 304, 103, 105, 106). The method includes the telephone receiving audio information (i.e., voice packets) from the multimedia server. '684 Patent, 11:54-12:10, Fig. 11 (element 1103). If the amount of audio information (i.e., voice packets) received by the telephone falls below a threshold, the telephone sends a congestion message to the multimedia server. '684 Patent, 12:15-13:35, 14:30-34, Fig. 11 (1104, 1105), Fig. 12A (element 1202, 1208). The workstation is then throttled, reducing the amount of data or the rate at which data is transmitted from the workstation to the telephone. '684 Patent, 12:15-13:35, 14:30-34, Fig. 10 (elements 1004, 1006). One purpose of the throttling

5

is to increase the rate at which audio information is exchanged between the telephone

and the multimedia server. *See id.*

6

## IV.    ARGUMENT

### A.    Claim Construction

#### 1.    The preambles of independent claims 29, 36, and 37.

The preamble of claim 29 recites "In an information handling system comprising a hub, a multimedia server ('multimedia server') coupled to <u>the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone</u>, and a data server coupled to the hub, a method comprising the steps of." '684 Patent, claim 29 (emphasis added). The preambles of independent claims 36 and 37 are identical to the preamble of claim 29. *Compare* preamble of claim 29 *with* preamble of claim 36 and preamble of claim 37.

As a threshold matter, the preambles of independent claims 29, 36, and 37 are limiting for at least two reasons. First, the preamble provides antecedent basis for many of the claim terms (e.g., "the workstation," "the telephone," "the data server," "the multimedia server"). "We have repeatedly held a preamble limiting when it serves as antecedent basis for a term appearing in the body of a claim." *In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019). Second, the preamble recites the architecture in which the claimed method is performed, so the preamble is necessary to give life, meaning, and vitality to the claim. *See Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. 2018) (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)) ("A preamble limits the

7

invention if it recites essential structure or steps, or is 'necessary to give life, meaning, and vitality' to the claim.").

Again, the preambles of independent claims 29, 36, and 37 recite, in part, a "hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone." By listing the elements separately and by using the word "coupled," independent claims 29, 36, and 37 require that the "hub," the "telephone," and the "workstation" all be distinct components (i.e., separate devices). *See Comcast Cable Communs., LLC v. Promptu Sys. Corp.*, 838 Fed. App'x. 551, 553 (Fed. Cir. 2021) ("The broadest reasonable interpretation of 'coupled to' requires that the 'speech recognition system' and 'wireline node' are distinct components."); *see also Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention.") (cleaned up); *CAE Screenplates, Inc. v. Heinrich Fiedler Gmbh & Co. Kg*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").

Further, the interpretation that the "hub," the "telephone," and the "workstation" are all distinct components (i.e., separate devices) is consistent with the specification. For example, Figure 1 of the '684 Patent is reproduced below:

8



'684 Patent, Fig. 1 (cropped and annotated).  As another example, Figure 3 of the

'684 Patent is reproduced below:



'684 Patent, Fig. 3 (cropped and annotated).  In fact, in every disclosed embodiment,

the "telephone," the "workstation," and the "hub" are described/shown as being

distinct components (i.e., separate devices).  *See e.g., id.* at 13:50-14:40, Fig. 4

(elements 103, 105, 106).  Accordingly, upon review of the specification, a POSITA

9

would interpret the "hub," the "telephone," and the "workstation" as being distinct components (i.e., separate devices). Thus, this is how the "hub," "telephone" and "workstation" should be interpreted. "Even under the broadest reasonable interpretation, the Board's construction cannot be divorced from the specification and the record evidence, and must be consistent with the one that those skilled in the art would reach." *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (cleaned up).

For these reasons, the "hub," the "telephone," and the "workstation," as recited by independent claims 29, 36, and 37, should be interpreted as distinct components (i.e., separate devices).

### 2.    "telephone"

As discussed above, each of independent claims 29, 36, and 37 recites a "telephone." *E.g.,* '684 Patent, claim 29. Under the broadest reasonable interpretation standard, the claimed "telephone" necessarily includes (*i*) an interface (e.g., keypad or keyboard) for dialing another individual to initiate a telephone call with the other individual, (*ii*) a speaker so that the user of the claimed "telephone" can listen to the other individual during the telephone call, and (*iii*) a microphone to capture the voice of the user of the claimed "telephone," so that the captured voice can be transmitted to the other individual during the telephone call. There should be

no reasonable dispute that a POSITA would recognize that a "telephone" necessarily has those features.

Further, this interpretation is confirmed by the specification. For example, Figure 8 of the '684 Patent "illustrates a block diagram of a telephony device configured in accordance with the present invention." '684 Patent, 3:34-35. Figure 8 is reproduced below:



'684 Patent, Fig. 8 (annotated). As shown, the "telephony device 105" includes "keyboard 807," "handsfree speaker 821," "mic[rophone] 822," and "handset connector 818." *See id.*, 11:5-13 ("CODEC 817 is connected to the handset['s] speaker and microphone elements (not shown) via connector 818, while CODEC

819 is connected to the <u>hands-free speaker 821</u> through amplifier 820, and to the

<u>hands-free microphone 822</u>") (emphasis added).    Additionally, the '684 Patent

discloses the "audio (voice) data packets being received from hub 103 have been

sent by multimedia server 101, and are packets containing audio information

communicated between telephony device 105 and some other telecommunications

device coupled to the system . . . the audio packets will then be<u> played by telephony

device 105 to the user through the speaker 821 or handset 818</u>." '684 Patent, 11:63-

12:4 (emphasis added).

As another example, Figure 4 of the '684 Patent shows a "fast ethernet

telephone 105."  Figure 4 is reproduced below:



'684 Patent, Fig. 4 (cropped and annotated). As shown, the "fast ethernet telephone 105" has a keypad and a handset. A POSITA would recognize the handset as having a speaker and a microphone.

Accordingly, upon review of the specification, a POSITA would interpret the claimed "telephone" as having features (*i*)-(*iii*). Thus, this is how the claimed "telephone" should be interpreted. "Even under the broadest reasonable interpretation, the Board's construction cannot be divorced from the specification and the record evidence, and must be consistent with the one that those skilled in the art would reach." *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (cleaned up).

### 3.    "throttling the data sent from the workstation to the telephone"

Each of independent claims 29, 36, and 37 recites "throttling the data sent from the workstation to the telephone." *See e.g.*, '684 Patent, claim 29 (emphasis added). A POSITA would interpret this to mean reducing the amount of data transmitted "from the workstation to the telephone" or reducing the rate at which data is transmitted "from the workstation to the telephone." A POSITA would reach this interpretation because (1) it is consistent with the plain and ordinary meaning of "throttling," "from," and "to," and (2) it is consistent with the dependent claims. Specifically, dependent claim 34 captures the scenario where "the throttling results

13

in <u>no data</u> being sent <u>from the workstation to the telephone</u>." '684 Patent, claim 34

(emphasis added).

A POSITA would also reach this interpretation because it is consistent with

the specification of the '684 Patent.  In particular, the '684 Patent discloses

> the process illustrated in FIG. 10 has the IP telephony device 105 beginning a <u>hold-off procedure with the workstation 106</u>.  The level of aggressiveness, whether it is the Most Aggressive Mode or the Least Aggressive Mode can be thought of as a duty cycle whereby the [IP telephony] device <u>blocks data from the workstation 106</u> for a percentage of the time . . .

> The present invention permits the IP telephony device 105 from <u>stopping the workstation 106 from sending data</u> by causing so many collisions that none of the data can make it through . . . These collision bursts are generally short enough that the protocol does not time out, but <u>long enough to throttle the data flow</u>. The duty cycle of the collision bursts may be proportional to the amount of data allowed to flow (i.e., if the duty cycle is 80/20, eighty percent of the time data is blocked).

> A duty cycle may be used since jabbering cannot continue forever . . . The duty cycle allows data to flow often enough so that the effective <u>throughput is reduced</u> while allowing the protocols to survive . . . The detection mechanism (monitoring circuitry) in the IP telephony devices 105 alerts the multimedia server 101 that the network is in trouble with respect to too much congestion to permit real-time multimedia communications to occur, or merely that the transfer rate of such communications has decreased unsatisfactorily. The multimedia server 101 messages to all of the IP telephony devices that they need to <u>throttle-down the workstation data they are receiving</u> using the most aggressive algorithm.

'684 Patent, 13:44-14:66 (emphasis added); *see also, id*. at 2:19-30.

14

Accordingly, upon review of the specification and the claims, a POSITA would interpret the claimed "throttling the data sent from the workstation to the telephone" to mean reducing the amount or rate of data transmitted from the workstation to the telephone. Thus, this is how the claimed "throttling the data sent from the workstation to the telephone" should be interpreted. "Even under the broadest reasonable interpretation, the Board's construction cannot be divorced from the specification and the record evidence, and must be consistent with the one that those skilled in the art would reach." *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (cleaned up).

Further, the United States District Court for the Eastern District of Texas determined that: "[i]n the context of the surrounding claim language and intrinsic evidence, a person of ordinary skill in the art would understand the term 'throttling the data' to mean 'reducing the amount or rate of data transmitted.'" *Estech Systems IP, LLC, v. Mitel Networks, Inc.,* Case No. 2:21-cv-00473-JRG-RSP, Dkt. No. 328 at 19-24 (E.D. Tex. March 28, 2023). Although that court construed the claim term according to the standard articulated in *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) (en banc), it only reinforces that a POSITA would understand "throttling the data sent from the workstation to the telephone" to mean reducing the amount or rate of data transmitted from the workstation to the telephone. A copy of that court's claim construction order is enclosed ("Ex. 2001") with this Appeal Brief.

**B.** **Ground 1 — U.S. Patent Publication No. 2002/0071424 ("*Chiu*") and U.S. Patent No. 5,313,454 ("*Bustini*") Do Not Render Obvious Claims 29-41.**

The combination of *Chiu* and *Bustini* does not render claims 29-41 obvious.

**1.** **_Chiu_ and _Bustini_ do not render independent claim 29 obvious.**

**a.** **_Chiu_ and _Bustini_ do not teach or suggest the preamble of claim 29.**

The preamble of claim 29 recites, in part, a "hub, a telephone coupled to the hub, [and] a workstation coupled to the hub through the telephone." '684 Patent, claim 29. The fundamental disagreement between Patent Owner and the Examiner is whether *Chiu* teaches the claimed "workstation" and claimed "telephone." As discussed above in Section IV(A), the claimed "workstation" and the claimed "telephone" are distinct components (i.e., separate devices). As also discussed above, the claimed "telephone" necessarily has an interface (e.g., keyboard or keypad) for dialing and initiating a telephone call, a microphone for use during the telephone call, and a speaker for use during the telephone call.

*Chiu* teaches a "telephony system." *Chiu*, ¶[0008]. *Chiu's* Figure 1 is reproduced below:

16



*Chiu*, Fig. 1 (annotated).  In the Final Office Action dated Nov. 21, 2022 ("Action"),

the Examiner mapped *Chiu's* "telephone 160" to the claimed "telephone."  *See*

Action, p. 6 ("Chiu clearly illustrates <u>telephone 160</u> coupled to the <u>hub</u>") (emphasis

added).  But *Chiu's* "telephone 160" does <u>not</u> couple a "workstation" to a "hub," as

claim 29 requires, because *Chiu* does not describe or depict a workstation coupled

to "telephone 160."  *Chiu*, Fig. 1.  In fact, *Chiu's* "telephone 160" is just a

"conventional" analog telephone that would be incapable of transmitting digital data

received from a workstation.  *Chiu*, ¶[0029].  Accordingly, *Chiu's* "telephone 160"

is <u>not</u> the claimed "telephone."

Reexam of Patent No. 7,068,684
Control No. 90/014,804

The Examiner also mapped *Chiu's* "IP Telephony Peripheral 100" and "computer 200" to the claimed "telephone" and "workstation," respectively. Action, pp. 5-6, 16. But that mapping also fails to teach "a workstation coupled to the hub through the telephone," as claim 29 requires. Specifically, *Chiu's* "IP Telephony Peripheral 100" is a computer peripheral, <u>not</u> the claimed "telephone." *Chiu's* "IP Telephony Peripheral 100" is <u>not</u> the claimed "telephone" because (1) *Chiu's* "IP Telephony Peripheral 100" is <u>not</u> a separate device from *Chiu's* "computer 200" (the Examiner-identified "workstation") and (2) *Chiu's* "IP Telephony Peripheral 100" is not capable of making or receiving telephone calls by itself—the "IP Telephony Peripheral 100" does not have a microphone, a speaker, or interface for dialing (e.g., keypad).

Figure 2 of *Chiu* is a block diagram of "computer 200" (the Examiner-identified "workstation"). *Chiu*, ¶[0030]. Figure 2 of *Chiu* is reproduced below:



**FIG. 2**

APPX0711

*Chiu*, Fig. 2 (emphasis added).  As shown, *Chiu's* "IP Telephony Peripheral 100" is actually a PCMCIA card that is integrated <u>inside</u> Chiu's "computer 200" on PCMCIA Bus 224.  *See Chiu*, Fig. 2.  Accordingly, *Chiu's* "IP Telephony Peripheral 100" (the Examiner-identified "telephone") and *Chiu's* "computer 200" (the Examiner-identified "workstation") are <u>not</u> distinct components (i.e., separate devices), as claim 29 requires.

Further, *Chiu's* "IP Telephony Peripheral 100" relies on the GUI of *Chiu's* "computer 200" to display "soft keypad 380" and capture the phone number that the user wishes to call.  *See Chiu*, ¶[0034], Fig. 3 (depicting "a simplified computer-screen based interface of the IP telephony peripheral of FIG. 1").  Chiu's Figure 3 is reproduced below:

19

Reexam of Patent No. 7,068,684
Control No. 90/014,804



*Chiu*, Fig. 3 (annotated).  *Chiu's* Figure 4 shows "speaker 400," "microphone 402,"

and "keypad 380" all being <u>external to and separate from</u> the "IP Telephony

Peripheral 100." *Chiu*, Fig. 4.  *Chiu's* Figure 4 is reproduced below:

20

Reexam of Patent No. 7,068,684
Control No. 90/014,804



*Chiu*, Fig. 4 (annotated).  In fact, *Chiu* expressly discloses "[s]peaker 400 may be a

component <u>of the computer</u> to which the peripheral is adjunct."   *Chiu*, ¶[0037]

(emphasis added).  Accordingly, *Chiu's* "IP Telephony Peripheral 100," by itself,

cannot be the claimed "telephone."

   In one instance, the Examiner also mapped *Chiu's* "IP Telephony Peripheral

100" to the claimed "hub."   *See* Action, p. 5 ("telephony device 100 (annotated

21

below) (the recited 'hub')"). But the claimed "hub" is a distinct component (i.e., separate device) from the claimed "telephone." This only reinforces that *Chiu's* "IP Telephony Peripheral 100" is not the claimed "telephone."

To the extent that the Examiner is combining *Chiu's* "IP Telephony Peripheral 100" and *Chiu's* "computer 200" to meet the claimed "telephone," *Chiu* still fails to teach a "workstation" physically separate from the "telephone," where the "workstation" is coupled to a "hub" through the "telephone," as independent claim 29 requires.

Further, the Examiner mapped *Chiu's* "computer 170" and *Chiu's* "PSTN Gateway 140" to the claimed "workstation" and claimed "hub," respectively. *See* Action, p. 6 ("Chiu also describes <u>PSTN gateway 140</u>, which a [POSITA] would understand to also be an example of the <u>claimed hub</u> . . . <u>computer 170 (workstations)</u> couple to said hubs"). But *Chiu's* "IP Telephony Peripheral 100" (the Examiner-identified "telephone") does <u>not</u> couple *Chiu's* "computer 170" (the Examiner-identified "workstation") to *Chiu's* "PSTN gateway 140" (the Examiner-identified "hub"). This contradicts what claim 29 requires.

In view of the above, *Chiu* does not teach or suggest the claimed "telephone," *Chiu* does not teach or suggest that the claimed "workstation" and the claimed "telephone" are two physically separate devices, and *Chiu* does not teach or suggest that the claimed "workstation" is coupled to the claimed "hub" through the claimed

22

"telephone," as independent claim 29 requires.  *Bustini* does not cure the deficiencies

of *Chiu*, and the Examiner does not so allege.  *See* Action, pp. 5-7.  Accordingly,

*Chiu* and *Bustini* fail to render independent claim 29 obvious.

### b.    *Chiu* and *Bustini* do not teach or suggest claim element 29[a].

Claim element 29[a] recites "transferring data from the workstation to the

telephone."   As discussed above, the Examiner mapped *Chiu's* "computer 200" and

"IP Telephony peripheral 100" to the claimed "workstation" and "telephone,"

respectively.  Action, pp. 5-6.

The Examiner also mapped the "computer data" sent from *Chiu's* "computer

200" (the Examiner-identified "workstation") to the claimed "data."  *See* Action, p.

7 ("A [POSITA] would understand that the computer data . . . of Chiu transported to

and from said computer 200 (annotated) through IP telephone device 100 would be

addressed . . . to a server on the internet") (emphasis added).  But as discussed above

regarding the preamble of claim 29, *Chiu's* "IP telephony peripheral 100" is not the

claimed "telephone."   Rather, it is a component of *Chiu's* "computer 200."

Accordingly, *Chiu* does teach or suggest claim element 29[a].  *Bustini* does not cure

the deficiencies of *Chiu* and the Examiner does not so allege.  Action, pp. 5-7.

Accordingly, the combination of *Chiu* and *Bustini* fails to teach or suggest claim

element 29[a], and thus fails to render independent claim 29 unpatentable.

23

### c.    *Chiu* and *Bustini* do not teach or suggest claim element 29[b].

Claim element 29[b] recites "communicating audio information between the telephone and the multimedia server." As discussed above, the Examiner mapped *Chiu's* "IP telephony peripheral 100" to the claimed "telephone." *See* Action, pp. 5-6.

The Examiner also mapped the "digitized voice packets" transported to and from *Chiu's* "IP telephony peripheral 100" to the claimed "audio information." *See* Action, p. 8 (citing *Chiu*, ¶[0009]). But as discussed above regarding the preamble of claim 29, *Chiu's* "IP telephony peripheral 100" is not the claimed "telephone." Rather, it is a component of *Chiu's* "computer 200." Accordingly, *Chiu* does not teach or suggest claim element 29[b]. *Bustini* does not cure the deficiencies of *Chiu* and the Examiner does not so allege. Action, pp. 5-8. Accordingly, the combination of *Chiu* and *Bustini* fails to teach or suggest claim element 29[b], and thus fails to render independent claim 29 unpatentable.

### d.    *Chiu* and *Bustini* do not teach or suggest claim element 29[c].

Claim element 29[c] recites "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone

from the multimedia server."  The combination of *Chiu* and *Bustini* fails to render this limitation obvious.

### i.    "throttling the data sent from the workstation to the telephone"

As discussed above in Section IV(A), "throttling the data sent from the workstation to the telephone" means reducing the amount or rate of data sent <u>from the workstation to the telephone</u>.  To meet this requirement, the Examiner argued that *Bustini* "teaches throttling data" (Action, p. 8) and "a [POSITA] would easily program <u>the algorithm</u> disclosed by Bustini into the circuitry disclosed by Chiu including, for example, the media access controller [of the IP Telephony Peripheral 100]" (Action, p. 9 (emphasis added)).  The Examiner is incorrect.

As a threshold matter, to meet claim element 29[c], the Examiner cited to both *Bustini*, Abstract and *Bustini*, 1:32-68.  *See* Action, p. 9.  But these two portions of *Bustini* are describing different algorithms.  *Compare Bustini*, Abstract *with Bustini*, 1:32-68.  In this Appeal Brief, the algorithm disclosed in *Bustini's* Abstract will be referred to as *Bustini's* "Main Algorithm," while the algorithm disclosed in *Bustini*, 1:32-68, will be referred to as *Bustini's* "Background Algorithm."  Each of the two algorithms is addressed in turn.

Further, to the extent the Examiner is attempting to combine *Bustini's* Background Algorithm and *Bustini's* Main Algorithm, the Examiner has failed to

explain why such a combination would be obvious. That is improper because the analysis supporting a rejection under 35 U.S.C. § 103 should be made explicit, even when the teachings being combined are from a single reference. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 538, 418 (2007) (the analysis including "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue . . . should be made explicit."); *see also In re Stepan Co.*, 868 F.3d 1342, 1346 n.1 (Fed. Cir. 2017) ("Whether a rejection is based on combining disclosures from multiple references [or] combining multiple embodiments <u>from a single reference</u> . . . there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful, otherwise a skilled artisan would not arrive at the claimed combination.") (emphasis added); MPEP § 2143 ("The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in KSR noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit.").

### *Bustini's* Background Algorithm

A network node executing *Bustini's* Background Algorithm receives data of different class types (e.g., high priority, voice, bursty, etc.). *Bustini*, 1:32-54. "Each of these six traffic types are buffered at each network node in accordance with their particular sensitivities to network delay and cell loss . . . each class of traffic is

26

typically placed in a preassigned queue, <u>each with a different service priority</u>. During periods of network traffic congestion, when network traffic demand exceeds the network's bandwidth capacity, <u>servicing algorithms</u> are typically employed to <u>discriminate between traffic classes</u> in order to allocate bandwidth." *Bustini*, 1:52-68 (emphasis added). Accordingly, *Bustini's* Background Algorithm enables the network node to throttle data transmitted <u>from the network node</u>. But *Bustini's* Background Algorithm, executing on the network node, does <u>not</u> enable the network node to control the amount or rate of data transmitted <u>to the network node</u>.

As discussed above, the Examiner's proposed modification to *Chiu* includes installing *Bustini's* Background Algorithm on *Chiu's* "IP Telephony Peripheral 100" (the Examiner's identified "telephone"). *See* Action, pp. 9-10. But following the Examiner's proposed modification, *Bustini's* Background Algorithm, now executing on *Chiu's* "IP Telephony Peripheral 100" (the Examiner's identified "telephone"), does <u>not</u> enable *Chiu's* "IP Telephony Peripheral 100" to reduce the amount of "computer data" (the Examiner-identified "data") transmitted "from the workstation <u>to the telephone</u>" or reduce the rate at which "computer data" (the Examiner-identified "data") is transmitted "from the workstation <u>to the telephone</u>," as discussed above. Thus, the Examiner's proposed combination of *Chiu* and *Bustini* does not meet the requirements of claim element 29[c].

27

The Examiner notes that "Bustini's algorithm is bidirectional." Action, pp. 9-10 (citing *Bustini*, 9:15, 9:58-10:2). This only means that data may be transmitted from network node A to network node B, and from network node B to network node A. This does not mean that a network node executing *Bustini's* algorithm can control the amount of data transmitted <u>to the network node</u> or the rate at which data is transmitted <u>to the network node</u>. Accordingly, this does not correct the above-mentioned deficiencies in *Bustini*.

<u>*Bustini's* Main Algorithm</u>

*Bustini's* Main Algorithm requires a source node, one or more intermediate nodes, and a destination node. *See Bustini*, Abstract ("a control signal can be generated at <u>each intermediate node</u> . . . queue status is forwarded to the <u>destination node</u> where it is interpreted and sent back to the <u>source node</u>") (emphasis added). With *Bustini's* Main Algorithm, each of the source node, intermediate node(s), and destination node execute different steps involving different types of control signals. *See id.* ("monitoring the buffer queue lengths . . . a control signal can be generated. . . a feedback rate control signal using a 2-bit code").

Again, the Examiner argued "a [POSITA] would <u>easily program</u> the algorithm disclosed by Bustini into the circuitry disclosed by Chiu including, for example, the media access controller [of the IP Telephony Peripheral 100]." Action, p. 9 (emphasis added). But the Examiner has failed to explain what it means to program

28

*Bustini's* Main Algorithm into *Chiu's* "IP Telephony Peripheral 100." As discussed above, *Bustini's* Main Algorithm requires at least three nodes (i.e., source node, intermediate node(s), destination node) that exchange multiple control signals. The Examiner has not provided any details on how *Chiu's* "IP Telephony Peripheral" fits within the multi-node architecture of *Bustini's* Main Algorithm. That is improper because the analysis supporting a rejection under 35 U.S.C. § 103 should be made explicit. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 538, 418 (2007) (the analysis including "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue . . . should be made explicit."); MPEP § 2143 ("The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in KSR noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit."). Thus, the Examiner's obviousness rejection is fatally flawed, and the Examiner has failed to show that the combination of *Chiu* and *Bustini* meets the requirements of claim element 29[c].

The Examiner notes that "Bustini's algorithm is bidirectional." Action, pp. 9-10 (citing *Bustini*, 9:15, 9:58-10:2). Even if this is true, this does not correct the above-mentioned deficiencies in *Bustini*.

Further, the Examiner's proposed combination of *Chiu* and *Bustini* is non-obvious because the Examiner's proposed modifications to *Chiu* have no reasonable

29

expectation of success. Obviousness requires both a reason to modify or combine

prior art to achieve a claimed invention <u>and</u> a reasonable expectation of success. *See*

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1367 (Fed.

Cir. 2016) ("One must have a motivation to combine accompanied by a <u>reasonable</u>

<u>expectation</u> of achieving what is claimed" and "the Board conflated two different

legal concepts—<u>reasonable expectation of success</u> and motivation to combine")

(emphasis added).

Both *Bustini's* Background Algorithm and *Bustini's* Main Algorithm are

designed to operate over geographically distant nodes connected by digital trunk

lines (e.g., T1 lines). *See Bustini*, 1:16-21 ("A typical fully-integrated voice and data

network using <u>digital trunk lines (e.g., T1</u>, FT1, E1, T3, etc.) includes a number of

<u>geographically distant interconnect nodes</u>. Each node acts as a cell exchanger for

receiving and forwarding cell information to its destination.") (emphasis added),

6:18-53 ("FIG. 1 illustrates a fully-integrated voice and data <u>T1 telecommunication</u>

<u>network</u> 20 using telecommunication nodes 22 . . . Each telecommunication node 22

takes existing voice and data streams from its associated communication equipment,

assembles the streams into a more efficient cell format, and transmits the cells

between nodes via cell <u>T1 lines 42.</u>"), Fig. 1 (showing a node 22 in Dallas, a node

22 in Chicago, a node 22 in Atlanta, a node 22 in Boston").

In contrast, as discussed above, *Chiu's* "computer 200" (the Examiner-identified "workstation") and *Chiu's* "IP Telephony Peripheral 100" (the Examiner-identified "telephone") communicate via a PCMCIA Bus. *See Chiu*, Fig. 2. Further, *Chiu's* "IP Telephony Peripheral 100" (the Examiner-identified "telephone") is a PCMCIA card that is integrated <u>inside</u> *Chiu's* "computer 200" (the Examiner-identified "workstation"). *See Chiu*, Fig. 2. The Examiner provides no evidence that *Bustini's* algorithms, designed for execution on geographically distant nodes connected by T1 lines, could be successfully implemented on the PCMCIA architecture in *Chiu*. The Examiner's contentions that a POSITA could "easily program *Bustini's* algorithm" into *Chiu's* system, (Action, p. 9), is a gross oversimplification. This is a fatal flaw in the Examiner's obviousness rejection.

Further, the Examiner's proposed combination of *Chiu* and *Bustini* is non-obvious because the Examiner's proposed modifications to *Chiu* changes *Chiu's* principle of operation. "If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified, then the teachings of the references are not sufficient to render the claims *prima facie* obvious." MPEP § 2143.01 (citing *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959)); *see also Plas-Pak Indus. v. Sulzer Mixpac AG*, 600 F. App'x. 755, 758 (Fed. Cir. 2015) ("combinations that change the basic principles under which the [prior art]

31

was designed to operate or that render the prior art inoperable for its intended

purpose, may fail to support a conclusion of obviousness.") (cleaned up).

> *Chiu* discloses
>
> The physical transport 430 [of IP telephony device 100] may . . . involve a <u>pass-through</u> connection serving as an intermediary between another network device such as a computer and the network 130. If so, the media access controller will employ collision avoidance mechanisms well known in the networking arts to <u>avoid packet collisions</u> with any other downstream attached device(s) to the physical layer 430.

*Chiu*, ¶[0043] (emphasis added). *Chiu* also discloses

> a transparent transport [of IP telephony device 100] coupled to said network, said transport including connection means for <u>coupling a computer to said network and transporting computer data</u> to and from said computer;
>
> a media access controller [of IP telephony device 100] coupled to said transport, said media access controller including <u>collision enforcement means</u> coupled to said transparent transport for broadcasting said [voice] packet onto said network <u>without influencing said computer data</u>.

*Chiu*, claim 12 (emphasis added). In other words, *Chiu's* "IP Telephony Peripheral

100" acts as a "pass-through" and implements "collision avoidance mechanisms" to

avoid interfering with *Chiu's* "computer data" (the Examiner-identified "data").

This is part of *Chiu's* principle of operation. The Examiner's proposed modification

to *Chiu* includes programming *Chiu's* "IP Telephony Peripheral 100" with one of

*Bustini's* algorithms to throttle *Chiu's* "computer data" (the Examiner-identified

32

"data").  This proposed modification violates *Chiu's* principle of operation (i.e., to operate "without influencing said computer data"), and thus is far too drastic to be considered obvious.  Accordingly, the Examiner's obviousness rejection is flawed.

For all of these reasons, the combination of *Chiu* and *Bustini* does not render claim 29 obvious.

> **ii.    "throttling the data . . . to increase a rate of transfer of the audio information"**

The Examiner contends that *Bustini* teaches "throttling the data . . . to increase a rate of transfer of the audio information," as required by claim element [29(c)].  Action, pp. 8-10.  It does not.  As discussed above, the Examiner is relying on both *Bustini's* Main Algorithm and *Bustini's* Background Algorithm to meet the requirements of claim element 29[c].  Each of the two algorithms is addressed in turn.

<u>*Bustini's* Main Algorithm</u>

Regarding *Bustini's* Main Algorithm, *Bustini* discloses that "congestion control is accomplished by controlling the transmission rate of <u>bursty traffic</u> in the presence of high priority, <u>voice</u>, low speed statistical, high speed deterministic and multicast data."  *Bustini*, Abstract (emphasis added).  The Examiner mapped *Bustini's* "bursty traffic" and "voice" data to the claimed "data" and "audio information," respectively.  Action, p. 8.  But this disclosure is silent regarding any

33

"increase in a rate of transfer" for the "voice" data or any other type of data. Accordingly, this disclosure fails to teach or suggest "throttling the data . . . to increase a rate of transfer of the audio information," as required by claim element [29(c)].

The Examiner argued that because the transmission rate of bursty traffic is controlled, "the audio data rate is increased over what the audio data rate would have been in the presence of congested, bursty traffic." Action, p. 9. This reasoning is flawed. Claim 29 requires an actual increase in the "rate of transfer of the audio information," not a hypothetical increase. Further, the Examiner provided no evidence that the "congested, bursty traffic" necessarily affects (e.g., decreases) the transfer rate of the "voice" data (the Examiner identified "audio information"). Indeed, the congestion might only affect the transfer rates of data with a different (e.g., lower) priority than the "voice" data. Further still, the Examiner provided no evidence that any bandwidth savings from throttling the "bursty traffic" is necessarily allocated to increase the transfer rate of "voice" data. It is much more likely that any bandwidth savings would be allocated to maintain or increase the transfer rate of data with a higher priority than the "voice" data.

The Examiner also cited to Figure 16 of *Bustini* as teaching "throttling the data . . . to increase a rate of transfer of the audio information." Action, p. 9. It does not. Figure 16 is "a flow diagram of the data rate control algorithm." *Bustini*, 6:10-

34

11.  While step 508 in Figure 16 discloses a possible "rate increase," this corresponds

to the transmission rate of the "bursty traffic" (the Examiner-identified "data"), not

audio information.  *Bustini*, 23:39-24:14.  Step 508 does <u>not</u> correspond to the

transfer rate of the "voice" data (the Examiner-identified "audio information").  *Id*.

In fact, step 518 in Figure 16 executes a 50% decrease in the rate.  *Id*.  This confirms

that Figure 16 pertains to "bursty traffic" and not "voice" data because, as

acknowledged by *Bustini*, "voice" data is "relatively intolerant of servicing delays,"

and a 50% rate reduction could not be tolerated. *Bustini*, 7:47-53.

*Bustini's* Background Algorithm

Regarding *Bustini's* Background Algorithm, *Bustini* discloses that a network

node is

> capable of handling six classes of cell traffic, each class having
> different characteristics and different service requirements . . . To
> accommodate these differences, each class of traffic is typically placed
> in a preassigned queue, each with a different service priority. During
> periods of network traffic congestion, when network traffic demand
> exceeds the network's bandwidth capacity, servicing algorithms are
> typically employed to discriminate between traffic classes in order to
> allocate bandwidth.

*Bustini*, 1:32-68.  Even if "bursty data" (the Examiner-identified "data") and "voice"

data (the Examiner-identified "audio information") belong to different classes, this

disclosure is still silent regarding any "increase in a rate of transfer" for the "voice"

data or any other type of data.  *Id*.  No details are disclosed regarding the "servicing

35

algorithms" and how these algorithms "allocate bandwidth" by "discriminat[ing] between traffic classes." *Id.* Again, the Examiner provides no evidence that discrimination against the class with the "bursty data" results in bandwidth savings, and that these bandwidth savings are necessarily allocated to the class with the "voice" data to increase the transfer rate of the "voice" data (the Examiner-identified "audio information").

In view of the above, *Bustini* does not teach or suggest claim element 29[c]. *Chiu* does not cure the deficiencies of *Bustini*, and the Examiner does not so allege. Action, pp. 8-10. Accordingly, the combination of *Chiu* and *Bustini* fails to teach or suggest claim element 29[c], and thus fails to render independent claim 29 unpatentable.

### 2.    *Chiu* and *Bustini* do not render claims 30-35 obvious.

Claims 30-35 depend, either directly or indirectly, from and add limitations to independent claim 29. As discussed above, the combination of *Chiu* and *Bustini* does not render claim 29 obvious. Accordingly, the combination of *Chiu* and *Bustini* does not render claims 30-35 obvious for at least the same reasons.

36

**3.**    ***Chiu* and *Bustini* do not render independent claim 36 obvious.**

**a.**    ***Chiu* and *Bustini* do not teach or suggest the preamble of claim 36.**

The preamble of independent claim 36 recites "In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of." This is identical to the preamble of independent claim 29. Accordingly, the combination of *Chiu* and *Bustini* fails to teach or suggest the preamble of claim 36 for the same reasons the combination fails to teach or suggest the preamble of claim 29 (discussed above). Thus, the combination of *Chiu* and *Bustini* fails to render independent claim 36 unpatentable.

**b.**    ***Chiu* and *Bustini* do not teach or suggest claim element 36[a].**

Claim element 36[a] recites "transferring data from the workstation to the telephone." This is identical to claim element 29[a]. The combination of *Chiu* and *Bustini* fails to teach or suggest this limitation for all the reasons discussed above regarding claim element 29[a]. Accordingly, the combination of *Chiu* and *Bustini* fails to render claim 36 unpatentable.

37

c. ***Chiu*** **and** ***Bustini*** **do not teach or suggest claim element 36[b].**

Claim element 36[b] recites "communicating audio information between the telephone and the multimedia server." This is identical to claim element 29[b]. The combination of *Chiu* and *Bustini* fails to teach or suggest this limitation for all the reasons discussed above regarding claim element 29[b]. Accordingly, the combination of *Chiu* and *Bustini* fails to render independent claim 36 unpatentable.

d. ***Chiu*** **and** ***Bustini*** **do not teach or suggest claim element 36[c].**

Claim element 36[c] recites "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold." The combination of *Chiu* and *Bustini* fails to teach or suggest this limitation.

i. **"throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information"**

Claim element 36[c] recites, in part, "throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information." Claim element 29[c] also has this requirement. Accordingly, the combination of

38

*Chiu* and *Bustini* fails to teach or suggest claim element 36[c] for all the reasons discussed above in Section IV(B)(1)(d)(i) and (ii).

> **ii.     "wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold."**

Claim element 36[c] also recites, in part, "wherein the throttling step further comprises the step of reducing a future amount of data <u>from being transferred from the workstation</u> if the amount of data exceeds <u>a predetermined threshold</u>." Accordingly, the "amount of data" is being compared with "a predetermined threshold" to determine "if the amount of data exceeds [the] predetermined threshold." When "true," something less than the original amount of data (i.e., a reduced amount) is transferred from the workstation.

To meet claim element 36[c], the Examiner cites to a portion of *Bustini* with a rate regulation scheme that color codes packets. Action, pp. 10-11 (citing *Bustini*, 2:27-3:7). Packets received for transmission are compared with a guaranteed minimum rate. *See Bustini*, 2:27-3:7. Packets that fall within the guaranteed minimum rate are color coded "green," while packets in excess of the guaranteed minimum rate are color coded "red." *Id.* The Examiner mapped *Bustini's* "green packets" and "red packets" to the claimed "audio information" and "data,"

respectively. Action, pp. 10-11. The Examiner also mapped *Bustini's* "guaranteed minimum rate" to the claimed "predetermined threshold." *Id*.

Even assuming *arguendo* that *Chiu* teaches the claimed "workstation" and "telephone," the Examiner did not articulate how *Bustini's* color coded "rate regulation scheme" would be implemented within *Chiu's* architecture. There is simply no component in *Chiu's* architecture that could perform the necessary comparisons and color code the claimed "data" red and the claimed "audio information" green, as proposed by the Examiner, while still meeting the requirements of claim element 36[c].

For example, the comparisons and color coding could not be performed by the claimed "workstation" because the claimed "workstation" never has access to the green packets (the Examiner-identified "audio information"). Further, the comparisons and color coding also could not be performed by the claimed "telephone." This is because, if the "the [original] amount of data" has arrived at the "telephone" for the comparison, "the [original] amount data" has already been "transferred from the workstation," and thus there is no possibility of transferring something less than the original amount of data from the "workstation," as claim element 36[c] requires.

The defects in the Examiner's obviousness rejection do not end there. *Bustini's* color coded "rate regulation scheme" is "for a bursty data source." *Bustini*,

40

2:38-29. This means both "red packets" and "green packets" come from the same "bursty data source" and contain bursty data. But as discussed above, the Examiner mapped *Bustini's* "green packets" and "red packets" to the claimed "audio information" and "data," respectively. The claimed "audio information" and "data" come from <u>different</u> sources. Specifically, the source of the claimed "audio information" is the "multimedia server," while the source of the claimed "data" is the "workstation." Further, the Examiner concedes that the claimed "audio information" is <u>not bursty data</u>. *See* Action, pp. 8-9. Thus, the claimed "audio information" would not be generated by the "bursty data source" in *Bustini's* color coded "rate regulation scheme," and would not be coded "green."

As already mentioned, the Examiner's proposed combination of *Bustini's* color coded "rate regulation scheme" with *Chiu's* architecture is unclear. *See* Action, pp. 10-11. The rejection of claim 36, however, does make multiple references to the proposed combination of *Bustini* and *Chiu* in the rejection of claim 29. Action, p. 10 ("Regarding independent claim 36, <u>see the claim 29 rejection</u> for additional details regarding the information handling system taught by Chiu in view of Bustini . . . Regarding the data prioritization mechanism obviously added to Chiu <u>as discussed in the claim 29 rejection above</u>") (emphasis added), p. 11 (a POSITA "would understand the combination of Chiu and Bustini renders this element obvious <u>for the same reasons</u> discussed in the claim 29 rejection above") (emphasis

41

added).   Because the Examiner proposes programming *Chiu's* "IP telephony peripheral 100" with *Bustini's* algorithm in the rejection of claim 29 (Action, p. 9), Patent Owner believes the Examiner is now proposing programming *Chiu's* "IP telephony peripheral 100" with *Bustini's* "rate regulation scheme" in the rejection of claim 36.   Under this proposed combination, *Chiu's* "IP telephony peripheral 100" (the Examiner-identified "telephone") would be discarding received "red packets" (the Examiner-identified "data") while passing along received "green packets" (the Examiner-identified "audio information").   The Examiner's proposed combination still does not meet claim element 36[c].

Under the Examiner's proposed combination, *Chiu's* "IP telephony peripheral 100," now programmed to operate as an "intermediate node" in *Bustini's* color coded "rate regulation scheme," is configured to receive "green packets" and "red packets." But it would be illogical for *Chiu's* "IP telephony peripheral 100" (the Examiner-identified "telephone") to pass along the "green packets" in accordance with *Bustini's* "rate regulation scheme."   *See Bustini*, 3:1-2 ("green packets are protected and passed along").   This is because *Chiu's* "IP telephony peripheral 100" (the Examiner-identified "telephone") would be the terminus for the received green packets (the Examiner-identified "audio information").   The "green packets" would not be transmitted to another network node.

42

The Examiner contends that the "rate of transfer of the green packets (e.g., audio information) would thereby increase with priority access to network bandwidth." Action, p. 11 (emphasis added). This is not correct because, as discussed above, *Chiu's* "IP telephony peripheral 100" (the Examiner-identified "telephone") would be the terminus for the received "green packets" (the Examiner-identified "audio information"). The received "green packets" (the Examiner-identified "audio information") no longer need to be transmitted and thus have no need for "priority access" or any type of access to network bandwidth. Thus, the combination of *Bustini* and *Chiu* does not "increase a rate of transfer of the audio information," as required by claim element 36[c].

Further, *Bustini* expressly discloses the color coded "rate regulation scheme" is from an IEEE paper entitled "Control for High Speed Packet Switched Networks." *See Bustini*, 2:28-32. But the color coded "rate regulation scheme" is not the same as *Bustini's* Main Algorithm (which the Examiner also relies on by virtue of citations to *Bustini's* Abstract). *Compare Bustini*, Abstract *with Bustini*, 2:51-3:7. The Examiner has failed to explain why it would be obvious to combine the color coded "rate regulation scheme" with *Bustini's* Main Algorithm. That is improper because the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit, even when the teachings being combined are from a single reference. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 538, 418 (2007); *see also In re Stepan Co.*, 868 F.3d

43

1342, 1346 n.1 (Fed. Cir. 2017) ("Whether a rejection is based on combining disclosures from multiple references [or] combining multiple embodiments <u>from a single reference</u> . . . there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful, otherwise a skilled artisan would not arrive at the claimed combination.") (emphasis added); MPEP § 2143.

Again, claim element 36[c] recites, in part, "reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold." The Examiner contends that a POSITA "would understand that queue management reduces a future amount of data from being transferred from a node if the amount of data within that node exceeds a predetermined threshold." Action, p. 11. Even if this is true—and Patent Owner does <u>not</u> concede that it is true—the Examiner has provided no evidence that *Chiu's* "computer 200" (the Examiner-identified "workstation") executes this specific form of queue management. Further, to the extent that the Examiner contends *Bustini's* "rate regulation scheme" performs this specific form of queue management, the Examiner has not explained how *Bustini's* "rate regulation scheme" would be implemented on *Chiu's* "computer 200" (the Examiner-identified "workstation").

44

In view of the above, *Bustini* does not teach or suggest claim element 36[c].

*Chiu* does not cure the deficiencies of *Bustini*, and the Examiner does not so allege.

Action, pp. 10-11.  Accordingly, the combination of *Chiu* and *Bustini* fails to teach

or suggest claim element 36[c], and thus fails to render independent claim 36

unpatentable.

### 4.    *Chiu* and *Bustini* do not render independent claim 37 obvious.

#### a.    *Chiu* and *Bustini* do not teach or suggest the preamble of claim 37.

The preamble of independent claim 37 recites "In an information handling

system comprising a hub, a multimedia server ("multimedia server") coupled to the

hub, a telephone coupled to the hub, a workstation coupled to the hub through the

telephone, and a data server coupled to the hub, a method comprising the steps of."

This is identical to the preambles of independent claims 29 and 36.  Accordingly,

the combination of *Chiu* and *Bustini* fails to teach or suggest the preamble of claim

37 for the same reasons the combination fails to teach or suggest the preamble of

claims 29 and 36 (discussed above).  Thus, the combination of *Chiu* and *Bustini* fails

to render independent claim 37 unpatentable.

#### b.    *Chiu* and *Bustini* do not teach or suggest claim element 37[a].

Claim element 37[a] recites "transferring data from the workstation to the

telephone."  This is identical to claim elements 29[a] and 36[a].  The combination

45

of *Chiu* and *Bustini* fails to teach or suggest this limitation for all the reasons discussed above regarding claim elements 29[a] and 36[a].   Accordingly, the combination of *Chiu* and *Bustini* fails to render claim 37 unpatentable.

### c.      *Chiu* and *Bustini* do not teach or suggest claim element 37[b].

Claim element 37[b] recites "communicating audio information between the telephone and the multimedia server."  This is identical to claim elements 29[b] and 36[b].  The combination of *Chiu* and *Bustini* fails to teach or suggest this limitation for all the reasons discussed above regarding claim elements 29[b] and 36[b].  Accordingly, the combination of *Chiu* and *Bustini* fails to render independent claim 37 unpatentable.

### d.      *Chiu* and *Bustini* do not teach or suggest claim element 37[c].

Claim element 37[c] recites

sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server, wherein the monitoring step further comprises the step of the telephone sending a congestion message to the multimedia server when the amount of the audio information falls below the predetermined level.

'684 Patent, claim 37.  The combination of *Chiu* and *Bustini* fails to teach or suggest this limitation.

### i.    "throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information"

Claim element 37[c] recites, in part, "throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information." Claim element 29[c] also has this requirement. *Compare* claim element 37[c] *with* claim element 29[c]. Accordingly, the combination of *Chiu* and *Bustini* fails to teach or suggest claim element 37[c] for all the reasons discussed above in Section IV(B)(1)(d)(i) and (ii).

### ii.    "wherein the monitoring step further comprises the step of the telephone sending a congestion message to the multimedia server when the amount of the audio information falls below the predetermined level."

Claim element 37[c] recites, in part, "wherein the monitoring step further comprises the step of the telephone sending a congestion message to the multimedia server when the amount of the audio information falls below the predetermined level." The Examiner mapped *Bustini's* "explicit congestion notification" ("ECN") to the claimed "congestion message." Action, p. 12. The Examiner contends that "ECNs may be triggered if a <u>threshold is exceeded</u>." *Id*. (emphasis added). But claim element 37[c] requires "sending the congestion message . . . when the amount of the audio information <u>falls below the predetermined level</u>." This is the reverse of

47

the trigger disclosed in *Bustini*. Accordingly, *Bustini* does not teach or suggest claim element 37[c].

Further, *Bustini* expressly discloses the "ECN" is part of a "reactive (feedback) control method" described in an IEEE paper entitled "Toward a Broadband Congestion Control Strategy." *See Bustini*, 3:65-4:31. But the "reactive (feedback) control method" is <u>not</u> the same as *Bustini's* Main Algorithm (which the Examiner also relies on by virtue of citations to *Bustini's* Abstract). *Compare Bustini*, Abstract *with Bustini*, 4:17-30. The Examiner has failed to explain why it would be obvious to combine the "reactive (feedback) control method" with *Bustini's* Main Algorithm (discussed above). That is improper because the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit, even when the teachings being combined are from a single reference. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 538, 418 (2007); *see also In re Stepan Co.*, 868 F.3d 1342, 1346 n.1 (Fed. Cir. 2017) ("Whether a rejection is based on combining disclosures from multiple references [or] combining multiple embodiments <u>from a single reference</u> . . . there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful, otherwise a skilled artisan would not arrive at the claimed combination.") (emphasis added); MPEP § 2143.

*Chiu* does not cure the deficiencies of *Bustini*, and the Examiner does not so allege. Action, p. 12. Accordingly, the combination of *Chiu* and *Bustini* fails to

48

teach or suggest claim element [37(c)], and thus fails to render independent claim 37 unpatentable.

### 5. *Chiu* and *Bustini* do not render claim 38 obvious.

Claim 38 recites "The method as recited in claim 37, further comprising the step of the multimedia server sending a throttling signal to the telephone in response to receipt of the congestion message." As discussed above, the combination of *Chiu* and *Bustini* does not teach or suggest each and every limitation of independent claim 37. Claim 38 depends from and adds limitations to claim 37. Accordingly, the combination of *Chiu* and *Bustini* also does not teach or suggest each and every limitation of dependent claim 38. Thus, the combination of *Chiu* and *Bustini* fails to render dependent claim 38 unpatentable.

Further, claim 38 recites "sending a throttling signal to the telephone in response to receipt of the congestion message." The Examiner contends that *Bustini* teaches a "throttle signal" and that "[u]pon receipt of the [throttle] signal, the source node reduces the window size from its current value thereby reducing the effective network data rate." Action, p. 13 (citing *Bustini*, 3:38-46). The Examiner mapped *Bustini's* alleged "throttle signal" to the claimed "throttling signal." *See id*. As discussed above, the Examiner also mapped *Bustini's* "ECN" to the claimed "congestion message." Action, p. 12. But *Bustini* fails to disclose that *Bustini's* alleged "throttle signal" (the Examiner-identified "throttling signal") is sent <u>in</u>

49

response to receipt of the "ECN" (the Examiner-identified "congestion message"), as claim 38 requires.

Further, by virtue of depending from claim 37, claim 38 includes all the limitations of claim 37. *See* 35 U.S.C. § 112, ¶4 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."). As discussed above regarding claim 37, the Examiner is combining the "reactive (feedback) control method" with *Bustini's* Main Algorithm (which the Examiner also relies on by virtue of citations to *Bustini's* Abstract). *Bustini* expressly discloses the "throttle signal" is part of a "window control method" described in an IEEE paper entitled "A Binary Feedback Scheme for Congestion Avoidance in Computer Networks." *See Bustini*, 3:8-56. But the "window control method" is <u>not</u> the same as the "reactive (feedback) control method" or *Bustini's* Main Algorithm. Accordingly, to meet claim 38, the Examiner must combine the "window control method," the "reactive (feedback) control method," and *Bustini's* Main Algorithm. But the Examiner has failed to adequately explain why it would be obvious to combine these three different algorithms. That is improper because the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit, even when the teachings being combined are from a single reference. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 538, 418 (2007); *see also In re Stepan Co.*, 868 F.3d 1342, 1346 n.1 (Fed. Cir. 2017) ("Whether a rejection is based on combining

50

disclosures from multiple references [or] combining multiple embodiments <u>from a single reference</u> . . . there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful, otherwise a skilled artisan would not arrive at the claimed combination.") (emphasis added); MPEP § 2143.

*Chiu* does not cure the deficiencies of *Bustini*, and the Examiner does not so allege.  Action, pp. 13-14.  Accordingly, the combination of *Chiu* and *Bustini* fails render dependent claim 38 unpatentable.

### 6. *Chiu* and *Bustini* do not render claim 39 obvious.

Claim 39 recites "The method as recited in claim 38, wherein the throttling step operates in response to receipt of the throttling signal."  As discussed above, the combination of *Chiu* and *Bustini* does not teach or suggest each and every limitation of independent claim 38.  Claim 39 depends from and adds limitations to claim 38.  Accordingly, the combination of *Chiu* and *Bustini* also does not teach or suggest each and every limitation of dependent claim 39.  Thus, the combination of *Chiu* and *Bustini* fails to render dependent claim 39 unpatentable.

Further, claim 39 depends from claim 38, which depends from claim 37.  Accordingly, claim 39 includes all the limitations/requirements of claims 37 and 38.  *See* 35 U.S.C. § 112, ¶4 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").

51

Accordingly, claim 39 requires (1) monitoring the amount of audio information (i.e., voice packets) received by the telephone from the multimedia server, (2) if that amount of received audio information falls below a predetermined level, the telephone send a congestion message to the multimedia server, (3) the multimedia server send a throttling signal back to the telephone in response to the congestion message, and (4) the amount of data transmitted "from the workstation to the telephone" or the rate at which data is transmitted "from the workstation to the telephone" be reduced in response to the telephone receiving the throttling signal from the multimedia server. *Bustini's* algorithms, whether viewed separately or in combination, simply do not teach or suggest all requirements (1)-(4), and thus do not render claim 39 obvious.  In particular, none of the algorithms teach throttling the data sent from the workstation to the telephone, based on the amount of audio information (i.e., voice packets) received by the telephone, as claim 39 requires. *Chiu* does not cure the deficiencies of *Bustini*, and the Examiner does not so allege. Action, pp. 11-14.  Accordingly, the combination of *Chiu* and *Bustini* fails render dependent claim 39 unpatentable.

### 7.    *Chiu* and *Bustini* do not render claims 40-41 obvious.

Claims 40-41 depend, either directly or indirectly, from and add limitations to claim 39.  As discussed above, the combination of *Chiu* and *Bustini* does not render

claim 39 obvious.  Accordingly, the combination of *Chiu* and *Bustini* does not render

claims 40-41 obvious for at least the same reasons.

## V.    NO SUBSTANTIAL NEW QUESTION (SNQ) OF PATENTABILITY EXISTS

Patent Owner respectfully asserts that no SNQs of patentability exist and thus the reexamination order should be vacated.  Patent Owner previously requested reconsideration of the SNQ issue by the Examiner in both the Reply under 37 C.F.R. § 1.111 filed on September 27, 2022, and in the Patent Owner's Statement under 37 C.F.R. § 1.530 filed on November 17, 2021.

In the Reexam Order dated September 17, 2021 ("Reexam Order"), the Office identifies two technological features as being "important" to the patentability of the independent claims for which reexamination is requested:

(1) a throttling step that reduces a future amount of data from being transferred from a workstation if the amount of data exceeds a predetermined threshold.

(2) a throttling step that monitors an amount of the audio information being received by a telephone from a multimedia server.

Reexam Order, p. 6.  The Office contends that "if a new reference . . . teaches [technological feature (1) or (2)], then that reference (or combination based on that reference) may raise a SNQ for those claims that recite [technological feature (1) or (2)]." *Id.*

The Office acknowledges that *Chiu* by itself fails to teach technological feature (1) or (2).  *Id*. at 10.  However, the Office contends that the combination of

*Chiu* and *Bustini* may teach technological feature (1) or (2), and thus the combination may raise a SNQ of patentability for the independent claims that include technological feature (1) or (2). *Id.* at 8-9. Patent Owner respectfully asserts the combination does not teach such features, and thus no SNQ of patentability exists.

As discussed above in reference to claim 36, the combination of *Chiu* and *Bustini* fails to teach or suggest a throttling step that reduces a future amount of data from being transferred from a workstation if the amount of data exceeds a predetermined threshold. In other words, the combination of *Chiu* and *Bustini* does not teach technological feature (1).

As discussed above in reference to claims 29 and 37, the combination of *Chiu* and *Bustini* fails to teach or suggest a throttling step that monitors an amount of the audio information being received by a telephone from a multimedia server. In other words, the combination of *Chiu* and *Bustini* does not teach technological feature (2).

Since the combination of *Chiu* and *Bustini* fails to teach or suggest either technological feature (1) or (2), a reasonable Examiner would conclude that no SNQ of patentability exists, and the order for *ex parte* reexamination should be vacated.

55

## VI.    CONCLUSION

The order for *ex parte* reexamination of the '684 Patent should be vacated because there is no SNQ of patentability.  Additionally, or alternatively, the cited art fails to render claims 29-41 unpatentable.

The Director is hereby authorized to charge any fees which may be required by this Appeal Brief under 37 C.F.R. § 41.37 to Deposit Account No. 604293.

DATED: May 22, 2023                    Respectfully submitted,

                                       By: /Todd E. Landis/
                                       Todd E. Landis
                                       Registration No. 44,200
                                       Counsel for Patent Owner

56

## VII.  CLAIMS APPENDIX

The following claims are involved in the appeal of the '684 Patent.

29. In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of:

transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;

communicating audio information between the telephone and the multimedia server; and

sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server.

30. The method as recited in claim 29, wherein the hub, multimedia server, data server, telephone, and workstation are coupled to each other via a network.

31. The method as recited in claim 30, wherein the network is a TCP/IP network.

32. The method as recited in claim 30, wherein the network is a packet switched network.

33. The method as recited in claim 30, wherein the telephone and multimedia server communicate using an IP protocol.

34. The method as recited in claim 29, wherein the monitoring step further comprises the step of monitoring a predetermined level within a jitter buffer.

35. The method as recited in claim 29, wherein the throttling results in no data being sent from the workstation to the telephone.

36. In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of:

transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;

communicating audio information between the telephone and the multimedia server; and

sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step,

wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold.

37. In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of:

transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;

communicating audio information between the telephone and the multimedia server; and

sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server, wherein the monitoring step further comprises the step of the telephone sending a congestion message to the multimedia server when the amount of the audio information falls below the predetermined level.

38. The method as recited in claim 37, further comprising the step of the multimedia server sending a throttling signal to the telephone in response to receipt of the congestion message.

39. The method as recited in claim 38, wherein the throttling step operates in response to receipt of the throttling signal.

40. The method as recited in claim 39, wherein the throttling signal includes a mode level.

41. The method as recited in claim 40, wherein the throttling step further comprises the step of adjusting a level of throttling of the data in response to the mode level included in the throttling signal.

## VIII.  EVIDENCE APPENDIX

Enclosed as Exhibit 2001 is the Claim Construction Order cited in Section IV(A)(3) (above).  Patent Owner notes that the Claim Construction Order issued on March 28, 2023, which is <u>after</u> the filing date of the Notice of Appeal (i.e., March 21, 2023).

# EXHIBIT 2001:
# CLAIM CONSTRUCTION ORDER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| ESTECH SYSTEMS IP, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 2:21-cv-00473-JRG-RSP |
| | § | (Lead Case) |
| MITEL NETWORKS, INC., | § | |
| | § | |
| *Defendant.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On February 22, 2023, the Court held a hearing to determine the proper construction of the

disputed claim terms in U.S. Patent Nos. 7,068,684 (the "'684 Patent") and 7,123,699 (the "'699

Patent") (collectively, "Asserted Patents"). Having reviewed the arguments made by the parties at

the hearing and in their claim construction briefing (Dkt. Nos. 292, 295, 304)[1], having considered

the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence,

the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH*

*Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz,*

*Inc.*, 135 S. Ct. 831, 841 (2015).

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites
are to the page numbers assigned through ECF.

# TABLE OF CONTENTS

I.  BACKGROUND .................................................................................................. 3

II.  APPLICABLE LAW ........................................................................................ 5

III.  THE PARTIES' STIPULATED TERMS ....................................................... 10

IV.  CONSTRUCTION OF DISPUTED TERMS ................................................ 11

    A.  "mode level" ........................................................................................ 11

    B.  "hub" .................................................................................................... 14

    C.  "throttling" ........................................................................................... 19

    D.  The "circuitry" terms .......................................................................... 24

    E.  "means for sending a request from the first LAN to the second LAN over the WAN to establish a connection between the first LAN and the second LAN in response to selection of a voice mail access input and selection of a direct station select input at a telephone within the first LAN" ........................................................ 31

    F.  "means for establishing an audio path over the connection between the voice mail box and the telephone" ......................................................................... 39

    G.  "means for playing a voice message stored in the voice mail box over a speaker in the telephone" ............................................................................................ 45

V.  CONCLUSION ................................................................................................ 48

## I.  BACKGROUND

Plaintiff Estech Systems IP, LLC ("Plaintiff" or "Estech") alleges that Defendants Mitel Networks, Inc., Abbott Laboratories, Fiserv, Inc., Fiserv Solutions, LLC, Randstad US LLC, Randstad Professionals US LLC, Marriott International, Inc., Primoris Services Corporation, Primoris Design & Construction, Inc., First American Financial Corporation, and Republic Title of Texas, Inc. ("Defendants") infringe the '684 Patent and '699 Patent. Shortly before the start of the February 22, 2023 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.

The '684 Patent, titled "Quality of Service in a Voice Over IP Telephone System," was filed on February 1, 2001, and issued on June 27, 2006. The '699 Patent, titled "Voice Mail in a Voice Over IP Telephone System," was filed on August 2, 2002, and issued on October 17, 2006. The '684 Patent and '699 Patent each share common priority to U.S. Patent Application No. 09/775,018, which was filed on February 1, 2001. The '684 Patent and '699 Patent relate "to information processing systems, and in particular, to the use of Voice over IP technology to transmit voice conversations." '699 at 1:10–12, 684 at 1:6–8.

The Abstract of the '684 Patent states:

> An information handling system comprises a TCP/IP network connecting a hub to a multimedia server and the hub to a data server, and the hub to an IP telephony device that is then coupled to a network device. Data sent from the network device is addressed for transmission to the data server and is transmitted through the IP telephony device to the TCP/IP network. The IP telephony device monitors when an amount of data being received over the network falls below a predetermined threshold. If this occurs, the IP telephony device will send a signal to the multimedia server, which will then generate a congestion signal to send to all or selected IP telephony devices in the network to throttle data being received by the IP telephony devices from their respective connected network devices.

Claim 29 of the '684 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 29. In an information handling system comprising a *hub*, a multimedia server ("multimedia server") coupled to the *hub*, a telephone coupled to the *hub*, a workstation coupled to the *hub* through the telephone, and a data server coupled to the *hub*, a method comprising the steps of:
>
> transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;
>
> communicating audio information between the telephone and the multimedia server; and
>
> sufficiently *throttling* the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the *throttling* step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server.

The Abstract of the '699 Patent states:

> In a voice over IP system, an IP telephone includes an LED lamp that indicates a voice message has been stored in a remote voice mail system. The IP telephone can then access that voice message. The message can also be moved from one remote site to another.

Claim 4 of the '699 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 4. An information handling system comprising a first LAN, a second LAN, and a WAN coupling the first LAN to the second LAN using a network protocol, the system comprising:
>
> *means for sending a request from the first LAN to the second LAN over the WAN to establish a connection between the first LAN and the second LAN in response to selection of a voice mail access input and selection of a direct station select input at a telephone within the first LAN*, wherein the direct station select input identifies a voice mail box within the second LAN;
>
> *means for establishing an audio path over the connection between the voice mail box and the telephone*; and
>
> *means for playing a voice message stored in the voice mail box over a speaker in the telephone as a result of sending audio data* containing the voice message over the audio path.

## II. APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because

claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims

absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id.* Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871)

(a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

## B.   Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis*

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

*Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C.    Means-Plus-Function Limitations

Where a claim limitation is expressed in "means plus function" language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (citing 35 U.S.C. § 112, ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves multiple steps. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* Moreover, the focus of the "corresponding structure" inquiry is not merely whether a structure

is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.*

### III.    THE PARTIES' STIPULATED TERMS

The Parties agreed to the construction of the following terms in their Joint Claim Construction Chart Pursuant to Rule 4-5(d).

| Claim Term/Phrase | Agreed Construction |
| --- | --- |
| The preambles of Claims 1, 29, 36, 37, and 47 of the '684 Patent. | The preamble is limiting. |
| "a telephony device coupled to the hub"  ('684 Patent, Claim 1) | "a telephony device communicatively connected to the hub" |
| "a first network device coupled to the hub"  ('684 Patent, Claim 1) | "a first network device communicatively connected to the hub" |
| "a data server coupled to the hub"  ('684 Patent, Claims 29, 36, 37) | "a data server communicatively connected to the hub" |
| "multimedia server ('multimedia server') coupled to the hub"  ('684 Patent, Claims 29, 36, 37) | "a multimedia server communicatively connected to the hub" |
| "workstation coupled to the hub"  ('684 Patent, Claims 29, 36, 37) | "a workstation communicatively connected to the hub" |
| "reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold"  ('684 Patent, Claim 36) | "reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined level of data" |
| "coupling a second LAN to the first LAN over a WAN"  ('699 Patent, Claim 1) | "communicatively connecting a second LAN to the first LAN over a WAN" |

| | |
|---|---|
| "coupling an audio path over the channel between the telecommunications device and the voice mail box"<br><br>('699 Patent, Claim 1) | "communicatively connecting a path capable of transferring audio information such as voice data over the channel between the telecommunications device and the voice mail box" |
| "storing a voice mail message in a voice mail box in a voice mail system within a first LAN"<br><br>('699 Patent, Claim 1) | Plain and ordinary meaning |
| "direct station select input"<br><br>('699 Patent, Claim 2) | "key on a DSS console having LED lamps and keys that can be programmed by the user to monitor the status of individual stations, trunks or features" |
| "first LAN", "second LAN", "WAN"<br><br>('699 Patent, Claims 1, 2, 4) | "the first LAN, second LAN, and WAN are networks that are distinct from each other" |

Dkt. No. 305-1 at 2, 6-7, 10, 13, 30-31, 33, 35, 37-38, 41, 44. In view of the parties' agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the parties' agreed constructions.

## IV.    CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of sixteen terms or phrases in the Asserted Patents. Each dispute is addressed below.

### A.  "mode level"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "mode level" | Plain and ordinary meaning; no construction necessary. | "indication of whether to throttle in most aggressive mode or least aggressive mode" |

### 1.  Analysis

The term "mode level" appears in Asserted Claim 6, 7, 40, 41, 49, 50, 51, and 52 of the

'684 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "mode level" requires construction.[3]

The specification discloses an information handling system in which data from workstation 106 is sent to data server 104 through telephone 105 and hub 103. Audio information (e.g., voice data) from telephone 105 is transferred to IP Server 101 via hub 103.



'684 Patent at Figure 1. The specification states that the disclosed system "permits the IP telephony device 105 to throttle the data to/from the workstation 106." '684 Patent at 4:44–46. The purpose of throttling is to limit data flow from the workstation (106 (labeled as a PC in Figure 1)) to a data server (104) (through the telephone), which allows an increase in the amount of data flow between

---

[3] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Docket No. 292 at 10-11); Defendants' Responsive Claim Construction Brief (Docket No. 295 at 10-12); and Plaintiff's Reply Claim Construction Brief (Docket No. 304 at 2).

the telephone (105) and the multimedia server (101). *Id.*

With this background, the Court turns to the disputed term "mode level," which does not appear in the specification. However, the specification describes the concept of "mode level" as follows:

> The multimedia server 101 messages to all of the IP telephony devices that they need to throttle-down the workstation data they are receiving using *the most aggressive algorithm* (e.g., using an 80/20 duty cycle where eighty percent of the time the devices are in the jabber state, and twenty percent of the time they are allowing data to flow). As the IP telephony devices stop reporting congestion, the multimedia server 101 may issue *the next lower level or hold-off (e.g., a 50/50 duty cycle). The multimedia server 101 will continue until a point of equilibrium exists* that allows the maximum data flow in the network along with the required multimedia traffic bandwidth.

*Id.* at 14:63–15:7 (emphasis added). Contrary to Defendants' contention, the specification does not limit the term "mode level" to only "a most aggressive mode" and "a least aggressive mode." Instead, as illustrated above, the specification indicates that there may be multiple mode levels that are less aggressive than the "most aggressive mode:" Accordingly, the Court rejects Defendants' construction, because it would exclude embodiments that use multiple mode levels. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification. However, we have interpreted claims to exclude embodiments of the patented invention where those embodiments are clearly disclaimed in the specification.") (internal quotations omitted).

Moreover, the term "mode level" is first recited in dependent Claim 6, which recites "wherein the throttling signal includes a mode level in which the throttling circuitry should operate." Subsequent dependent claims identify "a most aggressive mode" (*e.g.*, Claims 8 and 9) and "a least aggressive mode" (*e.g.*, Claims 10 and 11) as different mode levels. "Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the

independent claims from which they depend." *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1242 (Fed. Cir. 2003). Defendants' construction violates this doctrine, because the term "mode level" is broader than the "most aggressive mode" and "least aggressive mode" recited in the dependent claims.

Defendants argue that the only pertinent uses of the phrase "mode" are to describe something as either being in "Most Aggressive Mode" or "Least Aggressive Mode." (Dkt. No. 295 at 10) (citing '684 Patent at 13:44–49, Figures 10, 12A, 12B). According to Defendants, Plaintiff should be held to two-mode algorithm for throttling because it is described in the specification, and recited in the identified dependent claims. (Dkt. No. 295 at 11). The Court disagrees. As illustrated above, Defendants fail to acknowledge the specification's disclosure of multiple mode levels (*i.e.*, not only most aggressive and least aggressive). In addition, dependent Claim 6 recites "*a* mode level" without requiring that the mode level be limited to only most-aggressive and least-aggressive mode levels. Only dependent Claims 8-11 require the specific mode levels that Defendants improperly seek to import into Claim 6. Furthermore, Defendants identify no disclaimer or lexicography to support their construction. Accordingly, the Court rejects Defendants' construction.

### 2. Court's Construction

For the reasons set forth above, the term **"model level"** is given its **plain and ordinary meaning.**

### B. "hub"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "hub" | Plain and ordinary meaning; no construction necessary. | Plain and ordinary meaning; a hub is not a switch. |

## 1. Analysis

The term "hub" appears in Asserted Claims 1, 29, 30, 36, and 37 of the '684 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether a "switch" would fall within the scope of the recited "hub."[4]

Defendants argue that the plain and ordinary meaning of that term does not include a "switch." (Dkt. No. 295 at 12). Defendants contend that the specification refers to a "hub" when describing the components of the network elements, but does not provide a description of what a "hub" is. *Id.* Defendants also contend that the patentees never recited that the claimed "information handling system" includes a "switch," despite describing that the "IP telephony device will contain two separate media access controllers ('MACs') configured to provide a two-port, layer 2 Ethernet switch." *Id.* (citing '684 Patent at 2:19–30).

Defendants further argue that the distinction between a "hub" and routing hardware is also reflected in the figures. (Dkt. No. 295 at 12-13) (citing '684 Patent at Figure 3). According to Defendants, the intrinsic record makes clear that a "hub" is not a "switch" or a "router." (Dkt. No. 295 at 14). Finally, Defendants contend that extrinsic evidence confirms that a "hub" is a specific piece of network hardware that is different from a switch. *Id.* at 15-17 (citing Dkt. No. 295-3 at 32:10–33:1, 98:2–99:4, 120:4–120:17; Dkt. No. 295-4 at 2 (Estech recommending "installation of a three-port hub to bypass the phone's built-in two-port switch"); Dkt. No. 295-5 citing (Hansen Dep. Ex. 13 at 148, 151); Dkt. No. 291-3 at 6; Dkt. No. 291-4 at 5; Dkt. No. 295-6 at 4-5; Dkt.

---

[4] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Docket No. 292 at 15-21); Defendants' Responsive Claim Construction Brief (Docket No. 295 at 12-17); and Plaintiff's Reply Claim Construction Brief (Docket No. 304 at 2-4).

No. 295-7 at 4; Dkt. No. 295-8 at 4).

Starting with the claim language, the term "hub" appears in the preamble of independent Claims 29, 36, and 37:

> 29. In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub, a method comprising the steps of:

The claim language indicates that the "hub" couples the "multimedia server," "telephone," "workstation" ("through the telephone"), and "data server." Defendants correctly argue that the specification does not explicitly describe the "hub" as a "switch." The specification also describes that the recited "IP telephony device 105 contains the ability to perform layer-2 switching between two Ethernet ports in the telephony device for total control over voice versus data quality of service in accordance with the present invention." '684 Patent at 10:28–33. However, the specification does not exclude switches from the "hub" term. Instead, the description of the hub is consistent with the claim language of communicatively connecting devices. For example, Figure 1 depicts hub 103 coupling IP server 101 (also referred to as "multimedia server 101"), IP telephone 105, workstation PC 106 (through IP telephone 105), and data server 104. *See* '684 Patent at 3:63–4:12, Figure 1.

Moreover, the intrinsic evidence indicates that the patentees intended to include "switches" within the scope of the term "hub." During prosecution, the examiner rejected the pending claims in view of the "Chen" prior art reference. The examiner specifically identified "switch 90" in Chen as disclosing the claimed "hub," as follows:

> Regards to claims 38 and 56, Chen teaches a system comprising: a Hub (Fig. 1a, switch 90), a multimedia server (Fig. 1a, 92), a telephony device ( telephone in 124) coupled to the hub (Fig. 1a, 90), and a work station coupled to the hub through the telephony device (Fig. 1a, work station 70c coupled to the hub 90 via telephone).

(Dkt. No. 292-5 at 5). This indicates that a person of ordinary skill in the art would have understood that the term "hub," as recited in the claims, includes switches.

Finally, the Court finds that the extrinsic evidence presented by Defendants in this case is unpersuasive. Regarding Mr. Hansen's deposition, this Court and the Federal Circuit have found that the testimony of a named inventor has little relevance in claim construction. *See Super Interconnect Techs. LLC v. Huawei Device Co.*, 2020 U.S. Dist. LEXIS 1672, *44 (E.D. Tex. Jan. 6, 2020) (Payne, J.) (concluding "testimony of named inventors is of little, if any, relevance in . . . claim construction proceedings.") (citing *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346-47 (Fed. Cir. 2008) (stating that inventor testimony is "limited by the fact that an inventor understands the invention but may not understand the claims, which are typically drafted by the attorney prosecuting the patent application"). Similarly, the *Estech* documents cited by Defendants are not persuasive, because those documents do not address the term "hub" as used in the asserted claims.

Defendants also cite the Newton's Telecom Dictionary, which states that "[h]ubs aren't switches, as they have very little intelligence, if any, and don't set up transmission paths." (Dkt. No. 295-6 at 4-5, Dkt. No. 295-7 at 4; *see also* Dkt. No. 295-8 at 4). When relying on a dictionary, the "court must ensure that any reliance on dictionaries accords with the intrinsic evidence: the claims themselves, the specification, and the prosecution history." *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1348 (Fed. Cir. 2005). Here, the Court finds that the Newton's

Telecom Dictionary contradicts the prosecution history, which shows that a person of ordinary skill in the art, at the time of the invention, would have understood that the term "hub" includes switches. Additionally, Plaintiff provides extrinsic evidence that is consistent with this understanding of the term "hub." For example, the fourth edition of the Microsoft Computer Dictionary defines a "hub" as follows:

> **hub** *n.* In a network, a device joining communication lines at a central location, providing a common connection to all devices on the network. The term is an analogy to the hub of a wheel. *See also* active hub, switching hub.

Dkt. No. 292-3 at 7 (highlight added).

> **switching hub** *n.* A central device (switch) that connects separate communication lines in a network and routes messages and packets among the computers on the network. The switch functions as a hub, or PBX, for the network. *See also* hub, packet (definition 1), PBX, switch (definition 3), switched Ethernet, switched network.

Dkt. No. 292-3 at 6 (highlight added). Thus, the extrinsic evidence cited by Plaintiff is consistent with the intrinsic evidence, and indicates that a person of ordinary skill in the art would understand that the term "hub," as recited in the claims, may include a switch. Accordingly, the Court rejects Defendants' construction, because the record does not support excluding switch from the scope of the term "hub."

### 2. Court's Construction

For the reasons set forth above, the term **"hub"** is given its **plain and ordinary meaning.**

### C. "throttling"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "throttling" | Plain and ordinary meaning; no construction necessary. | "the activity or process of limiting the bandwidth available to users of an electronic communication system" |

### 1. Analysis

The term "throttling" appears in Asserted Claims 29, 35, 36, 37, 38, 39, 40, and 41 of the '684 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. Defendants argue that "throttling" requires limiting bandwidth to effectively reduce data flow or data transfer.[5]

Defendants acknowledge that the longer phrase "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step" was previously construed by the Court. Defendants contend that neither the individual term "throttling," nor the particular dispute present in this case has been addressed by this (or any other) Court. (Dkt. No. 295 at 17). According to Defendants, the Court previously found that the longer phrase "sufficiently throttling…" was broader than "reducing the number of data packets." *Id.* (citing *Estech Systems Inc. v. Target Corporation*, Case No. 2:20-cv-00123-JRG-RSP (Lead Case), Claim Construction Memorandum Opinion and Order (Dkt. No. 159) at 23 (E.D. Tex. Mar. 21, 2021)).

Defendants argue that "throttling" requires limiting bandwidth to effectively reduce data flow or data transfer. (Dkt. No. 295 at 18-19) (citing '684 Patent at 2:11–30, 13:17–49, 19:4–19, 19:36–52). Defendants assert that Plaintiff intends to read "throttling" out of the claims with its

---

[5] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Docket No. 292 at 12-15); Defendants' Responsive Claim Construction Brief (Docket No. 295 at 17-24); and Plaintiff's Reply Claim Construction Brief (Docket No. 304 at 4-7).

"plain and ordinary meaning." *Id.* at 19. Defendants state that they understand Plaintiff to contend that as long as there is an increase in the rate of transfer of audio information, throttling has occurred. *Id.*

Defendants also argue that Plaintiff agreed during the *Markman* Hearing in *Estech Systems Inc. v. Carvana LLC*, Case No. 2:21-cv-00482-JRG-RSP, that "the plain and ordinary meaning of 'throttling' would be limiting the data sent from the workstation to the telephone." (Dkt. No. 295 at 20) (citing *Markman Hearing Transcript*, 15:24–16:7 (E.D. Tex. Dec. 13, 2022)). Defendants state that they do not disagree that if there is enough throttling of the data sent from the workstation to the telephone, this may make room for an increase in the rate of transfer of audio information from the telephone to the multimedia server, but argue that the converse is not necessarily true. (Dkt. No. 295 at 21-22) (citing '684 Patent at 4:44–45, 14:30–33, 19:33–35).

Defendants further contend that Plaintiff's additional arguments in response to patent office rejections in the *ex parte* reexamination also illuminate the claim construction issues in this case. (Dkt. No. 295 at 20). Defendants argue that in the *ex parte* reexamination, Plaintiff argued against a proposed combination of references as failing to "reduce the amount of data transmitted 'from the workstation to the telephone' and/or reduce the rate at which data is transmitted 'from the workstation to the telephone.'" *Id.* at 20-21 (citing Dkt. No. 295-11 at 6-7). According to Defendants, Plaintiff distinguished the prior art based on the location of the throttling algorithm (*i.e.*, in the network node), and confirmed that throttling must occur in the telephone. Dkt. No. 295 at 21.

Defendants also argue that during prosecution of the '684 Patent, the patentees made clear that "throttling" involved limiting the rate of transfer of data (*i.e.*, sending less data in a particular time). Defendants contend that the patentees distinguished a prior art reference by saying that "if

there would be any throttling [in the prior art reference], it would be of the rate of transfer of the audio information [as opposed to the data from the workstation]." *Id.* at 22 (citing Dkt. No. 295-9 at 20). Defendants further argue that as recently as September 27, 2022, Plaintiff argued in the *ex parte* reexamination of the '684 Patent that "throttling" resulted in "bandwidth savings." (Dkt. No. 295 at 23) (citing Dkt. No. 295-2 at 13-14). Defendants contend that Plaintiff argued that the prior art did not control the amount/rate of data "sent from the workstation to the telephone." (Dkt. No. 295 at 23) (citing Dkt. No. 295-2 at 15).

The plain language of the claim requires "throttling" the "data sent from the workstation to the telephone," which requires more than merely an increase in the rate of audio information. Indeed, as Plaintiff argued in the *ex parte* reexamination of the '684 Patent, "'throttling the data sent from the workstation to the telephone.' … means reducing the amount of data transmitted 'from the workstation to the telephone' and/or reducing the rate at which data is transmitted 'from the workstation to the telephone.'" Dkt. No. 295-11 at 6 (citing '684 Patent, Claim 29); *see also*, Dkt. No. 295-2 at 15 ("[The Prior art's] algorithm does <u>not</u> enable the network node to control the amount of data transmitted <u>to the network node</u> and/or the rate at which data is transmitted <u>to the network node</u>.") (emphasis in original). Accordingly, a person of ordinary skill in the art would understand "throttling the data" means "reducing the amount or rate of data transmitted."

The specification confirms this understanding by disclosing an information handling system in which data from workstation 106 is sent to data server 104 through telephone 105 and hub 103. Audio information (e.g., voice data) from telephone 105 is transferred to IP Server 101 via hub 103.



'684 Patent at Figure 1. The specification states that the disclosed system "permits the IP telephony device 105 to throttle the data to/from the workstation 106." '684 Patent at 4:44–46. The purpose of throttling is to limit data flow from the workstation (106 (labeled as a PC in Figure 1)) to a data server (104) (through the telephone), which allows an increase in the amount of data flow between the telephone (105) and the multimedia server (101). For example, the specification states the following:

> More specifically, an IP telephony device will contain two separate media access controllers ("MACs") configured to provide a two-port, layer 2 Ethernet switch. This approach permits one MAC to be connected to the network, while the other MAC is dedicated to a connected network device. This allows all traffic flowing between MACs to be manipulated by a hardware/software approach within the IP telephony device. The quality of service algorithm of the present invention uses this configuration *to restrict data traffic to/from the network device* during peak traffic conditions, thus providing increased multimedia traffic bandwidth when needed.

'684 Patent at 2:19–30 (emphasis added), *see also, id.* at 13:17–49. Likewise, the patentees argued

during prosecution that there must be "throttling" of some type of data. Specifically, in distinguishing the prior art, the patentees argued that "the most that [the prior art] teaches or suggests is that if there would be any throttling, it would be of the rate of transfer of the audio information and not throttling of other types of data." (Dkt. No. 295-9 at 20).

In summary, the method recites the step of "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step." In the context of the surrounding claim language and intrinsic evidence, a person of ordinary skill in the art would understand the term "throttling the data" to mean "reducing the amount or rate of data transmitted."

Turning to Defendants' construction, the Court finds that it introduces unnecessary ambiguity into the claims. The claims do not recite "an electronic communications systems [sic]." Rather, the preamble of independent Claims 29, 36, and 37 recite "an information handling system." Defendants' construction also requires "limiting bandwidth available to users." The claims do not recite a user, or multiple users. As discussed above, "throttling" relates to "the data sent from the workstation to the telephone." The claims do not require that throttling impacts the bandwidth available to "users."

Defendants' limitations also do not find support in the specification. Instead, Defendants' construction is copied directly from the Merriam-Webster Online Dictionary. (Dkt. No. 295 at 23) (citing Dkt. No. 295-7 at 5). Although courts can "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1322-23 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)) (emphasis added). The "court must ensure that any reliance on dictionaries accords

with the intrinsic evidence: the claims themselves, the specification, and the prosecution history." *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1348 (Fed. Cir. 2005). Because Defendants' construction introduces unnecessary ambiguity into the claim language, it is not in accordance with the intrinsic evidence.

Moreover, Defendants do not consider the term "throttling" in the context of the surrounding claim language. As the Federal Circuit has repeatedly held, claim construction begins with the language of the claims themselves. *Skedco, Inc. v. Strategic Operations, Inc.*, 685 F. App'x 956, 959 (Fed. Cir. 2017) ("Claim construction must begin and remain centered on the claim language."). All of the Asserted Claims are method claims, and the claim language itself recites the required limitations. As discussed above, the disputed term "throttling" is included in the step of "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step" in independent Claims 29, 36, and 37. The step itself requires the activity or process of "throttling" the "data sent from the workstation to the telephone." To the extent that a party argues that "throttling" occurs as long as there is an increase in the rate of transfer of audio information, the Court rejects that argument.

### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"throttling the data"** to mean **"reducing the amount or rate of data transmitted."**

### D. The "circuitry" terms

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "circuitry for throttling data sent from the first network device"<br><br>'684 Patent: Claim 1 | Plain and ordinary meaning; no construction necessary. | **Function:** throttling data sent from the first network device<br>**Structure:** Telephone circuitry (e.g., DSP and jitter buffer) described in '684 Patent at Figs. 10, 11, 12A, 12B, 11:54–15:13 |

| "circuitry for monitoring an amount of data addressed to and received by the telephony device"<br><br>'684 Patent: Claim 1 | Plain and ordinary meaning; no construction necessary. | **Function:** motoring an amount of data addressed to and received by the telephony device<br>**Structure:** Telephone circuitry (e.g., DSP and jitter buffer) described in '684 Patent at Figs. 10, 11, 12A, 12B, 11:54–15:13 and in particular 11:54–12:19 |
| --- | --- | --- |
| "the throttling circuitry reduces a future amount of data"<br><br>'684 Patent: Claims 1, 48, 51 | Plain and ordinary meaning; no construction necessary. | **Function:** reducing a future amount of data<br>**Structure:** Telephone circuitry (e.g., DSP and jitter buffer) described in '684 Patent at Figs. 10, 11, 12A, 12B, 11:54–15:13 and in particular 12:44–14:12 |
| "circuitry for sending a congestion message"<br><br>'684 Patent: Claims 3, 47 | Plain and ordinary meaning; no construction necessary. | **Function:** further requires sending a congestion message to the multimedia server when the amount of data addressed to and received by the telephony device falls below the predetermined threshold<br>**Structure:** Telephone circuitry (e.g., DSP and jitter buffer) described in '684 Patent at Figs. 10, 11, 12A, 12B, 11:54–15:13 and in particular 12:11–19 |
| "circuitry for sending a throttling signal in response to receipt of the congestion message"<br><br>'684 Patent: Claim 4 | Plain and ordinary meaning; no construction necessary. | **Function:** sending a throttling signal in response to receipt of the congestion message<br>**Structure:** Telephone circuitry (e.g., DSP and jitter buffer) described in '684 Patent at Figs. 10, 11, 12A, 12B, 11:54–15:13 and in particular 12:44–13:16 |
| "throttling circuitry…throttles the future amount of data sent from the first network device in response to receipt of the throttling signal"<br><br>'684 Patent: Claim 5 | Plain and ordinary meaning; no construction necessary. | **Function:** sending a throttling signal in response to receipt of the congestion message<br>**Structure:** Telephone circuitry (e.g., DSP and jitter buffer) described in '684 Patent at Figs. 10, 11, 12A, 12B, 11:54–15:13 and in particular 12:44–13:16 |

| "throttling circuitry adjusts its level of throttling of the data in response to the mode level included in the throttling signal"<br><br>'684 Patent: Claim 47 | Plain and ordinary meaning; no construction necessary. | **Function:** adjusting a level of throttling of data in response to a mode level included in a throttling signal<br>**Structure:** Telephone circuitry (e.g., DSP and jitter buffer) described in '684 Patent at Figs. 10, 11, 12A, 12B, 11:54–15:13 and in particular 13:4–14:29 and 14:47–15:7 |
|---|---|---|
| "throttling circuitry…for sending a congestion message from a data output port when the amount of the information being received by the IP telephony device falls below a predetermined level."<br><br>'684 Patent: Claim 47 | Plain and ordinary meaning; no construction necessary. | **Function:** sending a congestion message from a data output port when the amount of the information being received by the IP telephony device falls below a predetermined level<br>**Structure:** Telephone circuitry (e.g., DSP and jitter buffer) described in '684 Patent at Figs. 10, 11, 12A, 12B, 11:54–15:13 and in particular 12:11–19 |
| "throttling circuitry throttles the future amount of data received at the input data port in response to receipt of a throttling signal at the input data port"<br><br>'684 Patent: Claim 48 | Plain and ordinary meaning; no construction necessary. | **Function:** throttling the future amount of data received at the input data port in response to receipt of a throttling signal at the input data port<br>**Structure:** Telephone circuitry (e.g., DSP and jitter buffer) described in '684 Patent at Figs. 10, 11, 12A, 12B, 11:54– 15:13 and in particular 12:44–13:16 |
| "circuitry for sufficiently throttling the data [received at the input data port]"<br><br>'684 Patent: Claim 47 | Plain and ordinary meaning; no construction necessary. | **Function:** sufficiently throttling data received at the input data port<br>**Structure:** Telephone circuitry (e.g., DSP and jitter buffer) described in '684 Patent at Figs. 10, 11, 12A, 12B, 11:54-15:13 |

### 1. Analysis

As indicated in the chart above, the "circuitry" terms appear in various claims of the '684

Patent. The parties dispute whether the ten "circuitry" terms require construction under 35 U.S.C.

§ 112 ¶ 6.[6] Defendants contend that each term should be governed by § 112 ¶ 6, and that their

proposed functions and structures should be adopted.

### i. Rebuttable Presumption

Here, there is a rebuttable presumption that § 112 ¶ 6 does not apply because the claims do

not recite the word "means." Therefore, the analysis proceeds in two steps. First, the Court must

determine whether the phrase is in means-plus-function form pursuant to 35 U.S.C. § 112(f). *See*

*Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1097 (Fed. Cir. 2014). If the Court determines

that the phrase recites a means-plus-function limitation, then the Court proceeds to the next step

and attempts "to construe the disputed claim term by identifying the corresponding structure,

material, or acts described in the specification to which the term will be limited."

### ii. The Claims are Not Subject to § 112 ¶ 6.

Defendants argue that in a post-*Williamson* analysis of "circuitry," the strong presumption

against construing "circuitry for . . ." under § 112 ¶ 6 has been discarded in favor of a more relaxed

standard of whether a person of ordinary skill in the art would understand the term "circuitry" as

meaning a specific structure. (Dkt. No. 295 at 26) (citing *Williamson*, 792 F.3d at 1349).

Defendants further argue the Federal Circuit has not analyzed "circuitry for . . ." under a post-

*Williamson* context with the more relaxed framework. (Dkt. No. 295 at 27). Defendants' expert,

Dr. Shukri Souri, opines that a POSITA would interpret each "circuitry" term as failing to convey

definite meaning as to what it is that performs the corresponding function of the claim term. (Dkt.

---

[6] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim
Construction Brief (Docket No. 292 at 8-10); Defendants' Responsive Claim Construction Brief
(Docket No. 295 at 24-29); and Plaintiff's Reply Claim Construction Brief (Docket No. 304 at 7-
9).

No. 295 at 28) (citing Dkt. No. 295-10 at ¶¶22–28). Defendants contend that while a POSITA could envision a number of different forms of circuitry that could accomplish this function, none are claimed. (Dkt. No. 295 at 28).

The Asserted Claims do not recite the word "means," and Defendants have not overcome the rebuttable presumption that § 112 ¶ 6 does not apply. The Federal Circuit has repeatedly held that "circuitry" connotes structure to those in the electronic arts, and it is not subject to 35 U.S.C. § 112 ¶ 6 when coupled with a description of the circuit's operation. *Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1355-56 (Fed. Cir. 2006) ("[T]he term 'circuitry,' by itself, connotes structure…. The claim language here … adds further structure by describing the operation of the circuit[, including] [t]he circuit's input …; its objective …; and its output… This description of the operation of the circuit is sufficient to avoid 112 ¶ 6"); *Apex Inc. v. Raritan Comp., Inc.*, 325 F.3d 1364, 1374 (Fed. Cir. 2003) ("[W]e hold that the terms 'first interface circuit' and 'second interface circuit' are not means-plus-function limitations.").

For example, in *Linear Technology Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004), the Federal Circuit reasoned that the technical dictionaries "plainly indicate that the term 'circuit' connotes structure," and "[t]hus, when the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply." *Id*. at 1320. After analyzing the claims at issue, the Federal Circuit "h[e]ld that because the term 'circuit' is used in each of the disputed limitations … with a recitation of the respective circuit's operation in sufficient detail to suggest structure to persons of ordinary skill in the art, the 'circuit' and 'circuitry' limitations of such claims are not means-plus-function limitations subject to 35 U.S.C. § 112 ¶ 6." Id. at 1320-21. Since *Linear*, the Federal Circuit has confirmed that "circuit" /

"circuitry" connotes sufficient structure. *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1365 (Fed. Cir. 2013) (The claim's description of "an input to the circuit …, a straightforward function …, and an output … is sufficient structure in the context of the claimed invention to avoid the ambit of means-plus-function claiming.");

Here, the context of the claims confirm the structural nature of the claimed "circuitry." For example, Claim 1 recites a "hub," "a multimedia server," "a telephony device," and "a first network device." The claim further recites that the "telephony device" includes "circuitry for throttling data sent from the first network device," and that "the throttling circuitry reduces a future amount of data from being transferred from the first network device if the amount of data addressed to and received by the telephony device falls below a predetermined threshold." Claim 1 also recites "circuitry for monitoring an amount of data addressed to and received by the telephony device."

By reciting the objectives of the "circuitry," and how the circuitry operates within the context of the claimed invention, the claim language connotes sufficiently definite structure to one of skill in the art. *See, e.g., Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1301 (Fed. Cir. 2014) (finding "heuristic [for performing a function]" to be sufficiently definite structure because the patent described the operation and objectives of the heuristic); *Collaborative Agreements, LLC v. Adobe Sys.*, No. 15-cv-03853-EMC, 2015 U.S. Dist. LEXIS 161809, at *11-*24 (N.D. Cal. Dec. 2, 2015) (determining "code segment [for performing a function]" to be sufficiently definite structure because the claim described the operation of the code segment); *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808-HSG, 2015 U.S. Dist. LEXIS 162504, at *31-*32 (N.D. Cal. Dec. 3, 2015) (determining "processor [for performing a function]" to be sufficiently definite structure because the claim described how the processor functions with the other claim

components). Accordingly, the "circuitry" terms do not invoke § 112 ¶ 6.

The specification further supports this understanding of the claim terms. Figure 8 illustrates a block diagram of a telephony device:



'684 Patent at Figure 8. As Defendants' expert opines, the specification "provides for a number of different instances of this circuitry, including at 11:54-15:13, which describe, for example, then existing Texas Instrument 5402 DSPs and other general DSP chips." Dkt. No. 295-10 at ¶ 25. Dr. Souri further states that "[s]uch chips (and their capabilities) would have been known to those skilled in the relevant art, and as such the disclosure of these particular and general DSPs to perform the required function would be sufficient for a POSITA to make and use the subject matter of the portion of each claim I was asked to review." *Id.* Accordingly, a person of ordinary skill in

the art would understand that the circuitry recited in the claims and described in the specification, would have sufficiently definite meaning as the name for a structure. Similar to the court's conclusion in *VR Optics, LLC v. Peloton Interactive, Inc.*, the placement of "telephony device" including circuitry alongside and in the same format as these other structural terms highlights that the patent is using the terms to connote a known structure rather than as a nonce substitute for the word "means." 345 F. Supp. 3d 394, 410 (S.D.N.Y. 2018). Accordingly, the Court rejects Defendants' position and finds that the "circuitry" terms are not governed by § 112 ¶ 6, and that they should be given their plain and ordinary meaning.

### 2. Court's Construction

For the reasons set forth above, the "circuity" terms are given their **plain and ordinary meaning.**

### E. "means for sending a request from the first LAN to the second LAN over the WAN to establish a connection between the first LAN and the second LAN in response to selection of a voice mail access input and selection of a direct station select input at a telephone within the first LAN"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "means for sending a request from the first LAN to the second LAN over the WAN to establish a connection between the first LAN and the second LAN in response to selection of a voice mail access input and selection of a direct station select input at a telephone within the first LAN" | **Function:** sending a request **Structure:** network controller, or equivalents thereof | **Function:** sending a request from the first LAN to the second LAN over the WAN to establish a connection between the first LAN and the second LAN in response to selection of a voice mail access input and selection of a direct station select input at a telephone within the first LAN **Structure:** Circuitry and algorithms described at '699 Patent at Fig. 12 and 11:64–12:14 |

### 1. Analysis

The phrase "means for sending a request from the first LAN to the second LAN over the

WAN to establish a connection between the first LAN and the second LAN in response to selection of a voice mail access input and selection of a direct station select input at a telephone within the first LAN" appears in Asserted Claim 4 of the '699 Patent. The parties agree that the phrase is subject to § 112 ¶ 6. The parties disagree over the corresponding function and structure.[7]

The disputed phrase uses the word "means" and specifies a function, thus the Court presumes that the patentees intended to invoke the statutory mandates for means-plus-function clauses. *York Prods. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1574 (Fed. Cir. 1996) ("In determining whether to apply the statutory procedures of section 112, ¶ 6, the use of the word 'means' triggers a presumption that the inventor used this term advisedly to invoke the statutory mandates for means-plus-function clauses."). Furthermore, the parties agree that the term is subject to § 112, ¶ 6. Accordingly, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6.

"The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "The court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002) (citation omitted). The Court finds that the recited function is "sending a request from the first LAN to the second LAN over the WAN to establish a connection between the first LAN and the second LAN in response to selection of a voice mail access input and selection of a direct station select input at a telephone within the first LAN."

---

[7] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Docket No. 292 at 22-25); Defendants' Responsive Claim Construction Brief (Docket No. 295 at 29-32); and Plaintiff's Reply Claim Construction Brief (Docket No. 304 at 9-10).

Having determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248 F.3d at 1311. The parties initially disagreed on the corresponding structure. However, during the claim construction hearing the parties agreed that the corresponding "circuitry" or "network controller" disclosed in the specification is Media Access Control device 814. (Dkt. No. 311 at 31:19-32:1 (Hearing Tr.)). The Court agrees. Referring to Figure 8, the specification states the following regarding Media Access Control device 814:



Devices 813, 814 perform the Media Access Control and the PHYsical layer functions. Devices 813, 814 communicate to DSP 801 via a standard PCI bus 812, and communicate to the LAN via post-transformer coupled RJ-45 connections 815, 816. Devices 813, 814 can contain FIFOs to minimize lost packets during traffic peaks. Per the PCI bus mastering specification, devices 813, 814 take control of the buses 805, 806 and direct memory access (DMA) data

> directly to SRAM 804. Conversely, DSP 801 writes data to be sent
> into the SRAM 804 and the devices 813, 814 DMA the data via the
> PCI bus 812 to the LAN.

'699 Patent at 9:54–64, Figure 8 (highlight added). Plaintiff further agreed during the claim

construction hearing that the specification discloses going from the physical layer to the

transmission layer in the various figures. (Dkt. No. 311 at 27:18–28:2, 29:7–13). For mean-plus-

function limitations implemented by computer software, the corresponding structure described in

the patent specification must include an algorithm for performing the function. *WMS Gaming Inc.*

*v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). In other words, the corresponding

structure is not a general purpose computer but rather the special purpose computer programmed

to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d

1328, 1333 (Fed. Cir. 2008). Here, the algorithm disclosed for performing the function is illustrated

in Figures 11, 12, and 13, as steps 1102, 1201, and 1301, respectively.



**Fig. 11**



**Fig. 12**



**Fig. 13**

Figures 11-13 (highlight added). For example, the specification describes step 1102 in Figure 11

as follows:

> Referring to FIG. 11, there is illustrated an exemplary message flow between remote sites A and B. For example, site A could refer to the Dallas LAN 301 previously discussed, while site B could refer to the Detroit LAN 302, also discussed previously. As noted in FIG. 10, when a voice message is received within a remote voice mail box in site B, then an LED message 1101 will be sent from site B over the WAN 201 to the IP server 101 in site A. IP server 101 will then send a message to the IP telephone 105 to illuminate a voice mail box (VMB) LED 808 to indicate to that user that the remote mail box has a message. In the IP Series system, a number of inter-site messages are defined for specific tasks. Specifically, the VMB LED messages are issued based on system configuration. That is, if a system is configured to support a Virtual Mailbox, one of the required parameters is to enter the destination's extension number. This is handled by a Location-Extension combination (i.e., 73106). When a message is left in a mailbox with the Virtual Mailbox function enabled, the system sends the VMB LED message to the destination site. Once received by the destination site, the message is decoded and the appropriate LED is lit. Note that other types of indications or alerts can be utilized to inform a user that a remote message has been received, other than an LED light on a telephone. *After some time has passed, when the user has noticed the VMB LED and wishes to listen to that voice message, the user will press the VMB key on phone 105. This sends an Establish_User_MBX_Connection message 1102 from the IP server 101 in site A to the IP server 306 in site B.* When the Virtual Mailbox key on phone 105 is pressed, the call processing software evaluates the key type pressed. Once the Virtual Mailbox type is identified, call processing then checks the mailbox number associated with the key. If the key is associated with a remote site (as in this case), message 1102 if formatted and sent to the host site (where the voicemail message is actually stored). This message will include a Channel (CH) in which a connection will be established between sites A and B, the extension (EXT) of the source (SRC) of the message, which in this case is the extension number of telephone 105, and an identification of the destination (DEST) mail box (MBX) to which the message is directed within site B. In other words, the destination mail box will be the mail box that caused the illumination of the VMB LED 808 on phone 105.

'699 Patent at 10:43–11:18 (emphasis added). The specification provides a similar description for

the embodiment disclosed in Figures 12 and 13. *Id.* at 12:3–6 ("This will send an

Establish_User_MBX_Connection message 1201 to site B, which will assign a voice channel to be established between site A and B in response thereto."), 12:30–32 ("[T]he message has been tagged by the user for moving, which results in an Establish_VMMove_Connection message 1301 being sent from site A to site B."). Accordingly, the Court finds that the corresponding structure is Media Access Control device 814 configured to perform step 1102 disclosed in Figure 11 and described at 11:2–4, step 1201 disclosed in Figure 12 and described at 12:3–6, or step 1301 disclosed in Figure 13 and described at 12:31–32, and equivalents thereof.

The Court rejects the corresponding structure originally proposed by Defendants, because it includes structure beyond that necessary to perform the recited function. *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369-70 (Fed. Cir. 2001) ("Section 112 paragraph 6 does not 'permit incorporation of structure from the written description beyond that necessary to perform the claimed function.'") (quoting *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1257-58 (Fed. Cir. 1999)). Defendants identify "Circuitry and algorithms described at '699 Patent at Fig. 12 and 11:64-12:14" as the corresponding structure. Although Figure 12 depicts a request being sent from the first LAN to the second LAN ("ESTABLISH_USER_MBY.CONNECTION (MBX)" 1201), it also depicts additional messages that occur after the request is sent. Thus, Defendants' identification of Figure 12 in its entirety as corresponding structure is improper, because it includes structure beyond that necessary to perform the recited function. Similarly, Defendants' citation to column 11, line 64 through column 12, line 14 includes structure beyond that necessary to perform the recited function. *See id.* at 11:64–12:14 (disclosing assignment of voice channels, playing voice prompts to the user, the user inputting key press messages, and the process of tearing down the connection after the user is done listening to voicemail). Indeed, Defendants agreed that their proposed structure was over inclusive during the claim construction

hearing. (Dkt. No. 311 at 32:3-16).

Regarding Plaintiff's original construction, the Court finds that it improperly broadens the function of this claim term. A proper § 112 ¶ 6 analysis cannot omit claim language in the recited limitation. Instead, the entire claim limitation must be analyzed. Regarding the structure it originally proposed, Plaintiff argues that its "construction identifies the circuitry identified in the specification that is capable of performing the recited function." Dkt. No. 292 at 25. But the corresponding structure must also include the algorithm for performing the function. In other words, the corresponding structure in this instance is not a general purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat,* 521 F.3d at 1333.

### 2. Court's Construction

In light of the intrinsic evidence, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6, and construes the phrase "means for sending a request from the first LAN to the second LAN over the WAN to establish a connection between the first LAN and the second LAN in response to selection of a voice mail access input and selection of a direct station select input at a telephone within the first LAN" as follows:

**Function:** sending a request from the first LAN to the second LAN over the WAN to establish a connection between the first LAN and the second LAN in response to selection of a voice mail access input and selection of a direct station select input at a telephone within the first LAN.

**Corresponding Structure:** MAC 814 configured to perform step 1102 disclosed in Figure 11 and described at 11:2–4, step 1201 disclosed in Figure 12 and described at 12:3–6, or step 1301 disclosed in Figure 13 and described at12:31–32, and equivalents thereof.

### F. "means for establishing an audio path over the connection between the voice mail box and the telephone"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "means for establishing an audio path over the connection between the voice mail box and the telephone" | **Function:** establishing an audio path over the connection between the voice mail box and the telephone<br>**Structure:** One or more microprocessors specially programmed to send a connection established message, or equivalents thereof | **Function:** establishing an audio path over the connection between the voice mail box and the telephone<br>**Structure:** Circuitry and algorithms described at Figs. 11–13 and 11:1–12:45 |

### 1. Analysis

The phrase "means for establishing an audio path over the connection between the voice mail box and the telephone" appears in Asserted Claim 4 of the '699 Patent. The parties agree that the phrase is subject to § 112 ¶ 6. The parties also agree on the recited function, but disagree over the corresponding structure.[8]

The disputed phrase uses the word "means" and specifies a function, thus the Court presumes that the patentees intended to invoke the statutory mandates for means-plus-function clauses. *York Prods. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1574 (Fed. Cir. 1996) ("In determining whether to apply the statutory procedures of section 112, ¶ 6, the use of the word 'means' triggers a presumption that the inventor used this term advisedly to invoke the statutory mandates for means-plus-function clauses."). Furthermore, the parties agree that the term is subject to § 112, ¶ 6. Accordingly, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6.

"The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys.,*

---

[8] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Docket No. 292 at 25-27); Defendants' Responsive Claim Construction Brief (Docket No. 295 at 32-33); and Plaintiff's Reply Claim Construction Brief (Docket No. 304 at 11).

*Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "The court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002) (citation omitted). The parties agree that the recited function is "establishing an audio path over the connection between the voice mail box and the telephone." The Court agrees.

Having determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248 F.3d at 1311. The parties initially disagreed on the corresponding structure. However, during claim construction hearing the parties agreed that the corresponding "circuitry" or "microprocessor" disclosed in the specification is Media Access Control device 814. (Dkt. No. 311 at 31:19-32:1 (Hearing Tr.)). The Court agrees. Referring to Figure 8, the specification states the following regarding Media Access Control device 814:



> Devices 813, 814 perform the Media Access Control and the PHYsical layer functions. Devices 813, 814 communicate to DSP 801 via a standard PCI bus 812, and communicate to the LAN via post-transformer coupled RJ-45 connections 815, 816. Devices 813, 814 can contain FIFOs to minimize lost packets during traffic peaks. Per the PCI bus mastering specification, devices 813, 814 take control of the buses 805, 806 and direct memory access (DMA) data directly to SRAM 804. Conversely, DSP 801 writes data to be sent into the SRAM 804 and the devices 813, 814 DMA the data via the PCI bus 812 to the LAN.

'699 Patent at 9:54–64, Figure 8 (highlight added). Plaintiff further agreed during the claim construction hearing that the specification discloses going from the physical layer to the transmission layer in the various figures. (Dkt. No. 311 at 27:18-28:2, 29:7-13). For mean-plus-function limitations implemented by computer software, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). In other words, the corresponding structure is not a general purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Here, the algorithm disclosed for performing the function is illustrated in Figures 11, 12, and 13, as steps 1103, 1202, and 1302, respectively.



Fig. 11



Fig. 12



**Fig. 13**

Figures 11-13 (highlight added). For example, the specification describes step 1103 in Figure 11 as follows:

> In response to message 1102, IP server 306 within site B will assign a voice channel to be established within the WAN 201 between sites A and B. There is a pool of speech compression channels available for use between any remote sites. Call processing software determines that a call is destined for a remote site and assigns a compression channel from the pool. Note that except for basic inter-cabinet signaling (i.e., LED lamp messages), a speech path is required in advance, before a call can be made. Once a channel is assigned, a message is sent to the destination site requesting a connection. The destination site will assign an available speech compression channel, then accept the request for connection. *A Connection Established message 1103 will be sent from site B to site A with the assigned channel, and site A will connect its IP server 101 to the established audio path to receive voice mail (VM) user prompt messages from site B.* As mentioned above, once a connection has been established between sites, call processing software treats the remote connection as though it was to a local user. That is, call processing checks to see if the mailbox number is valid, requests any password information then executes normal local voicemail processing. Once the connection has been established between sites, voicemail feature operation is identical to that of a local voicemail user. The same voice prompts normally sent to the local phone are routed to the assigned speech

> compression channel. Such message prompts are what is typically heard in current voice mail systems when one accesses their voice mail. As the user at site A listens to the voice mail user prompts, the user may input VM options in response to such prompts on the DTMF buttons of telephone 105. Such key presses 1104 are sent over the established connection 1103 to site B, which decodes these key presses. The decoding of the key presses will result in permitting the user at site A to select various options for listening, saving, deleting, forwarding, etc., the voice mail message left in the voice mail box at site B.

'699 Patent at 11:19–54 (emphasis added). The specification provides a similar description for the embodiment disclosed in Figures 12 and 13. '699 Patent at 12:6–9 ("A connection established message 1202 will then be sent to site A, and site B will begin playing voice mail prompts to the user 105 at site A."), 12:32–34 ("Site B will assign an uncompressed voice channel and respond with a Connection Established message 1302."). Accordingly, the Court finds that the corresponding structure is Media Access Control device 814 configured to perform step 1103 disclosed in Figure 11 and described at 11:31–35, step 1202 disclosed in Figure 12 and described at 12:6–9, or step 1302 disclosed in Figure 13 and described at 12:32–34, and equivalents thereof.

The Court rejects the corresponding structure originally proposed by Defendants, because it includes structure beyond that necessary to perform the recited function. *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369-70 (Fed. Cir. 2001) ("Section 112 paragraph 6 does not 'permit incorporation of structure from the written description beyond that necessary to perform the claimed function.'") (quoting *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1257-58 (Fed. Cir. 1999)). Defendants identify "Circuitry and algorithms described at Figs. 11–13 and 11:1–12:45" as the corresponding structure. Although Figures 11-13 depict a Connection Established message, they also depict additional messages that occur after the connection is established. Thus, Defendants' identification of Figures 11-13 in their entirety as corresponding structure is improper, because it includes structure beyond that necessary to perform the recited

function. Similarly, Defendants' citation to column 11, line 1 through column 12, line 45 includes structure beyond that necessary to perform the recited function. Indeed, Defendants agreed that their proposed structure was over inclusive during the claim construction hearing. (Dkt. No. 311 at 32:3-16).

Plaintiff's original construction failed to include the algorithm for performing the recited function. In other words, the corresponding structure in this instance is not a general purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### 2. Court's Construction

In light of the intrinsic evidence, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6, and construes the phrase "means for establishing an audio path over the connection between the voice mail box and the telephone" as follows:

**Function:** establishing an audio path over the connection between the voice mail box and the telephone.

**Corresponding Structure:** MAC 814 configured to perform step 1103 disclosed in Figure 11 and described at 11:31–35, step 1202 disclosed in Figure 12 and described at 12:6–9, or step 1302 disclosed in Figure 13 and described at12:32–34, and equivalents thereof.

### G. "means for playing a voice message stored in the voice mail box over a speaker in the telephone"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "means for playing a voice message stored in the voice mail box over a speaker in the telephone" | **Function:** playing a voice message stored in the voice mail box over a speaker in the telephone<br>**Structure:** Digital-to-analog CODEC, or equivalents thereof | **Function:** playing a voice message stored in the voice mail box over a speaker in the telephone<br>**Structure:** Circuitry and algorithms described at Figs. 11-13 and 11:1–12:45 |

### 1. Analysis

The phrase "means for establishing an audio path over the connection between the voice mail box and the telephone" appears in Asserted Claim 4 of the '699 Patent. The parties agree that the phrase is subject to § 112 ¶ 6, and the recited function is "playing a voice message stored in the voice mail box over a speaker in the telephone."[9] During the claim construction hearing, the parties also agreed that the corresponding structure is CODEC 819. (Dkt. No. 311 at 35:3–23) (referring to Slide 51 of Plaintiff's presentation). The Court agrees because the specification identifies CODEC 819, amplifier 820, and speaker 821 as the corresponding structure for performing the recited function:



Fig. 8

---

[9] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Docket No. 292 at 28-30); Defendants' Responsive Claim Construction Brief (Docket No. 295 at 33-34); and Plaintiff's Reply Claim Construction Brief (Docket No. 304 at 11).

> CODEC 817 and CODEC 819 perform analog to digital and digital to analog conversion of speech signals. CODEC 817 is connected to the handsets, speaker and microphone elements (not shown) via connector 818, while CODEC 819 is connected to the hands-free speaker 821 through amplifier 820, and to the hands-free microphone 822.

'699 Patent at 9:39–44, Figure 8 (highlight added). Accordingly, the Court adopts the parties' agreed construction.

### 2. Court's Construction

In light of the intrinsic evidence, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6, and construes the phrase "means for playing a voice message stored in the voice mail box over a speaker in the telephone" as follows:

**Function:** playing a voice message stored in the voice mail box over a speaker in the telephone.

**Corresponding Structure:** CODEC 819, amplifier 820, and speaker 821, and equivalents thereof.

## V.    CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 28th day of March, 2023.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address:  COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,804 | 07/16/2021 | 7068684 | 3725700.00001 | 9925 |

183824        7590        08/16/2023
Williams Simons & Landis PLLC/Estech
The Littlefield Building
601 Congress Ave, Suite 600
Austin, TX 78701

| EXAMINER |
|---|
| FOSTER, ROLAND G |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/16/2023 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

NOLAN R. HUBBARD
K &L GATES LLP-CHICAGO
P.O. BOX 1135
CHICAGO, IL 60690

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,804* .

PATENT UNDER REEXAMINATION *7068684* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

APPX0805



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

### BEFORE THE PATENT TRIAL AND APPEAL BOARD

Application Number: 90/014,804
Filing Date: 16 Jul 2021
Appellant(s): 7,068,684

_____

Todd E. Landis
For Appellant

### EXAMINER'S ANSWER

This is in response to the appeal brief filed May 22, 2023.

**(1) Grounds of Rejection to be Reviewed on Appeal**

Every ground of rejection set forth in the Office action dated November 21, 2022 from which the

appeal is taken is being maintained by the examiner except for the grounds of rejection (if any) listed

under the subheading "WITHDRAWN REJECTIONS." New grounds of rejection (if any) are provided

under the subheading "NEW GROUNDS OF REJECTION."

The following ground(s) of rejection are applicable to the appealed claims.

Application/Control Number: 90/014,804                                         Page 4
Art Unit: 3992

### *Claim Rejections - 35 USC § 103*

In the event the determination of the status of the application as subject to AIA 35 U.S.C. 102

and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the statutory

basis for the rejection will not be considered a new ground of rejection if the prior art relied upon, and

the rationale supporting the rejection, would be the same under either status.

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis for all obviousness

rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102, if the differences between the subject matter sought to be patented and the
> prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

This application currently names joint inventors. In considering patentability of the claims under

pre-AIA 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was

commonly owned at the time any inventions covered therein were made absent any evidence to the

contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and

invention dates of each claim that was not commonly owned at the time a later invention was made in

order for the examiner to consider the applicability of pre-AIA 35 U.S.C. 103(c) and potential pre-AIA 35

U.S.C. 102(e), (f) or (g) prior art under pre-AIA 35 U.S.C. 103(a).

Claims 29-41 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over U.S. Patent

Publication No. 2002/0071424 to Chiu et al. ("Chiu") in view of U.S. Patent No. 5,313,454 to Bustini et al.

("Bustini").

As an initial matter, Chiu (similarly to the instant Suder patent under reexamination) is directed

to a server-based IP telephony system.  Compare Fig. 1 of Suder to Fig. 1 of Chiu regarding the

architectural (structural) similarities between the two disclosures.



Fig. 1 of Suder Patent for which Reexamination is Requested.



Fig. 1 of Chiu prior art.

Regarding independent claim 29,

*In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and a data server coupled to the hub,*

Figure 1 of Chiu (as annotated below) depicts a system implementing IP telephony. See also ¶

17. Software Internet telephony requires multimedia computing resources on both the originating and

destination points in order to establish and maintain a call. ¶ 4. Thus, all originating and destination

points, which are processor-based devices executing software, illustrated in Fig. 1 are multimedia

devices.



FIG. 1

The instant Suder patent under reexamination describes the claimed hub as a multi-port device

used to connect, or network, multiple devices together. 4:1-12. Chiu describes PSTN gateway 140,

which a person of ordinary skill in the art would understand to be an example of the claimed hub

because it is a multiport device connecting multiple devices together. ¶ 28 Chiu also describes a IP

telephony peripheral 100 connected to network 130. See also ¶12. The telephony peripheral 100

connects multiple devices together via IP telephony calls and can also be considered a hub. Fig. 1 and

¶¶ 26, 29. Specifically, the telephony peripheral 100 includes a media access controller 428 and physical transport 430 that connects computer 200 and the IP telephony peripheral 100 together onto the same network. ¶¶ 42, 43. The claims do not require the "hub" to be a separately enclosed device from the "telephone," although the gateway 140 certainly is. A person of ordinary skill in the art would also understand that network 130 can comprise a LAN/WAN or the Internet, would include hubs that connect the claimed devices together to allow for the transfer of packets from one device to another.

Chiu uses the term "coupled" to describe the connection of these components, rendering obvious the connections under whatever construction is attributed to the word "coupled." Further, like the instant Suder patent under reexamination, Chiu is silent with regard to any wireless connection such that it implies its disclosures are limited to wired connections.

As discussed above, all originating and destination points illustrated in Figure 1 are multimedia devices. Thus, phone server 110 corresponds to the claimed multimedia server. Figure 1 depicts a second computer 170, also connected to the network. A person of ordinary skill in the art would understand network 130, which Chiu describes as the Internet (¶ 26), would include a variety of known servers taking different forms, such that a traditional "web server" would be an example of the claimed data server as it would be capable of receiving and sending data packets to computer 100 via the network. This is confirmed because the network 130 illustrated above connects to a PSTN, which is a public network. A person of ordinary skill in the art also understand that network 130, which Chiu describes as the Internet (¶ 26), would include servers, including data servers for handling information transmitted throughout network 130, for example, point-to-point internet protocol servers between the IP (internet protocol) telephony peripheral and the PSTN gateway.

Chiu clearly illustrates telephone 160 coupled to the hub (IP telephony peripheral 100 or PSTN Gateway 140 via network 130 Internet). Fig. 1. Chiu further clearly discloses computer 200 and computer 170 (workstations) couple to said hubs via the Internet.

As for the recited "telephone," as explained in the rejection below regarding the transfer of data from the workstation to the telephone, the IP Telephony Peripheral 100 reads on the recited telephone. As noted in prior arguments of record regarding the telephone, the IP Telephony Peripheral is repeatedly described as an IP Telephone Peripheral 100 by Chiu even specifically a "stand-alone," "Nortel Networks i2004 Telephone." See, e.g., ¶¶ 25, 26 and 29. The telephone is couple to the hub (either to the PSTN Gateway 140 via network 130, the LAN/WAN/Internet hubs via network 130, or the telephone's internal pass-through hub via MAC 428)

> *a method comprising the steps of: transferring data from the workstation to the telephone, wherein the data sent from the workstation is addressed for transmission to the data server;*

Chiu describes, and indeed claims, network transport for coupling the computer to the network, via the phone. Claim 12. Chiu further states that the phone's physical transport 430 may pass through data from the computer to the network. ¶43.

A person of ordinary skill would understand that the computer data (as shown in the annotated Fig. 1 below) of Chiu transported to and from said computer 200 (annotated) through IP telephone device 100 would be addressed, as it is IP data; IP is an addressed point-to-point protocol. (¶¶38, 44). One such available destination to which the data would be addressed would be to a data server on the network 130 (Internet), such as the other computer 170, another web server, or any other point-to-point IP server on the internet.



FIG. 1

*communicating audio information between the telephone and the multimedia server;*

Chiu states that IP telephone 100 would be an IP telephone having a predetermined IP address. ¶ 9. IP telephone 100 is used for sending and receiving audio information.

Chiu also teaches that the phone server acts as an intermediary between devices that transmits digital audio information in different formats. ¶411. For example, a phone with an OSI level 3 controller may receive data from a phone sending packets in OSI level 4 that contain "control information which it cannot process internally." ¶10. See also Fig. 1 Thus, the phone server acts as a control, receipt and response intermediary that is transparent to the destination telephony device. ¶ 11.

*and sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server.*

As an initial matter the Suder patent, for which reexamination requested, admits that "throttling can be performed using many different methods." Col. 13, ll. 50-51. See also the Request, p. 31.

To this point, Chiu teaches the use of "collision avoidance mechanisms well known in the network arts." ¶ 43.

Bustini teaches monitoring an amount of the audio information being received by the telephone from the multimedia server. Specifically, Bustini details one such collision avoidance mechanism in the form of a "feedback control system for congestion prevention in a cell (packet) switching communication network" that controls the "transmission rate of bursty traffic in the presence of high priority, voice . . . ." Abstract. See also the Request, 41, 42. Thus, Bustini teaches throttling data (e.g., bursty data) (e.g., a file transfer) from a computer workstation in favor of the higher priority voice data.

Specifically, Bustini describes six types of data network traffic sent throughout a network, which are prioritized in accordance with their respective delivery sensitivities. 1:32-54. Bustini teaches that real-time communications such as full-period voice signals require high integrity throughput because such packets are sensitive to both delay and data loss. 7:66-8:1. On the other hand, "data traffic, such as file transfers, is relatively insensitive to delay but is data loss sensitive." 1:58-60. Bustini notes that this "bursty traffic and multicast traffic [is] relatively delay insensitive," such that there is little concern for when the data ultimately arrives, as long as it arrives. 8:12-14. Bustini monitors the audio information network traffic and specifically throttles the bursty data (e.g. a file transfer from a computer workstation) in favor of the higher priority audio information as "[c]ongestion control is accomplished by controlling the transmission rate of bursty traffic in the presence of high priority, voice, low speed statistical, high speed deterministic and multicast data." Abstract, 1:61-68. Thus, Bustini monitors an amount of audio data being received in order to assign it higher priority as discussed above. As a result, the audio data rate is increased over what the audio data rate would have been in the presence of congested, bursty traffic. See also 6:29-38 and Table 1 (19:1-14) and 21:4-9, where Bustini "allocates spare bandwidth according to a predefined priority scheme," were voice is a higher priority than bursty

data traffic. 6:29-38, Table 1 (19:1-14) and 21:4-9. See also Bustini, Fig. 16, col. 4, ll. 47-67 and col. 23, l.

48-col. 24, l. 60 and particularly Fig. 16, step 508, rate increase ("yes/no") and col. 24, ll. 6-14.

Further, Chiu notes that its teachings are applicable to asynchronous transfer mode ("ATM") (¶

42, as is Bustini (4:17-32, 11:2).

The teaching/suggestion/motivation for adding the various teachings of Bustini would have

been as follows. A person of ordinary skill in the art would understand that the Bustini-type algorithm

would readily function in the system of Chiu. A person of ordinary skill would easily program the

algorithm disclosed by Bustini into the circuitry disclosed by Chiu including, for example, the media

access controller which would employ such an algorithm "well known in the networking arts" with

expected results. ¶ 4. This would improve the reliability of real-time communication in VoIP systems

where data was also being transmitted in addition to voice, such as that of Chiu. As Bustini's algorithm is

bidirectional (9:15, 9:58-10:2), its implementation within the IP telephone of Chiu would be able to

monitor data coming to the telephone from the multimedia server as well as throttle data coming from

the workstation to the telephone and vice versa.

Thus, to one of ordinary skill in the art at the time the invention was made, it would have been

obvious to add all of the data prioritization mechanisms of Bustini as discussed above to the IP

telephony system of Chiu.

Regarding independent **claim 36**, see the claim 29 rejection for additional details regarding the

information handling system taught by Chiu in view of Bustini.

Claim 36 further recites:

*sufficiently throttling the data sent from the workstation to the telephone to increase a rate of
transfer of the audio information during the communicating step, wherein the throttling step
further comprises the step of reducing a future amount of data from being transferred from the
workstation if the amount of data exceeds a predetermined threshold.*

Regarding the data prioritization mechanisms obviously added to Chiu as discussed in the claim 29 rejection above, Bustini further teaches that reducing a future amount of data if the amount of data being transferred from the workstation if the amount of data exceeds a predetermined threshold. Specifically, Bustini describes an algorithm utilizing a token system. 2:60-3:4. In this system, information (in the form of colored tokens) is communicated along with the packets to ensure, when needed, the right types of packets are limited. 2:60-3:4. The algorithm monitors a queue length of data to be transmitted in which "green packets are protected and passed along while red packets are discarded upon arrival whenever the chosen metric (usually queue lengths) for congestion threshold is exceeded." 3:1-4. This queue length triggers the feedback control that Bustini notes "regulates the rate of bursty data transmission" over the network in accordance with the feedback control. Abstract.

A person of ordinary skill in the art would understand that queue management reduces a future amount of data from being transferred from a node if the amount of data within that node exceeds a predetermined threshold. The rate of transfer of the green packets (e.g. audio information) would thereby be increased with priority access to network bandwidth.

Bustini describes other algorithms that also render obvious this element. 3:8-46. For example, it describes invoking certain collision avoidance mechanisms when a monitored queue length in a buffer exceeds a prescribed threshold using congestion indicator bits to trigger the discarding of cells when congestion occurs. 11:35-44.

The teaching/suggestion/motivation for adding the teachings of Bustini would have been as follows. A person of ordinary skill in the art would understand the combination of Chiu and Bustini renders this element obvious for the same reasons discussed in the clam 29 rejection above. Moreover, as discussed, the consistency, rate and reliability of the data communications would have been increased because queue length triggers the feedback control that "regulates the rate of bursty data transmission" (Bustini, Abstract) and increases the data transfer rate of high priority traffic.

Thus, to one of ordinary skill in the art at the time the invention was made, it would have been obvious to add the data prioritization mechanisms of Bustini as discussed above to the IP telephony system of Chiu.

Regarding independent **claim 37**, see the claim 29 rejection for additional details regarding the information handling system taught by Chiu in view of Bustini.

Claim 37 further recites:

*wherein the monitoring step further comprises the step of the telephone sending a congestion message to the multimedia server when the amount of the audio information falls below the predetermined level*

Bustini further describes setting minimum bandwidth assignments for certain classes of data. 19:15-16, 19:64-68. Bustini teaches monitoring an amount of audio information and prioritizing that information if it falls below a selectable minimum bandwidth (i.e. a predetermined level).

Bustini states that "a reactive (feedback) control method that combines cell tagging with explicit congestion notification (ECN)" was a known way of managing transmissions. 4:17-32. These ECNs may be transmitted to a variety of destinations, including a target component or target node. 4:17-32. ECNs may be triggered if a threshold is exceeded. 4:22-30. The switches of Bustini operate at one of two preset thresholds using these ECNs. 4:25-28.

The teaching/suggestion/motivation for adding the teachings of Bustini would have been as follows. A person of ordinary skill in the art would understand the combination of Chiu and Bustini renders this element obvious for the same reasons discussed in the clam 29 rejection above. Moreover, a person of ordinary skill in the art would understand that the transition between thresholds would be triggered by the level of packets buffered in a queue in a given switch. 5:33-35. When necessary, a lower threshold is used (and therefore more throttling needed) a corresponding ECN is sent, when a

higher threshold is sufficient (and less throttling needed) a different corresponding ECN would be sent.

Thus, the reliability and consistency of the data transfer rate would have been increased.

Thus, to one of ordinary skill in the art at the time the invention was made, it would have been obvious to add the data prioritization mechanisms of Bustini as discussed above to the IP telephony system of Chiu.

Regarding **claim 30**, see the claim 29 rejection above.

Regarding **claims 30-34**, see the claim 29 rejection above for additional details. Both Chiu and Bustini clearly teach that devices are connected via a network. For example, see Chiu, Fig. 1 and Bustini, 6:18-19. Bustini teaches a packet switching network. 1:12-15. Bustini teaches that lower-priority data packets (e.g. those of the "bursty" type), are frozen out or halted altogether when the network encounters periods of high data traffic. 18:52-57.

Regarding **claim 38**, Bustini teaches to an example of "prior art feedback control" known as "a window control method" whereas "[t]he window control method indirectly controls the effective network data rate by having the user adjust the window duration controlling the number of contiguous packets that can be transmitted at a given time." 3:8-17. These packets transmitted by a source node (e.g. IP telephone device) are equipped with a congestion information bit that is set in high congestion conditions. 3:31-34. A remote destination server (e.g. multimedia server) receives the packets, and counts the number of set congestion bits. 3:38-46. If the congestion bits indicate a high congestion condition over the network, the server uses feedback mechanism to send a throttle signal to the source node. Upon receipt of the signal, the source node reduces the window size from its current value thereby reducing the effective network data rate. 3:38-46.

The teaching/suggestion/motivation for adding the teachings of Bustini would have been as follows. A person of ordinary skill in the art would understand the combination of Chiu and Bustini renders this element obvious for the same reasons discussed in the clam 29 rejection above. Moreover, if the congestion bits indicate a high congestion condition over the network, the server uses feedback mechanism to send a throttle signal to the source node. Upon receipt of the signal, the source node reduces the window size from its current value thereby reducing the effective network data rate. 3:38-46. Thus, the reliability and consistency of the data transfer rate during periods of congestion would have been increased.

Thus, to one of ordinary skill in the art at the time the invention was made, it would have been obvious to add the data prioritization mechanisms of Bustini as discussed above to the IP telephony system of Chiu.

Regarding **claim 39**, Bustini teaches a "prior art feedback control method" known as a "window control method." In the final step of this feedback mechanism, "[t]he user transport entity updates the window size based on the number of packet congestion bits set during the last transmission window used. If at least 50% of the bits are set, the window size is reduced from its current value." 3:38-46. Reducing the window size is a way to throttle "the effective network data rate by having the user adjust the window duration controlling the number of contiguous packets that can be transmitted at a given time." 3:8-17.

The teaching/suggestion/motivation for adding the teachings of Bustini would have been as follows. A person of ordinary skill in the art would understand the combination of Chiu and Bustini renders this element obvious for the same reasons discussed in the clam 29 rejection above. Moreover, reducing the window size is a way to throttle "the effective network data rate by having the user adjust the window duration controlling the number of contiguous packets that can be transmitted at a given

time." 3:8-17. Thus, the reliability and consistency of the data transfer rate during periods of

congestion would have been increased.

Thus, to one of ordinary skill in the art at the time the invention was made, it would have been

obvious to add the data prioritization mechanisms of Bustini as discussed above to the IP telephony

system of Chiu.


Regarding **claims 40 and 41**, Bustini further teaches that the feedback control (as added in the

parent claim rejection) can include mode levels to throttle the data transmission at different rates,

moderate rate decrease, and large rate decrease. 13:28-41, 12:57-66. A "two-bit coded message

embedded in the cell header (octet 3, bits 2 and 3) of return traffic is used to encode a four state rate

message: increase, decrease, large decrease and no-change. In response to the rate control message,

controller 811 increases the rate by linear additive increments (typically 1/10 of MIR [minimum

information rate"]) and incrementally decreases the rate by a multiplicative factor of 7/8 or '%2, the

latter being used when cell loss in conjunction with congestion is detected by the destination FRP 59."

12:57-66. The throttling rate is dynamically decreased by different amounts (e.g., large decrease or

increase) depending on the state of packet transmission at that time.

The teaching/suggestion/motivation for adding the teachings of Bustini would have been as

follows.   A person of ordinary skill in the art would understand the combination of Chiu and Bustini

renders this element obvious for the same reasons discussed in the clam 29 rejection above.   Moreover,

throttling modes with variable data rates would have increased the versatility of the throttling

mechanism added in the parent rejection by responding to different levels of congestion with more

granular data rate decrease or increases.

**(2) Response to Argument**

*Introduction*

The Patent Owner's arguments assert certain structural characteristics of the Chiu in view of Bustini combination, which the Examiner respectfully disagrees with, for example, the thematic assertions that the IP Telephone 100 is an internal card connected to the computer 200 via a PCMIA bus. The Patent Owner also repeatedly asserts that the Examiner is relying upon separate embodiments from Bustini even though the Examiner set forth an obviousness rejection using Bustini as a secondary, teaching reference. Thus, as an initial matter, the Examiner summarizes the basic structures of Chiu in view of Bustini.

As discussed in the final Office action, Chiu teaches a combination of a IP telephony peripheral 100 and computer 200.



Fig. 1 of Chiu prior art.

Chiu teaches that IP telephony peripheral 100 (also described as "Internet telephone peripheral 100) (¶ 26) can be a <u>Nortel Network i2004 Internet Telephone</u>, which is a "hardware based telephony apparatus" and a "stand-alone IP telephone." ¶ 25 (emphasis added).

Chiu further teaches that the standalone IP telephone supports a "pass-through connection" of the computer 200 network connect, but that the stand-alone Internet peripheral 100 communicates with the computer 200 in order support a call management graphical user interface (GUI) providing features such as placing calls, receiving calls, conferencing, forwarding, caller id, etc. Fig. 3 and ¶¶ 34, 35. Chiu teaches that the data connection may be in the form of a <u>USB peripheral connection.</u> ¶ 31.

Chiu also teaches that the IP telephone Peripheral 100 can be connected to the computer 200 via a PCMIA interface as a card. ¶ 31.

As also discussed in the final rejection above, Chiu teaches transferring data from the computer 200 addressed for transmission to a data server, such as the other computer 170. Thus, the data transferred from computer 200 and addressed to a data server (e.g., computer 170) would be transmitted to and through the telephone's pass-through connection.

Thus, Chiu clearly and explicitly teaches the following structural arrangements:





Chiu also teaches that the network pass-through at the Telephone 100 may instead be replaced by a termination. ¶ 43. For these implementations, the network connection between the computer 200 and telephone 100 illustrated above would be removed, however the computer is still explicitly disclosed as accessing the same network 130 via some other means. Fig. 1. Thus, data from the workstation (computer 200) would again pass through that portion of IP Telephone 100 sharing the same portion of network 130 as the computer 200.

Regardless as to whether IP Telephone 100 is stand-alone or an internal PCMIA care however, Chiu in view of Bustini teaches the claimed invention.

As for Bustini, it teaches a preferred embodiment using an internal congestion avoidance ("ICA") method and apparatus that also incorporates Bustini's own prior art teachings.

Specifically, Bustini surveys the prior art congestion control techniques and builds upon this

prior in the description of its invention.  For example, Bustini teaches that a typical modern node is

capable of handling six classes of traffic (e.g., voice, bursty, etc.) each having different characteristics

and service requirements and queued accordingly.  1:31-2:4.  Moreover, feedback (closed loop) of

congesting status information is used for medium-term congestion control.  2:18-27.  Bustini further

teaches of open loop regulation of bursty data using a leaky bucket algorithm utilizing colored tokens.

2:28-7.  Moreover, Bustini teaches of feedback (closed loop) method using window control.  3:8-64.

Bustini finally teaches of method that has "elements of both open-loop and closed-loop control" using

"explicit congestion notification ("ECN")."  3:65-4:32.

The Examiner sets forth an obviousness (rather than an anticipatory) rejection using Bustini as a

secondary reference.  Thus, the teachings of Bustini may be obviously added to Chiu regardless as to

whether these secondary teachings are directed to separate embodiment or not.

Nonetheless, Bustini incorporates this background technology (open, closed and hybrid ECN)

into the inventive concept rather than repudiate it.  Bustini describes an inventive "internal congestion

avoidance ('ICA') method and apparatus.  Fig. 7 and 11:7-20.  ICA incorporates the background art

teachings, such as traffic classes and queues (class-based queues 135 corresponding to the "six classes

of traffic").  Fig. 9, 6:27-37, 7:32-53, 14:22-39, 19:1-14 (Table 1)  Moreover, Bustini's ICA incorporates

both open-loop techniques (21:10-17), closed-loop (feedback) techniques (21:17-23) including hybrid

ECN signaling.  14:22-34 and 21:53-54.

Illustrative, independent claim 29 recites "sufficiently throttling the data sent from the

workstation to the telephone to increase a rate of transfer of the audio information during the

communicating step."  Thus, the claims do not recite where the throttling occurs, merely that data "sent

from the workstation" is throttled.  Thus, the claims facially encompass throttling data at the

workstation or throttling data at the IP Telephone or both.

To this point, Bustini teaches of a closed-loop (feedback) congestion control algorithm that can

be applied to three nodes (see Fig. 7 reproduced below) or two nodes (5:20-23). Although not germane

to an obviousness rejection, Bustini does not describe these a separate embodiments in contrast to

other portions of the specification where the term "embodiment" is used.



Regarding Bustini's two node implementation, the entire congestion control algorithm is clearly

implemented at Node B (IP Telephone 200) (i.e., congestion control is not required at computer 200).

Regarding Bustini's optional, three node implementation, the congestion control algorithm is

clearly implemented at Node A (computer 200), Node B (IP Telephone 200) and Node C (Phone Server

110). Note that Bustini teaches Node B (IP Telephone 200) of the three-node implementation receives

additional data input (11:29-34) which corresponds to Node B (IP Telephone 200) not only receiving

computer network data from Node A (computer 200), but also additional telephone voice data at Node

B (IP Telephone 200).

Regardless as to whether the Bustini two-node or three node implementation is added to Chiu

however, the resulting combination teaches the claimed invention.

*A Telephone Coupled to a Hub*

The Patent Owner asserts that "Chiu's 'IP Telephony Peripheral 100' is a computer peripheral, not the claimed 'telephone.'". Brief, 18. The Patent Owner's conclusion is based on a narrow interpretation of "telephone." Chiu's peripheral 100, it is argued, is "not a separate device" and is "not capable of making or receiving telephone calls by itself." Id. These arguments are based on the narrow interpretation of "telephone" set forth earlier in the Brief, 10-13.

The Patent Owner's assertions have been carefully considered, but respectfully are not deemed fully persuasive.

Chiu explicitly and repeatedly discloses a telephone, including a "stand-alone" Nortel Networks i2004 Internet Telephone.

> One known implementation to address some of the aforementioned problems is the **Nortel Networks i2004 Internet Telephone**, of Nortel Networks, Brampton, Ontario, Canada, which is a hardware based telephony apparatus compatible with MGCP and H.323 devices. This is a **stand-alone IP telephone client device** which connects to an IP network directly and provides the familiarity and ease-of-use of a traditional telephone.

Chiu, ¶ 25 (emphasis added).

> As shown in the figure, Internet **telephone** peripheral 100 is coupled to computer 200. Internet **telephone** peripheral 100 is also coupled to network 130, which can comprise a LAN/WAN or the Internet.

Chiu, ¶ 26 (emphasis added). See also ¶¶ 27, 28.

> It should be noted here that through the call establishment and IP packet transmission procedures discussed below, Internet **telephone** peripheral 100 may be able to **invoke and maintain an Internet telephony session** with multimedia computer 170 including microphone 172 and speaker 171 connected to network 130 or even conventional telephone 160 connected to network 130 via the aforementioned PSTN gateway 140. Also, although not shown in figure, the IP telephony peripheral 100 may also **place a voice over IP telephone call and maintain a**

*call with a like IP telephone, as will readily be understood by those ordinarily skilled in the art upon review of this disclosure.*

Chiu, ¶ 29 (emphasis added).

Thus, Chiu explicitly and repeatedly discloses an "Internet <u>Telephone</u> Peripheral 100" (emphasis added), including in the form of a Nortel Networks i2004 Internet Telephone, which the Examiner will not disregard.

This repeated and explicit disclosure discussed above also provides intrinsic evidence that one of ordinary skill in the art at the time the invention was made would understand that Chiu's peripheral device would be considered a telephone.

Moreover, a telephone peripheral is a species of the genus telephone. Consistently, Chiu discloses that the IP Telephone Peripheral 100 performs typical telephonic functions, such as placing and maintaining calls. ¶¶26, 29 (as previously cited above).

The Examiner declines to read claimed limitations regarding the particulars of a very specific type of structural telephone envisioned (but not claimed) by the Patent Owner in order to read the "telephone" out of Chiu's explicitly and repeatedly disclosed "telephone" (even including a Nortel Network i2004 Internet stand-alone telephone) and thus patentably distinguish the invention over the applied prior art.

The Patent Owner also repeatedly asserts that Chiu's Internet Telephone Peripheral 100 is integrated inside computer 200 via a PCMIA Bus 224. Brief, 18, 19.

Chiu however also teaches that the Internet Telephone Peripheral 100 connects to the computer 200 via a USB connector. Specifically regarding Fig. 2, Chiu teaches a "Universal Serial Bus (USB) bus bridge 218, which supports peripherals via a USB **connector** and communications protocol connected via USB Bus 226" and that "IP telephony peripheral 100 is coupled . . . though preferably, . . .

is implemented on a circuit board that connects via one of these aforesaid bus **connectors**." ¶ 31

(emphasis added). Thus, Chiu teaches that the IP Telephone Peripheral 100 can be connected to the

computer (workstation) to for example, to provide a <u>computer-screen based interface</u> of the IP

Telephone 100 on the workstation's screen 240. Chiu, Figs. 2, 3 and ¶ 34.

    This does not mean that the IP Telephone 100 does not rely upon the computer to implement

some additional telephone functionality for user-convenience. For example, the computer screen

window of Fig. 3 is labelled "Nortel Networks IP Telephone," which is consistent with the IP Telephone

being a "stand-alone," "Nortel Networks i2004 Internet Telephone" above, and as reproduced again

below in the Examiner annotated Fig. 3.



**FIG. 3**

[0025] One known implementation to address some of the aforementioned problems is the Nortel Networks i2004 Internet Telephone, of Nortel Networks, Brampton, Ontario, Canada, which is a hardware based telephony apparatus compatible with MGCP and H.323 devices. This is a stand-alone IP telephone client device which connects to an IP network directly and provides the familiarity and ease-of-use of a traditional telephone. Also known, is commonly owned application titled "Packet Voice Telephony System and Method", Ser. No. 09/224,548, filed Dec. 31, 1998, which is herein incorporated by reference.

Furthermore, the Patent Owner also appears to suggest with this argument that Chiu's computer 200 only communicates with network 130 via a PCMIA connection (or alternatively USB connection as noted above). However, as was discussed above in the *Response to Arguments - Introduction* section and as will be discussed below in response to "throttling the data sent from the workstation" section below, Chiu explicitly discloses that computer 200 access network 130 via a pass-through network connection at IP Telephone 100 (¶ 43), not via the USB data connection.

Finally and regardless, the claims do not recite a physically separate telephone. Arguments directed to unclaimed features are not persuasive. Thus, the language of the claims would not distinguish over Chiu even if it were the case that telephone peripheral 100 was only coupled to the workstation via a PCMIA bus instead of a USB connector.

### *Throttling the Data Sent from the Workstation to the Telephone*

As an initial matter, illustrative, independent claim 29 recites "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step." Thus, the claims do not recite where the throttling occurs, merely that data "sent from the workstation" is throttled. Thus, the claims facially encompass throttling data at the workstation or throttling data at the IP Telephone or both.

The Patent Owner asserted that the Examiner relied upon two separate embodiments in Bustini (Brief, 25, 26).

The Examiner however set forth an obviousness rejection, thus multiple congestion-control technologies as taught by Bustini can be obviously added to Chiu all for the similar, articulated reasons:

(1)  A person of ordinary skill in the art would understand that the Bustini-type algorithm would readily function in the system of Chiu.

(2) A person of ordinary skill would easily program the algorithm disclosed by Bustini into the circuitry disclosed by Chiu including, for example, the media access controller which would employ such an algorithm "well known in the networking arts" with expected results.

(3) This would improve the reliability of real-time communication in VoIP systems where data was also being transmitted in addition to voice over the same network (e.g., the data connection of computer 200 and the voice connection of IP telephone 200 sharing the same network 130 as discussed in the Response to Arguments – Introduction section above).

Nonetheless, what the Patent Owner refers to as the "background embodiment" is rather background prior art that the Bustini invention builds upon and cites in the description of its invention. That is, Bustini's solution builds on the background prior art, the two sections are neither opposed nor inconsistent. The Examiner cited to both Bustini's inventive disclosure and where appropriate to the background prior art that the invention is built upon for the obvious addition of their teachings to Chiu.

For example, Bustini teaches that a typical modern node is capable of handling six classes of traffic (e.g., voice, bursty, etc.) each having different characteristics and service requirements and queued accordingly. 1:31-2:4. Moreover, feedback (closed loop) of congesting status information is used for medium-term congestion control. 2:18-27. Bustini further teaches of open loop regulation of bursty data using a leaky bucket algorithm utilizing colored tokens. 2:28-7. Moreover, Bustini teaches of feedback (closed loop) method using window control. 3:8-64. Bustini finally teaches of method that has "elements of both open-loop and closed-loop control" using "explicit congestion notification ("ECN")." 3:65-4:32.

Unsurprisingly, Bustini incorporates this background technology (open, closed and hybrid ECN) into the inventive concept rather than repudiating it. Bustini describes an inventive "internal congestion avoidance ('ICA') method and apparatus. Fig. 7 and 11:7-20. ICA incorporates the background art teachings, such as underline{traffic classes and queues} (class-based queues 135 corresponding to the "six classes

of traffic"). Fig. 9, 6:27-37, 7:32-53, 14:22-39, 19:1-14 (Table 1)  Moreover, Bustini's ICA incorporates

both open-loop techniques (21:10-17), closed-loop (feedback) techniques (21:17-23) including hybrid

<u>ECN signaling</u>.  14:22-34 and 21:53-54.

The Patent Owner asserts that Bustini requires an intermediate node.  Brief, 28, 29.

Although it would not affect the Examiner's obviousness rationale (either two nodes or three

nodes can be added to Chiu), Bustini teaches that the intermediate node is optional.  5:20-23.

The Patent Owner asserts that Bustini's algorithm is "designed to operate over geographically

distant nodes connected by digital trunk lines (e.g., T1 lines)."  In contrast, it is argued, Chiu's computer

200 and IP Telephone Peripheral 100 "communicate via a PCMIA Bus."  Brief, 30, 31.

As an initial matter, and as discussed extensively above, Chiu does not require the computer 200

and IP Telephone Peripheral 100 to communicate via a PCMIA bus.  Rather, computer 200 and the

stand-alone IP Telephone 100 can communicate via a USB connector to provide, for example, an

computer-screen based interface on the computer for user-convenience.

As also discussed above in the *Response to Arguments - Introduction* section, computer 200 also

communicates via IP Telephone 100 to network 130 via a separate network connection.  Specifically, as

shown in Chiu, Fig. 1 (reproduced below) and as discussed in prior Office actions, the workstation

communicates to network 130 via the **same** network link as IP Telephone 100 similarly to the structural

arrangement presented on the Suder patent under reexamination.



Fig. 1 of Chiu prior art.

Compare this structural arrangement to the similar structural arrangement of the Suder patent

under reexamination:



Fig. 1 of the Suder Patent under Reexamination.

Chiu further teaches the IP telephone 100 comprises physical transport 430 involves a "pass-

through connection serving as an intermediary between . . . a computer and the network 130. If so, the

media access controller will employ collision avoidance mechanisms well known in the network arts to

avoid packet collisions with any other downstream attached devices(s) to the physical layer 430." ¶ 43.

Thus, the workstation clearly communicates to network 130 via the same network via the IP

telephone 100 pass-through at physical transport 430. For this reason, the Patent Owner's arguments

that the workstation communicates via the network via a PCMIA bus connected to the IP Telephone are

unpersuasive (in addition to being unpersuasive because the workstation and IP Telephone can be

connected via a USB connector as discussed previously to support computer-screen calling on the

computer).

Moreover, the Patent Owner's argument here appears to be based on a misapprehension of the

claimed subject matter and thus the Examiner's formulated rejection.

Illustrative, independent claim 29 recites "sufficiently throttling the data sent from the

workstation to the telephone to increase a rate of transfer of the audio information during the

communicating step." Thus, the claims do not recite where the throttling occurs, merely that data "sent

from the workstation" is throttled. Thus, the claims facially encompass throttling data at the

workstation or throttling data at the IP Telephone.

Thus, the throttling arrangements of data sent from the computer as taught by Bustini can be

added to either the computer 200 or the IP telephone 100, where, as discussed above, the claims do not

recite where the throttling occurs, only that "data from the computer" is throttled and where, as

discussed above, the data originating from the computer 200 goes through IP telephone 200.

Thus, the throttling of data "sent from the workstation" can take place at IP telephone 100, which

discloses significant computer and network processing capability. Chiu, Fig. 4.

The Patent Owner also asserts that the Examiner's modification of Chiu's pass-through

implementation would violate Chiu's principle of operations. Brief, 31-32.

As discussed above, Chiu's pass-through option is described in one paragraph, specifically paragraph 43. The teaching in this paragraph is described on optional ("may involve a pass-through connection serving as an intermediary . . . ."). Thus, the Examiner is not persuaded that this alleged alternate embodiment goes to any basic principle of operation.

Nonetheless, the aforementioned paragraph 43 states that IP Telephone 100 serves "as an intermediary between another network device such as a computer and the network 130." Adding congestion control algorithms to IP Telephone 100 is consistent with its role acting as an "intermediary" between the computer and the network.

Furthermore, the IP Telephone's disclosed "collision avoidance mechanism" is an access method to gain access to the shared network resource in an orderly manner, it does not go whether other network resources should be prohibited from ever using the shared resource.

Indeed, Chiu discloses that stand-alone IP Telephone 100 accesses the shared network resource to do work on behalf of the computer 200, such as place and received calls via the use of a computer-screen based interface that is displayed on display 240 of the computer 200. Figs. 2 and 3 and ¶ 34. Thus, stand-alone IP Telephone 100 accesses the shared network using a collision avoidance mechanism in order to provide call services to computer 200.

In another example of Chiu teaching that stand-alone Internet Telephone 200 accessing the shared network on behalf of computer 200, Chiu teaches IP telephone accesses the shared network resource in order not to "saddle" the workstation with "complicated negotiation and delivery requirements, which still require advanced computing resources to handle" and to offload this processing overhead to the adjunct (stand-alone IP Telephone 100). ¶ 5, 6. Indeed, adding additional data throttling capabilities to the IP Telephone would have been consistent with Chiu's concept of offloading IP telephony overhead from computer 200 to the stand-alone, IP telephone 100. Adding

congestion control algorithms to IP Telephone 100 is consistent with its role offloading complicated

negotiation and delivery network requirements from computer 200.

Thus, it would not violate any fundamental principle of Chiu to add Bustini's congestion control

to the IP Telephone for both IP Telephone Data and data originating from computer 200. As discussed in

the *Response to Arguments - Introduction* section above, Bustini's two-node (or three-node)

implementation is well suited to this.

Also note that the Patent Owner's arguments here also appear to presume that the congestion

control as taught by Bustini must take place at IP Telephone, which Bustini's two-node implement does,

but also not that Bustini three-node implementation can perform throttling of data at the computer

200. See the *Response to Arguments - Introduction* section above.

The Patent Owner also asserts Bustini is "silent regarding any 'increase in a rate of transfer' for

the 'voice' data or any other type of data." Brief, 33, 34.

Bustini however explicitly incorporates the class queues (e.g., voice, data) and "allocates spare

bandwidth according to a predefined priority scheme," were voice is a higher priority than bursty data

traffic. 6:29-38, Table 1 (19:1-14) and 21:4-9 reproduced below:

### TABLE 1

| Traffic Name | Class Number i | Service Order*, j | Spare Bandwidth Priority, k |
|---|---|---|---|
| High Priority | 0 | First | X |
| High Speed Deterministic | 1 | * | 1 |
| Low Speed Statistical | 2 | * | 2 |
| Voice | 3 | * | (3)** |
| Bursty | 4 | * | (4)** |
| Multicast | 5 | * | (5)** |

\*Service order determined by minimum configured bandwidth.
\*\*Spare bandwidth priority for classes i = 3, 4, and 5 are equal.

See also Fig. 14 and 20:39-21:23.

Allocating "spare bandwidth" to higher priority voice and limiting (throttling) spare bandwidth

to lower priority bursty data increases the data rate of the voice data when the voice data utilizes the

spare (extra) bandwidth.

Moreover, as Bustini notes, when congestion occurs, traffic exceeds the network's bandwidth.

Abstract. 1: 64-68. If audio information is being transmitted as part of overall traffic being transmitted

at the available network data rate without the benefit of any congestion control algorithms, the audio

bandwidth cannot be increased any further because that act alone would push the overall network

traffic rate over the available traffic rate. Bustini's congestion control algorithms generally throttle

lower priority data types (decrease the data rate of lower priority data types) in order to allow audio

data rate (a higher priority data type) to be increased during congestion similarly to the Patent Owner's

throttling of data.

See also Bustini Fig. 6, which illustrates that overall bandwidth goes down to zero (including

audio information) during increased congestion (region III) without congestion control.



Thus, Bustini's congestion control throttles teaches the recited "throttling the data . . . to

increase a rate of transfer of the audio information," for example, by throttling lower priority data in

order to increase the rate of overall bandwidth (including audio information) from zero during severe congestion.

The Patent Owner also asserts controlling bursty traffic would not increase the audio data rate over what the audio data rate would have been in the presence of congested, bursty traffic and that reasoning amounts to a "hypothetical increase." Brief, 34.

However, as discussed above, Bustini's congestion control algorithm directly increases the voice data rate by allocating spare bandwidth to the higher priority voice traffic and also throttles lower priority data (such as bursty traffic) thereby also increasing the rate of overall bandwidth (including audio information) from zero during severe congestion.

The Patent Owner also refers asserts that data rate increase of Fig. 16 of Bustini only applies to bursty data. Brief, 34, 35.

However, as discussed above, Bustini's congestion control algorithm throttles lower priority data (such as bursty traffic) thereby increasing the rate of overall bandwidth (including audio information) from zero during severe congestion. Moreover, as noted by the Patent Owner, the bursty data rate is also decreased (Brief, 35) thereby increasing the overall bandwidth available to voice data thereby increasing the voice data rate from zero during severe congestion. As also noted above, Bustini's congestion control algorithm directly increases the voice data rate by allocating spare bandwidth to the higher priority voice traffic and limiting spare bandwidth (throttling) the lower priority bursty data.

The Patent Owner also asserts Bustini's color coded "rate regulation scheme" could not be implemented within Chiu's architecture. "There is simply no component in Chiu's architecture that could perform the necessary comparisons and color code the claimed 'data' red and the claimed 'audio' green' . . . ." Brief, 39-40.

The congestion-control teachings of Bustini, as discussed above, are in no way limited to color coding of packets, which Bustini mentions in one paragraph. 2:27-3:7.

Nonetheless, Chiu has ample processing capability to implement this feature either in Bustini's two-node or three-node implementation. IP Telephone 100 contains processor DSP 410, Controller 414, MAC 428, Packetizer 434 and Controller 450 Fig. 4 and ¶¶ 37-50. For example, Chiu teaches that packetizer 434 is capable of building packets. ¶¶ 39-41. IP Telephone can even perform higher layer processing that involves reading, routing and generating packets. Figs. 6, 7 and ¶¶ 61-69.

Also note that Bustini's 3-node implementation can be added to both the computer 200 and IP Telephony peripheral 200 and requires less processing capability than what the IP Telephone is disclosed as possessing (e.g., the IP Telephone is disclosed as providing high-level routing capability, ability to perform complicated network negotiation and delivery requirements, and provide a GUI to computer 200).

The Patent Owner also asserts regarding color coding that the "'workstation' never has access to the green packets . . . ." (Brief 40, 41), but Bustini's two-node congestion control algorithm can be implemented at the IP Telephone 100 regarding both data and audio packets and moreover Bustini's three-node congestion-control algorithm can be implemented at the workstation (regarding data packets) and the IP Telephone (regarding audio and data packets) as discussed above.

The Patent Owner again focusing on red and green packets, asserts that "both 'red packets' and 'green packets' come from the same 'bursty data source' . . . ," (Brief 41), but as discussed repeatedly above and in the rejections, the data comes from the computer 200 and the voice from IP Telephone 200, which is a "stand-alone" telephone and thus distinct from computer 200. Even if the IP Telephone is considered an internal card, it is still a distinct telephone and it is disclosed as receiving network data from computer 200 (as discussed in the *Response to Arguments – Introduction* section above).

The Patent Owner also premises several argument on the notion that Chiu's IP telephone would be the "terminus for the received green packets" (Brief 42, 43), but as discussed in the final Office action and as discussed above (e.g., see the *Response to Arguments - Introduction*), Chiu teaches that the IP Telephone places audio packets onto the shared, network connection as the pass-through using collision avoidance mechanisms. ¶ 43.

As discussed in the Introduction section above, Chiu also teaches that the network pass-through at the Telephone 100 may instead be replaced by a termination. ¶ 43. For these implementations, the network connection between the computer 200 and telephone 100 illustrated above would be removed, however the computer is still disclosed as accessing the same network 130 via some other means. Fig. 1. Thus, data from the workstation (computer 200) would again pass through that portion of IP Telephone 100 sharing the same portion of network 130 as the computer 200.

The Patent Owner also asserts the Examiner has failed to provide evidence how Bustini's rate regulation scheme "would be implemented on Chiu's 'computer 200' (the Examiner-identified 'workstation'). Brief, 44.

This argument however fails to address the formulated rejection, which added Bustini's rate regulation to stand-alone IP telephone 100 as discussed in the final Office and as discussed above. Even if the IP telephone 100 is implemented as a PCMIA card (rather than Chiu's explicitly disclose "stand-alone" telephone connected to the computer by a network and USB connection), it is still reasonably considered a IP telephone distinct from computer 200, as also discussed above. Although Bustini describes the three-node implementation as optional, even the three-node implementation of Bustini's congestion-control algorithms is structurally compatible with Chiu's first node (computer 200), second node (IP Telephone 100) and third node (destination network node), as also discussed above.

Regarding independent claim 37, the Patent Owner asserts triggering ECN(s) when a "threshold is exceeded" is the opposite of triggering when "audio information falls below a predetermined level." Brief, 47.

However, a minimum threshold can be exceeded in the decreasing direction.  As explained in the final Office action, it would have been obvious that the threshold for the ECN trigger is a selectable, <u>minimum</u> bandwidth.

The Patent Owner also asserts the ECN (as part of a feedback control method) "is not the same as Bustini's Main Algorithm)." Brief, 48.

However, as discussed in the *Response to Arguments - Introduction* section, Bustini incorporates background technology, including ECN signaling (14:22-34 and 21:53-54) into its invention.

The remaining Patent Owner arguments have been addressed above or are based upon the arguments addressed above.

**Requirement to pay appeal forwarding fee.** In order to avoid dismissal of the instant appeal in

any application or ex parte reexamination proceeding, 37 CFR 41.45 requires payment of an appeal

forwarding fee within the time permitted by 37 CFR 41.45(a), unless appellant had timely paid the fee

for filing a brief required by 37 CFR 41.20(b) in effect on March 18, 2013.

Respectfully submitted,

/ROLAND G FOSTER/
Primary Examiner, Art Unit 3992

Conferees:
/MICHAEL FUELLING/
Supervisory Patent Examiner, Art Unit 3992

/DAVID E ENGLAND/
Primary Examiner, Art Unit 3992

Reexam of Patent No. 7,068,684
Control No. 90/014,804

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

*In re* Reexam of: U.S. Patent No. 7,068,684

Control No.: 90/014,804

Confirmation No.: 9925; Art Group: 3992

Reexam Request Filed: July 16, 2021

Appellant: Estech Systems IP, LLC

Title:  QUALITY OF SERVICE IN A VOICE OVER IP TELEPHONE SYSTEM

### REPLY BRIEF UNDER 37 C.F.R. § 41.41

Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite 125, #453
Philadelphia, PA 19103

Mark J.E. McCarthy (Reg. No. 69,575)
601 Congress Avenue, Suite 600
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

## TABLE OF CONTENTS

I.  ARGUMENTS ............................................................................... 1

    A.  The combination of *Chiu* and *Bustini* fails to teach or suggest a "hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone." ................................................ 3

    B.  The combination of *Chiu* and *Bustini* fails to teach or suggest "throttling the data sent from the workstation to the telephone" ........................................................................................... 10

    C.  The combination of *Chiu* and *Bustini* fails to teach or suggest "wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold." ................................................................................. 16

II.  CONCLUSION ......................................................................... 17

i

Reexam of Patent No. 7,068,684
Control No. 90/014,804

# TABLE OF AUTHORITIES

**Cases**

*McGinley v. Franklin Sports, Inc.*,
  262 F.3d 1339 (Fed. Cir. 2001) ............................................................15

ii

## I.    ARGUMENTS

In the *ex parte* reexamination of U.S. Patent No. 7,068,684 ("'684 Patent"), Patent Owner presents the following arguments in reply to the Examiner's Answer dated August 16, 2023 ("Answer"). The Examiner's Answer highlights the issues that Patent Owner has faced during this proceeding—the Examiner has maintained rejections despite unequivocal failures of proof. But now before the Board, the Examiner introduces new positions and evidence in an attempt to salvage those unsupported rejections.

A fundamental failure of the Examiner's rejection is that *Chiu* does not disclose "a workstation coupled to the hub through the telephone" as depicted, for example, in Figure 1 of the '684 Patent:



'684 Patent, Fig. 1 (excerpted). By contrast, the "IP Telephone Card 100" that the Examiner relies on as the claimed "telephone" is unequivocally a component of the computer disclosed in *Chiu*:

1



*Chiu*, Fig. 2 (excerpted).  For the first time during these proceedings, the Examiner relies heavily on the mention of USB in *Chiu* in an attempt to avoid the fact that *Chiu* describes "IP Telephone Card 100" as a peripheral to the computer, not a separate telephone.  But, as described in further detail below, the mere mention of USB does not support the rejection.

In another example, for the first time during these proceedings, the Examiner relies on disclosure of the Nortel Networks i2004 Internet Telephone in *Chiu*.  Here is the entirety of the disclosure regarding that telephone:

> **[0025]**  One known implementation to address some of the aforementioned problems is the Nortel Networks i2004 Internet Telephone, of Nortel Networks, Brampton, Ontario, Canada, which is a hardware based telephony apparatus compatible with MGCP and H.323 devices. This is a stand-alone IP telephone client device which connects to an IP network directly and provides the familiarity and ease-of-use of a traditional telephone.

*Chiu*, ¶25.  That limited disclosure does not grant the Examiner free license to disregard the text and figures of *Chiu*.

The facts before the Board do not support the Examiner's rejections. Accordingly, Patent Owner respectfully requests that the Board reverse the Examiner's rejections.

### A.    The combination of *Chiu* and *Bustini* fails to teach or suggest a "hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone."

The preambles of independent claims 29, 36, and 37 each recite a "hub, a telephone coupled to the hub, [and] a workstation coupled to the hub through the telephone." *E.g.*, '684 Patent, claim 29.  As discussed in the Appeal Brief, the claimed "workstation" and the claimed "telephone" are distinct components (i.e., separate devices), and the claimed "telephone" necessarily has an interface (e.g., keypad) for dialing and initiating a telephone call, a microphone for use during the

3

telephone call, and a speaker for use during the telephone call.  *See* Appeal Brief dated May 22, 2023 ("Appeal Brief"), pp. 8-13.

In an attempt to maintain a baseless rejection, the Examiner asks the Board to depart from the well-understood meaning of the word "telephone."  In support, the "Examiner declines to read claimed limitations regarding the particulars of a very specific type of structural telephone envisioned (but not claimed) by the Patent Owner."  Answer, p. 23.  In other words, the Examiner refuses to acknowledge that the claimed "telephone" must include the components necessary for it to function as a telephone (i.e., interface, microphone, speaker).  Put another way, in an effort to maintain the rejection, the Examiner contends that a device can be the claimed "telephone" even if it does not have the components necessary to function as a telephone.  There is no reasonable dispute over the fact that a "telephone" must be capable of making telephone calls.  So too must the claimed "telephone," and the Examiner has provided no basis to depart from that well-understood meaning of a "telephone."

Next, for the very <u>first time</u> in this reexamination proceeding, the Examiner argues that *Chiu* "teaches that IP telephony peripheral 100 . . . <u>can be</u> a Nortel Networks i2004 Internet Telephone, which is a 'hardware based telephony apparatus' and a 'stand-alone IP telephone.'"  Answer, p. 18 (quoting *Chiu*, ¶25) (emphasis added).  But this is simply not true.  *Chiu* <u>never</u> discloses "IP telephony

4

peripheral 100" is the "Nortel Networks i2004 Internet Telephone." To the contrary,

here is the entirety of the disclosure in *Chiu* regarding that phone:

> **[0025]** One known implementation to address some of the aforementioned problems is the Nortel Networks i2004 Internet Telephone, of Nortel Networks, Brampton, Ontario, Canada, which is a hardware based telephony apparatus compatible with MGCP and H.323 devices. This is a stand-alone IP telephone client device which connects to an IP network directly and provides the familiarity and ease-of-use of a traditional telephone.

*Chiu*, ¶25. *Chiu* does not identify which of the "aforementioned problems" are

allegedly solved by that phone. *See id.* *Chiu* does not identify any functionality of

that phone. *See id.* But the Examiner improperly relies on that disclosure to

disregard the fact that *Chiu* continuously describes "IP telephony peripheral 100" as

a peripheral, consistent with the disclosure of *Chiu*. Absent any specific disclosure

in *Chiu*, the Examiner contends that *Chiu's* "IP telephony peripheral 100" connects

to *Chiu's* "computer 200" via USB or PCMCIA. *See* Answer, pp. 18-19 (citing

*Chiu*, ¶31). Patent Owner asserts that the "Nortel Networks i2004 Internet

Telephone" does not have USB or PCMCIA connections to a "computer." The lone

paragraph in *Chiu* does not contain any such disclosure. *Chiu*, ¶25. Nor does the

patent application referenced in that same paragraph of *Chiu*. *See* Ex. 2002, U.S.

Patent Application Serial No. 09/224,548; *see also Chiu*, ¶25 ("Also known, is

5

commonly owned application titled 'Packet Voice Telephony System and Method',

Ser. No. 09/224,548, filed Dec. 31, 1998, which is herein incorporated by

reference.").  Not only is the Examiner's position unsupported, it is contradicted by

evidence regarding the "Nortel Networks i2004 Internet Telephone."  Accordingly,

*Chiu's* "IP Telephony Peripheral 100" (the Examiner-identified "telephone") <u>cannot</u>

be the "Nortel Networks i2004 Internet Telephone."  Any Examiner argument that

relies on the "Nortel Networks i2004 Internet Telephone" is baseless and should be

disregarded.

The Examiner concedes that *Chiu* discloses the following "structural

arrangement:"



Answer, p. 19 (Examiner-generated figure).  In that arrangement, C*hiu's* "IP

Telephony Peripheral 100" (the Examiner-identified "telephone") is a component of

(i.e., within) *Chiu's* "computer 200" (the Examiner-identified "workstation").  In

6

other words, in that allegedly disclosed "structural arrangement," *Chiu's* "IP Telephony Peripheral 100" (the Examiner-identified "telephone") and *Chiu's* "computer 200" (the Examiner-identified "workstation") are <u>not</u> distinct components (i.e., separate devices). That is contrary to what independent claims 29, 36, and 37 require.

The Examiner contends that *Chiu* also discloses the following "structural arrangement:"



Answer, p. 20 (emphasis added to Examiner-generated figure). Patent Owner disagrees because *Chiu* <u>never</u> describes "IP Telephony Peripheral 100" (the Examiner-identified "telephone") as being a "stand-alone" device. The Examiner had to generate a figure because no such figure exists in *Chiu*. In fact, *Chiu* fails to disclose even a single instance where *Chiu's* "IP Telephony Peripheral 100" has its own interface, its own microphone, and its own speaker to perform the core functions of a telephone without relying on *Chiu's* "computer 200" (the Examiner-identified "workstation").

7

The Examiner also disregards the fact that *Chiu* unequivocally describes "IP Telephony Peripheral 100" as being operational only through a computer program—the same computer that that peripheral is part of.  According to the Examiner, "the computer screen window of [*Chiu's*] Fig. 3 is labelled 'Nortel Networks IP Telephone,' which is consistent with the IP Telephone being a 'stand-alone,' 'Nortel Networks i2004 Internet Telephone,'" without any supporting disclosure in *Chiu*. Answer, p. 24.  In doing so, the Examiner ignores the express disclosure in *Chiu* that Figure 3 depicts "a simplified computer-screen based interface of the IP telephony peripheral."  *Chiu*, ¶19, ¶34.  The Examiner also ignores the express disclosure that Figure 3 depicts that "IP telephony peripheral GUI 300 may be implemented on a windows-based graphical user interface, an example of which is Microsoft Windows NT of the Microsoft Corporation, Redmond, Wash."  *Id.*, ¶34.  The Examiner also ignores the figure itself—anyone that has used a Windows computer in the last several decades would recognize that the buttons in the right corner of Figure 3 are minimize, restore, and close buttons.  There is no reasonable dispute that Figure 3 does not show that "IP Telephony Peripheral 100" is the "Nortel Networks i2004 Internet Telephone" as the Examiner contends.

The Examiner contends that because *Chiu* "explicitly and repeatedly discloses an 'Internet Telephone Peripheral 100,'" a POSITA "would understand that Chiu's peripheral device would be considered a telephone."  Answer, p. 23 (emphasis in

8

original).  *See also* Answer, p. 22 ("Chiu explicitly and repeatedly discloses a telephone").  Patent Owner disagrees.  *Chiu* refers to the peripheral component "100" as both a "<u>Telephony</u> Peripheral" and a "<u>Telephone</u> Peripheral," sometimes in the same paragraph.  *See, e.g., Chiu*, ¶26 ("Internet <u>telephone peripheral 100</u> is also coupled to network 130 . . . the IP <u>telephony peripheral 100</u> will include sufficient network resources . . .") (emphasis added).  But this is a typographical error.  The term "<u>telephony</u> peripheral 100" appears twenty-four times in Chiu's specification and twice in the figures (e.g., Fig. 1, Fig. 6).  In contrast, the term "<u>telephone</u> peripheral 100" only appears five times in *Chiu's* specification and never appears in the figures.  Accordingly, a POSITA would conclude "<u>telephony</u> peripheral" is the correct label for peripheral component "100," while "<u>telephone</u> peripheral" is a typographical error.  Once this error is realized, the Examiner's rationale as to why a POSITA would consider *Chiu's* peripheral component "100" to be a telephone is no longer valid.

But even if *Chiu* is intentionally using two labels (i.e., "telephony peripheral 100" and "telephone peripheral 100") for the same peripheral component "100," *Chiu* fails to disclose even a single instance where *Chiu's* peripheral component "100" has its own interface (e.g., keypad), its own microphone, and its own speaker to perform the core functions of a telephone without relying on *Chiu's* "computer

200" (the Examiner-identified "workstation").  Accordingly, a POSITA would not

consider *Chiu's* peripheral component "100" to be the claimed "telephone."

For the above reasons, *Chiu* fails to teach or suggest the claimed "telephone."

*Bustini* does not cure the deficiencies of *Chiu*, and the Examiner does not so allege.

*See* Answer, pp. 6-8.  Accordingly, *Chiu* and *Bustini* fail to render independent

claims 29, 36, and 37 obvious.

**B.    The combination of *Chiu* and *Bustini* fails to teach or suggest "throttling the data sent from the workstation to the telephone"**

Independent claims 29, 36, and 37 each recite "throttling the data sent from

the workstation to the telephone."  *E.g.*, '684 Patent, claim 29.  As discussed in the

Appeal Brief, Patent Owner asserts this means reducing the amount or rate of data

sent <u>from the workstation to the telephone</u>.  *See* Appeal Brief, pp. 13-15.

For the <u>first time</u> in this reexamination proceeding, the Examiner expressly

details the allegedly obvious combination of *Chiu* and *Bustini*.  Answer, p. 21 (citing

*Bustini*, Fig. 7).  *Bustini* teaches an internal congestion avoidance ("ICA") feedback

control system.  *See Bustini*, 11:12-58; Fig. 7.  The ICA feedback control system has

three nodes:  Node A, Node B, and Node C.  *See id.*  Bursty data is transmitted from

Node A to Node B, where it is placed in a "bursty data queue."  *See id.*, 11:21-38,

Fig. 7.  Then, "[i]f the queue length exceeds a prescribed threshold length, a

congestion indicator bit (c-bit) is set in the header (octet 3, bit 5) of all bursty data

10

cells transmitted from node B to node C while [the] threshold is exceeded." *Id.*,

11:38-41. After Node C receives the bursty data from Node B, Node C

> examines the headers of each bursty data virtual circuit and generates
> an estimate of the congestion status by comparing the average c-bit rate
> with a threshold reference value. If threshold is exceeded, indicating
> incipient congestion, an ICA rate control message is fed back to [Node
> A], where user A's input rate is decreased so as to relieve the congestion
> present on its virtual circuit.

*Id.*, 11:55-58. *See also* Fig. 7 (element 180).

Again, the Examiner mapped *Chiu's* "computer 200," "IP Telephony

Peripheral 100," and "Phone Server 110" to the claimed "workstation," "telephone,"

and "multimedia server," respectively. *See* Answer, p. 7 ("phone server 110

corresponds to the claimed multimedia server"), p. 8 ("IP Telephony Peripheral 100

reads on the recited telephone"). The Examiner's proposed combination of *Chiu* and

*Bustini* includes modifying *Chiu's* "computer 200," "IP Telephony Peripheral 100,"

and "Phone Server 110" to operate as *Bustini's* Node A, Node B, and Node C,

respectively. *See* Answer, p. 21 (*Bustini's* "congestion control algorithm is clearly

implemented at <u>Node A (computer 200)</u>, <u>Node B (IP Telephone 200)</u> and <u>Node C</u>

<u>(Phone Server 110).</u>") (emphasis added). As a summary, the Examiner's mappings

and proposed combination are illustrated below:

11

| | | |
|---|---|---|
| Claimed "workstation"<br><br>*Chui's* "computer 200"<br><br>*Bustini's* "Node A" | Claimed "telephone"<br><br>*Chui's* "IP Telephony Peripheral 100"<br><br>*Bustini's* "Node B" | Claimed "multimedia server"<br><br>*Chui's* "Phone Server 110"<br><br>*Bustini's* "Node C" |

*See* Answer, pp. 7, 8, 21. But the Examiner's proposed combination does not render independent claims 29, 36, and 37 obvious for multiple reasons.

Each of independent claims 29, 36, and 37 recites "transferring data from the workstation to the telephone, wherein the data sent from the workstation is <u>addressed for transmission to the data server</u>." *E.g.,* '684 Patent, claim 29 (emphasis added). In other words, the destination of workstation data (i.e., bursty data) is the claimed "data server," <u>not</u> the claimed "multimedia server." Accordingly, the Examiner's proposed combination would be inoperable because *Chiu's* "phone server 110" (*Bustini's* "Node C") (the Examiner-identified "multimedia server") would not even receive the bursty data in the first place. Thus, *Chiu's* "phone server 110" (*Bustini's* "Node C") (the Examiner-identified "multimedia server") <u>could not</u> "examine[] the headers of each bursty data virtual circuit and generate[] an estimate of the congestion status by comparing the average c-bit rate with a threshold reference value" and transmit "an ICA rate control message" if congestion is detected, as *Bustini's* ICA feedback control system requires. *Bustini*, 11:50-58. "If references taken in combination would produce a seemingly inoperative device, we have held

12

that such references teach away from the combination and thus cannot serve as predicates for a prima facie case of obviousness." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001) (cleaned up).

Further, as discussed in the Appeal Brief, *Chiu's* "IP Telephony Peripheral 100" acts as a "pass-through" without "influencing" the bursty data received from *Chiu's* "computer 200" (*Bustini's* "Node A"). *See* Appeal Brief, pp. 31-33 (quoting *Chiu*, ¶43, claim 12). But *Bustini's* ICA feedback control system requires Node B to set "a congestion indicator bit (c-bit) . . . in the header (octet 3, bit 5) of all bursty data." *Bustini*, 11:35-43. Modifying *Chiu's* "IP Telephony Peripheral 100" (*Bustini's* "Node B") to start setting header bits in bursty data from *Chiu's* "computer 200" violates its core function as a mere "pass-through." Additionally, or alternatively, by virtue of *Chiu's* express disclosure that "IP Telephony Peripheral 100" acts as a mere "pass-through" for bursty data from *Chiu's* "computer 200," *Chiu* teaches away from the Examiner's proposed modification. At bottom, the Examiner's proposed modification is too drastic to be obvious.

Further, *Bustini's* nodes (A, B, C) require transmitters/receivers ("TXRs") and frame replay pads ("FRPs") with sophisticated hardware and software to implement *Bustini's* ICA feedback control system. *See Bustini*, 5:63-66, Figs. 7-9. Accordingly, the Examiner's proposed combination would involve installing *Bustini's* TXRs and FRPs into *Chui's* "computer 200," "IP Telephony Peripheral

13

100," and "Phone Server 110." But the Examiner provides no evidence that such a drastic modification could be successfully implemented (i.e., no evidence that there is a reasonable expectation of success). Instead, the Examiner merely states that a POSITA "would understand that the Bustini-type algorithm <u>would readily function</u> in the system of Chiu. A [POSITA] would <u>easily program</u> the algorithm disclosed by Bustini into the circuitry disclosed by Chiu." Answer, p. 11 (emphasis added). That is a gross oversimplification and a fatal flaw in the Examiner's obviousness rejection.

The Examiner argues that "adding additional data throttling capabilities to the IP Telephone would have been consistent with Chiu's concept of offloading IP telephony overhead from computer 200 to the stand-alone, IP telephone 100. Adding congestion control algorithms to IP Telephone 100 is consistent with its role offloading complicated negotiation and delivery network requirements from computer 200." Answer, pp. 30-31. Patent Owner disagrees. While it is realistic to expect *Chiu's* "IP Telephony Peripheral 100" to handle the "complicated negotiation and delivery requirements" associated with Internet telephony communications, a POSITA would find it unrealistic to expect *Chiu's* "IP Telephony Peripheral 100" to act as a node in *Bustini's* ICA feedback control system. Again, as discussed in the Appeal Brief, *Bustini's* nodes are geographically distant nodes connected by digital trunk lines (e.g., T1 line). *See* Appeal Brief, p. 30 (citing *Bustini*, 1:16-21,

14

6:18-53, Fig. 1).  In contrast, *Chiu's* "IP Telephony Peripheral 100" is a PCMCIA

card.  *See* Chiu, Fig. 2.  This is a defect in the Examiner's obviousness rejection.

As noted by the Examiner, *Bustini's* ICA feedback control system can be

implemented with two nodes, instead of three.  *See* Answer, p. 21.  Specifically,

*Bustini* discloses "[i]ntermediate node B is <u>not necessary</u> for implementing a virtual

connection or for operation of the ICA system." *Bustini*, 12:18-20 (emphasis added).

Yet despite this express disclosure that Node B is the omitted node in the two-node

implementation, the Examiner states "[r]egarding *Bustini's* <u>two node</u>

<u>implementation</u>, the entire congestion control algorithm is <u>clearly implemented at</u>

<u>Node B</u> (IP Telephone 200) (i.e., congestion control is not required at computer

200)."  Answer, p. 21 (emphasis added).  Accordingly, the Examiner's mapping is

unclear.  This is a defect in the Examiner's obviousness rejection.

If the Examiner's proposed combination involves modifying *Chiu's* "IP

Telephony Peripheral 100" to operate as *Bustini's* "Node A" and *Chiu's* "Phone

Server 110" to operate as *Bustini's* "Node C," this two-node implementation still

suffers from all the deficiencies discussed above regarding the three-node

implementation.  Further, the Examiner provides no evidence that the two-node

configuration would reduce the amount or rate of data sent from *Chiu's* "computer

200" (the Examiner-identified "workstation") to *Chiu's* "IP Telephony Peripheral

100" (the Examiner-identified "telephone"), as the independent claims require.

15

For the above reasons, the combination of *Chiu* and *Bustini* fails to render independent claims 29, 36, and 37 obvious.

**C.    The combination of *Chiu* and *Bustini* fails to teach or suggest "wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold."**

Independent claim 36 recites, in part, "wherein the throttling step further comprises the step of reducing a future amount of data from being transferred from the workstation if the amount of data exceeds a predetermined threshold."  '684 Patent, claim 36.  As discussed in the Appeal Brief, to meet this claim element, the Examiner cited to a portion of *Bustini* with a rate-regulation scheme involving color coded packets ("color scheme").  *See* Appeal Brief, p. 39.  Now, in the Answer, the Examiner argues that *Bustini's* ICA feedback control system implements the color scheme.  *See* Answer, pp. 34-35.  Patent Owner disagrees.  The color scheme is only mentioned once in the background section of *Bustini*.  *See Bustini*, 2:51-3:17.  It is never mentioned in conjunction with *Bustini's* ICA feedback control system.  And the Examiner fails to even articulate how the color scheme would be used with the features of *Bustini's* ICA feedback control system (e.g., congestion indicator bit (c-bit), an ICA rate control message, etc.).   This is a defect in the Examiner's obviousness rejection.

16

Further, the color scheme assigns different colors (e.g., red, green) to packets from a single bursty data source. *See Bustini*, 2:51-3:17. In the Answer, the Examiner is assigning "red" to data packets from *Chiu's* "computer 200" and "green" to audio packets from *Chiu's* "IP Telephony Peripheral 100." *See* Answer, p. 34. But these are different sources, and the audio packets are not "bursty data." The Examiner fails to articulate why a POSITA would extend the color scheme to two data sources instead of a single data source and/or apply the color scheme to non-bursty data. This is a defect in the Examiner's obviousness rejection.

For the above reasons, the combination of *Chiu* and *Bustini* fails to render independent claim 36 obvious.

## II.    CONCLUSION

For the aforementioned reasons, and all the reasons mentioned in the Appeal Brief, the cited art fails to render obvious the claims under reexamination.

DATED: October 16, 2023            Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

17

# EXHIBIT 2002:

# U.S. PATENT APPLICATION SERIAL NO. 09/224,548

# APPLICATION FOR U.S. PATENT
## TRANSMITTAL FORM

December 31, 1998

Attorney Docket No. SS0159

"Express Mail" mailing label number  EL225850074US

Date of Deposit: December 31, 1998

I hereby certify that this paper or fee is being deposited with the United
States Postal Service "Express Mail Post Office to Addressee" service
under 37 CFR 1.10 on the date indicated above and is addressed to the
Assistant Commissioner for Patents, Box PATENT APPLICATIONS,
Washington, DC 20231, on December 31, 1998

Amy Deckard Davis
(Typed or printed name of person mailing paper or fee)

*Amy Deckard Davis*

(Signature of person mailing paper or fee)

December 31, 1998
Date

Assistant Commissioner for Patents
Box Patent Applications
Washington, DC  20231

Dear Sir:

Transmitted herewith for filing is the patent application of:

Inventor(s):        Phillip Karl Edholm

For:                PACKET VOICE TELEPHONY SYSTEM AND METHOD

Enclosed are a Specification (32 pages), Abstract (1 page), and  six (6) sheets of informal
drawings.

All correspondence regarding this application may be directed to Applicant(s) attorney at the
below listed telephone number and address.

Respectfully submitted,

W. Glen Johnson
Reg. No. 39,525

W. Glen Johnson
Nortel Networks IP Department
P.O. Box 832130
Richardson, TX 75083-2130
Phone: (972) 685-1420
Fax: (972) 685-3030

**Attorney Docket No. SS0159**

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## TITLE

**PACKET VOICE TELEPHONY SYSTEM AND METHOD**

INVENTOR

**Phillip Karl Edholm**

"Express Mail" mailing label number
_EL225850074US_____

Date of Deposit: _December 31, 1998_

   I hereby certify that this paper or fee is
being deposited with the United States Postal
Service "Express Mail Post Office to Addressee"
service under 37 CFR 1.10 on the date indicated
above and is addressed to the Assistant
Commissioner for Patents, Box Patent Application,
Washington, DC  20231, on _December 31, 1998_

_____Amy Deckard Davis_____
(Typed or printed name of person mailing paper or
fee)

_____Amy Deckard Davis_____
(Signature of person mailing paper or fee)

_____December 31, 1998_____
Date

## PACKET VOICE TELEPHONY SYSTEM AND METHOD

Inventor: Phillip Karl Edholm

5

### FIELD OF INVENTION

This invention is generally concerned with packet network telephony, and is particularly concerned with a packet voice telephone architecture.

10

### DESCRIPTION OF THE RELATED ART

Within the past few years, a lot of interest, hype, and money has been spent on making practical use of the Internet. One of the most promising new technologies, and the one which may offer consumers the first real alternative to conventional switched telephone service, is Internet telephony. Simply put, Internet telephony is directed to using the Internet as the transport for telephone calls. Unlike the traditional telephone call, in Internet telephony, the use of the public switched telephone network is minimized, and instead the Internet backbone is used as the primary long-haul communications carrier. By leveraging fixed cost Internet access and global points of presence (the parties to the call could be as close as next door or as far away as the next hemisphere), Internet telephony can significantly reduce or even eliminate the time and distance costs heretofore expected in a long distance call utilizing the public switched telephone network ("PSTN").

In a conventional Internet telephony session, an originating computer having a TCP/IP stack and a communications pathway to the Internet establishes a TCP virtual circuit or UDP connection with a destination computer also having its own TCP/IP stack and communications pathway to the Internet. Once the TCP virtual circuit or UDP connection is established, analog voice perceived at the source computer is converted into streaming data and sent over the

1

Internet in a series of TCP/IP or UDP/IP packets.  The
destination computer receives the so-packetized
streaming data and converts it back to analog form as
it is received.  The destination may likewise transfer
5   locally perceived streaming voice back to the source
to enable two-way voice communications between the
source and destination users, much like the
traditional telephone call.

10   Known Internet telephony implementations are
software-based, and require sophisticated multimedia
computing resources be utilized by both the
originating and destination points in order to
establish and maintain the call.  This is because
15   these computing resources are designed to utilize the
Internet in its traditional role as an asynchronous
data communications network, and as such, need a
reliable way to transfer information.  The TCP
protocol promises such reliability, since a single
20   data route is selected and all TCP transferred data is
checked at the destination to ensure all data is
received in good condition (otherwise, the destination
requests the source to resend the missing or corrupted
packets).  This protocol is great for transferring a
25   data file or an application that doesn't work if even
a small piece of data is missing.  However, TCP is not
so great when real-time streaming data such as voice
is being transmitted, since it requires that the
destination confirm delivery of each packet and
30   request the source to resend it if it doesn't show up.

As a result, some known software-based telephony
applications can be configured to attempt Internet
telephony communications using UPD, real time protocol
35   ("RTP"), real time control protocol ("RTCP"), or the
recently announced real time streaming protocol
(RTSP), all of which sacrifice TCP's transmission
reliability to some degree in exchange for enhanced
throughput and/or adding special timing information

2

relevant to streaming data transmission.  While these
protocols offer improved real-time  streaming data
transmission performance over TCP, they nevertheless
saddle the Internet telephony application or an
5   apparatus with complicated negotiation and delivery
requirements, which still require advanced computing
resources to handle.

Moreover, even though conventional Internet
10  telephony software may be available at low-cost or
even bundled with the implementing computer, the
underlying multimedia computer hardware required to
execute the software is quite expensive when compared
to the cost of a conventional telephone.  Also, the
15  interfaces are quite dissimilar, even if the telephony
application displays a "phone" paradigm on the screen.
This makes current Internet telephony applications
difficult for the casual user to understand, much less
utilize.
20

Therefore, it would be desirable if a simple
telephony device was developed which could
simultaneously transmit and receive packetized
streaming voice data without the encumbrances imposed
25  by existing reliable data communication or real-time
protocols.  It would also be desirable to provide a
telephony device that provides a interface familiar
with telephone users.

3

## SUMMARY OF THE INVENTION

In accordance with these and related desires, the
present invention is directed to Applicant perceives
as a useful, novel and nonobvious packet voice
5    telephone and telephony system incorporating the same.
Consistent with a first embodiment of the present
invention, the purely connectionless Layer 3 IP
protocol is used to transfer streaming voice.  As
such, the IP telephone of the first embodiment
10   includes a controller and memory specifying the
destination IP address or addresses, a packetizer
coupled the controller and memory for packetizing
outbound digitized voice into at least one outbound IP
packet, and a network interface for transmitting the
15   outbound IP network onto a network which may include
the Internet.  Preferably, this IP phone also includes
an extractor coupled to the memory and controller for
extracting inbound digitized voice within an incoming
IP packet whose source address correlates to the
20   destination IP address or addresses stored in the
memory.

By using base IP transmission protocol without
TCP, UDP, or real time extensions, in this embodiment
25   call setup and voice transmission operations are
greatly simplified.  This feature enables the IP
telephone controller to preferably comprise a finite
state machine for directing bi-directional IP packet
flow in a purely connectionless manner.  This finite
30   state machine may be implemented by a programmed
microntroller, or a synchronous network of discrete
logic.

The IP telephone according to the first
35   embodiment present invention preferably communicates
with a phone server having a predetermined IP address
in order to resolve user input into a viable
destination IP address for establishing a call, as

4

well as implement advanced call features such as
forwarding and conferencing.  To establish the call,
the IP telephone packetizer may transmit a predefined
call request IP packet to this phone server using the
5    predetermined IP address as the destination address.
The phone server will utilize a call model for
resolving or verifying requested destination
information specified by the user and contained in the
data portion of the call request IP packet, and either
10   issues a connection reply containing the resolved or
verified destination IP address, or a connection error
if the phone server is unable to decipher or confirm
the desired destination information.  In turn, the IP
telephone controller will identify the server feedback
15   and, if a connection reply is perceived, the
destination IP address specified in the reply is
placed in IP telephone memory.  Thereafter, the
packetizer will route digitized voice packets to this
stored address.
20

     According to a second embodiment of the
invention, OSI level 4 and higher layer protocols
(such as TCP/IP and ITU H.323) can be preserved
through encapsulation, redirection, and resolution of
25   such layer control.  To this end, the IP telephone of
the second embodiment will include a controller
capable of directly or indirectly determining whether
an incoming packet includes control information
germane to the layer 4+ protocol being supported.  If
30   this controller determines that the received packet
includes such control information which it cannot
process internally, it encapsulates the received
control information into an outbound layer 3 packet
and directs that it be sent to the phone server using
35   base IP protocols.

5

The phone server receives inbound layer 4+ control information, and, using appropriate higher layer service routines, extracts the control information and formulates a response. Then, the
5  phone server encapsulates and broadcasts the response to the IP telephone using Layer 3 IP protocols and the controller of the IP telephone routes it to the destination in native higher layer format. In such way, the phone server of the second embodiment acts as
10  a control, receipt and response intermediary that is transparent to the destination telephony device. Moreover, layer 4+ protocols can be supported while adding minimal processing functionality to the IP telephone controller, thereby keeping IP telephone
15  costs low.

Preferably, the IP telephone of the first and second embodiments will include a dedicated handset much like a conventional telephone, and appropriate
20  analog/digital converter circuitry coupled to the aforementioned extractor and packetizer for converting voice acquired by the handset microphone into outbound digitized voice as well as for converting inbound digitized voice into analog for playback in the
25  handset speaker.

In addition, preferably, the IP telephone according to the first and second embodiments of the invention includes a phone-like keypad for eliciting
30  desired destination identification information from the user. The destination information may consist of the destination's IP address or addresses, or other information from which the destination IP address can be locally or remotely resolved. In addition, a
35  display may be provided so that the user can e.g. self-verify her keypad entry or identify the calling party.

6

Other aspects and features of the present invention will become apparent to those ordinarily skilled in the art upon review of the following description of the specific preferred embodiments of 5 the invention in conjunction with the accompanying figures.

## BRIEF DESCRIPTION OF THE DRAWINGS

The features of the invention, as well as the invention itself may be best understood with reference to the following drawings, in which like numbers indicate like parts, to which:

Fig. 1 is a system diagram implementing an IP telephone according to a first embodiment of the invention;

Fig. 2 is a plan view of the IP telephone of Fig. 1;

Fig. 3 is a schematic block diagram of the IP telephone of Figs. 1 and 2;

Fig. 4 is a state transition diagram for the controller of Fig. 3 according to the first embodiment of the invention;

Fig. 5 is a system diagram implementing an IP telephone according to a second embodiment of the invention; and

Fig. 6 is a state transition diagram for the controller of Fig. 3 according to the second embodiment of the invention.

8

**DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS**

In the following detailed description, references are made to the accompanying drawings which form a part hereof and in which is shown by way of
5   illustration specific embodiments in which the invention may be practiced. These embodiments are described in sufficient detail to enable those ordinarily skilled in the art to practice the invention, and it is to be understood that other
10   embodiments may be utilized in that structural, logical, and electrical changes may be made without departing from the spirit and scope of the invention. The following detailed description is, therefore, not to be taken in the limiting since, and the scope of
15   the present invention is to be defined solely by the appended claims.

A network diagram including the IP telephone of the first embodiment of the invention is shown with
20   reference to Fig. 1. As shown in the figure, Internet telephone 100 is coupled to network 130 which can comprise a LAN/WAN or the Internet. As will be discussed in greater detail hereinbelow, the IP telephone 100 will include sufficient network
25   resources to enable the broadcast receipt of Internet protocol ("IP") packets of digitized voice to and from other telephony devices in communication with the network 130.

30   Also coupled to the network 130 is a phone server 110.   This phone server is used to resolve call requests emanating from the Internet telephone 100 as well as issued connection replies or connection errors in response thereto.   Such call requests will be
35   received by, and resulting connection replies or errors transmitted by the network 130 aware I/O module 115 of the phone server 110.  A call model 120 within the phone server 110 will be used to resolve

9

destination information contained in the call request and indicate whether the connection reply or connection errors should be transmitted by the aforementioned I/O module 115 to the requesting IP

5  telephone 100.  The call model 120 is also assigned to handle forward requests and forward cancellation requests issued by the IP telephone 100, and so will direct the I/O module 115 to issue the appropriate forward reply or forward error to the requesting IP

10  telephone 100.  A more detailed description of the requests (e.g. CONTROL_REQ, CALL_REQ, FWD_REQ, CAN_FWD) replies (CONTROL_REPLY, CONN_REPLY, FWD_REPLY) and errors (CONN_ERROR, FWD_ERROR, NO_ANS) issued by the IP telephone 100 or phone server 110

15  shown in Fig. 1, as well as their interpretation and handling, will be discussed in more detail below with reference to the block diagram of Fig. 3 and the alternative state transition diagrams of Figs. 4 and/or 6.

20

Still referring to Fig. 1, also coupled to network 130 is PSTN gateway 140 to allow communications between IP telephone 100 and/or other devices connected to the network such as computer 170

25  to communicate to a remote telephone 160 via the public switched telephone network ("PSTN") 150.  PSTN gateway 140 and computer 170 are conventional telephony devices well known in the art and accordingly detailed description thereof is omitted

30  herein other than to amplify the principles of the present invention.

It should be noted here that through the call establishment and IP packet transmission procedures

35  discussed below, Internet telephone 100 may be able to invoke and maintain an Internet telephony session with multimedia computer 170 including microphone 172 and speaker 171 connected to network 130 or even conventional telephone 160 connected to network 130

10

via the aforementioned PSTN gateway 140. Also, although not shown in figure, the IP telephone 100 also place a voice over IP telephone call and maintain a call with a like IP telephone, as will readily be

5    understood by those ordinarily skilled in the art upon review of this disclosure.

Turning now to Fig. 2 the simplified plan view of the IP telephone 100 of Fig. 1 indicating the major

10   external functional components of the Internet telephone according to the first and second embodiments of the invention. As shown therein, IP telephone 100 takes on the general appearance and form factor of a conventional PSTN telephone, and as such

15   includes a handset 270 including a speaker 300 (Fig. 3) for relaying incoming voice to the user thereof as well as microphone 302 for acquiring voice spoken by the user. Keypad 200 including phone keys 250 are disposed on the base 280 of the IP telephone 100

20   arranged as in the case of a conventional telephone. The keypad is used by the Internet telephone 100 to capture user input conveying destination information as well as selectively activate or deactivate advanced calling features such as conference (CNF) and forward

25   (FWD). As will be discussed hereinbelow with reference to Fig. 4, according to the present embodiment, the user will specify destination information by entering a sequence of digits using phone keys 250 accompanied by depression of the send

30   button (SND) 210 or the memory key (M) 220 followed by one or more of the digit phone keys 0-9. It should be realized here that requiring the user to terminate entry with a predetermined keystroke (the send key) or sequence of stokes (the memory key followed by one of

35   the digit phone keys 0 - 9) greatly simplifies acquisition of the user entry as well as the error-checking and interpretation thereof, at least with respect to the IP telephone 100.

11

A display 260 is also provided on base 280 for providing user feedback regarding the digits keyed in via keypad 200 of the IP telephone 100 and/or the status of the phone itself as well as that of the

5  remote phone server 110.    Also, in the case of an incoming call, information involving the calling or called party may be obtained and displayed as is with the case of conventional calling line identification technology, since the originating VOIP device(s) IP

10  address is contained in each packet received by the IP telephone.    In addition, the display 260 may be used to provide visual cues to the user regarding the request and reply transactions used in establishing a call according to the present embodiment.

15     Preferably, although not required, this display will be a single line alpha-numeric display is an LCD display to reduce development and manufacturing costs of IP telephone 100.

20     A detailed discussion of the conference (CNF) 230 and the forward (FWD) 240 buttons will be discussed hereinbelow with reference to Fig. 4.

25     Fig. 3 is a system block diagram of the IP telephone 100 according to the first and second embodiments of the invention.    As shown therein, speaker 302 residing in handset 270 (Fig. 2) is coupled to analog/digital converter 304 for converting

30  perceived speech into an appropriate digital form.    In this embodiment, analog to digital converter 304 converts acquired speech into PCM coded data representing voice sampled at sufficient sampling rate to ensure that at least conventional PSTN voice

35  quality can be assured.    Also coupled to analog/digital converter 304 is a sound generator 306 for providing alert tones in digital form to analog/digital converter 304 which it then converts it into appropriate analog format for transmission to the

12

user via speaker 300 located in the handset or another
audio output device (not shown herein).  Also coupled
to analog/digital converter 304 is digital signal
processor ("DSP").  DSP 310 is used for selectively
5    encoding or decoding inbound and outbound digitized
voice respectively using industry standard H.323
compression techniques.  Also, DSP 310 is used to
selectively encode or decode inbound or outbound
digitized voice respectively using echo cancellation
10   procedures well known in the art.  Coupled to the
output of DSP 310 is an outbound FIFO buffer 312 used
for temporarily storing process digitized voice
captured by the microphone 302 for subsequent delivery
to the packetizer 334 described hereinbelow.

15

     Packetizer 334 is coupled to the output of
outbound buffer 312 to packetize the buffered and
processed digitized voice into the payload of
connectionless layer 3 Internet protocol (IP) upon
20   authorization from controller 314.  In the present
embodiment, the packetizer latches in a number of
octets defining digitized voice from the outbound
buffer 312 for each layer 3 IP packet to be created.
The packetizer then queries memory 332 for the desired
25   destination IP address (or IP addresses in the case of
a conference call), and builds an IP packet header
information using at least one of the returned
destination IP addresses, a predetermined source IP
address specified for the IP telephone 100, and the
30   number of octets latched in from buffer 312
(preferably a predetermined number to reduce circuit
complexity and increase processing speed).  The Vers,
Hlen, Service Type (high priority streaming data),
Total Length, Identification, Flags, Fragment Offset,
35   Time to Live, Protocol (base IP), Header, Options, and
any padding fields of the IP packet header can be
obtained using the above-identified size and
addressing information or through predefined or hard-
coded values retained by the packetizer 334 or memory

13

332, as is well known in the art.  Once each IP header
is built (but for error correction checksum fields),
the latched in digitized voice octets are placed into
the data portion of the IP packet, and result is sent
5    to the checksum generator 336.

Also,  the  packetizer  334  of  the  present
embodiment  is  capable  of  generating  predefined
requests  (i.e.  the  call  request  CALL_REQ  or  the
10   forward request FWD_REQ or CAN_FWD) directed to the
phone server 110 or a predefined NO_ANS error message
to be relayed to the source IP address of an incoming
call indicating that no answer has occurred.  Each are
generated  in  this  embodiment  by  the  packetizer  334
15   upon direction of the controller 314.

With  respect  to  each  of  the  aforementioned
requests, the packetizer 334 will build the IP packet
header  of  the  IP  packet  embodying  the  request  using
20   the pre-established address of the IP telephone 100 as
the source address and the pre-established IP address
of the phone server 110 assigned to service the IP
telephone 100.   In the case of the call request
(CALL_REQ) and forward request (FWD_REQ) requests, the
25   data portion of the packet will include appropriate
request identification information understood by both
the telephone 100 and the phone server 110 as well as
any user information captured from keypad 200 and
relayed to the packetizer 334 by controller 314 for
30   resolution by the aforementioned call model component
120 of the phone server 110.  However, in the case of
the cancel forward request, the data portion of the
packet  will  only  include  request  identification
information used by the call model 120 of the phone
35   server 110 to classify the request and cancel any
existing forwarding state for the IP telephone 100
established via a prior forward request.

APPX0878

In the case of the NO_ANS request, the packetizer
334 of this embodiment builds an appropriate IP packet
specifying the source IP address of a perceived and
correctly routed incoming IP packet determined as
5   being an incoming caller to notify this caller that
VOIP communications cannot proceed at the present
time. The data portion and format is not of true
significance, and in fact any data can be placed in
the data portion of the IP packet defining the IP
10   request as long as the so-mentioned no answer
notification can be ascertained by the calling device
or terminal.

As mentioned previously, coupled to the output of
15   packetizer 334 is check sum generator 336 for filling
out error correction information (specifically, the
Checksum field disposed within each IP packet header)
for each of the request, error and streaming
preferably PCM-digitized voice IP packets generated by
20   packetizer 334. In turn, the output of checksum
generator 336 is connected to the network interface
340 herein comprising media access controller ("MAC")
328 coupled to a physical transport 330. In this
embodiment, the network interface 340 is an IEEE 802.3
25   compliant Ethernet interface connecting to Ethernet
network 130 using known Ethernet protocols and
transport mechanisms. It should be realized here,
however, that the teaching present invention are
limited to any particular type of physical layer
30   network interfacing or network transport as long as
bi-directional transmission of layer 3 IP packets can
be accomplished, as is well understood in the art.
As such, other types of networks and accompanying
interfaces such as token ring, ATM, SONET, modem- PPP
35   or SLIP server are contemplated here without
detracting from the teachings of the invention.

The physical transport 330 may contain a
dedicated port or termination node to the network 130

15

or it may involve a pass-through connection serving as
an intermediary between another network device such as
a computer and the network 130.  If so, the media
access controller will employ collision avoidance
5    mechanisms well known in the networking arts to avoid
packet collisions with any other downstream attached
device(s) to the physical layer 330.

Also, the media access controller 328 preferably
10    intercepts and extracts at least the source and
destination IP address information for inbound packets
received from network 130 via the physical transport
330.  The MAC 328 will  retain IP packets having the
same destination address as the IP telephone's
15    predetermined IP address stored in memory 332, and
will route onto the extractor 322 at least those
retained packets indicating as a source address at
least one of the destination IP addresses or
indicating the predetermined destination address for
20    the phone server 110.  As be discussed hereinbelow in
greater detail with respect to incoming call
processing shown in Fig. 4, retained IP packets
specifying source address which does not match any of
the established destination IP addresses or the phone
25    server 110's pre-established address will be assumed
in this embodiment to be an incoming call.

Still referring to Fig. 3, the extractor 322 is
coupled to an output of the MAC 128 for receiving
30    inbound packets matching the predetermined phone
server 110 or established destination IP addresses
stored in memory 332.  The extractor will extract the
digitized voice contained in these packets and pass it
along to the inbound FIFO buffer 316.  If conference
35    features according to the present embodiment are
supported, in addition, the extractor will be able to
match the IP source address of the inbound packets to
each of the established IP destination addresses
stored in memory 332 and route the digitized voice

16

samples therein to one of up to three different buffers 316, 318, and 320 corresponding to the established IP addresses. Although additional buffers above three can be supported (and so additional

5   conferees can be supported), in this embodiment only up to three conferees are supported in view of practical needs for such conferencing as well as resulting additional circuitry complexity and components costs additional buffers would impart.

10

In addition, the extractor 322 of this embodiment will perceive one of the aforementioned replies (i.e. the connection reply CONN_REPLY or forward reply FWD_REPLY) or error messages (i.e. connection error

15   CONN_ERROR or forward error FWD_ERROR) issued by the phone server 110 in response to requests issued by the IP telephone 100 by sequentially evaluating the source IP address and the data portion of the incoming IP packet if the source IP address matches the pre-

20   established phone server IP address. If such replies or error messages are received, the data portions of each are submitted to the controller 314 of the present embodiment for processing in accordance with the state transition diagram shown in Fig. 4 and

25   discussed in detail hereinbelow.

Still referring to Fig. 3, the output of each inbound FIFO buffer 316, 318, and 320 is coupled to DSP 310. In turn, as stated above, DSP 310 will take

30   received digitized audio streams placed in these buffers as they are received and will selectively decode them using known echo cancellation and h.323 compression techniques. The decoded streams are then relayed on to analog/digital converter 304 for

35   subsequent transmission in analog form to the user using speaker 300 or similar output device (not shown).

17

The controller 314 is coupled to the aforementioned packetizer 334, memory 332, the extractor 322, the media access controller 328 and the DSP 310 for sequencing call setup and packet
5    transmission reception procedures according to the present embodiment. The controller herein will include phone server 350 and answer 352 timing resources for controlling internal timing for said processing as will be described hereinbelow with
10   reference to the state transition diagram of Fig. 4.

The controller 314 is also coupled to display 260 to display interface 324 as well as keypad 200 through keypad interface 326. Display interface 324 will
15   perform routine display operations of information provided by controller 314 as well as track keypad entry from keypad 200 responsive to the de-bounced keystrokes detected by keyboard interface 326. Likewise keypad interface 326 notifies controller 314
20   and display interface 324 what keys have been depressed by the user. In addition, keypad interface 326 includes a conventional DTMF sound generator (not shown) for placing DTMF sounds into the inbound and outbound voice streams.
25

Also coupled to controller 314 is off-hook switch 308 used for indicating the current hook state of the handset 270 of the IP telephone 100.

30   Fig. 4 is a state transition diagram executed by the controller 314 shown in Fig. 3 in isolation, or in conjunction with the other highlighted components of the IP telephone 100 according to the first embodiment of the present invention. The idle state is
35   represented at 400. When a digit sequence terminating in a send (SND) key, or a sequence comprising a memory key plus one of digits 0-9 is detected by the controller 314, AND the handset is in an off-hook state the controller transitions to state 402. At

18

state 402, the controller 314 instructs the packetizer
334 to issue a call request to the phone server 110
(Fig. 1). In turn, the packetizer will query memory
332 for the phone server 110's IP address and then
5   place a CALL_REQ IP packet to the phone server, as
discussed above. The packetizer 334 will include
information captured from the user using keypad 200
indicated before depression of the send (SND) button.
Alternatively, the packetizer can consult a predefined
10   memory table containing IP address entries
corresponding to key sequence M0,M1, M2, ..., N9 as is
well known in the art. Also, in state 402, the
controller resets a watchdog server time-out timer 350
used to indicate a period of time in which the IP
15   telephone 100 is likely to receive a response from a
connected phone server 110.

Thereafter control transitions to state 404 in
which the controller 314 waits for a connection reply
(CONN_REPLY) from the phone server 110 servicing the
20   IP telephone 100. If the aforementioned server time-
out timer 350 expires before receipt of the CONN_REPLY
from the phone server 110, a SERV_TIMEOUT signal is
issued and control transitions to error state 406. At
state 406, a connection error is perceived by the
25   controller 314. Likewise, if during the duration of
the server timer 350 initialized in state 402, a
connection error CONN_ERROR has been perceived by the
controller 314 based on communications with the
extractor 322, control likewise transitions to state
30   406. In either case, at state 406 a connection error
tone is transmitted to the user and the status of the
call counter variable is interrogated. When no calls
have previously been established, in this embodiment,
35   the control will transition back to the idle state
400. However, where the call counter is greater than
0 indicating that a successful connection has already
been established as will be discussed hereinbelow,

19

control transitions to the IP voice packet transmit
and receive state 410.

5    If, however, while in state 404 a connection
reply (CONN_REPLY) has been received before the server
timer 350 has timed out, control instead transitions
to state 408 in which the call counter is incremented,
indicating that a successful telephony connection has
been established with the destination.  In addition,
10   at this state the controller will add the resolved
destination IP address specified in the connection
reply to the memory 332.  Also in this embodiment, a
DTMF_EN enable flag is set indicating that the keypad
interface 326 will generate DTMF tones responsive to
15   the phone keys 250 (Fig. 2) depressed by the user, as
is well understood in the art.  Thereafter, control
transitions to state 410 where perceived voice is
captured, digitized packetized, and transmitted by the
IP telephone 100 and inbound IP packets are received
20   and assembled into inbound voice streams for replay
over speaker 300 or similar output device.

Call termination processing according to the
first embodiment is now detailed.  From the
25   transmit/receive state 410, if the controller
perceives that the user has placed the handset back in
the cradle portion of base 280, and the off-hook
switch has been toggled in the on-hook state, control
transitions to state 412.  At state 412, it is assumed
30   that the user wants to hang-up, so all the destination
IP addresses are flushed from memory 332, the call
counter is initialized to 0 and the DTMF_EN flag is
cleared.  Control thereafter transitions back to the
idle state 400.

35

Call conferencing according to the first
embodiment is now detailed.  From the transmit/receive
state 410 in which a call has already been
established, if a conference key 230 is depressed by

20

the user, the controller  transitions back to state
402  in  which  the  controller  314  instructs  the
packetizer  to  issue  an  appropriate  call  request.
Control then transitions to state 404, 408, or 406 as
5    outlined hereinabove.    It should be noted here that
since  connectionless  data  transfer  is  contemplated
using IP packets, the extra connection only involves
verification or resolution by the call model  120 of
the  phone  server 110 and receipt  of  the CONN_REPLY
10   including the resolved destination IP address before
the  server  timer  350  expires.    Also,  as  stated
previously,  assuming  that  a  successful  conference
connection has been made, extractor 322 will route the
conferee's received digitized voice to inbound buffer
15   318 instead of inbound buffer 316 so as not to garble
the  incoming  streaming  audio  data  of  the  two called
parties whose destination IP addresses are contained
in memory 332.   Also, as stated before, up to three
callers (one original caller and up to two conferees)
20   may be supported simultaneously.

An  incoming call  is handled by  the  IP  telephone
100  of  the  first  embodiment  is  now  described  with
reference to Fig. 4.   From the idle state 400, if the
25   media access controller 128 determines that a received
inbound IP packet specifies a source address not in
the  destination  IP  address  list  within  memory  332,
control transitions from the idle state to state 414.
At state 414, the controller 314 instructs the sound
30   generator 306 to send an alert tone to a ringer (not
shown) to audibly indicated  that an incoming call has
been  perceived,  as  with  the  case  in  a  conventional
analog phone.    At the same time, the controller will
initialize a watchdog answer timer 352 to time the
35   duration of the ring before the handset is picked up.
If the answer timer 352 times out before an off-hook
state has been detected, control transitions to state
416 in which the controller instructs the packetizer
to  issue  a  predetermined  NO_ANS  error  message  IP

21

packet to the calling party. Control thereafter transitions back to the idle state 400.

5   If, however, in state 414 controller perceives the off-hook state before the expiration of the answer timer 352's preset or adjustable duration, control instead transitions to state 408 which, as indicated above, the call counter incremented, the DTMF enabled flag is enabled and the calling party's originating IP 10   address is added to the destination IP address list contained in memory 332. Control thereafter transitions to step 410 in which IP packet transmission and reception operations ensue.

15   Call forwarding is handled by the IP telephone 100 according to the first embodiment is now described with reference to Fig. 4. From the idle state 400, if the controller perceives that the forward button 240 has been depressed by the user, control transitions to 20   state 418. At state 418, the controller selectively issues a forward request (FWD_REQ) or a cancel forward request (CAN_FWD) to the phone server 110 utilizing the aforementioned packetizer 334, check sum generator 336, and network interface 340 based on the status of 25   the forward enable FWD_EN flag contained in memory 332. It should be noted here that if the forward request is deemed appropriate, destination information will be incorporated into the forward request FWD_REQ IP packet as specified by the appropriate user entry 30   using keypad 200 as discussed hereinabove with respect to initiating a call. Also, at state 418, the controller restarts the server timer 352.

35   Control thereafter transitions to state 420, in which the control awaits for a forward reply FWD_REPLY issued by the phone server 110. If the aforementioned server time-out timer 350 expires before receipt of the FWD_REPLY from the phone server 110, a SERV_TIMEOUT signal is issued and control transitions

22

to error state 424.  At state 424, a forward error is perceived by the controller 314.  Likewise, if during the duration of the server timer 350 initialized in state 418, a forward error FWD_ERROR has been
5  perceived by the controller 314 based on communications with the extractor 322, control likewise transitions to state 424.

At the error state 424, an alert tone is
10  generated to the user in state 424 and control then transitions back to the idle state 400.  However, if a forward reply FWD_REPLY is received from the phone server before the server timer times-out, control transitions to state 402 in which the forward enable
15  flag is toggled enabled, meaning that the forward request has been perceived and stored by the phone server 110, or disabled, meaning that a previous filled request has been canceled by the forward by the phone server 110.  Control thereafter transitions to
20  the idle state 400.

It should be noted here that while the forward enable flag is set, controller will not initiate a call nor will it answer an incoming call.
25

According to a second embodiment of the invention, an IP telephone-phone server tandem operates to set up and maintain voice over IP sessions with other IP telephony devices while preserving
30  higher OSI layer (layer 4+) signaling (e.g. TCP/IP and/or ITU H.323) communications with these other telephony devices.  According to this embodiment with reference to Fig. 6, the IP telephone 600 and the phone 610  server communicate using base IP (layer 3)
35  protocols as is the case with the IP telephone 100 and server 110 described above with respect to the first embodiment of the invention.  However, the IP telephone 600 will encapsulate the higher layer (layer 4+) control and signalling packets received from other

23

telephony devices it has established a call or session with into layer 3 IP packets for transmission to the phone server 610.

5    According to the second embodiment, the phone server 610 includes a network aware I/O module 115 and call model 120 discussed previously, along with a layer 4+ processor 625 responsible for parsing the higher layer control and signaling packets forwarded
10   by the IP telephone 600, and encapsulating the appropriate responses and control information in base layer 3 IP protocol for transmission back to the IP telephone 600.  It should be noted that, except that the phone server knows to substitute origination
15   information corresponding to the IP appropriate telephone 600 it is servicing rather than itself as the originator of these responses, conventional layer 4+ servicing routines may be conveniently utilized.

20   To make it appear to other telephony devices as though the IP telephone 600 that it is actually processing the layer 4+ control and signaling packets and thus appear as higher layer compliant, the IP telephone 600 (not the server 610) receives and
25   transmits all higher layer packets to these telephony devices, including reissuing the higher layer control and signalling packets in native form sent to it by the server 610 encapsulated in base IP packets.

30   Thus, even though the server 610 according to this aspect of the present invention is given responsibility for actually acting on the layer 4+ commands, control and signalling packets used to e.g. set up an H.323 session, its operations and
35   communications with the IP telephone 600 are transparent to the other telephony devices engaged in the communications session.

24

The functions of the telephone 600 as well as interactions with the phone server 610 may be best understood by referring to the telephone 600 controller state transition diagram of Fig. 6. As

5   shown in Fig. 6, controller 314 processing is similar to that illustrated and described above with reference to Fig. 4, except as noted below. The primary difference is that, in this embodiment, once basic call setup is complete and call setup packets are

10  broadcast from the IP telephone 600 (state 509), the controller 314 transitions to the TX/RCV state 510 to direct that layer 4+ voice and control packets (rather than layer 3) are created, issued, received, and voice information is extracted therefrom. Thus, when the

15  payload of packet to be sent to other telephony devices using layer 4+ protocols such as TCP/IP or H.323 is full, the controller 314 transitions to state 558, in which the controller 314 directs that the packetizer 334 develop appropriate layer 4 + overhead

20  (such as the TCP/IP packet sequencing number) in a routine manner. Thereafter, the controller transitions to state 554 where it directs the packetizer 334 and checksum generator 336 to create and deliver a complete layer 4+ packet to the MAC 328

25  for transmission across the network 130 to the other telephony device(s) engaged in a layer 4+ call or session with the telephone 600.

Next, assume that the controller 314 according to

30  the second embodiment detects an incoming packet received by the extractor 322 in fact contains control information germane to the layer 4+ protocol being utilized for communications (CONTROL_REC'D) while at state 510. If so, the controller transitions to state

35  550, where it directs the packetizer 334 to encapsulate the entire received control packet (or alternatively just the control portion) into a layer 3 packet for transmission to the phone server 610. It should be noted here that the controller 314 and/or

25

extractor 322 will determine if the received packet
constitutes or includes layer 4+ control information
by e.g. comparing the received header/payload portions
against a predefined protocol table (not shown) in
5    memory 333.

From state 550, the controller 314 thereafter
transitions to state 554, in which the controller
directs the packetizer 334, checksum generator 336 and
10    MAC 328 to transmit the layer 3 packet encapsulating
the layer 4+ control packet to the phone server 610.

Next assume that the controller 314 according to
the second embodiment detects that an incoming packet
15    or packet stream received by the extractor 322 in fact
contains encapsulated control response information
generated by the phone server 610 (CONTROL_REPLY)
while at state 510. In such case, the controller 314
transitions to state 556, in which the controller
20    directs the packetizer to create a layer 4+ packet
including the control response information presented
in the payload of the incoming layer 3 packet. The
controller thereafter transitions to state 554, in
which the controller directs the packetizer 334,
25    checksum generator 336 and MAC 328 to transmit the
layer 4+ packet(s) including the control response
information to the other telephony device(s) engaged
in the call or session with the IP telephone 600.

30    It should be noted here that non-control layer 4+
components (such as TCP/IP sequencing placed in the
header of each TCP/IP packet bearing a voice payload)
are discarded without reply where possible to simplify
construction of the telephone 600.
35

While the invention is described above in terms
of specific preferred embodiments and associated
drawings, those of ordinary skill in the art will
recognize that the invention can be practiced in other

26

embodiments as well.    It is felt therefore that the invention should not be limited to the disclosed embodiments above, but rather should be limited only by the spirit and scope of the appended claims.

APPX0891

**WHAT IS CLAIMED IS:**

1    1.    An IP telephone for use with a network,
2    comprising:
3        a controller;
4        a memory coupled to said controller for
5    selectively storing a destination IP address;
6        a packetizer coupled to said controller and said
7    memory for packetizing outbound digitized voice into
8    at least one outbound IP packet, the outbound IP
9    packet including destination data based on the stored
10    destination IP address; and
11        a network interface in communication with said
12    memory for broadcasting the outbound IP packet onto
13    the network.

1    2.    The telephone of Claim 1, wherein said controller
2    comprises a finite state machine.

1    3.    The telephone of Claim 2, wherein said controller
2    comprises a programmed microcontroller.

1    4.    The telephone of Claim 2, wherein said controller
2    comprises a synchronous network of discrete logic
3    components.

1    5.    The telephone of Claim 2, wherein said finite
2    state machine, said memory, said packetizer, and said
3    network interface are commonly housed in an ASIC,

1    6.    The telephone of Claim 2, wherein said network
2    interface captures an inbound IP packet, the inbound
3    IP packet including source data correlating to the
4    destination IP address.

28

Attorney Docket:    SS0159

1   7.    The telephone of Claim 6, further comprising an
2   extractor coupled to said network interface and said
3   controller for extracting inbound digitized voice from
4   the inbound IP packet.

1   8.    The telephone of Claim 7, wherein the destination
2   IP address includes plural IP addresses.

1   9.    The telephone of Claim 2, further comprising:
2        a handset, said handset including a speaker and a
3   microphone for acquiring and relaying voice
4   respectively; and
5        an analog/digital converter coupled to said
6   handset for converting acquired voice into the
7   outbound digitized voice and for converting inbound
8   digitized voice into analog form.

1   10.   The telephone of Claim 9, further comprising a
2   digital signal processor coupled to said
3   analog/digital converter, said controller, said
4   packetizer, and said extractor for selectively
5   performing echo cancellation and compression
6   operations on the inbound and outbound digitized
7   voice.

1   11.   The telephone of Claim 9, further comprising:
2        a base;
3        a keypad disposed on said base;
4        a keypad interface coupled to said controller and
5   said keypad for detecting at least one keypress and
6   for selectively issuing a corresponding DTMF tone to
7   said analog/digital converter.

29

1    12.   The telephone of Claim 2, wherein said network
2    interface comprises:
3         a transparent transport coupled to the network,
4    said transport including connection means for coupling
5    a computer to said network and transporting computer
6    data to and from the computer;
7         a media access controller coupled to said
8    transport, said media access controller including
9    collision enforcement means coupled to said
10   transparent transport for broadcasting the outbound IP
11   packet onto the network without influencing the
12   computer data.

1    13.   An IP telephony system, comprising:
2         an IP telephone, comprising:
3              a controller;
4              a memory coupled to said controller;
5              a packetizer coupled to said controller and
6    said memory for packetizing a call request into an
7    outbound IP packet; and
8              an interface for transmitting the outbound
9    IP packet; and
10        a phone server in communication with said IP
11   telephone, comprising:
12             an IP parser for parsing the call request
13   from the transmitted outbound packet;
14             a call model for resolving a destination IP
15   address from the extracted call request and
16   transmitting the destination IP address to the IP
17   telephone as an inbound IP packet;
18        wherein the IP telephone further comprises an
19   extractor coupled to said controller, said memory, and
20   said interface for extracting the destination IP
21   address from the inbound IP packet and storing the
22   destination IP address into said memory.

30

1  14.  The IP telephony system of Claim 13, wherein said
2  packetizer packetizes outbound digitized voice into a
3  stream of outbound IP packets, each outbound IP packet
4  of the stream including destination data based on the
5  stored destination IP address.

1  15.  The telephony system of Claim 13, wherein said
2  telephone controller comprises a finite state machine.

1  16.  An IP call establishment method, comprising the
2  steps of:
3      packetizing a call request into an outbound IP
4  packet;
5      transmitting the outbound IP packet;
6      remotely parsing the call request from the
7  transmitted outbound packet;
8      remotely resolving a destination IP address from
9  the extracted call request;
10     transmitting the destination IP address as an
11 inbound IP packet;
12     extracting the destination IP address from the
13 inbound IP packet; and
14     packetizing outbound digitized voice into a
15 stream of outbound IP packets, each outbound IP packet
16 of the stream including destination data based on the
17 stored destination IP address.

1  17.  A packet voice communications system,
2  comprising:
3      a packet voice telephone operable to receive a
4  packet containing layer 4+ control information,
5  encapsulate the layer 4+ control information into a
6  lower level packet, and issue the lower level packet;
7  and
8      a phone server coupled to said packet voice
9  telephone and comprising:
10         an i/o module to receive the lower level
11     packet; and

31

APPX0895

12          a layer 4+ processor to generate at least
13     one response packet responsive to the layer 4+
14     control information encapsulated within the
15     received lower level packet, wherein said i/o
16     module issues the at least one response packet;
17     wherein the packet voice telephone receives the
18 at least one response packet and issues an outbound
19 response containing a portion of the at least one
20 response packet.

1  18.  A packet voice communications system, comprising:
2     a packet voice telephone comprising:
3          means for receiving a packet containing
4     layer 4+ control information;
5          means for encapsulating the layer 4+ control
6     information into a lower level packet; and
7          means for issuing the lower level packet;
8     and
9     a phone server, comprising:
10          means for receiving the lower level packet;
11     and
12          means for generating at least one response
13     packet responsive to the layer 4+ control
14     information encapsulated within the received
15     lower level packet, wherein said phone server
16     receiving means includes issuing means for
17     issuing the at least one response packet;
18     wherein the packet voice telephone receiving
19 means receives the at least one response packet and
20 includes issuing means for issuing an outbound
21 response containing a portion of the at least one
22 response packet.

32

## ABSTRACT OF THE DISCLOSURE

According to the present disclosure, connectionless base IP protocol is leveraged to transfer streaming voice to a destination telephony device. As such, the disclosed IP telephone includes a controller and memory specifying the destination IP address, a packetizer coupled the controller and memory for packetizing outbound digitized voice into at least one outbound IP packet, and a network interface for transmitting the outbound IP network onto a network which may involve a LAN, WAN or the Internet. The disclosed IP phone also includes an extractor coupled to the memory and controller for extracting inbound digitized voice within an incoming IP packet whose source address correlates to the destination IP address or addresses stored in the memory.

APPX0897



**FIG. 1**



## FIG. 2



**FIG. 3**

TO NETWORK



FIG. 4



FIG. 5





**FIG. 6**

RECORD OF ORAL HEARING

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

ESTECH SYSTEMS, INC. ET AL,
Appellant,

_____

REEXAMINATION APPEAL

Appeal 2024-000245
Reexamination 90/014,804
Technology Center 3900

_____

Oral Hearing Held:  January 30, 2024

_____

BEFORE:  ALLEN R. MACDONALD, THOMAS L. GIANNETTI, and
JENNIFER L. MCKEOWN, Administrative Patent Judges.

APPEARANCES:

ON BEHALF OF THE APPELLANT:

JOHN WITTENZELLNER, ESQUIRE
Williams Simons & Landis PLLC/Estech
The Littlefield Building
601 Congress Avenue, Ste. 600
Austin, TX 78701
(512) 543-1373
johnw@wsltrial.com, IPRestechwsl@wsltrial.com

The above-entitled matter came on for hearing on January 30, 2024, commencing at 10:00 a.m., via video teleconference.

Case: 24-1935     Document: 12     Page: 334     Filed: 11/22/2024

1          (Whereupon, the above-entitled matter went off the record at

2     10:22 a.m.)

13

<div align="right">
Reexam of Patent No. 7,068,684<br>
Control No. 90/014,804
</div>

<div align="center">

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

</div>

*In re* Reexam of: U.S. Patent No. 7,068,684 (Control No. 90/014,804)

Reexam Request Filed: July 16, 2021

Appellant: ESTECH SYSTEMS IP, LLC

Art Group: 3992

Title: QUALITY OF SERVICE IN A VOICE OVER IP TELEPHONE SYSTEM

<div align="center">

### PATENT OWNER'S NOTICE OF APPEAL
### TO THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT

</div>

Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Filed on behalf of Patent Owner by:

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Mark J.E. McCarthy (Reg. No. 69,575)
601 Congress Avenue, Suite 600
Austin, TX 78701

<div align="center">

**WILLIAMS SIMONS & LANDIS PLLC**

</div>

Reexam of Patent No. 7,068,684
Control No. 90/014,804

Pursuant to 35 U.S.C. §§ 141 and 142 and 37 C.F.R. §§ 90.2 and 90.3, Patent Owner hereby provides notice that it appeals to the United States Court of Appeals for the Federal Circuit from the Patent Trial and Appeal Board's "Decision on Appeal" dated May 29, 2024, in the *ex parte* reexamination of U.S. Patent No. 7,068,684 (Control No. 90/014,804; Appeal No. 2024-000245).

Patent Owner's issues on appeal include at least (i) the Board's affirmation of the Examiner's rejections under 35 U.S.C. § 103, (ii) the USPTO's jurisdiction over expired patents, (iii) the existence of a substantial new question of patentability, and (iv) any finding or determination supporting or related to the aforementioned issues, including claim constructions, that are adverse to Patent Owner.

Copies of Patent Owner's Notice of Appeal are being filed simultaneously with the Director of the United States Patent and Trademark Office, the Patent and Trial Appeal Board, and the United States Court of Appeals for the Federal Circuit.

DATED:  June 7, 2024                    Respectfully submitted,

                                        By: /John Wittenzellner/
                                        John Wittenzellner
                                        Registration No. 61,662
                                        Counsel for Patent Owner

Priority Mail Express Mailing Label No. EI 311 662 839

1

# CERTIFICATE OF SERVICE

The undersigned certifies that, in addition to being electronically filed via the Patent Center, a true and correct copy of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express with the Director of the United States Patent and Trademark Office at the following address:

<div align="center">

Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

</div>

The undersigned also certifies that a true and correct copy of this Notice of Appeal was filed electronically with the Clerk's Office of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

By: /John Wittenzellner/
John Wittenzellner
Registration No. 61,662
Counsel for Patent Owner

Priority Mail Express Mailing Label No. EI 311 662 839

<div align="center">2</div>



US 20020071424A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2002/0071424 A1
Chiu et al. (43) Pub. Date: **Jun. 13, 2002**

(54) PACKET VOICE TELEPHONY APPARATUS AND METHOD

(76) Inventors: **King W. Chiu**, Calgary (CA); **Paul Hanreider**, Calgary (CA); **Todd R. Hunter**, Calgary (CA)

Correspondence Address:
**John Crane**
**Nortel Networks**
**P.O. Box 832130**
**Richardson, TX 75083-2130 (US)**

(21) Appl. No.: 09/735,667

(22) Filed: Dec. 12, 2000

**Publication Classification**

(51) Int. Cl.⁷ .................................................. H04L 12/66

(52) U.S. Cl. ............................................ 370/352; 370/463

(57) **ABSTRACT**

According to the present disclosure, connectionless base IP protocol is leveraged to transfer streaming voice to a destination telephony device. As such, the disclosed IP telephony peripheral adjunct to a computer includes an interface to the computer, a controller and memory specifying the destination IP address, a packetizer coupled to the controller and memory for packetizing outbound digitized voice into at least one outbound IP packet, and a network interface for transmitting the outbound IP network onto a network which may involve a LAN, WAN or the Internet. The disclosed IP phone peripheral also includes an extractor coupled to the memory and controller for extracting inbound digitized voice within an incoming IP packet whose source address correlates to the destination IP address or addresses stored in the memory.





**FIG. 1**

CISCO EXHIBIT 1006
Page 2 of 17



**FIG. 2**

CISCO EXHIBIT 1006
Page 3 of 17



**FIG. 3**



**FIG. 4**

TO NETWORK

CISCO EXHIBIT 1006
Page 5 of 17

Patent Application Publication    Jun. 13, 2002    Sheet 5 of 7    US 2002/0071424 A1



**FIG. 5**

CISCO EXHIBIT 1006
Page 6 of 17



**FIG. 6**

CREATE LAYER 4+ PACKET(S) WITH REPLY
756
ENCAPSULATE CONTROL INFO.
750
CONTROL_REC'D
ISSUE CALL SETUP PACKETS
709
DEST
DEST
ISSUE CONTROL_REQ
752
CONTROL_REPLY
APPEND OVERHEAD
758
SEND TO DEST.
754
END OF PACKET
TX/RCV
710
OFFHOOK
CALL_CTR >0
REMOVE ALL DEST CALL_CTR : = 0 CLEAR DTMF_EN
512
INC CALL_CTR AND SET DTMF_EN ADD DEST
508
516
ISSUE NO_ANS
ANS_TIMEOUT
522
TOGGLE FWD_EN
OFFHOOK&& ANS_TIMEOUT
SERV_TIMEOUT && CONN_REPLY
&& SERV_TIMEOUT
SERV_TIMEOUT
RING
FWD_REPLY
504
WAIT FOR CONN_REPLY
CONNECTION ERROR
SERV_TIMEOUT
ISSUE CALL_ TEARDOWN
FORWARD ERROR
WAIT FOR FWD_REPLY
514
520
INCOMING CALL && FWD_EN
524
CONN_ERROR
506
FWD_ERROR
ISSUE FWD_REQ OR CAN_FWD
ISSUE CALL_REQ
518
IDLE
502
SND, M0-9 && OFFHOOK
FWD
CALL_CTR = 0
500

FIG. 7

US 2002/0071424 A1

1

Jun. 13, 2002

## PACKET VOICE TELEPHONY APPARATUS AND METHOD

### FIELD OF INVENTION

[0001]  This invention is generally concerned with packet network telephony, and is particularly concerned with a packet voice telephone architecture in a device adjunct to a computer.

### BACKGROUND

[0002]  Within the past few years, a lot of interest, hype, and money has been spent on making practical use of the Internet. One of the most promising new technologies, and the one which may offer consumers the first real alternative to conventional switched telephone service, is Internet telephony. Simply put, Internet telephony is directed to using the Internet as the transport for telephone calls. Unlike the traditional telephone call, in Internet telephony, the use of the public switched telephone network is minimized, and instead the Internet backbone is used as the primary long-haul communications carrier. By leveraging fixed cost Internet access and global points of presence (the parties to the call could be as close as next door or as far away as the next hemisphere), Internet telephony could significantly reduce or even eliminate the time and distance costs heretofore expected in a long distance call utilizing the public switched telephone network ("PSTN").

[0003]  In a conventional Internet telephony session, an originating computer having a TCP/IP stack and a communications pathway to the Internet establishes a TCP virtual circuit or UDP connection with a destination computer also having its own TCP/IP stack and communications pathway to the Internet. Once the TCP virtual circuit or UDP connection is established, analog voice perceived at the source computer is converted into streaming data and sent over the Internet in a series of TCP/IP or UDP/IP packets. The destination computer receives the so-packetized streaming data and converts it back to analog form as it is received. The destination may likewise transfer locally perceived streaming voice back to the source to enable two-way voice communications between the source and destination users, much like the traditional telephone call.

[0004]  Some of the known Internet telephony implementations are software-based, running on a computer, and require sophisticated multimedia computing resources being utilized by both the originating and destination points in order to establish and maintain the call. This is because these computing resources are designed to utilize the Internet in its traditional role as an asynchronous data communications network, and as such, need a reliable way to transfer information. The TCP protocol provides increased reliability, since a single data route is selected and all TCP transferred data is checked at the destination to ensure all data is received in satisfactory condition (otherwise, the destination requests the source to resend the missing or corrupted packets). This protocol is great for transferring a data file or an application that doesn't work if even a small piece of data is missing. However, TCP has limitations when real-time streaming data such as voice is being transmitted, since it requires that the destination confirm delivery of each packet and request the source to resend it if it doesn't show up; and this adds to the load the on the processor, which may be running other applications also.

[0005]  As a result, some known software-based telephony applications can be configured to attempt Internet telephony communications using UPD, real time protocol ("RTP"), real time control protocol ("RTCP"), or the real time streaming protocol ("RTSP"), all of which sacrifice TCP's transmission reliability to some degree in exchange for enhanced throughput and/or adding special timing information relevant to streaming data transmission. While these protocols offer improved real-time streaming data transmission performance over TCP, they nevertheless saddle the Internet telephony application and a computer apparatus with complicated negotiation and delivery requirements, which still require advanced computing resources to handle.

[0006]  Moreover, when computers run many tasks and applications simultaneously, problems may occur with resource allocation. The result of this may add delay, echo, or at worst, the computing resource may 'hang' due to processing or resource overload, thus affecting the call.

[0007]  Therefore, it would be desirable if a simple computer-interfaced telephony device were developed which could simultaneously transmit and receive packetized streaming voice data without the encumbrances imposed by existing reliable data communication or real-time protocols on computer systems.

### SUMMARY OF THE INVENTION

[0008]  Accordingly, the present invention is directed to a packet voice telephone peripheral adjunct to a computer and telephony system incorporating the same. Consistent with a first embodiment of the present invention, the connectionless Layer 3 IP protocol is used to transfer streaming voice. As such, the IP telephony peripheral of the first embodiment includes a controller and memory specifying the destination address or addresses, a packetizer coupled to the controller and memory for packetizing outbound digitized voice into at least one outbound IP packet, and a network interface for transmitting the outbound IP packet onto a network which may include the Internet. As used here, a "destination address" may be a telephone number, a DN key, an IP address or any other identifier associated with the telephony apparatus herein described. Preferably, this IP telephony peripheral also includes an extractor coupled to the memory and controller for extracting inbound digitized voice within an incoming IP packet whose source address correlates to the destination IP address or addresses stored in the memory.

[0009]  The IP telephone according to the first embodiment of the present invention preferably communicates with a call server having a predetermined IP address in order to resolve user input into a viable destination IP address for establishing a call, as well as implement advanced call features such as forwarding and conferencing. To establish the call, the IP telephone packetizer may transmit a predefined call request IP packet to this phone server using the predetermined IP address as the destination address. The phone server will utilize a call model for resolving or verifying requested destination information specified by the user and contained in the data portion of the call request IP packet, and either issues a connection reply containing the resolved or verified destination IP address, or a connection error if the phone server is unable to decipher or confirm the desired destination information. In turn, the IP telephone controller will identify the server feedback and, if a connection reply is

CISCO EXHIBIT 1006
Page 9 of 17

perceived, the destination IP address specified in the reply is placed in IP telephone memory. Thereafter, the packetizer will route digitized voice packets to this stored address.

[0010] According to a second embodiment of the invention, OSI level 4 and higher layer protocols (such as TCP/IP and ITU H.323) can be preserved through encapsulation, redirection, and resolution of such layer control. To this end, the IP telephone of the second embodiment will include a controller capable of directly or indirectly determining whether an incoming packet includes control information germane to the layer 4+ protocol being supported. If this controller determines that the received packet includes such control information which it cannot process internally, it encapsulates the received control information into an outbound layer 3 packet and directs that it be sent to the phone server using base IP protocols.

[0011] The phone server receives inbound layer 4+ control information, and, using appropriate higher layer service routines, extracts the control information and formulates a response. Then, the phone server encapsulates and broadcasts the response to the IP telephone using Layer 3 IP protocols and the controller of the IP telephone routes it to the destination in native higher layer format. In such way, the phone server of the second embodiment acts as a control, receipt and response intermediary that is transparent to the destination telephony device. Moreover, layer 4+ protocols can be supported while adding minimal processing functionality to the IP telephone controller, thereby keeping IP telephone costs low.

[0012] Preferably, the IP telephone of the first and second embodiments will include connection facilities to connect a handset, a headset or speaker/microphone combination much like a conventional telephone, and appropriate analog/digital converter circuitry coupled to the aforementioned extractor and packetizer for converting voice acquired by the handset microphone into outbound digitized voice as well as for converting inbound digitized voice into analog for playback in the speaker.

[0013] In addition, preferably, the IP telephone according to the first and second embodiments of the invention includes a thin-client representing a phone-like keypad for eliciting desired destination identification information from the user. The destination information may consist of the destination's address or addresses, or other information from which the destination address can be locally or remotely resolved. In addition, a display may be provided so that the user can e.g. self-verify her keypad entry or identify the calling party.

[0014] A further advantage of the present invention is that it saves power by reducing the load on a computer processor and therefore it materially contributes to the more efficient utilization and conservation of energy resources.

[0015] Other aspects and features of the present invention will become apparent to those ordinarily skilled in the art upon review of the following description of the specific preferred embodiments of the invention in conjunction with the accompanying figures.

BRIEF DESCRIPTION OF THE DRAWINGS

[0016] The features of the invention, as well as the invention itself may be best understood with reference to the following drawings, in which like numbers indicate like parts, to which:

[0017] FIG. 1 is a system diagram implementing an IP telephony peripheral according to a first embodiment of the invention;

[0018] FIG. 2 is a block diagram of a multimedia computer system, in accordance with the first and second embodiments of the invention;

[0019] FIG. 3 is a simplified computer-screen based interface of the IP telephony peripheral of FIG. 1;

[0020] FIG. 4 is a schematic block diagram of the IP telephone of FIGS. 1 and 6;

[0021] FIG. 5 is a state transition diagram for the controller of FIG. 4 according to the first embodiment of the invention;

[0022] FIG. 6 is a system diagram implementing an IP telephony peripheral according to a second embodiment of the invention; and

[0023] FIG. 7 is a state transition diagram for the controller of FIG. 4 according to the second embodiment of the invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

[0024] In the following detailed description, references are made to the accompanying drawings which form a part hereof and in which is shown by way of illustration specific embodiments in which the invention may be practiced. These embodiments are described in sufficient detail to enable those ordinarily skilled in the art to practice the invention, and it is to be understood that other embodiments may be utilized in that structural, logical, and electrical changes may be made without departing from the spirit and scope of the invention. The following detailed description is, therefore, not to be taken in the limiting sense, and the scope of the present invention is to be defined solely by the appended claims.

[0025] One known implementation to address some of the aforementioned problems is the Nortel Networks i2004 Internet Telephone, of Nortel Networks, Brampton, Ontario, Canada, which is a hardware based telephony apparatus compatible with MGCP and H.323 devices. This is a standalone IP telephone client device which connects to an IP network directly and provides the familiarity and ease-of-use of a traditional telephone. Also known, is commonly owned application titled "Packet Voice Telephony System and Method", Ser. No. 09/224,548, filed Dec. 31, 1998, which is herein incorporated by reference.

[0026] A system diagram including the IP telephone of the first embodiment is shown with reference to FIG. 1. As shown in the figure, Internet telephone peripheral 100 is coupled to computer 200. Internet telephone peripheral 100 is also coupled to network 130, which can comprise a LAN/WAN or the Internet. As will be discussed in greater detail hereinbelow, the IP telephony peripheral 100 will include sufficient network resources to enable the broadcast receipt of Internet protocol ("IP") packets of digitized voice to and from other telephony devices in communication with the network 130.

[0027] Also coupled to the network 130 is a phone server 110. This phone server is used to resolve call requests

CISCO EXHIBIT 1006
Page 10 of 17

emanating from the Internet telephone peripheral **100** as well as issued connection replies or connection errors in response thereto. Such call requests will be received by, and resulting connection replies or errors transmitted by the network **130** aware I/O module **115** of the phone server **110**. A call model **120** within the phone server **110** will be used to resolve destination information contained in the call request and indicate whether the connection reply or connection errors should be transmitted by the aforementioned I/O module **115** to the requesting IP telephony peripheral **100**. The call model **120** is also assigned to handle forward requests and forward cancellation requests issued by the IP telephony peripheral **100**, and so will direct the I/O module **115** to issue the appropriate forward reply or forward error to the requesting IP telephony peripheral **100**. A more detailed description of the requests (e.g. CONTROL_REQ, CALL_REQ, FWD_REQ, CAN_FWD) replies (CONTROL_REPLY, CONN_REPLY, FWD_REPLY) and errors (CONN_ERROR, FWD_ERROR, NO_ANS) issued by the IP telephony peripheral **100** or phone server **110** shown in FIG. 1, as well as their interpretation and handling, will be discussed in more detail below with reference to the block diagram of **FIG. 5**.

[0028]    Still referring to FIG. 1, also coupled to network **130** is PSTN gateway **140** to allow communications between IP telephony peripheral **100** and/or other devices connected to the network such as computer **170** to communicate to a remote telephone **160** via the public switched telephone network ("PSTN") **150**. PSTN gateway **140** and computer **170** are conventional telephony devices well known in the art and accordingly detailed description thereof is omitted herein other than to amplify the principles of the present invention.

[0029]    It should be noted here that through the call establishment and IP packet transmission procedures discussed below, Internet telephone peripheral **100** may be able to invoke and maintain an Internet telephony session with multimedia computer **170** including microphone **172** and speaker **171** connected to network **130** or even conventional telephone **160** connected to network **130** via the aforementioned PSTN gateway **140**. Also, although not shown in figure, the IP telephony peripheral **100** may also place a voice over IP telephone call and maintain a call with a like IP telephone, as will readily be understood by those ordinarily skilled in the art upon review of this disclosure.

[0030]    Referring now to FIG. 2, a block diagram of a multimedia computer, which may be implemented in accordance with both the first and second embodiments of the present invention is depicted. Multimedia computer **200**, in this example, is a single processor system including a processor **202** connected to system bus **206**. Also connected to system bus **206** is memory controller/cache **208**, which provides an interface to local memory **209**. I/O bus bridge **210** is connected to system bus **206** and provides an interface to I/O bus **212**. Memory controller/cache **208** and I/O bus bridge **210** may be integrated as depicted.

[0031]    Peripheral component interconnect (PCI) bus bridge **214** connected to I/O bus **212** provides an interface to PCI local bus **222**. A number of peripheral components may be connected to PCI bus **222**. Typical PCI bus implementations will support four PCI expansion slots or add-in connectors. Also connected to I/O bus **212** is Personal

Computer Memory Card International Association (PCM-CIA) bus bridge **216**, which supports PCMCIA bus connectors connected via PCMCIA Bus **224**. Presently, there are four physical standards for PCMCIA cards; type I, II, III and IV. This invention may be implemented using any of these peripheral standards. In addition, connected to I/O bus **212** is Universal Serial Bus (USB) bus bridge **218**, which supports peripherals via a USB connector and communications protocol connected via USB Bus **226**. As may be seen from FIG. 2, IP telephony peripheral **100** is coupled via PCMCIA Bus **224**, though preferably, the invention of the first and second embodiments is implemented on a circuit board that connects via one of these aforesaid bus connectors. Independent of which connector is used; a common feature of the various implementations that the present invention may take is that the circuitry on the peripheral device adjunct to multimedia computer **200** communicates with the multimedia computer components over I/O bus **212**.

[0032]    A memory-mapped graphics adapter **230** and hard disk **232** may also be connected to I/O bus **212** as depicted, either directly or indirectly. A computer-screen **240** is connected to graphics adapter **230** for graphical display. Those of ordinary skill in the art will appreciate that the hardware depicted in FIG. 2 may vary. For example, other peripheral devices, such as optical disk drives and the like, also may be used in addition to or in place of the hardware depicted. The depicted example is not meant to imply architectural limitations with respect to the present invention. For example, although a number of different buses are illustrated as providing interconnects between the various components, other mechanisms other than the buses illustrated may be used to provide interconnects between the various components illustrated.

[0033]    The multimedia computer depicted in FIG. 2 may be, for example, an IBM personal computer system, a product of International Business Machines Corporation in Armonk, New York, running the Microsoft Windows NT operating system, a product of Microsoft Corporation, Redmond, Wash.

[0034]    Turning now to FIG. 3 the simplified computer-screen based graphical user interface (GUI) of the IP telephony peripheral **100** of FIG. 1 indicates the major external functional components of the Internet telephone computer-screen based GUI according to the first and second embodiments of the invention as may be displayed on computer screen **240** of FIG. 2. As shown therein, IP telephony peripheral GUI **300** takes on the general appearance of a conventional PSTN telephone on a computer screen, and as such a representation of handset **370** is included to simulate the appearance of a conventional PSTN telephone. IP telephony peripheral GUI **300** may be implemented on a windows-based graphical user interface, an example of which is Microsoft Windows NT of the Microsoft Corporation, Redmond, Wash. As shown on handset **370**, a send (SND) key **372** to connect a call and an end key **374** to end the call is included to initiate the off-hook and on-hook states. Soft keypad **380** including phone keys **350** are disposed on the IP telephony peripheral screen GUI **300** of the IP telephony peripheral **100** arranged as in the case of a conventional telephone. The soft keypad is used by the Internet telephone peripheral **100** to capture user input conveying destination information as well as selectively activate or deactivate advanced calling features such as conference (CNF) and

CISCO EXHIBIT 1006

Page 11 of 17

US 2002/0071424 A1

Jun. 13, 2002

4

forward (FWD). As will be discussed hereinbelow with reference to **FIG. 5**, according to the present embodiment, the user will specify destination information by entering a sequence of digits using phone keys **350** accompanied by selection of the send key (SND) **372** or the memory key (M) **320** followed by one or more of the digit phone keys 0-9. These keys are activated by key input on the computer, by mouse click on the appropriate key, or if the computer has a touch-sensitive display, by direct screen input. Destination information may also be entered using voice activation techniques, as commonly known in the art. It should be realized here that requiring the user to terminate entry with a predetermined keystroke (the send key) or sequence of strokes (the memory key followed by one of the digit phone keys 0-9) greatly simplifies acquisition of the user entry as well as the error-checking and interpretation thereof, at least with respect to the IP telephony peripheral **100**.

[0035]   A display **360** is also provided on IP telephony peripheral screen GUI **300** for providing user feedback regarding the digits keyed in via keypad **380** of the IP telephony peripheral screen GUI **300** and/or the status of the phone itself as well as that of the remote phone server **110**. Also, in the case of an incoming call, information involving the calling or called party may be obtained and displayed as is with the case of conventional calling line identification technology, where the originating VOIP device(s) IP address is contained in each packet received by the IP telephone. In addition, the display **360** may be used to provide visual cues to the user regarding the request and reply transactions used in establishing a call according to the present embodiment.

[0036]   A detailed discussion of the conference (CNF) **330** and the forward (FWD) **340** keys will be discussed hereinbelow with reference to **FIG. 5**.

[0037]   **FIG. 4** is a schematic block diagram of the IP telephony peripheral according to the first and second embodiments of the invention. As shown therein, speaker **400** is communicatively coupled to analog/digital converter **404** for converting perceived speech into an appropriate digital form. Speaker **400** may be a component of the computer to which the peripheral is adjunct, or may be coupled to the peripheral itself via a known speaker connector. In this embodiment, analog to digital converter **404** converts acquired speech into PCM coded data representing voice sampled at sufficient sampling rate to ensure that at least conventional PSTN voice quality can be assured. Also coupled to analog/digital converter **404** is a sound generator **406** for providing alert tones in digital form to analog/digital converter **404** which it then converts it into appropriate analog format for transmission to the user via speaker **400** audio output device. Also coupled to analog/digital converter **404** is digital signal processor ("DSP"). DSP **410** is used for selectively encoding or decoding inbound and outbound digitized voice respectively using industry standard H.323 compression techniques. Also, DSP **410** is used to selectively encode or decode inbound or outbound digitized voice respectively using echo cancellation procedures well known in the art. Coupled to the output of DSP **410** is an outbound FIFO buffer **412** used for temporarily storing process digitized voice captured by the microphone **402** for subsequent delivery to the packetizer **434** described hereinbelow.

[0038]   Packetizer **434** is coupled to the output of outbound buffer **412** to packetize the buffered and processed digitized

voice into the payload of connectionless layer **3** Internet protocol (IP) upon authorization from controller **414**. In the present embodiment, the packetizer latches in a number of octets defining digitized voice from the outbound buffer **412** for each layer **3** IP packet to be created. The packetizer then queries memory **432** for the desired destination IP address (or IP addresses in the case of a conference call), and builds an IP packet header information using at least one of the returned destination IP addresses, a predetermined source IP address specified for the IP telephony peripheral **100**, and the number of octets latched in from buffer **412** (preferably a predetermined number to reduce circuit complexity and increase processing speed). The Vers, Hlen, Service Type (high priority streaming data), Total Length, Identification, Flags, Fragment Offset, Time to Live, Protocol (base IP), Header, Options, and any padding fields of the IP packet header can be obtained using the above-identified size and addressing information or through predefined or hard-coded values retained by the packetizer **434** or memory **432**, as is well known in the art. Once each IP header is built (but for error correction checksum fields), the latched in digitized voice octets are placed into the data portion of the IP packet, and result is sent to the checksum generator **436**.

[0039]   Also, the packetizer **434** of the present embodiment is capable of generating predefined requests (i.e. the call request CALL_REQ or the forward request FWD_REQ or CAN_FWD) directed to the phone server **110** or a predefined NO_ANS error message to be relayed to the source IP address of an incoming call indicating that no answer has occurred. Each are generated in this embodiment by the packetizer **434** upon direction of the controller **414**.

[0040]   With respect to each of the aforementioned requests, the packetizer **434** will build the IP packet header of the IP packet embodying the request using the pre-established address of the IP telephony peripheral **100** as the source address and the pre-established IP address of the phone server **110** assigned to service the IP telephony peripheral **100**. In the case of the call request (CALL_REQ) and forward request (FWD_REQ) requests, the data portion of the packet will include appropriate request identification information understood by both the telephone **100** and the phone server **110** as well as any user information captured from keypad **380** and relayed to the packetizer **434** by controller **414** for resolution by the aforementioned call model component **120** of the phone server **110**. However, in the case of the cancel forward request, the data portion of the packet will only include request identification information used by the call model **120** of the phone server **110** to classify the request and cancel any existing forwarding state for the IP telephony peripheral **100** established via a prior forward request.

[0041]   In the case of the NO_ANS request, the packetizer **434** of this embodiment builds an appropriate IP packet specifying the source IP address of a perceived and correctly routed incoming IP packet determined as being an incoming caller to notify this caller that VOIP communications cannot proceed at the present time. The data portion and format is not of true significance, and in fact any data can be placed in the data portion of the IP packet defining the IP request as long as the so-mentioned no answer notification can be ascertained by the calling device or terminal.

[0042]   As mentioned previously, coupled to the output of packetizer **434** is check sum generator **436** for filling out

CISCO EXHIBIT 1006
Page 12 of 17

5

error correction information (specifically, the Checksum field disposed within each IP packet header) for each of the request, error and streaming preferably PCM-digitized voice IP packets generated by packetizer **434**. In turn, the output of checksum generator **436** is connected to the network interface **440** herein comprising media access controller ("MAC") **428** coupled to a physical transport **430**. In this embodiment, the network interface **440** is an IEEE 802.3 compliant Ethernet interface connecting to Ethernet network **130** using known Ethernet protocols and transport mechanisms. It should be realized here, however, that the teachings of the present invention are limited to any particular type of physical layer network interfacing or network transport as long as bidirectional transmission of layer 3 IP packets can be accomplished, as is well understood in the art. As such, other types of networks and accompanying interfaces such as token ring, ATM, SONET, modem- PPP or SLIP server are contemplated here without detracting from the teachings of the invention.

[0043] The physical transport **430** may contain a dedicated port or termination node to the network **130** or it may involve a pass-through connection serving as an intermediary between another network device such as a computer and the network **130**. If so, the media access controller will employ collision avoidance mechanisms well known in the networking arts to avoid packet collisions with any other downstream attached device(s) to the physical layer **430**.

[0044] Also, the media access controller **428** preferably intercepts and extracts at least the source and destination IP address information for inbound packets received from network **130** via the physical transport **430**. The MAC **428** will retain IP packets having the same destination address as the IP telephone's predetermined IP address stored in memory **432**, and will route onto the extractor **422** at least those retained packets indicating as a source address at least one of the destination IP addresses or indicating the predetermined destination address for the phone server **110**. As discussed hereinbelow in greater detail with respect to incoming call processing shown in **FIG. 5**, retained IP packets specifying source address which does not match any of the established destination IP addresses or the phone server **110**'s pre-established address will be assumed in this embodiment to be an incoming call.

[0045] Still referring to **FIG. 4**, the extractor **422** is coupled to an output of the MAC **128** for receiving inbound packets matching the predetermined phone server **110** or established destination IP addresses stored in memory **432**. The extractor will extract the digitized voice contained in these packets and pass it along to the inbound FIFO buffer **416**. If conference features according to the present embodiment are supported, in addition, the extractor will be able to match the IP source address of the inbound packets to each of the established IP destination addresses stored in memory **432** and route the digitized voice samples therein to one of up to three different buffers **416**, **418**, and **420** corresponding to the established IP addresses. Although additional buffers above three can be supported (and so additional conferees can be supported), in this embodiment only up to three conferees are supported in view of practical needs for such conferencing as well as resulting additional circuitry complexity and components costs additional buffers would impart.

[0046] In addition, the extractor **422** of this embodiment will perceive one of the aforementioned replies (i.e. the connection reply CONN_REPLY or forward reply FWD_REPLY) or error messages (i.e. connection error CONN_ERROR or forward error FWD_ERROR) issued by the phone server **110** in response to requests issued by the IP telephony peripheral **100** by sequentially evaluating the source IP address and the data portion of the incoming IP packet if the source IP address matches the pre-established phone server IP address. If such replies or error messages are received, the data portions of each are submitted to the controller **414** of the present embodiment for processing in accordance with the state transition diagram shown in **FIG. 5** and discussed in detail hereinbelow.

[0047] Still referring to **FIG. 4**, the output of each inbound FIFO buffer **416**, **418**, and **420** is coupled to DSP **410**. In turn, as stated above, DSP **410** will take received digitized audio streams placed in these buffers as they are received and will selectively decode them using known echo cancellation and H.323 compression techniques. The decoded streams are then relayed on to analog/digital converter **404** for subsequent transmission in analog form to the user using speaker **400** or similar output device (not shown).

[0048] The controller **414** is coupled to the aforementioned packetizer **434**, memory **432**, the extractor **422**, the media access controller **428** and the DSP **410** for sequencing call setup and packet transmission reception procedures according to the present embodiment. The controller herein will include phone server **450** and answer **452** timing resources for controlling internal timing for said processing as will be described hereinbelow with reference to the state transition diagram of **FIG. 5**. The controller **414** is adapted to perform wideband audio compression according to International Telecommunications Union (ITU-T) compliant schemes such as G.711, G723.1 and G.729A. Other wideband audio compression schemes, as known in the art, may also be employed.

[0049] The controller **414** is also communicatively coupled to display **360** to display interface **424** as well as keypad **380** through keypad interface **426**. Display interface **424** will perform routine display operations of information provided by controller **414** as well as track keypad entry from keypad **380** responsive to the de-bounced keystrokes detected by keyboard interface **426**. Likewise keypad interface **426** notifies controller **414** and display interface **424** what keys have been depressed by the user. In addition, keypad interface **426** could include a conventional DTMF sound generator (not shown) for placing DTMF sounds into the inbound and outbound voice streams.

[0050] Also coupled to controller **414** is off-hook switch **408** used for indicating the current hook state of the handset **370** of the IP telephony peripheral **100**.

[0051] **FIG. 5** is a state transition diagram executed by the controller **414** shown in **FIG. 4** in isolation, or in conjunction with the other highlighted components of the IP telephony peripheral **100** according to the first embodiment of the present invention. The idle state is represented at **500**. When a digit sequence terminating in a send (SND) key, or a sequence comprising a memory key plus one of digits 0-9 is detected by the controller **414**, the controller transitions to state **502**. At state **502**, the controller **414** instructs the packetizer **434** to issue a call request to the phone server **110**

CISCO EXHIBIT 1006
Page 13 of 17

**(FIG. 1)**. In turn, the packetizer will query memory **432** for the phone server **110**'s IP address and then place a CALL_REQ IP packet to the phone server, as discussed above. The packetizer **434** will include information captured from the user using keypad **380** indicated before depression of the send (SND) key. Alternatively, the packetizer can consult a predefined memory table containing IP address entries corresponding to key sequence M0, M1, M2, . . . , N9 as is well known in the art. Also, in state **502**, the controller resets a watchdog server time-out timer **450** used to indicate a period of time in which the IP telephony peripheral **100** is likely to receive a response from a connected phone server **110**.

[0052]   Thereafter control transitions to state **504** in which the controller **414** waits for a connection reply (CONN_REPLY) from the phone server **110** servicing the IP telephony peripheral **100**. If the aforementioned server time-out timer **450** expires before receipt of the CONN_REPLY from the phone server **110**, a SERV_TIMEOUT signal is issued and control transitions to error state **506**. At state **506**, a connection error is perceived by the controller **414**. Likewise, if during the duration of the server timer **450** initialized in state **502**, a connection error CONN_ERROR has been perceived by the controller **414** based on communications with the extractor **422**, control likewise transitions to state **506**. In either case, at state **506** a connection error tone is transmitted to the user and the status of the call counter variable is interrogated. When no calls have previously been established, in this embodiment, the control will transition back to the idle state **500**. However, where the call counter is greater than 0 indicating that a successful connection has already been established as will be discussed hereinbelow, control transitions to the IP voice packet transmit and receive state **510**.

[0053]   If, however, while in state **504** a connection reply (CONN_REPLY) has been received before the server timer **450** has timed out, control instead transitions to state **508** in which the call counter is incremented, indicating that a successful telephony connection has been established with the destination. In addition, at this state the controller will add the resolved destination IP address specified in the connection reply to the memory **432**. Also in this embodiment, a DTMF_EN enable flag is set indicating that the keypad interface **426** will generate DTMF tones responsive to the phone keys **350** (FIG. 3) selected by the user, as is well understood in the art. Thereafter, control transitions to state **510** where perceived voice is captured, digitized, packetized, and transmitted by the IP telephony peripheral **100** and inbound IP packets are received and assembled into inbound voice streams for replay over speaker **400** or similar output device.

[0054]   Call termination processing according to the first embodiment is now detailed. From the transmit/receive state **510**, if the controller perceives that the user has ended the call via the IP telephony peripheral screen GUI **300** by clicking the end call key **372** (END), and the off-hook switch is toggled to the on-hook state, control transitions to state **512**. At state **512**, it is assumed that the user wants to hang-up, so all the destination IP addresses are flushed from memory **432**, the call counter is initialized to 0 and the DTMF_EN flag is cleared. Control thereafter transitions back to the idle state **500**.

[0055]   Call conferencing according to the first embodiment is now detailed. From the transmit/receive state **510** in

which a call has already been established, if a conference key **330** is depressed by the user, the controller transitions back to state **502** in which the controller **414** instructs the packetizer to issue an appropriate call request. Control then transitions to state **504**, **508**, or **506** as outlined hereinabove. It should be noted here that since connectionless data transfer is contemplated using IP packets, the extra connection only involves verification or resolution by the call model **120** of the phone server **110** and receipt of the CONN_REPLY including the resolved destination IP address before the server timer **450** expires. Also, as stated previously, assuming that a successful conference connection has been made, extractor **422** will route the conferee's received digitized voice to inbound buffer **418** instead of inbound buffer **416** so as not to garble the incoming streaming audio data of the two called parties whose destination IP addresses are contained in memory **432**. Also, as stated before, up to three callers (one original caller and up to two conferees) may be supported simultaneously.

[0056]   An incoming call is handled by the IP telephony peripheral **100** of the first embodiment is now described with reference to FIG. 5. From the idle state **500**, if the media access controller **128** determines that a received inbound IP packet specifies a source address not in the destination IP address list within memory **432**, control transitions from the idle state to state **514**. At state **514**, the controller **414** instructs the sound generator **406** to send an alert tone to a ringer (not shown) to audibly indicate that an incoming call has been perceived, as with the case in a conventional analog phone. At the same time, the controller will initialize a watchdog answer timer **452** to time the duration of the ring before the handset is picked up. If the answer timer **452** times out before an off-hook state has been detected, control transitions to state **516** in which the controller instructs the packetizer to issue a predetermined NO_ANS error message IP packet to the calling party. Control thereafter transitions back to the idle state **500**.

[0057]   If, however, in state **514** controller perceives the off-hook state before the expiration of the answer timer **452**'s preset or adjustable duration, control instead transitions to state **508** which, as indicated above, the call counter incremented, the DTMF enabled flag is enabled and the calling party's originating IP address is added to the destination IP address list contained in memory **432**. Control thereafter transitions to step **510** in which IP packet transmission and reception operations ensue. Call forwarding handled by the IP telephony peripheral **100** according to the first embodiment is now described with reference to FIG. 5. From the idle state **500**, if the controller perceives that the forward key **340** has been selected by the user, control transitions to state **518**. At state **518**, the controller selectively issues a forward request (FWD_REQ) or a cancel forward request (CAN_FWD) to the phone server **110** utilizing the aforementioned packetizer **434**, check sum generator **436**, and network interface **440** based on the status of the forward enable FWD_EN flag contained in memory **432**. It should be noted here that if the forward request is deemed appropriate, destination information will be incorporated into the forward request FWD_REQ IP packet as specified by the appropriate user entry using keypad **380** as discussed hereinabove with respect to initiating a call. Also, at state **518**, the controller restarts the server timer **452**.

7

[0058] Control thereafter transitions to state **520**, in which the control awaits for a forward reply FWD_REPLY issued by the phone server **110**. If the aforementioned server time-out timer **450** expires before receipt of the FWD_REPLY from the phone server **110**, a SERV_TIM-EOUT signal is issued and control transitions to error state **524**. At state **524**, a forward error is perceived by the controller **414**. Likewise, if during the duration of the server timer **450** initialized in state **518**, a forward error FWD_ER-ROR has been perceived by the controller **414** based on communications with the extractor **422**, control likewise transitions to state **524**.

[0059] At the error state **524**, an alert tone is generated to the user in state **524** and control then transitions back to the idle state **500**. However, if a forward reply FWD_REPLY is received from the phone server before the server timer times-out, control transitions to state **502** in which the forward enable flag is toggled enabled, meaning that the forward request has been perceived and stored by the phone server **110**, or disabled, meaning that a previous filled request has been canceled by the forward by the phone server **110**. Control thereafter transitions to the idle state **500**.

[0060] It should be noted here that while the forward enable flag is set, controller will not initiate a call nor will it answer an incoming call.

[0061] According to a second embodiment of the invention, an IP telephony peripheral—phone server tandem operates to set up and maintain voice over IP sessions with other IP telephony devices while preserving higher OSI layer (layer 4+) signaling (e.g. TCP/IP and/or ITU H.323) communications with these other telephony devices. According to this embodiment with reference to FIG. **6**, the IP telephony peripheral **600** and the phone **610** server communicate using base IP (layer **3**) protocols as is the case with the IP telephony peripheral **100** and server **110** described above with respect to the first embodiment of the invention. However, the IP telephony peripheral **600** will encapsulate the higher layer (layer 4+) control and signaling packets received from other telephony devices it has established a call or session with into layer 3 IP packets for transmission to the phone server **610**.

[0062] According to the second embodiment, the phone server **610** includes a network aware I/O module **115** and call model **120** discussed previously, along with a layer 4+ processor **625** responsible for parsing the higher layer control and signaling packets forwarded by the IP telephony peripheral **600**, and encapsulating the appropriate responses and control information in base layer 3 IP protocol for transmission back to the IP telephony peripheral **600**. It should be noted that, except that the phone server knows to substitute origination information corresponding to the IP appropriate telephone **600** it is servicing rather than itself as the originator of these responses, conventional layer 4+ servicing routines may be conveniently utilized.

[0063] To make it appear to other telephony devices as though the IP telephony peripheral **600** that it is actually processing the layer 4+ control and signaling packets and thus appear as higher layer compliant, the IP telephony peripheral **600** (not the server **610**) receives and transmits all higher layer packets to these telephony devices, including

reissuing the higher layer control and signaling packets in native form sent to it by the server **610** encapsulated in base IP packets.

[0064] Thus, even though the server **610** according to this aspect of the present invention is given responsibility for actually acting on the layer 4+ commands, control and signaling packets used to e.g. set up an H.323 session, its operations and communications with the IP telephony peripheral **600** are transparent to the other telephony devices engaged in the communications session.

[0065] The functions of the telephone peripheral **600** as well as interactions with the phone server **610** may be best understood by referring to the telephone peripheral **600** controller state transition diagram of FIG. **7**. As shown in FIG. **7**, controller **414** processing is similar to that illustrated and described above with reference to FIG. **5**, except as noted below. The primary difference is that, in this embodiment, once basic call setup is complete and call setup packets are broadcast from the IP telephony peripheral **600** (state **709**), the controller **414** transitions to the TX/RCV state **710** to direct that layer 4+ voice and control packets (rather than layer **3**) are created, issued, received, and voice information is extracted therefrom. Thus, when the payload of packet to be sent to other telephony devices using layer 4+ protocols such as TCP/IP or H.323 is full, the controller **414** transitions to state **758**, in which the controller **414** directs that the packetizer **434** develop appropriate layer 4+ overhead (such as the TCP/IP packet sequencing number) in a routine manner. Thereafter, the controller transitions to state **754** where it directs the packetizer **434** and checksum generator **436** to create and deliver a complete layer 4+ packet to the MAC **428** for transmission across the network **130** to the other telephony device(s) engaged in a layer 4+ call or session with the telephone **600**.

[0066] Next, assume that the controller **414** according to the second embodiment detects an incoming packet received by the extractor **422** in fact contains control information germane to the layer 4+ protocol being utilized for communications (CONTROL_REC'D) while at state **710**. If so, the controller transitions to state **750**, where it directs the packetizer **434** to encapsulate the entire received control packet (or alternatively just the control portion) into a layer **3** packet for transmission to the phone server **610**. It should be noted here that the controller **414** and/or extractor **422** will determine if the received packet constitutes or includes layer 4+ control information by e.g. comparing the received header/payload portions against a predefined protocol table (not shown) in memory **433**.

[0067] From state **750**, the controller **414** thereafter transitions to state **754**, in which the controller directs the packetizer **434**, checksum generator **436** and MAC **428** to transmit the layer **3** packet encapsulating the layer 4+ control packet to the phone server **710**.

[0068] Next assume that the controller **414** according to the second embodiment detects that an incoming packet or packet stream received by the extractor **422** in fact contains encapsulated control response information generated by the phone server **610** (CONTROL_REPLY) while at state **710**. In such case, the controller **414** transitions to state **756**, in which the controller directs the packetizer to create a layer 4+ packet including the control response information presented in the payload of the incoming layer 3 packet. The

8

controller thereafter transitions to state **754**, in which the controller directs the packetizer **434**, checksum generator **436** and MAC **428** to transmit the layer 4+ packet(s) including the control response information to the other telephony device(s) engaged in the call or session with the IP telephony peripheral **600**.

[0069]    It should be noted here that non-control layer 4+ components (such as TCP/IP sequencing placed in the header of each TCP/IP packet bearing a voice payload) are discarded without reply where possible to simplify construction of the telephone **600**.

[0070]    While the invention is described above in terms of specific preferred embodiments and associated drawings, those of ordinary skill in the art will recognize that the invention can be practiced in other embodiments as well. It is felt therefore that the invention should not be limited to the disclosed embodiments above, but rather should be limited only by the spirit and scope of the appended claims.

What is claimed is:

1. An IP telephony peripheral for use adjunct to a computer and for use with a network, comprising:

a controller;

a computer interface communicatively coupled to said controller;

a memory coupled to said controller for selectively storing a destination IP address;

a packetizer coupled to said controller and said memory for packetizing outbound digitized voice into at least one outbound IP packet, said outbound IP packet including destination data based on said stored destination IP address; and

a network interface in communication with said memory for broadcasting said outbound IP packet onto said network.

2. The telephone of claim 1, wherein said controller comprises a finite state machine.

3. The telephone of claim 2, wherein said controller comprises a programmed microcontroller.

4. The telephone of claim 2, wherein said controller comprises a synchronous network of discrete logic components.

5. The telephone of claim 2, wherein said finite state machine, said memory, said packetizer, and said network interface are commonly housed in an ASIC.

6. The telephone of claim 2, wherein said network interface captures an inbound IP packet, said inbound IP packet including source data correlating to said destination IP address.

7. The telephone of claim 6, further comprising an extractor coupled to said network interface and said controller for extracting inbound digitized voice from said inbound IP packet.

8. The telephone of claim 7, wherein said destination IP address includes plural IP addresses.

9. The telephone of claim 2, further comprising:

a handset interface, said handset interface including a speaker connector for connecting a speaker and a microphone connector for connecting a microphone; and

an analog/digital converter coupled to said handset interface for converting acquired voice into said outbound digitized voice and for converting inbound digitized voice into analog form.

10. The telephone of claim 9, further comprising a digital signal processor coupled to said analog/digital converter, said controller, said packetizer, and said extractor for selectively performing echo cancellation and compression operations on said inbound and outbound digitized voice.

11. The telephone of claim 9, further comprising:

a graphical user interface, said graphical user interface having a keypad disposed on said graphical user interface; and

a keypad interface coupled to said controller, said keypad for detecting selection of at least one key and for selectively issuing a corresponding DTMF tone to said analog/digital converter.

12. The telephone of claim 2, wherein said network interface comprises:

a transparent transport coupled to said network, said transport including connection means for coupling a computer to said network and transporting computer data to and from said computer;

a media access controller coupled to said transport, said media access controller including collision enforcement means coupled to said transparent transport for broadcasting said outbound IP packet onto said network without influencing said computer data.

13. The telephone of claim 1, wherein said communicative coupling of a computer and said computer interface is through a radio communications link.

14. The telephone of claim 13, wherein said radio communications link conforms to Bluetooth specification.

15. The telephone of claim 1, wherein said communicative coupling of a computer and said computer interface is via a physical connector conforming to a Personal Computer Memory Card International Association standard.

16. The telephone of claim 1, wherein said communicative coupling of a computer and said computer interface is via a physical connector conforming to a Peripheral Component Interconnect standard.

17. The telephone of claim 1, wherein said communicative coupling of a computer and said computer interface is via a physical connector conforming to a Universal Serial Bus standard.

18. An IP telephony system, comprising:

an IP telephony peripheral, comprising:

a controller;

a computer interface coupled to said controller;

a memory coupled to said controller;

a packetizer coupled to said controller and said memory for packetizing a call request into an outbound IP packet; and

an interface for transmitting the outbound IP packet; and

a phone server in communication with said IP telephone, comprising:

CISCO EXHIBIT 1006
Page 16 of 17

an IP parser for parsing the call request from the transmitted outbound packet;

a call model for resolving a destination IP address from the extracted call request and transmitting the destination IP address to said IP telephone as an inbound IP packet;

wherein said IP telephony peripheral further comprises an extractor coupled to said controller, said memory, and said interface for extracting the destination IP address from the inbound IP packet and storing the destination IP address into said memory.

**19.** The IP telephony system of claim 18, wherein said packetizer packetizes outbound digitized voice into a stream of outbound IP packets, each outbound IP packet of the stream including destination data based on the stored destination IP address.

**20.** The telephony system of claim 19, wherein said telephone controller comprises a finite state machine.

**21.** An IP call establishment method, comprising the steps of:

receiving a call request from a graphical user interface on a computer;

packetizing the call request into an outbound IP packet;

transmitting the outbound IP packet;

remotely parsing the call request from the transmitted outbound packet;

remotely resolving a destination IP address from the extracted call request;

transmitting the destination IP address as an inbound IP packet;

extracting the destination IP address from the inbound IP packet; and

packetizing outbound digitized voice into a stream of outbound IP packets, each outbound IP packet of the stream including destination data based on the stored destination IP address.

**22.** The IP call establishment method of claim 20, further comprising the step of:

generating the call request responsive to user input on said graphical user interface.

**23.** A packet voice communications system, comprising:

a packet voice telephone peripheral for use adjunct to a computer, operable to receive a packet containing layer 4+ control information, encapsulate the layer 4+ control information into a lower level packet, and issue the lower level packet; and

a phone server coupled to said packet voice telephone and comprising:

an i/o module to receive the lower level packet; and

a layer 4+ processor to generate at least one response packet responsive to the layer 4+ control information encapsulated within the received lower level packet, wherein said i/o module issues the at least one response packet;

wherein the packet voice telephone receives the at least one response packet and issues an outbound response containing a portion of the at least one response packet.

**24.** A packet voice communications system, comprising:

a packet voice telephone peripheral comprising:

means for receiving a call request from a graphical user interface on a computer;

means for receiving a packet containing layer 4+ control information;

means for encapsulating the layer 4+ control information into a lower level packet; and

means for issuing the lower level packet; and a phone server, comprising:

means for receiving the lower level packet; and

means for generating at least one response packet responsive to the layer 4+ control information encapsulated within the received lower level packet, wherein said phone server receiving means includes issuing means for issuing the at least one response packet;

wherein the packet voice telephone peripheral receiving means receives the at least one response packet and includes issuing means for issuing an outbound response containing a portion of the at least one response packet.

**25.** An article including one or more machine-readable storage media containing instructions to control an IP telephony peripheral apparatus in a communications network, the instructions when executed causing a controller to:

transmit a call request to the IP telephony peripheral apparatus responsive to an activation command on a computer;

wherein the call request comprises control information to selectively control the operation of the IP telephony peripheral.

\*    \*    \*    \*    \*

CISCO EXHIBIT 1006

Page 17 of 17



US005313454A

# United States Patent [19]

## Bustini et al.

[11] **Patent Number:** **5,313,454**

[45] **Date of Patent:** **May 17, 1994**

[54] **CONGESTION CONTROL FOR CELL NETWORKS**

[75] Inventors: **Lionel A. Bustini**, Campbell; **Patrick D. Daley**, Belmont; **Charles M. Corbalis**, Milpitas, all of Calif.

[73] Assignee: **Stratacom, Inc.**, San Jose, Calif.

[21] Appl. No.: **861,761**

[22] Filed: **Apr. 1, 1992**

[51] Int. Cl.⁵ ...................... H04L 12/56; H04L 12/02

[52] U.S. Cl. ....................................... 370/13; 370/60; 370/60.1; 370/94.1; 370/94.2

[58] Field of Search ................ 370/13, 17, 94.1, 94.2, 370/94.3, 60, 60.1, 58.1, 58.2, 58.3

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,988,545 | 10/1976 | Kuemmerle et al. | 370/60 |
| 4,238,851 | 12/1980 | Takahashi et al. | 370/94.1 |
| 4,475,192 | 10/1984 | Fernow et al. | 370/17 |
| 4,491,943 | 1/1985 | Turner | 370/13 |
| 4,494,230 | 1/1985 | Turner | 370/60 |
| 4,499,576 | 2/1985 | Fraser | 370/60 |
| 4,506,358 | 3/1985 | Montgomery | 370/60 |
| 4,561,090 | 12/1985 | Turner | 370/60 |
| 4,644,533 | 2/1987 | Braff et al. | 370/60 |
| 4,703,475 | 10/1987 | Dretzka et al. | 370/60 |
| 4,703,477 | 10/1987 | Adelmann et al. | 370/94.1 |
| 4,757,529 | 7/1988 | Glapa et al. | 370/60 |
| 4,771,424 | 9/1988 | Suzuki et al. | 370/60.1 |
| 4,771,425 | 9/1988 | Baran et al. | 370/94.1 |
| 4,819,228 | 4/1989 | Baran et al. | 370/94.1 |
| 4,819,230 | 4/1989 | Calvignac et al. | 370/94.1 |
| 4,839,891 | 6/1989 | Kobayashi et al. | 370/94.1 |
| 4,903,261 | 2/1990 | Baran et al. | 370/94.2 |
| 4,905,233 | 2/1990 | Cain et al. | 370/94.1 |
| 4,914,650 | 4/1990 | Sriram | 370/60 |
| 4,939,718 | 7/1990 | Servel et al. | 370/60 |
| 4,974,224 | 11/1990 | Boone | 370/94.1 |
| 5,020,058 | 5/1991 | Holden et al. | 370/109 |
| 5,072,449 | 12/1991 | Enns et al. | 370/94.2 |
| 5,088,032 | 2/1992 | Bosack | 395/200 |
| 5,115,431 | 5/1992 | Williams et al. | 370/94.1 |

### OTHER PUBLICATIONS

K. K. Ramakrishnan and R. Jain, "A Binary Feedback Scheme for Congestion Avoidance in Computer Networks," ACM Transactions on Computer System, vol. 8, pp. 158–181 (May, 1990).
K. W. Fendick, D. Mitra, I. Mitrani, M. A. Rodrigues, J. B. Seery, and A. Weiss, "An Approach to High-Performance, High-Speed Data Networks," IEEE Communications Magazine, pp. 74–82 (Oct. 1991).
C. Anthony Cooper and Kun I. Park, "Toward a Broadband Congestion Control Strategy," IEEE Network Magazine, pp. 18–23 (May 1990).
K. Bala, I. Cidon and K. Sohraby, "Congestion Control for High Speed Packet Swtiched Networks," IEEE, pp. 520–526 (1990).
IPX System Operation Guide, StrataCom, Inc., pp. 2–1 through 2–18 (1988).
The IPX Product Family System Description, Strata-Com, Inc., pp. 1–114 (1990).

*Primary Examiner*—Wellington Chin
*Attorney, Agent, or Firm*—Blakely, Sokoloff, Taylor & Zafman

[57] **ABSTRACT**

A feedback control system for congestion prevention in a cell (packet) switching communication network is described. Congestion control is accomplished by controlling the transmission rate of bursty traffic in the presence of high priority, voice, low speed statistical, high speed deterministic and multicast traffic. Because bursty traffic is relatively insensitive to delay, adequate buffer capacity can be provided at the network nodes in order to minimize bursty data cell loss. By monitoring the buffer queue lengths at the nodes, a control signal can be generated at each intermediate node indicating the state of congestion. Excess queue length indicates incipient congestion while short queue lengths indicate excess capacity. Queue status is forwarded to the destination node where it is interpreted and sent back to the source node as a feedback rate control signal using a 2-bit code. The source node regulates the rate of bursty data transmission over the cell network thus minimizing congestion and concomitant data loss while efficiently utilizing available network bandwidth.

**47 Claims, 15 Drawing Sheets**



CISCO EXHIBIT 1008
Page 1 of 33

FIG _1

U.S. Patent

May 17, 1994

Sheet 1 of 15

5,313,454

CISCO EXHIBIT 1008
Page 2 of 33





FIG_2

|  | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|---|

OCTET Ø — MSB OF VIRTUAL CIRCUIT IDENTIFIER
OCTET 1 — LSB OF VIRTUAL CIRCUIT IDENTIFIER
OCTET 2 — PACKET TYPE | CRC5 / SLOT NO.
OCTET 3 — FAIR QUEUING CONTROL (TIMESTAMPS / HOP COUNTS)

INFORMATION FIELD

OCTET 23



FIG_3

CISCO EXHIBIT 1008
Page 3 of 33



FIG _ 4

CISCO EXHIBIT 1008
Page 4 of 33

U.S. Patent

May 17, 1994

Sheet 4 of 15

5,313,454

# FIG _ 5



NETWORK 20

CISCO EXHIBIT 1008
Page 5 of 33

FIG_6

REGION I
NO CONGESTION
REGION II
MILD CONGESTION
REGION III
SEVERE CONGESTION
OPTIMUM
CLIFF
A
B
THROUGHPUT
AND
DELAY
MAXIMUM
NETWORK
CAPACITY
DELAY
THROUGHPUT
OFFERED LOAD

FIG_7

NODE A
FRP 59
• RECEIVE
• DISSASSEMBLE FRAMES
• TRAFFIC CONTROL (CLP,ICA)
TXR 56
• TRANSMIT CELLS
• ICA DETECT
• TRAFFIC CONTROL (CLP)
FRAME
VC PORT
USER A
CELL
VIRTUAL
CONN
182
NODE B
TXR 56
• RECEIVE CELLS
• DIRECT TRAFFIC FLOW
TXR 56
• TRANSMIT CELLS
• ICA DETECT
• TRAFFIC CONTROL (CLP)
CELL
VIRTUAL
CONN
182
NODE C
TXR 56
• RECEIVE CELLS
• DIRECT TRAFFIC FLOW
FRP 59
• ASSEMBLE AND TRANSMIT FRAMES
• ICA CONTROL MESSAGE GENERATOR
FRAME
VC PORT
USER C
22
22
22
180
ICA RATE CONTROL FEEDBACK

U.S. Patent

May 17, 1994

Sheet 6 of 15

5,313,454



FIG _ 8

CISCO EXHIBIT 1008
Page 7 of 33

U.S. Patent

May 17, 1994

Sheet 7 of 15

5,313,454

# FIG _ 9



# FIG _ 10



CISCO EXHIBIT 1008
Page 8 of 33

U.S. Patent

May 17, 1994

Sheet 8 of 15

5,313,454

# FIG _ 11



CISCO EXHIBIT 1008
Page 9 of 33

U.S. Patent

May 17, 1994

Sheet 9 of 15

5,313,454



FIG_12

CISCO EXHIBIT 1008
Page 10 of 33

U.S. Patent

May 17, 1994

Sheet 10 of 15

5,313,454

# FIG _ 13

HOP COUNT = 1

| |
|---|
| PACKET START ADDRESS |
| INPUT TIME |
| CONTROL DATA/HOP COUNT (OCTET 3) |
| LINK |

⋮

| |
|---|
| PACKET START ADDRESS |
| INPUT TIME |
| CONTROL DATA/HOP COUNT (OCTET 3) |
| LINK |

⋮

| |
|---|
| PACKET START ADDRESS |
| INPUT TIME |
| CONTROL DATA/HOP COUNT (OCTET 3) |
| 0000 |

FIFO

HOP COUNT = 2

| |
|---|
| PACKET START ADDRESS |
| INPUT TIME |
| CONTROL DATA/HOP COUNT (OCTET 3) |
| LINK |

⋮

| |
|---|
| PACKET START ADDRESS |
| INPUT TIME |
| CONTROL DATA/HOP COUNT (OCTET 3) |
| LINK |

⋮

| |
|---|
| PACKET START ADDRESS |
| INPUT TIME |
| CONTROL DATA/HOP COUNT (OCTET 3) |
| 0000 |

FIFO

• • •

HOP COUNT = 15

| |
|---|
| PACKET START ADDRESS |
| INPUT TIME |
| CONTROL DATA/HOP COUNT (OCTET 3) |
| LINK |

⋮

| |
|---|
| PACKET START ADDRESS |
| INPUT TIME |
| CONTROL DATA/HOP COUNT (OCTET 3) |
| LINK |

⋮

| |
|---|
| PACKET START ADDRESS |
| INPUT TIME |
| CONTROL DATA/HOP COUNT (OCTET 3) |
| 0000 |

FIFO

CISCO EXHIBIT 1008
Page 11 of 33



FIG _14A



FIG _ 14B

U.S. Patent

May 17, 1994

Sheet 13 of 15

5,313,454



FIG __ 15

TIME
(RTD UNITS)

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |



DESTINATION
FRP

AVERAGE — SEND ADJ MSG

START — AVERAGE — SEND ADJ MSG

START — AVERAGE — SEND ADJ MSG

AVERAGE — SEND ADJ MSG



SOURCE
FRP

ADJ RATE     ADJ RATE     ADJ RATE     ADJ RATE

CISCO EXHIBIT 1008
Page 14 of 33

**FIG_16**



CISCO EXHIBIT 1008
Page 15 of 33



FIG _17

600 — INITIALIZE CREDIT MANAGER: $T_i = D_i$

602 — SET VC INDEX: $i = 1$

604 — $T_i = T_i - 1$

606 — $T_i \le \emptyset$ ?  NO / YES

608 — INC. $i^{th}$ CREDIT: $C_i = C_i + 1$

610 — $C_i > C_{MAX}$ ?  NO / YES

612 — SET $C_i = C_{MAX}$

614 — $T_i = T_i + D_i$

616 — INC. INDEX: $i = i + 1$

618 — $i > I$ ?  NO / YES

620 — WAIT TICK PERIOD (T)

FIG _18

700 — INITIALIZE VC INDEX: $i = 1$

702 — SERVICE $i^{th}$ CELL TRANSMIT QUEUE IF $C_i \ge 1$, $Q_i = 1$ ?  NO / YES

704 — DEC. $C_i$: $C_i = C_i - 1$

706 — INC. VC INDEX: $i = i + 1$

708 — $i > I$ ?  NO / YES

CISCO EXHIBIT 1008
Page 16 of 33

5,313,454

**1**

CONGESTION CONTROL FOR CELL NETWORKS

FIELD OF INVENTION

The present invention relates to the field of cell switching network communications. More specifically, the present invention relates to apparatus and method of traffic congestion prevention and control within the cell switching network.

BACKGROUND OF THE INVENTION

The desire to integrate data, voice, image, and video over high speed digital trunks has led to the development of a packet switching technique called cell relay or asynchronous transfer mode.

A typical fully-integrated voice and data network using digital trunk lines (e.g., T1, FT1, E1, T3, etc.) includes a number of geographically distant interconnect nodes. Each node acts as a cell exchanger for receiving and forwarding cell information to its destination. By the use of a variety of interface cards, each node is capable of interfacing to user generated voice and data streams, then segmenting and assembling the streams into a more efficient cell format for transmission over a closed network using digital lines. Each node is also capable of receiving data from other network nodes and forwarding that data through to other network nodes to its ultimate destination. All terminal nodes also provide the necessary interface cards required to reassemble the data contained in the cells into a standard user data stream format.

A typical modern node is capable of handling six classes of cell traffic, each class having different characteristics and different service requirements. The six classes of traffic include:

(1) High priority ("HP") for node-to-node control messages;

(2) Voice for pulse code or adaptive pulse code voice signals;

(3) Low speed statistical ("LSS") traffic sent at rates of less than 64 Kbps which includes statistical and deterministic full-period traffic;

(4) High speed deterministic ("HSD") traffic for full period voice or data at data rates exceeding 64 Kbps;

(5) Bursty data for point-to-point traffic generated by such sources as local area networks, bridges, routers or high speed packet switches within the cell network; and

(6) Multicast traffic which is of the same type as bursty data except that it is simultaneously broadcast from one source to many destinations (vs. point-to-point).

Each of these six traffic types are buffered at each network node in accordance with their particular sensitivities to network delay and cell loss. Cell loss may occur due to intermittent short term overload of network bandwidth and lack of adequate buffer capacity. For example, voice traffic is relatively delay sensitive and insensitive to occasional cell loss. In contrast, data traffic, such as file transfers, is relatively insensitive to delay but is data loss sensitive. High priority data is both delay and loss sensitive. To accommodate these differences, each class of traffic is typically placed in a preassigned queue, each with a different service priority. During periods of network traffic congestion, when network traffic demand exceeds the network's bandwidth capacity, servicing algorithms are typically employed to discriminate between traffic classes in order to allocate bandwidth. Delay is managed by properly

**2**

sizing the queue depths and prioritizing transmission within a class based upon a measure of the time that a cell has been in the network as, for example, by use of time stamps and hop counts.

Even with these sophisticated queueing and service algorithms, congestion (due to excess arriving traffic) can occur. This congestion is typically divided into three categories: short-term, medium-term, and long-term. Short-term congestion, typically handled by discarding traffic at the queue, may be done haphazardly or preferably selectively by having cells marked with their "discard eligibility". Long-term congestion is controlled by admission policies that allocate resources (bandwidth and buffers) at the time a connection is established. If no resources are available, the connection is not allowed.

Medium-term congestion control has been an active topic of research during the last couple of years. Two types of techniques that have been researched are (1) open-loop control techniques involving no explicit feedback from the network in which congestion is controlled by smoothing the flow of input traffic and (2) closed-loop techniques that sense the level of congestion on the virtual circuit and control the in-flow of traffic based on feedback of congesting status information to the source terminal.

An example of a general rate regulation scheme for a bursty data source on a per virtual connection basis is described in a paper by K. Bala, et al., entitled, *Congestion Control for High Speed Packet Switched Networks*, published in the proceedings of the IEEE INFOCOM Jun. 5–7, 1990, pages 520–526. At the initial establishment of a virtual connection, a minimum amount of guaranteed bandwidth is allocated. The simplest system described uses the concept of a "leaky bucket" input rate controller that uses "tokens" and "spacers" to control the average data rate introduced into the packet switched network. Tokens arrive at the controller at a fixed rate. Each token corresponds to fixed number of bytes. The controller buffers the packet until enough tokens are collected for transmitting the entire packet. The token bucket has a fixed maximum capacity corresponding to the maximum packet burst duration. Tokens arriving to a full bucket are dropped. Thus, the system can handle different length packets which are transmitted without fragmentation. Peak rate control is accomplished by means of a spacer that introduces a suitable delay proportional to the length of the prior transmitted packet.

A given session on a virtual connection may last for long periods of time (up to hours). Bursty data sources are characterized by intermittent high data rate burst with significant spans of inactivity between bursts. Under these circumstances, the above described simplest system would result in underutilization of the bandwidth capacity of the system because of the prescribed safe bandwidth limit assigned to the virtual connection session.

Average bandwidth utilization efficiency is typically improved by introducing "colored" tokens, for example, green and red. Green tokens correspond to packets received for transmission that fall within the minimum guaranteed bandwidth protocol while the red tokens correspond to packet data received for transmission in excess of the guaranteed minimum rate. Intermediate nodes provide per trunk FIFO buffer service and use the colors associated with each packet for congestion

CISCO EXHIBIT 1008
Page 17 of 33

5,313,454

3

control. In general, green packets are protected and passed along while red packets are discarded upon arrival whenever the chosen metric (usually queue lengths) for congestion threshold is exceeded. Even though discarding of packets implies retransmission of the lost packet data, the system is represented as improving the average utilization of bandwidth capacity.

An example of prior art feedback control is a window control method, described by K. K. Ramakrishnan and Raj Jain in an article entitled *A Binary Feedback Scheme for Congestion Avoidance in Computer Networks*, ACM Transactions on Computer Systems, Vol. 8, pages 158–181, May 1990. The window control method indirectly controls the effective network data rate by having the user adjust the window duration controlling the number of contiguous packets that can be transmitted at a given time.

For ISO Transport network architectures, each network layer packet has a header that is used for "housekeeping" functions, including routing. Within that header, a bit is assigned as a congestion indication bit. The packet source clears the congestion indication bit when a packet is originally transmitted from a source node end system. Each network router is equipped with congestion detection means that monitors the average queue length at the router at the time the packet arrives.

The average queue length is determined by the number of packets that are queued and in service, averaged over an interval. This interval corresponds to the duration of the sum of the last busy plus idle cycle duration plus the busy interval of the current cycle. When certain average queue length threshold conditions are met at any router, the congestion indication bit is set and forwarded with its associated packet. Once set, the congestion bit remains set even though it subsequently passes through routers with queue lengths not exceeding threshold.

At the destination end system (user transport entity) an acknowledgement message is generated if no error is detected and is sent together with the congestion indication bit status associated with the acknowledged packet. The user transport entity updates the window size based on the number of packet congestion bits set during the last transmission window used. If at least 50% of the bits are set, the window size is reduced from its current value. Otherwise, it is increased. In order to avoid instability in this feedback control system, updating of the user's transparent entity window size occurs only after a time period corresponding to the duration of the last two windows. This delay allows enough time to see the effects of the last window change. In order to promote "fairness" of access by all network users and to achieve stable operation, the window size adjustment algorithm provides for increasing window size by linear increments and for decreasing window size by a multiplicative factor.

In summary, Ramakrishnan and Jain describe a system using window control at the ISO Transport layer using window duration control rather than rate control. Rate control is indirectly controlled by the limiting actions of acknowledgements and window length. Because transmission rate is a direct measure of bandwidth, better short term control of this system resource can be obtained by direct rate control.

C. A. Cooper and K. I. Park in an article entitled *Toward a Broadband Congestion Control Strategy*, IEEE Network Magazine, May 1990, p. 18–23, discuss a congestion control system for variable bit rate traffic using

4

an ATM based fixed length cell switching network which may have elements of both open-loop and closed-loop control. The authors describe a system carrying different classes of service in which a cell rate is assigned to variable bit rate data that is less than the available peak cell rate so as to provide capacity for statistical multiplexing of data. A new connection is admitted only if sufficient network resources are available to support that connection. Cells offered to the network in excess of the assigned rate are immediately discarded because, in the opinion of the authors, the tagging of floating cells for possible subsequent discard appears to yield no substantial advantage. Traffic enforcement is applied on the ingress direction of each virtual circuit. A leaky bucket or credit manager algorithm is used to control the rate.

The Cooper article refers to a reactive (feedback) control method that combines cell tagging with explicit congestion notification ("ECN"). When an asynchronous transfer mode ("ATM") switch detects congestion on a given route, it sends an ECN message over the variable rate virtual circuits on that route to the serving ATM switches which may, in turn, relay these ECN messages to the involved customer premises node. The serving ATM switches operate at one of two preset thresholds for rate enforcement on each variable bit rate virtual circuit using ECN. The lower threshold is used during congestion. Additionally, the ECN message may be transported between network nodes possibly using a separate virtual circuit, and possibly using a bit in the ATM cell header.

## SUMMARY AND OBJECTS OF THE INVENTION

One object of the present invention is to optimize the use of available system bandwidth.

Another object of the present invention is the optimization of network resource allocation to bursty traffic when sharing a network digital trunk with the five other traffic classes.

Another object of the present invention is to provide a dynamic bandwidth (or data rate) allocation scheme that allows individual users to use unused network capacity for increasing throughput when necessary to accommodate the peak loads of individual users.

Another object is to provide a method used for allocation that also helps to ensure "fairness" in network resource availability to all users by using linear incremental increases and multiplicative decreases in data rates together with guaranteed minimum rate allocations.

Another object is to provide a cell switching network operating at the International Standards Organization ("ISO") Data Link Layer that direct rate control based on virtual circuit connection congestion.

A further object of the invention is to provide for the fast recovery from congestion.

Another object is to provide congestion relief by tagging cells at the source node when the virtual circuit's guaranteed minimum information rate ("MIR") is exceeded so that if a prescribed cell loss priority ("CLP") of queue depth threshold is exceeded at any intermediate node, tagged cells using that connection may be dropped.

Another object is to provide an adaptive interval between sending rate updates based on the actual measured round trip of the connection.

CISCO EXHIBIT 1008
Page 18 of 33

5,313,454

| 5 | 6 |

Another object is to provide each node with means for measuring virtual connection round trip transmission time for use in adaptive interval control.

Another object is to provide means for generating supervisory cells for transmission of congestion control information from destination node to source node in the absence of normal two-way traffic.

Another object is to provide a quiescent information sending rate ("QIR") greater than the guaranteed minimum information rate ("MIR") and less than the peak information rate ("PIR").

Another object is to provide a no rate change feedback indicator in the feedback cell header sent from destination to source node while waiting for the effects of the previous adjustments to occur or while measuring the effects of previous rate adjustments.

A method and apparatus for congestion prevention control, on a per virtual circuit connection basis, in a cell switching communication network handling bursty traffic is described. The control system comprises a source node, optional intermediate nodes, and a destination node. The source node is capable of accepting, queueing and buffering user bursty data, formatting the bursty data into cells, and transmitting the cells to a destination node by a virtual circuit connection through a cell switching network to a destination node. The rate of transmission is incrementally controlled by the state of congestion on the virtual network as reported by the destination node to the source node using the existing two-way virtual connection. Intermediate nodes accept, queue, buffer and forward the bursty cells toward the destination together with an associated incipient congestion indicator. Incipient congestion is measured by monitoring of the virtual connection queue and buffer lengths. The destination node receives the data cells together with the congestion indicator, reconstructs and formats the data for delivery to the end user, and counts the received congestion indicators over an adaptive interval. A feedback rate control signal is generated from the congestion indicator count.

Other objects, features, and advantages of the present invention will be apparent from the accompanying drawings and detailed description that follows.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example, and not limitation, in the accompanying figures in which like references indicate similar elements and in which:

FIG. 1 is a block diagram of a telecommunication network for voice and data;

FIG. 2 is a cell format diagram;

FIG. 3 is a functional block diagram of a telecommunication node;

FIG. 4 is a data flow diagram;

FIG. 5 illustrates an example of congestion in a cell network;

FIG. 6 illustrates the effects on throughput and delay due to congestion;

FIG. 7 illustrates a cell switching network internal congestion avoidance ("ICA") scheme;

FIG. 8 is a functional block diagram of a frame relay pad ("FRP");

FIG. 9 is a functional block diagram of the transmit portion of a transmitter/receiver ("TXR");

FIG. 10 shows cell loss priority ("CLP") two level thresholding in a TXR;

FIG. 11 shows the architecture of a FRP and a frame relay interface (FRI);

FIG. 12 is a block diagram of the T1 transmitter/-receiver;

FIG. 13 is a diagram of a bursty data queue;

FIGS. 14(a) and 14(b) comprise a flow diagram of a cell traffic servicing routine;

FIG. 15 shows the c-bit count interval timing using the regeneration cycle algorithm;

FIG. 16 is a flow diagram of the data rate control algorithm;

FIG. 17 is a flow diagram of the ICA credit manager function; and

FIG. 18 is a flow diagram for the servicing of the muxbus cell transmit queue by the cell transmitter.

DETAILED DESCRIPTION

FIG. 1 illustrates a fully-integrated voice and data T1 telecommunication network 20 using telecommunication nodes 22, also referred to as integrated cell exchangers 22. The network 20 shown is a domestic network. Those skilled in the art will appreciate that the illustrated network 20 can be modified in known ways to accommodate international traffic by the addition of various interfaces to user equipment and T1-to-E1 interfaces to each node 22.

Each node 22 incorporates a T1 transmitter/receiver that includes the fair queuing and servicing circuitry. The T1 transmitter/receivers support six classes of cell traffic: high priority (HP), voice, low speed statistical (LSS), high speed deterministic (HSD), bursty, and multicast. As will be discussed in detail below, each T1 transmitter/receiver supports the traffic classes via six queues and a service routine. The service routine guarantees a minimum amount of bandwidth to each class of traffic under normal operation and allocates spare bandwidth according to a predefined priority scheme.

Network 20 of FIG. 1 includes nodes 22 in Atlanta, Boston, Chicago, Dallas, and Seattle. Each node 22 is connected to local communication equipment. For example, in Atlanta, a private branch exchange (PBX) telephone system 24, a fax machine 26, a computer 28, video equipment 30, local area networks (LANs) 32, high speed statistical equipment 34, a control terminal 36 and a printer 38 are all connected to the integrated cell exchanger 22. All communication equipment associated with a node 22 is connected through circuit T1 trunks 40.

Each telecommunication node 22 takes existing voice and data streams from its associated communication equipment, assembles the streams into a more efficient cell format, and transmits the cells between nodes via cell T1 lines 42 (shown by broken lines). Similarly, each telecommunication node 22 receives cells from the cell T1 lines 42, disassembles the cells into data streams, and transmits those streams to the appropriate communication equipment via circuit T1 lines 40. Thus, each integrated node 22 can function both as a source and a destination of information.

The term "T1" refers to a telephone line operating at a synchronous data rate of 1.544 million bits per second. T1 lines are digital, and voice signals are digitized prior to their transmission over T1 lines. Under the DS-0 signaling standard, T1 line capacity is segmented prior to individual channels each operating at 64 thousand bits per second to support voice transmission.

Each node 22 increases the apparent capacity of cell T1 lines 42 using virtual connections. In other words,

CISCO EXHIBIT 1008
Page 19 of 33

5,313,454

7

rather than committing specific resources to a given source-destination pair, each node 22 connects a source-destination pair only when information, in the form of a cell, is present. When cells are not being created for a given source-destination pair, the same network resources are used to transmit cells for other source-destination pairs.

Information is transmitted between nodes over the T1 lines 42 in the form of cells. Cells are packets of fixed length and are typically used in systems that switch a number of traffic classes, as opposed to a single traffic class as in packet switching. The short message length of cells as opposed to packets permits cell switching networks to achieve very high rates of network utilization and still maintain short transmission delays. Despite the distinction between cells and packets, the terms are used interchangeably herein.

A general cell format is illustrated in FIG. 2. The cell includes 24 octets, or 8-bit bytes, of information. The first two bytes, octet 0 and octet 1, represent the cell's virtual circuit identifier. The virtual circuit identifier allows the cell to be self-routing through network 22. Octet 2, the third byte, indicates the type of data contained within the cell namely, voice, video, etc. Octet 2 also includes a cyclic redundancy check ("CRC") code, which is used by node 22 to perform an error check on the first four octets of the header. Octet 3, the fourth byte of the cell, may contain a time stamp, congestion control bits, or hopcount depending upon the traffic class. The remaining octets of the cell are generally devoted to information or payload.

Using the traffic type bits in octet 2, nodes 22 support six types of cell traffic. Identification of different traffic classes allows T1 transmitter/receivers to discriminate among classes of cell traffic for queuing and servicing purposes. The classes of cell traffic supported by nodes 22 are high priority traffic, voice traffic, low speed statistical traffic, high-speed deterministic traffic, bursty traffic, and multicast traffic.

High priority cells are indicated by a binary 100 in octet 2. High priority traffic includes inter-node cell exchanger-to-cell exchanger messages. This class of traffic is given the highest servicing priority so that network failures and overloads can be quickly remedied.

Voice traffic is represented by a binary 010 in octet 2. Voice traffic includes pulse coded modulated ("PCM") and adaptive differential pulse coded modulated ("ADPCM") voice signals. Such traffic is relatively intolerant of servicing delays but, given its redundant statistical nature, can withstand some intermittent loss of cells without a noticeable adverse effect.

Low-speed statistical traffic includes cells generated by equipment operating at less than 64 thousand bits per second. Low speed statistical traffic can tolerate some delay between generation and transmission, but cannot tolerate any loss of data from a message. This class of traffic is represented by a binary 111 in octet 2.

Low speed statistical cells carry a timestamp in octet 3. Using timestamps, nodes 22 can determine how long low-speed statistical cells have been in network 20 and transmit the oldest cells first. Timestamps are also used to discard cells exceeding a maximum age, which is software-setable.

High speed statistical cells encompass high-speed, full-period voice or data signals. This class of traffic tolerates very little service delay and is equally intoler-

8

ant of loss of data from a message. A binary 110 in octet 2 indicates a cell of high speed statistical.

The bursty and multicast classes of cell traffic supported by nodes 22 are quite different from the four other traffic types. Bursty and multicast traffic transport high-speed, statistical data from sources such as local area networks (LANs), bridges, routers, brouters and high-speed cell switches. Both types of traffic are characterized by burstiness. As used herein, the term "bursty data" refers to bursty point-to-point traffic between nodes 22. Multicast traffic carries bursty traffic from any one to all other nodes 22 in network 20. Both bursty traffic and multicast traffic are relatively delay insensitive. Thus, during periods of congestion, cells of these traffic classes may be buffered rather than discarded. Bursty traffic is represented in octet 2 by a binary 101 and multicast traffic is represented by a binary 011.

Bursty traffic and multicast traffic also differ from other traffic classes in that the octet 3 of each cell contains a hopcount. Hopcounts serve a purpose similar to timestamps, but are more practical than timestamps at high speeds. A cell's hopcount indicates the number of nodes 22 previously traversed by the cell in its journey between source and destination. The higher a cell's hopcount the greater the cell's service priority as compared to other cells within that class of traffic. In one embodiment, the maximum hopcount is 15; however this number is software selectable and may be modified to suit specific network applications.

A block diagram of a node 22, which includes the T1 transmitter/receiver ("TXR") and frame relay pad ("FRP") of the present invention, is shown in FIG. 3. The circuitry within the node 22 performs two basic functions: traffic segmentation and reassembly. While the node 22 is functioning as a source of messages, segmentation involves receiving incoming bit streams from the communication equipment and assembling it into cell formats. Trunk interface units buffer data in queues and route the cells through the network 20. Similarly, when node 22 functions as a destination for messages, the trunking interface receives cells and routes them to the appropriate circuitry for reassembly. Reassembly is the process of converting cells into data streams or packet frames.

Node 22 includes a processor controller 50, a data assembler/disassembler ("PAD") group 52, a voice data assembler/disassembler ("PAD") group 54, TXR 56, circuit/cell T1 interface 58 and FRP 59. A system-wide system bus 60 which includes two buses, transports data and control information throughout node 22. Part of system bus 60, muxbus is a high speed statistical bus for switching cells. Also part of bus 60, control bus configures, manages, and monitors the components 50, 52, 54, 56, 58, and 59 of node 22.

Processor controller 50 manages the various circuits within node 22, with direction from an operator using a control terminal and a printer. Processor controller 50 manages the routing of cells via network configuration databases. Processor controller 50 distributes control and configuration information via the control bus to the 50, 52, 54, 56, 58, and 59 each of which is coupled to the control bus by an 80C31 controller. Additionally, network processor controllers 50 in Atlanta, Boston, Chicago, etc., cooperate to perform network-wide functions.

Processor controller 50 uses a 16-bit 68000 microprocessor supplied by Motorola Corporation of

CISCO EXHIBIT 1008
Page 20 of 33

5,313,454

9 | 10

Schaumberg, Ill., as its basic processing unit. The 68000 microprocessor contains the software for controlling, diagnosing, and monitoring integrated cell exchanger 22. This software is stored in 2 Megabytes of flash EPROM and 8 Mbytes of DRAM. The preferred embodiment of processor controller 50 also utilizes a bus controller sold by Intel Corporation of Santa Clara, Calif. to manage the control bus.

A portion of the node's 22 segmentation and reassembly function is performed by voice/data processor 62. Voice/data processor 62 assembles and disassembles cells of voice and data samples for cell T1 lines 42 using the DS-0 standard. This includes voice-band data generated by modems and FAX machines. Voice/data processor 62 is bidirectional.

Each voice connection within network 20 requires two voice/data processors 62, one at each end of the connection. Utilizing voice activity detection the source voice/data processor 62 determines when to generate cells. Voice activity detection provides a 2:1 compression of PCM voice. The source voice/data processor 62 extracts voice from a T1 port, packetizes it, and sends the packets to the remote voice/data processor 62. The remote voice/data processor 62 reassembles the voice signal from the cell stream and passes it on to the appropriate external device, for example, PBX 24.

Voice compressor/decompressor 64 receives voice samples from the voice/data processor 62. The voice samples are converted from PCM to compressed adaptive differential pulse code modulation (ADPCM) when the node 22 is acting as a source. Voice compressor/decompressor 64 converts ADPCM back to PCM when node 22 acts as a destination.

Synchronous data interface 66, synchronous data cell assembler/disassembler 68, and low-speed data cell assembler/disassembler 70 perform another portion of the segmentation and reassembly function within node 22. Both cell assembler/disassemblers 68 and 70, commonly referred to as packet assemblers/dissemblers ("PADs") buffer, assemble and format data cells. The cells are transmitted to and received from system bus. Synchronous data PAD 68 provides four different physical interfaces: RS232C/D (V.24), V.35, RS422/449, and X.21/V.11. Low speed data PAD 70 supports low speed data applications. Both low speed data PAD 70 and synchronous data PAD 68 can be configured for transparent, bit-for-bit transmission or for data compression using repetitive pattern suppression.

Frame relay PAD (FRP) 59 performs segmentation and reassembly of high-speed bursty data and multicast data. Frame relay PAD 59 is typically connected to LAN devices, such as routers and bridges. In the present invention, FRP 59 provides network cell rate control functions in cooperation with TXR 56.

Queuing and transmission functions for node 22 are provided by T1 TXR 56 and circuit/cell interface 58 of FIG. 3. TXR 56 contains routing tables for the cells to be transmitted on cell T1 lines 40 and buffers, or queues, for those cells. Each of the six traffic types supported by node 22 is queued separately, as will be discussed in detail below. TXR 56 performs the T1 line framing and signal control, cell servicing, and alarm detection and generation. Circuit/cell interface 58 provides interface support for bidirectional T1 lines 40 and 42. The conversion of bipolar signals from cell T1 lines 42 into logic-levels for use internal to node 22 is also performed by circuit/cell interface 58.

Data is transmitted across T1 network 20 over a virtual circuit between a pair of data PADs, 68, 70, or 59. The flow of data into and out of node 22 is illustrated in FIG. 4. A data stream from local communication equipment is received either by synchronous data PAD 68, low speed data PAD 70, or frame relay PAD 59. The source data PAD 68, 70, or 59 builds data cells at a rate proportional to the baud rate of the data. The PAD 68, 70, or 59 passes the cells to system bus 60 for delivery to TXR 56. Transmitter/receiver 56 places the cells in the appropriate queue according to traffic type where the cells await delivery to cell/circuit interface 58. The cells are transmitted onto cell T1 lines 42 by cell/circuit interface 58. Cell traffic coming into node 22 follows the reverse path.

FIG. 5 is an example of a four node network 20 for use in explaining the onset of congestion interval to network 20. Assume that a bursty data working connection between user A at node 22-A and user C1 at 22-C via node 22-B involving FRP 59A1, TXR 56A1, TXR 56B1, TXR 56B2, TXR 56C1, and FRP 59C1. Further, assume that user D subsequently establishes a working bursty data connection through node B to user C2 at node 22-C involving FRP 59D1, TXR 56D1, TXR 56B3, TXR 56B2, TXR 56C1, and FRP 59C2. If either user A or D should increase their transmission rate because of an excess available input load, node 22-B could become congested at the common TXR 56B2 (shown shaded) if the combined bursty data rate exceeds the available capacity on trunk 42 connecting nodes 22-B and 22-C. Similarly, congestion could occur in the reverse direction at TXR 56B3 of node 22-B interfacing with cell trunk 42 connecting nodes 22-B and 22-D if the combined bursty traffic between user C2 and node 22-D plus that between, say, user B and node D exceeded the available bandwidth between nodes 22-B and 22-D.

FIG. 6 shows the effects of congestion on effective network bandwidth and delay as a function of the offered load bandwidth. At low average load rates (Region I), throughput increases linearly with load, while delay shows a moderate rate of increase with load. When throughput approaches the network's information rate capacity, mild congestion results (Region II) as average queue lengths increase. Throughput saturates, increasing only slightly with increased offered load, while delay exhibits sharp increases. Finally, if the offered load increases some more, threshold is exceeded when Region III is reached, causing a breakdown in throughput (severe congestion) and hence unlimited delay because of data losses requiring constant retransmission.

In order to efficiently use the bandwidth resource of a cell switching network, it is desirable that peak offered loads be accommodated by adequate buffering, particularly for bursty data which is more tolerant of network delay. Bursty data tends to be high-bandwidth short-duration messages that, if uncontrolled, may either cause congestion or require that the network operate with a high percentage of average unused bandwidth. Ideally, the average offered load would operate at point A of FIG. 6, where peak loads would not be likely to cause severe congestion.

The method and apparatus for congestion prevention control described below is applied to cell switching networks of the type described. These cell networks are

CISCO EXHIBIT 1008
Page 21 of 33

5,313,454

**11**

designed to interface with user data ports operating at the CCITT asynchronous transfer mode ("ATM") adaptation layer of ISDN networks. The cell network accepts frame relay data at its input nodes and produces frame relay data at its output nodes. The entire operation of the cell switching network is intended to be completely transparent to the frame relay user. For this reason, the congestion control system is hereafter referred to as an internal congestion avoidance ("ICA") method and apparatus, wherein "internal" means internal to the cell switching network.

FIG. 7 is an abstract representation of an internal congestion avoidance feedback control system. The purpose of the ICA feedback control system is to anticipate the onset of congestion in the bursty data queues of the network nodes and correct the cause of the incipient congestion in a timely fashion. Corrective action is taken, on a per channel basis, by controlling the rate at which each bursty source node contributing to the congestion, accepts incoming user data.

In FIG. 7, assume that node 22-A is the source node, node 22-B is an intermediate node and node 22-C is the destination node. FRP 59 of node 22-A accepts user data from one of the input virtual data ports. It is assumed that the input data contains bursty framed data. FRP 59 disassembles the data frames into cells and regulates the rate at which they are delivered to TXR 56 for transmission over virtual connection 182 to intermediate node 22-B. Other TXR 56 units (not shown) at node 22-B may each receive bursty data cells, each 30 receiving TXR 56 directing the bursty data cells over the system bus 60 to the appropriate bursty data queue in a TXR 56 for transmission over one or more common trunks.

Each of the output TXR 56 units of nodes 22-A and 22-B performs traffic control and an ICA detection function by monitoring the length of its bursty data queue. If the queue length exceeds a prescribed threshold length, a congestion indicator bit (c-bit) is set in the header (octet 3, bit 5) of all bursty data cells transmitted from node B to node C while threshold is exceeded. This same TXR 56 unit also performs a traffic control function including the discarding of cells when congestion conditions require.

At the input to node 22-C a TXR 56 performs the receive functions previously described and directs the cell traffic to the appropriate queue of an output FRP 59 unit via system bus 60 where the cells are assembled into frames for delivery to the user C virtual port 40. In addition, FRP 59 examines the headers of each bursty data virtual circuit and generates an estimate of the congestion status by comparing the average c-bit rate with a threshold reference value. If threshold is exceeded, indicating incipient congestion, an ICA rate control message is fed back to the source FRP 59 unit in source node 22-A, where user A's input rate is decreased so as to relieve the congestion present on its virtual circuit.

The FRP 59 unit of the source node 22-A also provides an additional traffic control feature by marking burst data cells that are delivered by user A at an excess rate. A cell loss priority ("CLP") indicator bit is set in the cell header (octet 3, bit 4) and, like the c-bit, once set remains set throughout its journey to the destination FRP 59. This CLP bit is used by the intermediate transmit TXR 56 of node 22-B for prioritizing cells for discard when required by congestion conditions. Cells marked by asserted CLP bits are discarded first. Of

**12**

course, the discard of any one cell in a given data frame requires the retransmission of the entire frame of data. A two threshold algorithm is used in order to discard cells that, with high probability, belong to the same frame.

Although this overview of the ICA control system was explained in the context of a data transmission virtual link between source and destination, it should be noted that the virtual connections are usually two-way connections sharing common resources. Hence, for one embodiment both source and destination nodes have symmetrically interchangeable roles. As will be seen in the following discussion, each FRP 59 and TXR 56 has a distinct receiver function coupling node input data to system bus 60 and a distinct transmit function coupling data from system bus 60 to the node output.

The ICA rate control feedback path 180 is the return path of the existing virtual connection. Intermediate node B is not necessary for implementing a virtual connection or for operation of the ICA system. Instead, the intermediate node B should be interpreted representing a possible multiplicity of concatenated intermediate nodes performing similar functions.

FIG. 8 is a more detailed functional description of an FRP 59 unit. Input user data arriving on user input 40 is accepted by traffic monitor 801 that compares data with the guaranteed minimum information rate ("MIR"), the committed burst duration (Bc) and the quiescent information rate ("QIR") time-out parameter, $T_Q$. If MIR, for a given connection, is exceeded, a CLP bit is set in each cell of each frame exceeding the MIR. Frames are sorted into distinct virtual connection ("VC") queues 803, one per connection. Segmenter 805 operates on the data in VC queues 803, in an order prescribed by the serving protocol, and segments the VC frames into VC cells, which are sent to system bus 60 of node 22 by cell transmitter 807. Additionally, segmenter 805 sets a bit in the final cell of a frame if that frame was received with its DE bit set (indicating excess frame rate at the frame relay layer). The rate of transmitting cells for each virtual connection by cell transmitter 807 is controlled by credit manager 809 operating cooperatively with rate controller 811 to provide incrementally variable transmission rates. $C_{max}$ is a configurable parameter for credit manager 809 that specifies the maximum number of cell transmission credits that may be accumulated by a given virtual connection, when the virtual connection is idle.

Rate controller 811 initially sets each VC cell rate to a value equal to the configuration parameter QIR, representing the quiescent information rate. QIR is bounded on the lower side by the guaranteed minimum information rate (MIR) and on the upper by the peak information rate parameter ("PIR"). The rate setting is subsequently dynamically adjusted by rate commands received from the VC destination FRP 59 via cell receiver 815. For one preferred embodiment, a two-bit coded message embedded in the cell header (octet 3, bits 2 and 3) of return traffic is used to encode a four-state rate message: increase, decrease, large decrease, and no-change. In response to the rate control message, controller 811 increases the rate by linear additive increments (typically 1/10 of MIR) and incrementally decreases the rate by a multiplicative factor of $\frac{3}{4}$ or $\frac{1}{2}$, the latter being used when cell loss in conjunction with congestion is detected by the destination FRP 59. Controller 811 also monitors the VC queue depth to see if sufficient data is present to warrant a data rate increase.

CISCO EXHIBIT 1008
Page 22 of 33

5,313,454

**13**

No increase is made if sufficient data is not present. Traffic monitor 801 also provides controller 811 with a reset signal that causes the rate to be reset to QIR when no data has been presented to traffic monitor 801 for a period equal to configuration parameter, $T_Q$.

Credit manager 809 performs the function of controlling the intervals at which each virtual connection is permitted by cell transmitter 807 to transmit a cell to system bus 60.

The receive portion of FRP 59 comprises cell receiver 815, reassembler 817, DE filter 821, port transmit queues 819 and traffic analyzer 813. Receiver 815 interfaces with the local system bus 60 from which it receives its virtual circuit data from the connection's other terminal node. The congestion indicators (c-bits) 15 and loss data information is provided to traffic analyzer 813. Cell data is passed on to reassembler 817 that reconstructs frames from cells and sets the DE bit if the last cell of the frame indicates that the DE bit was set in the frame header when received from the sending user. 20 DE filter 821 monitors the port transmit queue depths and compares them against a threshold, DEth, typically set at approximately 75% of total queue depth. If threshold is exceeded, frames with the DE bit asserted are discarded. 25

Traffic analyzer 813 analyzes the average c-bit rate over the measured round trip delay ("RTD") provided by PCC 50 of the local node 22 of FIG. 3. If the average count of c-bits exceeds a prescribed threshold, TAth, (typically $\frac{1}{8}$ of total possible count), a moderate rate 30 decrease message is generated and supplied to cell transmitter 807 where it is embedded in a cell header and transmitted to the other terminal FRP 59. If cell loss is also present, a large rate decrease message is sent. If threshold is not exceeded a rate increase message is 35 generated. A no-change rate message is sent with all outgoing cells for an interval of two times RTD, so that the effects of the previous rate change message may be observed before introducing additional changes. This delay in adjustments is necessary for stable congestion 40 control.

Traffic analyzer 813 also monitors port transmit queues 819. If the output port transmit queue used by a particular VC shows incipient congestion, any rate increase message generated by traffic analyzer 813, 45 based on the VC average c-bit count not exceeding the TAth threshold, is changed to a rate decrease message even though the c-bit count threshold, TAth, is not exceeded. In one embodiment, output port incipient congestion is determined by comparing the average 50 queue depth of port transmit queues 819 against a configurable threshold, PQth. The PQth threshold is normally set at four kilobytes, a fraction of the 64 kilobyte queue capacity. Average queue depth is calculated by traffic analyzer 813 using a regeneration cycle averag- 55 ing period.

A regeneration cycle is defined as a busy plus idle interval of burst data. This average may be used for the entire duration of the next cycle. Alternatively, when the regeneration cycle is very long, the averaging may 60 include the previous regeneration cycle count as well as the current count, averaged over the previous regeneration cycle time plus the current portion of the subsequent regeneration period.

In addition, test generator 861, echo unit 863 and 65 RTD measure unit 865 comprise the means for measuring the RTD of a virtual connection. Periodically, PCC 50 of local node 22 initiates an RTD measurement test

**14**

by instructing test generator 861, via system bus 60, to generate a high priority RTD cell for transmission by cell transmitter 807. When the RTD cell is received at the other terminal node by its FRP 59 cell receiver 815, it is directed to RTD echo unit 863 and retransmitted as a high priority RTD cell via its associated cell transmitter 807. Upon receipt of this echoed RTD cell, the initiating node 22 cell receiver directs the cell to RTD measure unit 865 that measures the elapsed time between the time of original RTD cell transmission and the receipt of its echo. RTD measure unit 865 provides this data to PCC 50 via system bus 60 which in turn supplies this information as an RTD configuration parameter to traffic analyzer 813.

FIG. 9 shows a more detailed functional block diagram of the transmit portion of TXR 56. This part of TXR 56 provides the traffic control and congestion detection in the preferred embodiment. On one side, TXR 56 interfaces with system bus 60 of its local node 22 from which it receives cells destined to be transmitted over a common trunk 42.

Bursty cells arriving at the input of TXR 56 are sorted into queues 135 according to traffic class. Bursty data cells are queued in BD queue 855 where the average depth is monitored for indications of incipient congestion by congestion detector 857 by comparing the average queue depth with configurable threshold parameter, ECNth. If threshold is exceeded, the next bursty cell processed by cell server 853 will have a c-bit set in its header.

Threshold ECNth is selected so as to introduce a tolerable amount of delay due to queue length while minimizing the amount of cells discarded. A value of 30 cells has been found acceptable.

The average BD queue 855 queue depth is also based on a regeneration cycle averaging period. Also, the BD queue 855 depth is used to control the discard of cells by CLP filter 851 which discards arriving bursty cells with the CLP bit set if threshold CLPth1 is exceeded. Discarding of CLP labelled cells continues as long as a second threshold, CLPth2, is exceeded (CLPth2≧CLPth1). In this manner, hysterisis is provided in the control mechanism so that it tends to discard the following cells belonging to the same frame, as shown in FIG. 10. This strategy recognizes that once a cell belonging to a given frame is discarded, the integrity of the entire frame is violated, requiring retransmission of the entire frame. Also, this control method has the added advantage of more probably relieving the congestion, rather than oscillating about a single threshold value. Thresholds CLPth1 and CLPth2 are configurable parameters supplied by PCC 50 of FIG. 3 and typically set a approximately 75% and 25% of queue capacity, respectively.

In order to facilitate the explanation and understanding of the various embodiments, the following is a more detailed description of the FRP 59 and TXR 56 architecture and hardware wherein the invention is implemented.

FIG. 11 shows the architecture of a FRP 59 and of a frame relay interface (FRI) unit 300 used to interface FRP 59 to four V.35 data ports, in one preferred embodiment.

DMA controller 301 of FRI 300 is a dedicated Motorola Corporation 56001 digital signal processor ("DSP") that interfaces between global frame RAM 230 and two-way serial communication controller ("SCC") 303. Four V.35 ports are provided, each capa-

CISCO EXHIBIT 1008
Page 23 of 33

5,313,454

**15**                                                                  **16**

ble of operating full duplex at bit rates up to 2.048
Mbits/sec. DMA 301 receives frames from the ports via
SCC 303 and stores them in frame buffers 237 of global
frame RAM 230. Also, DMA 301 transmits frames from
frame buffers 237 to the data ports through SCC 303. In
addition to data transfer, DMA 301 handles start and
end of frame interrupts, extracts the cyclical redun-
dancy check ("CRC") indicator from SCC 303 and
appends it to the frame, and interfaces with frame trans-
mit controller 202 and frame receive controller 201 in
ACP 200 through queues in global frame RAM 230.
Once the data ports are configured and enabled, DMA
301 takes pointers to frame buffers 237 from port free
buffer queue 234 for use in storing incoming frame data.
Because all ports may operate simultaneously, DMA
301 maintains a separate control block for each port.
When a start or end of frame interrupt occurs during
frame reception, DMA 301 notifies frame receive con-
troller 201 through port frame receive queue 231. For
frame transmission, DMA 301 polls frame transmit
queues 232 (one per port). Separate control blocks are
maintained for each port. An entire chained frame may
be transmitted or received without ACP 200 interven-
tion for each frame buffer. DMA 301 maintains the
following information for each transmitted or received
frame: pointer to the start of frame in global frame
RAM 230, pointer to the current work location in RAM
230, and current length of the frame.

FRP 59 comprises four major units: administration/-
communication processor (ACP) 200, multiported
global frame RAM 230, cell receiver 210, and cell trans-
mitter 220. Four processors are included on the FRP 59
board: an Intel Corporation 8751 microcomputer acting
as a control bus kernel, interfacing FRP 59 to the con-
trol bus of system bus 60; a Motorola Corporation 68020
microprocessor that serves an administrative and main
communication control (ACP 200) functions; two Mo-
torola Corporation 56001 digital signal processors, one
dedicated to cell transmitter 220 and the other to cell
receiver 210. FIG. 5 shows two paths between the
68020 microprocessor of ACP 200 and the 56001 micro-
processors in receiver 210, transmitter 220, and DMA
301. The solid lines represent the typical flow of data
and control information between the microprocessors
and global frame RAM 230. Normal frame relay com-
munications is done through these data paths. The
dashed lines represent a secondary control path be-
tween ACP 200 and the host port of each 56001 micro-
processor for handling administrative functions such as
diagnostics and statistics collection.

Control bus command server 203 of ACP 200 re-
sponds to commands received from processor control-
ler 50 (FIG. 3) over the control bus 95 portion of system
bus 60, sending responses to event server 204 for for-
warding to processor controller 50 via a FIFO queue to
the control bus kernel microcomputer, or for forward-
ing commands to the communication units, i.e., frame
receive controller 201 and frame transmit controller
202. Controllers 201 and 202 perform real-time control
functions. Cell transmitter 220 maps frames received
from FRI 300 data ports to cell network connections,
applies the ICA control scheme, fragments frames into
cells, and transmits cells on muxbus 96 toward the desti-
nation node. Cell receiver 210 coordinates receipt of
frame fragments (cells) from muxbus 96, reassembles
cells into frames. Frame transmit controller 202 trans-
mits those frames to the proper user port, linking cell
receiver 210 to DMA 301 through RAM 230, where

reassembly takes place. Transmit controller 202 main-
tains muxbus free buffer queue 233 for the use of re-
ceiver 210 to determine the next buffer to use to store
reassembled frame data. LMI 205 is an optional local
management interface for verifying the integrity of the
V.35 physical link and for providing status from the cell
network to the user device. These ACP functions (re-
ceive controller 201, transmit controller 202, command
server 203, event server 204 and LMI 205) are tasks
executed under the operating system running on the
68020 microprocessor.

Cell receiver 210 and transmitter 220 operate as dedi-
cated controllers. Communications between them and
communication controller tasks 201, 202 and DMA 301
is primarily through queues in global frame RAM 230.
Using these queues simplifies the timing requirements
on the communication control tasks, allowing them to
operate less frequently on larger groups of requests.

Queue 236 points to the location of the cell data in
frame buffers 237 of RAM 230 together with the num-
ber of octets to send, the virtual circuit identifier for the
cell, the initial timestamp value to be placed in the cell
header, and an indication of whether the cell is a start-,
middle-, or end-of-frame fragment. The cell is sent to
muxbus 96 via the muxbus transmit FIFO of cell trans-
mitter 220.

Cell transmitter 220 controls the rate of transmission
of cells onto muxbus 96 by means of a credit manager
(similar to that described for servicing cell traffic by
TXR 56). After the start of frame indication, queueing
of cells for transmission on muxbus 96 does not occur
until one of the following occurs:

(1) the end-of-frame indication is received in frame
receive queue 231, so that the exact length of frame is
known, or

(2) the data received since the start-of-frame indica-
tion is sufficient for a full cell's payload data to have
been received.

Cell transmit queue 236 is polled successively to see if
one of these two conditions (ensuring sufficient data to
transmit a cell) prevail. If so, the control is subjected to
the ICA credit-manager control scheme to be described
later.

FIG. 12 illustrates T1 transmitter/receiver 56 that
implements the circuitry and method for queuing and
servicing cell traffic. T1 TXR 56 is divided into two
sections, a transmitter 72 and a receiver 70.

Receive state control 74 coordinates the operation of
T1 receiver 70. Incoming data from another node 22 is
received as a T1 bit stream 80 and an extracted clock 82
sent by circuit/cell interface 58. T1 deframer 84 strips
the T1 framing pattern from the incoming bit stream
and sends the received octets of the cell through de-
scrambler 86 and CRC checker 88. If the CRC for the
cell is in error the cell is destroyed. If the CRC is cor-
rect, the cell is placed into receive packet FIFO 90.

When muxbus output control 92 is notified by mux-
bus address and control signals 94 that it may dispatch
a cell onto muxbus 96, the first cell stored in receive
packet FIFO 90 is driven onto muxbus data bus 98
through output register 100. If there are no cells in
receive packet FIFO 90, a cell consisting of "all ones"
is written to muxbus data bus 98.

The operation of the T1 transmitter 72 is coordinated
by queue manager 76. Queue manager 76 includes a
high-speed microprocessor 110, RAM 112 and program
ROM 114. The fair queueing and service routines are
implemented in software, which runs on microproces-

CISCO EXHIBIT 1008
Page 24 of 33

5,313,454

17

sor **110**. The fair queuing and servicing routines will be described below, following a general description of the structure and operation of transmitter **72**.

The arrival of a cell via muxbus **96** to transmitter **72** is accompanied by a combination of asserted address and control signals **116** to input state control **118**. Coincident with these control signals **116**, the first two octets of the cell, comprising a virtual circuit identifier, are received into the pipeline registers **120** from muxbus data bus **96**.

If the cell is to be queued, then input state control **118** performs a series of functions. First, a new packet start address is fetched from packet start address FIFO **124** which is passed together with the output of counter **126**, through mux **128**. This forms the address for queue memory **135**. As each successive octet of the cell exits pipeline registers **120** onto queue memory bus **140**, each byte is written into a location in queue memory **135** pointed to by the packet start address and indexed by counter **126**, which increments with each octet.

Simultaneously, a packet information block is created for the cell. Octet **2** and **3** of the packet and the current time, which is used as a queue input time, are written into packet information FIFO **152**. This is done through mux **154**, and forms the packet information block. Thus, queue manager **76** is notified that a cell has just been queued, where that cell is stored, the traffic type, its timestamp value or hopcount, if applicable, and when the cell arrived.

Current time counter **158** is incremented by the 125 microsecond clock **160** from muxbus **96**. Current time counter **158** may be interrogated by queue manager **76**.

When queue manager **76** decides to dispatch a cell, it writes the packet start address and updated hopcount, if applicable, to output state control **144**. Output state control **144** fetches each byte of the cell to be dispatched from queue memory **130** by applying the appropriate addresses to queue memory **135** through mux **128**. Each octet of the cell is moved via queue memory bus **140** through MUX **146** to CRC generator **142**. Queue memory **135** is time-shared between input state control **118** and output state control **144**.

In the case of timestamped data cells, an updated timestamp, previously written to output state control **144** by queue manager **76**, will replace the fourth octet of the cell. This is achieved by activating mux **146**. CRC generator **142** calculates and then writes a CRC-5 code into the lower bit field of the traffic type/CRC octet. The CRC covers the first four octets of the cell.

Similarly, in the case of cells bearing hopcounts, the cell hopcount will be updated prior to dispatch by queue manager **76**. Again, the cell CRC will be recalculated by CRC generator **142**.

The octets are then sent through scrambler **148** to T1 framer **150**, which inserts cells into T1 frames.

Given this general description of the operation of transmitter **72**, it will be appreciated that the difference in treatment between the various classes of cell traffic is determined by queue manager **76**. Queue manager **76** performs two major functions: queueing cells and servicing cells. During queueing and servicing, queue manager **76** treats the various classes of cell traffic differently.

During queueing, queue manager **76** fetches packet information blocks from packet information FIFO **152**. Packet information blocks contain a representation of the cells that have been stored in queue memory **130**.

18

The traffic type field of the packet information block is interrogated to determine into which queue the packet information block should be appended. There are six traffic queues: high priority, voice, low/speed statistical, high speed deterministic, bursty, and multicast.

The queues are linked lists of packet information blocks. FIG. **13** illustrates the queue structure of the bursty and multicast traffic queues, which utilize hopcounts.

The bursty traffic and multicast traffic queues are nearly identical. Thus, while the description that follows refers to the bursty traffic queue, it will be understood that the following description applies equally to the multicast traffic queue. Queuing of bursty traffic differs from the other queuing schemes. The difference arises, in part, because these traffic queues include a number of subqueues as shown, for example, in FIG. **7** and numbered **1** through **15**. Each of the subqueues is a FIFO queue including a set of linked-lists. As each cell of bursty traffic is received it is placed into one of the subqueues according to the hopcount stored in octet **3** of the cell. Thus, a cell of bursty traffic with a hopcount of **13** will be placed at the end of subqueue **13** of the bursty data queue. Cells of bursty traffic having hopcounts greater than **15** are simply discarded, as they have used more network resource (delay) and are permitted. The maximum hopcount is **3** for the bursty queue for one embodiment due to limited coding bits in octet **3** of the cell header. This maximum could, however, be increased to allow cells of bursty data traffic to use more network resource by increasing the hop-count coding capacity. Because of this coding bit limitation, cells are not discarded when the count exceeds **3** but continue to carry a maximum hop-count of **3**.

Cells within the bursty traffic queue are serviced according to subqueue priority order, with subqueue **15** having the highest priority and subqueue **1** having the lowest priority. For the bursty traffic queue a subqueue pointer indicates the highest ranked non-empty subqueue. The indicated subqueue will be serviced first whenever bursty data traffic is serviced. The subqueue pointer is updated whenever cells are placed into the bursty data queue or the queue is serviced.

Servicing the bursty traffic queue includes taking the cell designated by the subqueue pointer and updating both the linked lists and queue depths. Additionally, during the servicing of the bursty data queue the hop-count of the serviced cell is incremented by 1. If the serviced cell was the last cell in the subqueue, the subqueue pointer is updated to indicate the highest priority non-empty subqueue.

The result of the priority scheme used in the bursty traffic queue is that priority is given to cells which have used more network resource (delay). Possible undesirable effects of this priority scheme are freezing of lower priority subqueues during periods of congestion and lengthy queuing delays. These effects are avoided by an aging mechanism. The aging mechanism allows overraged cells to be discarded, while cells that have spent too long in one subqueue are moved to the next subqueue with a higher priority. A cell's queuing priority is effectively increased by moving to another subqueue, but the hopcount is unaffected.

Table 1 is an example that details the mapping of service order, j, and spare bandwidth priorities, k, for each class of traffic, i, in the preferred embodiment. Note that the service priority is according to assigned minimum bandwidth.

CISCO EXHIBIT 1008
Page 25 of 33

5,313,454

**19**

TABLE 1

| Traffic Name | Class Number i | Service Order*, j | Spare Bandwidth Priority, k |
|---|---|---|---|
| High Priority | 0 | First | X |
| High Speed Deterministic | 1 | • | 1 |
| Low Speed Statistical | 2 | • | 2 |
| Voice | 3 | • | (3)•• |
| Bursty | 4 | • | (4)•• |
| Multicast | 5 | • | (5)•• |

*Service order determined by minimum configured bandwidth.
••Spare bandwidth priority for classes i = 3, 4, and 5 are equal.

The servicing routine uses a credit accrual scheme to ensure that each class of traffic receives a selectable minimum bandwidth. In selecting minimum bandwidths for each class of traffic, let N denote the total available bandwidth on a cell T1 trunk and let T denote the cell server tick interval. The unit of N is not relevant; it can be specified as a number of cells per second, or any other throughput unit. For a non-fractional T1 trunk N=8000 cells per second. Similarly T can be given in any convenient unit of time. For one embodiment of the node, the tick interval T equals 125 microseconds. Thus, the product N*T represents the capacity of the cell trunk per tick interval, or the quantum of bandwidth.

Each class of traffic is assigned a minimum amount of the quantum of bandwidth, with the exception of high priority traffic. This is because all high priority traffic will be serviced regardless of the required bandwidth. The sum of the minimum class bandwidths must be less than N to allow some bandwidth for high priority traffic. In other words, if i represents the class number, and $N_i$ represents the minimum bandwidth assigned to the $i^{th}$ traffic class, then $N_1+N_2+N_3+N_4+N_5<N$.

Each minimum bandwidth $N_i$ can be transformed into a timer value, $D_i$, representative of the number of tick intervals T that must elapse for traffic class i to acquire its quantum of bandwidth. The timer value $D_i$=(1-/$N_i$)/T. Note that $D_i$ may not be an integer value because it represents a ratio of bandwidths, i.e., $D_i$=N/$N_i$ because N*T=1.

Given selected timer values $D_i$ for i=1, 2, 3, 4, 5, a credit accrual routine runs simultaneously with the service routine. Each class of traffic i is assigned a timer $T_i$, which is initialized to the associated timer value, $D_i$. The timer $T_i$ is decremented every T units of time. When the value of timer $T_i$ is less than or equal to zero a transmission credit $C_i$ accrues for traffic class i. Because of the inverse relationship between $N_i$ and $D_i$, the greater the allocated minimum bandwidth for a class of traffic, the faster the rate at which it acquires transmission credit. The presence of a transmission credit permits a cell from traffic class i to be serviced. After servicing of class i, timer $T_i$ is updated by adding $D_i$ to the previous value of $T_i$. Using this method of accrual, each class of traffic i accrues $N_i$ credit in a tick interval of T.

The maximum number of credits, $Cmax_i$, that may be accrued for each class of traffic i is selectable. For one embodiment, the maximum credit that may accrue to any traffic class is 1.

FIG. 14(a) is a flow diagram of the service routine for a single tick interval implemented by queue manager 76. Using a credit based strategy for servicing cell traffic, queue manager 76 guarantees each class of traffic a minimum bandwidth.

**20**

At the beginning of the tick interval queue manager 76 initializes the servicing routine at step 400, and at step 402 examines flag $Q_0$ for high priority traffic. If $Q_0$=1, then a cell of high priority traffic is queued at step 404, and queue manager 76 will service a cell of high priority traffic. Thus, it will be understood that no credit is necessary for high priority traffic to be serviced. The only requirement for servicing of high priority traffic is the presence of a cell in the high priority queue.

If, on the other hand, $Q_0$=0 because no cells are present in the high priority queue, then queue manager 76 begins examining the availability of cells and credit for each class. This examination occurs in order of traffic class service priority indicated by index j. Thus, it will be understood that the next step (406) is setting the service order, j=1, by incrementing index j.

In state 408, the queue manager 76 finds class i associated with service order j. For the $i^{th}$ class, found in step 408 queue manager 76 examines the associated boolean flag $Q_i$ in step 410 and the associated credit $C_i$ in step 412. A cell of traffic for class i will be serviced if credit has accrued to that class of traffic and a cell of that class is present in the associated queue. In other words, a cell of traffic from class i will be serviced in step 414 only if Qi=1 and Ci=1.

If $Q_i$ or $C_i$=0, no credit is available for class i or no cell is queued for class i, then spare bandwidth results. Consequently, index B, which indicates the number of spare bandwidth credits available is incremented in step 416.

Step 418 checks to see if the priority order index, j, has been exhausted, and if not, returns to step 406 where index j is incremented. If all values of j have been exhausted, step 420 checks to see if B>0, indicating that spare bandwidth is available for distribution in accordance with protocol 800 referenced in step 422. Otherwise, the process terminates.

FIG. 14(b) is a flow diagram for the spare bandwidth allocation process 800 which is initiated by setting the spare bandwidth priority index so that k=1. In step 802, the traffic class index, i, is set equal to the value of k. Step 804 checks boolean flag $Q_i$ to see if data is present, and if so, proceeds to step 806 where the credit, $C_i$, is checked. If $C_i$=1, then the $i^{th}$ class is serviced in step 808 and the excess bandwidth index B is decremented in step 810. Step 812 checks if any excess bandwidth remains and, if not, the process ends. If excess bandwidth is not exhausted, or if $Q_i$=0 or $C_i$=0, the process moves to step 814 where index k is incremented. Step 816 checks the value of index k: if k is less than 3, the process returns to step 802; if 3≦k≦6, then the process proceeds to step 818; and if k=6, the process moves to step 822.

If 3≦k<6, then one of three possible and equal priority queues may be serviced. In order to ensure fair and equal distribution of excess bandwidth to voice (i=3), bursty (i=4), or multicast (i=5) data, steps 818 and 820 service these three round-robin by incrementing index n (mod 3) in step 818 and setting i=3+n in step 820. The process then proceeds back to step 804. When the process ends because all excess bandwidth has been allocated, index n remains set at its last value. The next time that excess bandwidth obtains after class i=1 and i=2 have been serviced, index n picks up the next round-robin value in step 818.

If the test in step 816 indicates that k=6, all five classes have been serviced. Step 822 tests to see if excess

CISCO EXHIBIT 1008
Page 26 of 33

5,313,454

**21**

bandwidth still exists and if so, repeats the sequence by initializing the priority index so that k=1 and then proceeds to step **802**. Otherwise, the process ends.

The order of allocating spare bandwidth described causes the impact of heavy high priority traffic to be born primarily by bursty data, multicast data and voice data. Correspondingly, low-speed statistical data and high speed statistical are less affected by periods of heavy high priority data.

The described method of allocating spare bandwidth between various traffic classes by TXR **56** is an open-loop control system because the data rate is controlled by the sending node without any feedback from the cell switching network. This procedure leads to a conservative allocation of network resources because each terminal network node acts independently and without specific knowledge of the traffic state of the network. In order to achieve higher bandwidth utilization by bursty traffic, without undo congestion on a given virtual connection, it is necessary to provided the ICA feedback information about the level of bursty traffic being handled by all FRPs involved with a given virtual connection.

ICA is configurable on a per connection basis. The configurable MIR and PIR guarantee that each connection gets at least its minimum allocated bandwidth, independent of other traffic.

System software resident in each process controller **50**, implements the user interface and ICA node functions, and further comprises the following functions:

(1) enables/disables the ICA feature on a per node basis;

(2) configures connections using the following parameters:

MIR: minimum information rate expressed in Kbps which is translated into cells per second for internal node use;

PIR: peak information rate expressed in Kbps (internal cells per second);

QIR: quiescent information rate corresponding to the initial rate after a period of ICA inactivity, expressed in Kbps (MIR≦QIR≦PIR);

$T_Q$: quiescent information rate (QIR) time-out parameter;

VCqd: virtual connection maximum queue depth in bytes;

Bc; committed burst in bytes (ICA only);

Be: excess burst in bytes (ICA only);

Cmax: maximum credit count, expressed in cell units and used to ensure fairness of access by guarding against an unreasonable credit count, typically set at Cmax=10 corresponding to two typical frames of five cell each;

ECNth: virtual connection (VC) queue threshold in bytes for explicit congestion notification (ECN);

CLPth1,2: cell loss priority thresholds in bytes (CLPth1≧CLPth2) to control loss of newly arriving cells with CLP bit set at **1**(indicating input rates in excess of MIR) are configurable for each TXR;

TAth: traffic analyzer average c-bit count threshold; and

PQth: output port transmit queue threshold.

(All of the above are not independent—(CIR, Bc, Be) or, (CIR, VCqd, PIR) or, (CIR, Bc, PIC), or (CIR, VCqd, Be) may be used interchangeable as optional parameter sets.)

(3) periodically requests a route's RTD measurement from the destination FRP and makes the necessary reconfigurations to perform the measurement;

**22**

(4) controls the routing of ICA connections only through ICA-capable nodes; and

(5) collects operating statistics from TXRs and FRPs.

For one embodiment, the two identical TXR queues previously labelled as bursty and multicast are redefined to accommodate the ICA feature. All ICA bursty traffic uses the bursty data queue, while non-ICA bursty data and multicast traffic share the same multicast queue. In this manner, both ICA non-ICA bursty data can be accommodated in the same cell switching network.

Also, for one ICA embodiment, the description of TXR **56** further comprises the following firmware functions:

(1) calculating the ICA average queue depth using the "regeneration cycle" averaging period;

(2) setting the congestion bit (c-bit) in the cell header when congestion is incipient as defined by configuration parameter ECNth;

(3) configuring and setting thresholds for ICA queues using ECNth for setting the c-bit and CLPth **1** and **2** for discarding new excess rate cells with CLP bit set; and

(4) maintaining statistics on the number of cells with c-bits set and the number of cells with CLP-bits set.

FRP **59** firmware provides augmented functions in support of ICA operation comprising:

(1) selectively setting the initial network cell rate at QIR, and varying the cell rate between MIR and PIR in accordance with ICA information received from the destination FRP which, for one embodiment, provides a configurable additive rate increase (+10% of MIR), multiplicative rate decrease ($\frac{1}{8}$ of current rate), or multiplicative fast decrease ($\frac{1}{4}$ of current rate), and also provides for ignoring "increase rate" message if the rate is at PIR, or if there is no offered load in the VC queue (cell transmit queue **236**), ignoring "decrease" rate or "fast decrease" rate message if the rate is at MIR, and resetting rate to QIR if traffic is absent over a prescribed period of time;

(2) measuring the adaptive rate adjustment period equal to twice the round trip delay for each connection;

(3) counting the c-bit generated by the last rate change instruction to the source FRP, i.e., after a delay of one RTD and counted over an additional RTD interval or until a cell is ready to be sent back, whichever is longer;

(4) measuring configuration parameter RTD approximately every five seconds for one of each connection being served by generating and sending a HP cell when an RTD measurement is requested by system software, and echoing back to source any RTD measurement HP cell received;

(5) generating a feedback control signal from the filtered or averaged c-bit count, comparing the average count with threshold TAth and sending it back to the source node **22** over the same two way connection in a queued cell or supervisory cell header and coded as follows:

(a) if less than TAth of the possible c-bits are set, send an "increase rate" adjustment message back to the source node;

(b) if greater than TAth, send a "decrease rate" adjustment message;

(c) if a cell loss is detected and some c-bits are set, send a "fast decrease" adjustment message; and

(d) send a "no-rate-change" message during regeneration cycles while the destination FRP is waiting for the effects of the previous rate change; and

CISCO EXHIBIT 1008
Page 27 of 33

5,313,454

23

(e) send a decrease rate message to the VC source node if the threshold, PQth, of the output port transmit queue 819 associated with that VC is exceeded, even if threshold TAth is not exceeded.

Additional FRP functions operating in conjunction with the external frame relay network comprise:

(1) monitoring incoming traffic rate and setting the CLP bit for all cells generated from frames received at rates exceeding the committed burst, $B_{c}$;

(2) copying the DE-bit of incoming frames to the CLP-bit of the cell header;

(3) setting the DE-bit of the external frame header using the same criteria as for the CLP-bit of the internal cell header;

(4) configuring FRP 59 so that each frame VC queue length can be thresholded so that if the frame DE-bit is set, incoming frames are discarded when threshold is reached; and

(5) configuring each frame transmit port queue 232 with a DE threshold (DEth) so that when reached, incoming frames from muxbus 60 with DE-bit set are discarded.

In order to further explain the operation of the ICA system, a more detailed description of the ICA algorithms follows for counting c-bits and controlling source node transmission rate.

ICA control is based on the detection of incipient congestion at each node traversed by the virtual connection. Incipient congestion obtains whenever the average bursty data queue length in TXR 56 is greater than congestion threshold parameter ECN$^{th}$. The average queue length is based on queue length measurements taken over a regeneration cycle consisting of a busy plus idle interval of the bursty data. If ECNth is exceeded, a c-bit is set in the cell header of the next cell to be transmitted by queue manager 76.

Destination ACP 200 of FRP 59 counts (averages) the c-bits over a RTD interval as shown in FIG. 15. At the end of the averaging period, a rate adjustment message may be sent by the destination FRP 59 through cell transmitter 220 onto muxbus 96 and thence through TXR 56 and the virtual connection to the source FRP 59. The source FRP 59 may adjust the rate once per two RTD delay units of time. Any change in congestion condition on the virtual connection due to a rate adjustment is detected in the average value measurement starting one RTD unit later.

FIG. 16 is a flow diagram that describes the per virtual connection rate (bandwidth) change process 500 by which data rate changes imposed on cell transmitter 220 are adjusted by frame receive controller 201. In step 500, the i$^{th}$ bursty channel bandwidth, Ni, is initialized by setting the transmission rate to the quiescent rate, QIR$_i$. Step 504 checks to see if the queue has been inactive for a period of time greater than T$_Q$, a prescribed configuration parameter. But because the channel has just been activated, the process passes on to step 507. Otherwise, it would go to step 506 where the quiescent rate, QIR$_i$, is assigned. If no rate change has been received, test step 507 moves the process back to step 504, forming a wait loop. If a rate change moves the process to step 508 where it is determined if it is a rate increase or decrease.

If it is a rate decrease, step 516 determines if it is a fast decrease due to cell loss at the other terminal FRP 59. If so, the process moves to step 518 where the rate is reduced by a factor of $\frac{1}{2}$, otherwise to step 520 where it is reduced by a moderate factor of $\frac{7}{8}$. After either reduc-

24

tion, the process moves to step 522 where it is determined if the reduction resulted in a rate less than the guaranteed minimum, MIR$_i$. If so, the rate is set at MIR$_i$, or otherwise left unchanged and the process moves back to step 504.

If the rate change in step 507 is an increase, the process moves to step 509 where it is determined if data is available, as indicated the boolean flag Q$_i$. If not, no rate increase is made and the process goes back to step 504. If data is available, step 510 increases N$_i$ by the linear increment of 1/10 of MIR$_i$and then checks (step 512) if the rate exceeds the maximum allowable, PIR$_i$. If so, the rate is set at PIR$_i$, in step 514. In either case, the process returns to step 504.

The credit manager function, resident in cell transmitter 220 determines cell receiver 210's per channel output rate by assigning credits in accordance with the state of congestion and data availability. In the four V.35 port embodiment, each channel is serviced roundrobin. The relative priority given to each (up to 252) virtual connections is determined by the bandwidth assignment algorithm in conjunction with the credit manager servicing algorithm as shown in the flow diagram of FIG. 17.

Step 600 initializes the credit process by setting the ith virtual circuit (VC) connection's credit, Ti, equal to Di, where Di=N/Ni or the number of tick intervals, T, that must elapse for VC connection i to acquire access to the cell network. Thus, Di is derived from the current value of Ni generated by bandwidth assignment process 500. Step 602 sets the VC index i=1. The corresponding interval, Ti, is decremented by one tick interval, T, in step 604. Test step 606 checks to see if the resulting value of Ti is equal to or less than zero, indicating that a credit should not be added to the i$^{th}$ credit index, Ci, and if so, passes on to step 616, where the round-robin procedure is initiated by incrementing index i. Otherwise, step 608 is invoked by crediting (incrementing) Ci. Step 610 checks if the incremented value of Ci exceeds the upper limit, Cmax, and if so, moves to step 612 where Ci is set equal to Cmax. The process moves on to step 614. Step 614 restores a positive non-zero value to Ti by adding Di to the value obtained from step 604. (In this manner, non-integer values of Ti are accommodated without the loss in precision that would result if Ti were to be rounded to the nearest integer value.) Step 616 leads to test step 618 to see if all of the VC connections have been served, and if so, a wait of one tick period, T, is imposed by step 620 before repeating the process by returning to step 602. Otherwise, the process returns to step 604.

For another embodiment, the wait period, T, may be extended by some multiplicative factor greater than 1 so that the credit manager to accrue credits as often. For example, if a wait of ten tick periods, 10T, is invoked at step 620, complete round-robin servicing by the credit manager would typically occur every millisecond for T=100 us. This would require that step 604 decrement Ti by 10 (Ti=Ti−10), and step 608 increment by 10 (Ci=Ci+10).

FIG. 18 shows the flow diagram for servicing of muxbus cell transmit queue 236 by cell transmitter 220. Step 700 initializes the VC queue index by setting i=1. Step 702 services the ith channel cell transmit queue 236 if Ci≧1 and Qi=1, indicating that data is present in frame buffers 237 at the location indicated by VC queue 236. If not, the process moves to step 706. Step 704 decrements the credit count, Ci, indicating that the

CISCO EXHIBIT 1008
Page 28 of 33

5,313,454

**25**

queue has been serviced. Step 706 movements the VC index and passes to test step 708 that checks if all VC connections have been attended and if so, passes back to the initial 700 steps. Otherwise, the remaining VC connections are attended by returning to step 702.

In the foregoing specification, the invention has been described with reference to specific exemplary embodiments thereof. It will, however, be clear that various modifications and changes may be made thereto without departing from the broader spirit and scope of the invention as set forth in the appended claims. The specification and drawings are, accordingly, to be regarded in an illustrative rather than a restrictive sense.

What is claimed is:

1. A feedback control system for congestion prevention control on a virtual connection of a cell switching communications network handling bursty traffic, the feedback control system comprising:

  a) a source node for accepting, queuing, and buffering user framed bursty data, for formatting the bursty data into bursty data cells, and for transmitting the bursty data cells over the virtual circuit connection through the cell switching communications network at an incrementally variable controllable transmission rate in response to a rate control signal to avoid congestion, wherein the source node and any intermediate node comprising the virtual connection include means for accepting, queuing, and buffering, the bursty data cells, means for detecting incipient congestion in the virtual connection queues and buffers, means for setting an incipient congestion indicator to a first state if incipient congestion is detected and setting the incipient congestion indicator to a second state if incipient congestion is not detected, and means for forwarding the bursty data cells over the virtual connection together with the incipient congestion indicator; and

  b) a destination node, which is a terminus of the virtual connection, for accepting the bursty data cells and the incipient congestion indicator, for reconstructing, formatting, and outputting the framed bursty data, for monitoring the incipient congestion indicator, for generating the rate control signal based on the incipient congestion indicator, for transmitting the rate control signal back to the source node.

2. The feedback control system of claim 1, wherein the source node further comprises means for accepting data and control cells from the destination node using a same virtual connection between the source node and the destination node.

3. The feedback control system of claim 1 wherein the rate control signal is transmitted in a cell header by the destination node over a same virtual connection between the source node and the destination node.

4. The feedback control system of claim 3, wherein the rate control signal is transmitted in a supervisory cell header if no return cell traffic is available.

5. The feedback control system of claim 1, further comprising means for measuring virtual connection round-trip delay times, wherein the measuring means comprise:

  a) destination node means for generating a high priority (HP) timestamped cell and for transmitting the HP timestamped cell to the source node;

  b) source node means for echoing HP timestamped cell back to the destination node;

**26**

  c) means for comparing a time-stamp of the HP timestamped cell with a destination node arrival time to determine round-trip delay time.

6. The feedback control system of claim 1, wherein the source node further comprises:

  a) cell transmitter rate controller that permits a queued bursty data cell to be transmitted only if an accumulated transmission credit is greater than zero and, if transmission is permitted, decrements the accumulated transmission credit.

  b) credit manager for incrementing the accumulated transmission credit each time a prescribed interval of time has elapsed, wherein the prescribed time interval corresponds to a clock period of the assigned cell rate, wherein the accumulated transmission credit is sent to the cell transmitter rate controller.

7. The feedback control system of claim 6, wherein the credit manager further comprises:

  a) means for accepting a maximum credit count configuration parameter; and

  b) means for limiting the accumulated transmission credit to the maximum credit count configuration parameter.

8. The feedback control system of claim 1, wherein the nodes are two-way nodes using a common virtual connection between source and destination nodes.

9. The feedback control system of claim 1 wherein the user framed data includes frames of data, each frame of data including a multiplicity of cells and a header, each cell including a multiplicity of bits, the multiplicity of bits including a cell loss priority (CLP) bit and wherein the means for accepting, queuing and buffering includes a queue for queuing the bursty data cells and wherein the source node further comprises:

  a) means for measuring an instantaneous bit rate of incoming frames of data;

  b) means for comparing the instantaneous bit rate of incoming frames of data against a committed burst size (Bc) and against a minimum information rate (MIR);

  c) means for setting a data expendable (DE) bit included in the header of each frame for each frame of data having an instantaneous bit rate exceeding Bc and MIR; and

  d) means for discarding each frame in which the DE bit is set if the queue length exceeds a threshold length; and

  e) means for copying the DE bit of each frame into the CLP bit of each cell associated with the frame.

10. A feedback control system for congestion prevention control on a virtual connection of a cell switching communications network handling bursty traffic, comprising:

  a) a source node for accepting, queueing, and buffering user framed bursty data, for formatting the bursty data into bursty data cells, and for transmitting the cells over the virtual circuit connection through the cell switching communications network at an incrementally variable controllable transmission rate wherein the source node and any intermediate node comprising the virtual connection include means for accepting, queueing, and buffering the bursty data cells, means for detecting incipient congestion in the virtual connection queues and buffers, and means for forwarding the bursty data cells over the virtual connection to-

CISCO EXHIBIT 1008
Page 29 of 33

5,313,454

27

gether with an associated incipient congestion indicator; and

b) a destination node, being the terminus of the communication network virtual connection for accepting the bursty data cells and the associated incipient congestion indicator, for reconstructing, formatting, and outputting the framed bursty data, for monitoring the congestion indicators, for creating a four state, two binary bit, rate control signal representing rate increase, rate decrease, fast rate decrease, and no-rate-change messages based on the congestion indicators, transmitting the rate control signal back to the source node, wherein the incrementally controllable transmission rate of the source node is adjusted in response to the rate control signal sent from the destination node in order to minimize congestion.

11. The feedback control system of claim 10 wherein the means for incrementally controlling the transmission rate is responsive to the four state control signal causing an additive fractional increase in response to a rate increase signal, a large fractional multiplicative factor decrease in response to a rate decrease signal, and a small fractional multiplicative factor decrease in response to a fast rate decrease signal.

12. The feedback control system of claim 10 wherein the user framed bursty data includes frames of data, each frame of data including a multiplicity of cells and a header, each cell including a multiplicity of bits, the multiplicity of bits including a cell loss priority (CLP) bit and wherein the means for accepting, queuing and buffering includes a queue for queuing the bursty data cells and wherein the source node further comprises:

  a) means for measuring an instantaneous bit rate of incoming frames of data;
  b) means for comparing the instantaneous bit rate of incoming frames of data against a committed burst size (Bc) and against a minimum information rate (MIR);
  c) means for setting a data expendable (DE) bit included in the header of each frame for each frame of data having an instantaneous bit rate exceeding Bc and MIR; and
  d) means for discarding each frame in which the DE bit is set if the queue length exceeds a threshold length; and
  e) means for copying the DE bit of each frame into the CLP bit of each cell associated with the frame

13. A feedback control system for congestion prevention control on a virtual connection of a cell switching communications network handling bursty traffic, comprising:

  a) a source node for accepting, queueing, and buffering user framed bursty data, for formatting the bursty data into bursty data cells, and for transmitting the cells over the virtual circuit connection through the cell switching communications network at an incrementally variable controllable transmission rate that is variable between a prescribed lower guaranteed minimum rate and an upper maximum rate, the source node and any intermediate node comprising the virtual connection include means for accepting, queueing and buffering the bursty data cells, means for detecting incipient congestion in the virtual connection queues and buffers, and means for forwarding the cells over the network virtual connection together

28

with an associated incipient congestion indicator; and

b) a destination node being the terminus of the communication network virtual connection having means for accepting the bursty data cells and the associated incipient congestion indicator, for reconstructing, formatting and outputting the framed bursty data, for monitoring the congestion indicators, for creating a rate control signal based on the congestion indicators, for transmitting the rate control signal back to the source node, wherein the incrementally controllable transmission rate of the source node is adjusted in response to the rate control signal sent from the destination node in order to minimize congestion.

14. The feedback control system of claim 13, wherein the rate control further comprises means for assigning an initial quiescent rate between the lower and upper rate.

15. The feedback control system of claim 14, wherein the rate control further comprises means for sensing lack of user input bursty data activity and resetting the rate to the quiescent rate.

16. The feedback control system of claim 13, wherein the rate control means ignores the rate control signal if the user input rate does not create an excess virtual circuit queue load.

17. The feedback control system of claim 13 wherein the user framed bursty data includes frames of data, each frame of data including a multiplicity of cells and a header, each cell including a multiplicity of bits, the multiplicity of bits including a cell loss priority (CLP) bit and wherein the means for accepting, queueing and buffering includes a queue for queuing the bursty data cells and wherein the source node further comprises:

  a) means for measuring an instantaneous bit rate of incoming frames of data;
  b) means for comparing the instantaneous bit rate of incoming frames of data against a committed burst size (Bc) and against a minimum information rate (MIR);
  c) means for setting a data expendable (DE) bit included in the header of each frame for each frame of data having an instantaneous bit rate exceeding Bc and MIR; and
  d) means for discarding each frame in which the DE bit is set if the queue length exceeds a threshold length; and
  e) means for copying the DE bit of each frame into the CLP bit of each cell associated with the frame.

18. A feedback control system for congestion prevention control on a virtual connection of a cell switching communications network handling bursty traffic, the feedback control system comprising:

  a) a source node for accepting, queuing and buffering user framed bursty data, for formatting the bursty data into bursty data cells, and for transmitting the cells over the virtual circuit connection through the cell switching communications network at an incrementally variable controllable transmission rate in response to a rate control signal to minimize congestion, the source node and any intermediate node comprising the virtual connection include means for accepting, queuing and buffering the bursty data cells, means for detecting incipient congestion in the virtual connection queues and buffers by monitoring the average queue length over a regeneration cycle time interval, means for

CISCO EXHIBIT 1008
Page 30 of 33

5,313,454

<table>
<tr><td>29</td><td>30</td></tr>
</table>

comparing the average queue length to an incipient congestion threshold, means for setting an incipient congestion indicator to a first state when the incipient congestion threshold is exceeded and setting the incipient congestion indicator to a second state when the incipient congestion threshold is not exceeded, and means for forwarding the cells over the network virtual connection together with the incipient congestion indicator; and

b) a destination node being the terminus of the communication network virtual connection having means for accepting the bursty data cells and the incipient congestion indicator, for reconstructing, formatting, and outputting the framed bursty data, for monitoring the incipient congestion indicators, for revising the rate control signal based on the incipient congestion indicators, for transmitting the rate control signal back to the source node.

**19.** The feedback control system of claim **18**, wherein the incipient congestion threshold is set to provide a tolerable delay in combination with a tolerable concomitant cell loss rate.

**20.** The feedback system of claim **18**, further comprising means for discarding cells that arrive while queue length exceeds the incipient congestion threshold.

**21.** The feedback control system of claim **18**, wherein the incipient congestion indicator is encoded in a cell header.

**22.** The feedback control system of claim **18** wherein the user framed bursty data includes frames of data, each frame of data including a multiplicity of cells and a header, each cell including a multiplicity of bits, the multiplicity of bits including a cell loss priority (CLP) bit and wherein the means for accepting, queuing and buffering includes a queue for queuing the bursty data cells and wherein the source node further comprises:

a) means for measuring an instantaneous bit rate of incoming frames of data;

b) means for comparing the instantaneous bit rate of incoming frames of data against a committed burst size (Bc) and against a minimum information rate (MIR);

c) means for setting a data expendable (DE) bit included in the header of each frame for each frame of data having an instantaneous bit rate exceeding Bc and MIR; and

d) means for discarding each frame in which the DE bit is set if the queue length exceeds a threshold length; and

e) means for copying the DE bit of each cell associated with the frame.

**23.** A feedback control system for congestion prevention control on a virtual connection of a cell switching communications network handling bursty traffic, comprising:

a) a source node for accepting, queueing and buffering user framed bursty data, for formatting the bursty data into bursty data cells, and for transmitting the cells over the virtual circuit connection through the cell switching communications network at an incrementally variable controllable transmission rate, the source node and any intermediate node comprising the virtual connection having means for accepting, queueing and buffering the bursty data cells, means for detecting incipient congestion in the virtual connection queues and buffers, and means for forwarding the cells over

the network virtual connection together with an associated incipient congestion indicator; and

b) a destination node being the terminus of the communication network virtual connection having means for accepting the bursty data cells and the associated incipient congestion indicator, for reconstructing, formatting and outputting the framed bursty data, for counting cells with the associated incipient congestion indicator asserted, for creating a rate control signal based on the cell count, for transmitting the rate control signal back to the source node, wherein the incrementally controllable transmission rate of the source node is adjusted in response to the rate control signal sent from the destination node in order to minimize congestion.

**24.** The feedback control system of claim **23**, wherein the cell count means begins counting after a round-trip delay interval following a transmission of the rate control signal from the destination node to the source node.

**25.** The feedback control system of claim **23**, wherein the means for generating the rate control signal further comprises means for indicating a rate increase if a threshold is not exceeded by an average incipient congestion count, and for indicating a rate decrease if threshold is exceeded.

**26.** The feedback control system of claim **23**, wherein the means for generating the rate control signal further comprises means for detecting cell loss together with the detection of the average incipient congestion count exceeding threshold, means for indicating a rate reduction when the threshold is exceeded and cell loss in detected.

**27.** The feedback control system of claim **23**, wherein the means for generating the rate control signal indicates no-rate-change for each cell while waiting for the effects on congestion due to a previous transmission of the rate control signal.

**28.** The feedback control system of claim **23** wherein the user framed bursty data includes frames of data, each frame of data including a multiplicity of cells and a header, each cell including a multiplicity of bits, the multiplicity of bits including a cell loss priority (CLP) bit and wherein the means for accepting, queuing and buffering includes a queue for queuing the bursty data cells and wherein the source node further comprises:

a) means for measuring an instantaneous bit rate of incoming frames of data;

b) means for comparing the instantaneous bit rate of incoming frames of data against a committed burst size (Bc) and against a minimum information rate (MIR);

c) means for setting a data expendable (DE) bit included in the header of each frame for each frame of data having an instantaneous bit rate exceeding Bc and MIR; and

d) means for discarding each frame in which the DE bit is set if the queue length exceeds a threshold length; and

e) means for copying the DE bit of each frame into the CLP bit of each cell associated with the frame.

**29.** A feedback control system for congestion prevention control on a virtual connection of a cell switching communications network handling bursty traffic, comprising:

a) a source node for accepting, queueing and buffering user framed bursty data, for formatting the bursty data into bursty data cells, for indicating those cells derived from user input data received at

CISCO EXHIBIT 1008
Page 31 of 33

5,313,454

31

rates exceeding a prescribed guaranteed minimum rate, and for transmitting the cells together with the indicators over the virtual circuit connection through the cell switching communications network at an incrementally variable controllable transmission rate, the source node and any intermediate node comprising the virtual connection having means for accepting, queueing and buffering the bursty data cells, means for detecting incipient congestion in the virtual connection queues and buffers, and means for forwarding the cells over the network virtual connection together with an associated incipient congestion indicator; and

b) a destination node being the terminus of the communication network virtual connection having means for accepting the bursty data cells and the associated incipient congestion indicator, for reconstructing, formatting and outputting the framed bursty data, means for monitoring the congestion indicators, for creating a rate control signal based on the congestion indicators, means for transmitting the rate control signal back to the source node, wherein the incrementally controllable transmission rate of the source node is adjusted in response to the rate control signal sent from the destination node in order to minimize congestion.

30. The feedback control system of claim 29, wherein the means for indicating those cells derived from user input frames exceeding a prescribed guaranteed minimum rate further comprises means for encoding the indications in the cell header.

31. The feedback control system of claim 29, wherein the source node and any intermediate node further comprises means for discarding the cells which have been indicated as being derived from input data exceeding the minimum guaranteed rate whenever the virtual connection queues exceed a prescribed cell loss priority threshold length.

32. The feedback control system of claim 31, wherein the means for discarding cells discards all cells belonging substantially to a same data frame as that which was being accepted when the prescribed cell loss threshold length was exceeded.

33. A feedback control system for congestion prevention control on a virtual connection of a cell switching communications network handling bursty traffic, comprising:

a) a source node for accepting, queueing and buffering user framed bursty data including an associated expendable data indicator that indicates an excess input frame data rate, for formatting the bursty data into bursty data cells, for encoding the expendable data indicator in the cell header, for discarding cells bearing the indicator for relief of congestion, and for transmitting the non-discarded cells over the virtual circuit connection through a cell switching communications network at an incrementally variable controllable transmission rate, the source node and any intermediate nodes comprising the virtual connection having means for accepting, queueing and buffering the bursty data cells, means for detecting incipient congestion in the virtual connection queues and buffers, and means for forwarding the cells over the network virtual connection together with an associated incipient congestion indicator; and

b) a destination node being the terminus of the communication network virtual connection having

32

means for accepting the bursty data cells and the associated incipient congestion indicator, for reconstructing, formatting and outputting the framed bursty data, for monitoring the congestion indicators, for creating a rate control signal based on the congestion indicators, means for transmitting the rate control signal back to the source node, wherein the incrementally controllable transmission rate of the source node is adjusted in response to the rate control signal sent from the destination node in order to minimize congestion.

34. The feedback control system of claim 33, wherein the source node and any intermediate node further comprises means for discarding cells associated with the expendable data indicator.

35. The feedback control system of claim 33, wherein the destination node further comprises:

a) at least one output queue for buffering reconstructed data frames;

b) means for monitoring the output queue length;

c) means for comparing the output queue length with a prescribed threshold; and

d) means for discarding the reconstructed bursty data frames having an associated asserted expendable data indicator whenever the prescribed output queue threshold is exceeded.

36. The feedback control system of claim 35, further comprising:

a) means for calculating an average queue length of the port transmit queue associated with the virtual connection;

b) means for comparing the average output port transmit queue length with a prescribed average output port transmit queue length threshold; and

c) means for generating a rate decrease signal if the average output port transmit queue length threshold is exceeded.

37. The feedback control system of claim 36, wherein the average output queue length is computed over a regeneration cycle time interval.

38. A feedback control method for congestion prevention on a virtual circuit connection of a cell switching network handling bursty data traffic, the method comprising the steps of:

a) queuing and buffering user bursty data frames at an input source node;

b) formatting the bursty data frames into bursty data cells;

c) queuing and buffering the bursty data cells within the input source node and intermediate nodes, for transmission to a next node of the virtual connection;

d) detecting incipient congestion of the bursty data cells that are buffered and queued for transmission to the next node by monitoring queue lengths;

e) setting an incipient congestion indicator to a first state when incipient congestion is detected;

f) setting the incipient congestion indicator to a second state when incipient congestion is not detected;

g) associating the incipient congestion indicator with corresponding cells that are contributing to the incipient congestion;

h) transmitting the cells and incipient congestion indicators to the destination node over a virtual circuit connection at a controllable rate;

i) incrementally controlling the transmission rate of bursty cells in response to a rate control signal so as to control congestion;

CISCO EXHIBIT 1008
Page 32 of 33

5,313,454

33

j) reconstructing frames at the destination node from received bursty cells;

k) monitoring the congestion indicators at the destination node for determining a congestion status of the virtual connection;

l) revising the rate control signal based on the congestion status; and

m) transmitting the rate control signal to the source node.

**39.** The feedback control method of claim **38**, wherein the step of revising the rate control signal based on the congestion status comprises generating a four state, two binary bit, signal representing rate increase, rate decrease, fast rate decrease, and no-rate-change.

**40.** The feedback control method of claim **39**, wherein the step of incrementally controlling the transmission rate of bursty cells is in response to the four state control signal causing an additive fractional increase in response to rate increase signal, a moderate fractional multiplicative factor decrease in response to a rate decrease signal, a large fractional multiplicative factor decrease in response to a fast decrease signal, and no rate change in response to a no-rate-change signal.

**41.** The feedback control method of claim **40**, wherein the step of incrementally controlling the transmission rate of bursty cells includes maintaining the transmission rate between a lower guaranteed minimum rate and an upper maximum rate.

**42.** The feedback control method of claim **41** wherein the step of incrementally controlling the transmission rate of bursty cells includes assigning an initial transmission rate that is between the lower guaranteed rate and upper maximum rate.

**43.** The feedback control method of claim **41**, wherein the step of controlling the transmission rate of bursty cells includes sensing a lack of user input bursty data activity, causing the transmission rate to be reset to a prescribed quiescent rate.

34

**44.** The feedback control method of claim **41**, wherein the step of incrementally controlling the transmission rate of bursty cells includes ignoring the rate increase signal if the user input rate does not create an excess virtual circuit queue load.

**45.** The feedback control method of claim **41**, wherein the step of incrementally controlling the transmission rate of bursty cells further comprises the following steps:

a) determining the assigned inner-cell interval corresponding to the assigned virtual circuit transmission rate expressed in queue server tick intervals:

b) decrementing the assigned interval each base rate period;

c) incrementing a transmission credit counter whenever the decremented assigned interval is equal to or less than zero, and renewing the decremented assigned interval by adding to it the prior assigned interval thereby creating a new assigned interval for user in step(b);

d) transmitting bursty cells at queue server tick intervals whenever the transmission credit count is greater than zero and a bursty cell is queued for transmission; and

e) decrementing the credit counter whenever a bursty cell is transmitted.

**46.** The feedback control method of claim **45**, further comprising the step of limiting the transmission credit counter to a prescribed maximum count.

**47.** The feedback control method of claim **38**, further comprising the following additional steps:

(a) monitoring the average length of any output port transmit queue associated with the bursty cell virtual connection;

(b) comparing the average queue length to a configurable queue length threshold value; and

(c) generating a rate decrease signal if the threshold level is exceeded.

* * * * *

CISCO EXHIBIT 1008
Page 33 of 33

#1 Best Seller
Over 350,000 Sold

# NEWTON'S TELECOM DICTIONARY

The Official Dictionary of Telecommunications Networking and the Internet

16th EXPANDED & UPDATED EDITION

BY HARRY NEWTON

# NEWTON'S TELECOM DICTIONARY

copyright © 2000 Harry Newton
Email: Harry Newton@TechnologyInvestor.com
Personal web site: www.HarryNewton.com

All rights reserved under International and Pan-American Copyright conventions, including the right to reproduce this book or portions thereof in any form whatsoever.

Published by Telecom Books
An imprint of CMP Media Inc.
12 West 21 Street
New York, NY 10010

ISBN # 1-57820-053-9

Sixteenth Edition, Expanded and Updated, February 2000

For individual orders, and for information on special discounts for quantity orders, please contact:

Telecom Books
6600 Silacci Way
Gilroy, CA 95020
Tel:  800-LIBRARY or 408-848-3854
FAX:  408-848-5784
Email: telecom@rushorder.com

Distributed to the book trade in the U.S. and Canada by
Publishers Group West
1700 Fourth St., Berkeley, CA 94710

Manufactured in the United States of America

kept for

d Abuse

it) serv-

Teletex,

support-

or fixed,

nd Data

stry for

Mobile

on-line

he best

natically

ese sys-

he diag-

e assis-

s from a

**Telephone** 1. The invention of the devil.

2. Telephone in London cockney rhyming slag is dog 'n' bone, bone obviously rhyming with phone, In most cases of cockney the rhyming word is dropped, leaving just dog.

3. The most intrusive device ever invented.

4. The biggest time waster of all time, as in: "What did you do all day?" "Nothing. Jusst spent the day on the phone."

5. Also a truly remarkable invention. Here are the eight things a telephone actually does.

a. When you lift the handset, it signals you with a dial tone wish to use the worldwide phone system. (The dial tone actually comes from the central office, not the phone. But

b. It indicates the phone system is ready for your wish by receiving a tone, called a dial tone.

c. It sends the number of the telephone to be called.

d. It indicates the progress of your call by receiving tones — ringing, busy, etc.

e. It alerts you to an incoming call.

f. It changes your speech into electrical signals for transmis-

845

NEWTON'S TELEC

sion to someone distant. It also changes the electrical signals it receives from the distant person to speech so you can understand them.

g. It automatically adjusts for changes in the power supplied to it.

h. When you hang up, it signals the phone system your call is finished.

And, most remarkably, most simple telephones cost under $20. See Bell and Bell, Alexander.

**Telephone Account Management** TAM. A telemarketing/call center term. Using the telephone channel to proac-

846